## United States District Court
## District of Columbia

United States of America,

       Plaintiff,

v.

Daniel Rodriguez,

       Defendant.

Case No. 1:21-cr-00246-ABJ-1

## MOTION TO SUPPRESS
(Evidentiary Hearing Requested)

*"I don't have any loyalty to any other country.  Just America.  And this is all I know, and this is all I want.  And I don't care about any other part of the world except for our team."[1]*

On March 31, 2021, the FBI interrogated Mr. Rodriguez and obtained this and other statements in violation of Mr. Rodriguez's Fifth Amendment right to be free from self-incrimination and the requirements under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Mr. Rodriguez, therefore, moves this Court to suppress those statements.

---

[1] Exhibit A at 17.

I.    **Background**

A.    **Officers broke into Mr. Rodriguez's home during the early hours of the morning to execute his arrest.[2]**

On March 31, 2021, around 5:00 a.m., several law enforcement officers marched onto Mr. Rodriguez's property to execute his arrest. Having just gone to bed three hours earlier, Mr. Rodriguez was jolted awake by the officers' arrival. Within minutes, officers broke through the sliding glass door, threw a flash bomb into the living room, and stormed into his home. As Mr. Rodriguez scrambled to get his clothes on, officers threw a second flash bomb directly into the bedroom where Mr. Rodriguez was standing. Officers immediately placed Mr. Rodriguez in handcuffs, walked him outside, and drove him to the local FBI office.

B.    **FBI agents began the interrogation without reading Mr. Rodriguez his *Miranda* rights.**

Once at the FBI office, agents handcuffed Mr. Rodriguez to a bar on the wall and left him alone in an office while the two assigned agents prepared for Mr. Rodriguez's interrogation. Questioning began around 7:00 a.m. and lasted for almost three hours.[3] Special Agent Armenta and Special Agent Elias sat on either side of Mr. Rodriguez, introduced themselves, and began the interrogation by asking "You seem to have a pretty good idea why we're here, right?"[4]

---

[2] Undersigned counsel obtained information underlying the arrest during the course of investigation. The facts included here will be developed at the evidentiary hearing.

[3] Exhibit A at 3.

[4] *Id.* at 4.

Overwhelmed by the stress of the morning and the allegations, Mr. Rodriguez broke down—"No.  No sense of crying.  I can't be crying.  I don't know what's wrong with me."[5]  With Mr. Rodriguez in tears, Agent Armenta pushed forward—informing him of the purpose of the interrogation and the information he expected to receive from Mr. Rodriguez.  At this point, he had not yet read Mr. Rodriguez any *Miranda* rights:

> AGENT ARMENTA: So what I wanted to is kind of just explain what's happening and then I want to give you an opportunity to kind of just kind of help us understand, you know, what happened from your perspective, okay?  I want to give you that opportunity. That's why we're here.  I wanted to take you away from this morning and that kind of hectic chaos and just give you a moment.  Take a breath, all right? I feel like you kind of want to talk about it.  I feel like you kind of want to get it off your chest.

> MR. RODRIGUEZ: I'm so weak.  I'm crying. . . .  Oh, God.  I shouldn't be crying.  I'm a grown man and I knew what I was doing.  Whatever happens to me is going to have to happen to me because I –[6]

Agent Elias interrupted—taking this moment to reiterate to Mr. Rodriguez:

> AGENT ELIAS:  You're in a important position right now, you know?  I mean, you've said it yourself.  The last couple of months have been really hard, right?  It's been difficult. . . .   This is an opportunity here for you to let us know and help us understand, because right now we don't frankly understand exactly what happened from your perspective.  And I think that there's an opportunity here

---

[5] *Id.*

[6] *Id.* at 4-5.

3

for us to get clarity on what went down and what you see happened.[7]

Absorbing all the prompting from agents, Mr. Rodriguez conceded "If I do that, I don't think it's going to reduce my sentence or something."[8]

**C.    Several minutes into the interrogation, FBI agents read Mr. Rodriguez his *Miranda* rights and continued the interrogation.**

Agent Elias eventually paused the interrogation, removed Mr. Rodriguez from handcuffs, read some *Miranda* rights, and provided him with a form detailing those rights.[9]  Agent Elias explained to Mr. Rodriguez:

> AGENT ELIAS: Well, look. By signing this, you're just acknowledging that you were read your rights and that you're willing to talk to us at this time. Just because you signed it doesn't mean any of these rights go away. These rights are always with you throughout the entire process that you're in the legal system, okay?  Does that make sense?
>
> MR. RODRIGUEZ: Yeah.
>
> AGENT ARMENTA: And you have the right -- if I ask a question or something makes you uncomfortable, just to let me know.[10]

Once agents read Mr. Rodriguez his *Miranda* rights, Agent Armenta reiterated the opportunity Mr. Rodriguez had to provide information:

> AGENT ARMENTA:  [O]ur goal today is just kind of to get your – get an understanding of what happened, right? Because D.C. kind of has their version of what happened

---

[7] *Id.* at 5.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 6.

> and kind of how they see things and now it's your
> opportunity to let us know, you know, what really
> happened.[11]

Throughout the interrogation, FBI agents repeatedly pushed Mr. Rodriguez

to tell his side of the story to set the record straight.[12]  Eventually, the agents

shifted from pushing Mr. Rodriguez to tell his side of the story to questioning his

honesty and accusing him of lying.  Agents pushed Mr. Rodriguez despite his

reiterated claims of honesty.

> AGENT ARMENTA:  The way you can help yourself is by
> being completely honest with us, okay? And that means
> not leaving things out, okay?[13]
>
> ***
>
> AGENT ELIAS: Danny, you need to concern yourself with
> yourself right now because my concern is you -- as much
> as you're holding back from us right now -- because you
> know we know all the names. You know we've looked at
> your phone records, your bank records, we -- and we've
> done it with everybody else, so why hold back?
>
> AGENT ARMENTA: You're making it really hard for us
> to help you..[14]
>
> ***
>
> AGENT ELIAS:  And you realize right now you're –
> whatever fabrication you're telling us . . . is not helping
> your situation.
>
> MR. RODRIGUEZ: I'm a hundred percent not fabricating
> anything at all.[15]

---

[11] *Id.* at 7.

[12] *Id.* at 38.

[13] *Id.* at 43.

[14] *Id.* at 51.

[15] *Id.* at 70.

In an effort to get Mr. Rodriguez to continue talking, agents stressed to

Mr. Rodriguez they already had all the information to the questions they were

asking him:

> AGENT ARMENTA: What he's trying to say is that we
> know about 99 percent of the questions that we're asking
> you. So that there's -- that it's completely clear and all our
> cards are on the table, that it's really important that you
> be completely honest with us and tell us everything,
> especially without us saying that -- these facts and then
> you later agreeing to them. It looks better if you just give
> us those facts. . . .

Agents pushed Mr. Rodriguez to believe that his information was honest only

if it matched up with the stories that everyone else was telling:

> AGENT ARMENTA: They're going to tell their version of
> the story and what happened. And if their version
> matches up and it's not what yours is, there's going to be
> a problem, right? And right now, you're the one looking at
> -- you're in the most trouble right now, okay? I think you
> understand that already.
>
> AGENT ARMENTA:  So who do you think D.C. is going to
> look at when those stories don't match up?  . . . . So I say
> that because I need you to be completely honest with me.[16]

Agents told Mr. Rodriguez that they could help him and suggested

Mr. Rodriguez could get a better resolution if he answered questions.

> AGENT ELIAS:  [Y]ou had asked earlier about how do
> you help yourself out of this situation.  And if you really
> want to help yourself out, you tell us a hundred percent
> the truth. And you let the U.S. Attorney's Office in D.C.
> know that you're willing to cooperate with and explain to
> them everything that happened and take responsibility. . .
> . [E]verybody that I know that I have worked with where
> they have stepped forward and told the courts and told

---

[16] *Id.* at 49.

the prosecutor, look, I take responsibility, the judge looks
at that favorably.[17]

When Mr. Rodriguez would not give agents the answers they were looking

for, they shifted their tactics to hollow promises of assistance in exchange for

answers:

> AGENT ELIAS:  You are in a great position right now to
> help yourself. . . . We're your two advocates right now.  We
> can advocate to the prosecutor, hey, Danny was -- Danny
> made some mistakes.[18]
>
> ***
>
> AGENT ARMENTA: -- I'm giving you the opportunity to
> be honest with me. . . .Completely, cards on the table,
> because the more that you're hiding from me . . .the less
> that you tell me . . . it just -- I can't help you.[19]
>
> ***
>
> AGENT ARMENTA: Yeah. You see what I'm saying,
> though? I'm trying to be all cards on the table right now,
> okay? And it's going to hurt you, man, and you're already
> looking at a serious charge. So please let me help you. . . .
> [20]
>
> ***
>
> AGENT ARMENTA: Is there anything that you want to
> let us know, so we can tell the prosecutors, hey, actually,
> Danny came forward and he told us this, and he was
> being really helpful.

---

[17] *Id.* at 39.

[18] *Id.* at 76-77.

[19] *Id.* at 97.

[20] *Id.* at 182.

> MR. RODRIGUEZ:  I would try to -- I would like to be
> more helpful, but I don't have any -- what do you -- I
> mean, if you ask me (indiscernible) --[21]

Although Mr. Rodriguez indicated early on he did not want to talk about the assault allegations, the FBI agents ignored Mr. Rodriguez's and eventually pursued that line of questioning:

> MR. RODRIGUEZ: No. You guys kind of told me. That I
> assaulted a officer.
>
> AGENT ARMENTA: And you don't want to talk about
> that?
>
> MR. RODRIGUEZ: No.
>
> AGENT ELIAS:  Because I tell you what. Everybody else
> is going to talk about that.
>
> MR. RODRIGUEZ: Yeah. I'm pretty ashamed.[22]

### D.    Overcome by the FBI Agents' coercive questioning, Mr. Rodriguez breaks down.

After hours in the interrogation room, Mr. Rodriguez broke down.  A young man, looking for a leader and someone he believed in, Mr. Rodriguez was drawn to President Trump's ideas and beliefs early on.  "I volunteered for Trump.  I even – I did door-to-door and everything."[23]  Following the 2016 election, Mr. Rodriguez's devotion grew.  "I tried to join the Army when Trump became President."[24]  When

---

[21] *Id.* at 178.

[22] *Id.* at 37-38.

[23] *Id.* at 26.

[24] *Id.* at 27.

that option became unavailable, Mr. Rodriguez began looking for other ways to show his support.  He described going to rallies to advocate for President Trump leading up to the 2020 election.  "I would go to the rallies . . . . I would try to talk to [non-supporters] . . . find some common ground. . . . I was just campaigning at a rally."[25]  As a devoted supporter, Mr. Rodriguez found his purpose at these rallies. "I thought that that was, like, one of my greatest days of my life and I thought it was something that I needed to be doing."[26]

That passion and energy quickly turned into fear and denial following President Trump's 2020 election loss.  "[M]y beliefs are that an overwhelming number of people came out to vote for Trump and he actually did win that election, the popular vote and the electoral vote."[27]  With President Trump's loss, Mr. Rodriguez described being led to believe the country was now on the verge of a "civil war."[28]  "They made sure that the election was lost and there's no point in voting anymore, so it's like -- I'm thinking they're going to come, like, you know – they're going to come round us [Trump supporters] up."[29]  That fear only intensified in the months leading up to January.

---

[25] *Id.* at 25.

[26] *Id.* at 24.

[27] *Id.* at 28.

[28] *Id.* at 22, 25.

[29] *Id.* at 28.

On January 6, 2021, Mr. Rodriguez and thousands of others received their order.  When asked how he got to January 6th, he said "Trump called us. Trump called us to D.C."[30]  Mr. Rodriguez and thousands more responded to the President's call.  "If he's the commander in chief and the leader of our country, and he's calling for help -- I thought he was calling for help. I thought he was -- I thought we were doing the Right thing. . . ."[31]

> AGENT ELIAS:  On January 6th, did you feel it was your responsibility . . . to go there?
>
> MR. RODRIGUEZ:  (Crying.) I did. I did. I thought that -- yes.  Yes. I thought that I knew enough or I knew better and I was -- I thought that I was doing the right thing.  I thought it was all going to be different.  I thought Trump was going to stay President. I don't know.  I just can't believe my life, what I did to it.[32]

Mr. Rodriguez described believing:  "I thought that there was going to be fighting, for some reason, in different cities and I thought that the main fight, the main battle, was going to be in D.C. because Trump called everyone there."[33] According to Mr. Rodriguez, following President Trump's order to "go to the Capitol,"[34] "we thought we were being a -- we were part of a bigger thing. We thought we were being used as a part of a plan to save the country, to save America,

---

[30] *Id.* at 34.

[31] *Id.* at 34.

[32] *Id.* at 175-76.

[33] *Id.* at 85-86.

[34] *Id.* at 110.

save The Constitution, and the election, the integrity."[35]  "[W]e thought that we were going to save America, and we were wrong."[36]

As Agent Elias confronted Mr. Rodriguez about these beliefs, Mr. Rodriguez again broke down.

> AGENT ELIAS:  When you were engaged in your activities at the Capitol, . . . there's a part of you that believed that there may be -- this may be a civil war moment where you had to be part of the necessary group of people that were going to repel the evil to make sure that our United States and our Constitution would survive, right?
>
> MR. RODRIGUEZ:  (Crying.) . . . Am I mental? Am I? Am I just that stupid?  I mean, yes. . . . Did we all really just -- are we all that stupid that we thought we were going to go do this and save the country and it was all going to be fine after?  We really thought that. That's so stupid, huh?[37]

Eventually, the interrogation turned to Mr. Rodriguez's interactions with Officer Fanone.  At the moment Mr. Rodriguez encountered Officer Fanone, "I thought we were saving the democracy and the election . . . ."[38]  Mr. Rodriguez believed Officer Fanone "was standing up against the racists or something . . . [l]ike the Trump people are bad and . . . he felt he was doing the right thing, too."[39]  Confronted with the fear and trauma experienced by Officer Fanone that day:

---

[35] *Id.* at 114-15.

[36] *Id.* at 38.

[37] *Id.* at 172-73.

[38] *Id.* at 155.

[39] *Id.* at 174.

> MR. RODRIGUEZ:  (Crying.) I'm sorry he had to go
> through that.  It's not right that he had to suffer like that.
> And it puts fear in him and worrying about his life.  He
> was scared for his own life and thought about having to
> kill us.[40]

Duped by a leader into believing his country was under attack, on the verge

of a civil war, Mr. Rodriguez went to the Capitol on January 6, believing he was

following orders and doing what was right.  Although the damage has been done: "If

I could go back . . .  I wouldn't do it again.  But what I did, I can't undo it. . . . I'm

embarrassed by it and I'm ashamed by it."[41]

## II.   Argument

The Fifth Amendment provides no person "shall be compelled in any criminal

case to be a witness against himself . . . ."  U.S. Const. amend. V. Accordingly, before

a custodial interrogation can take place, law enforcement must (1) warn the suspect

of certain Fifth Amendment rights the suspect may choose to exercise, and (2)

obtain a valid waiver of those rights.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Failure to administer *Miranda* warnings or to obtain a valid *Miranda* waiver

creates a presumption of compulsion requiring suppression of the resulting

statement.  *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  Even in situations where

these procedural safeguards are met, a defendant's statements must be suppressed

if the statement is involuntary.  *New Jersey v. Portash*, 440 U.S. 450, 459, (1979).

---

[40] *Id.*

[41] *Id.* at 158.

Use of a defendant's involuntary statements at trial "is a denial of due process of law." *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).

As discussed below, FBI agents violated Mr. Rodriguez's Fifth Amendment right to be free from self-incrimination when they (1) began asking him questions before reading him his *Miranda* rights; (2) failed to obtain a valid *Miranda* waiver; (3) questioned Mr. Rodriguez using an impermissible "two-step interrogation technique"; and (4) obtained statements from Mr. Rodriguez that were involuntary.

## A.   Mr. Rodriguez's statements, made before he was informed of his *Miranda* rights, must be suppressed.

"*Miranda* warnings are required where a suspect in custody is subjected to interrogation." *United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir. 2010) (quotation marks omitted). "Failure to administer *Miranda* warnings creates a presumption of compulsion." *Elstad*, 470 U.S. at 307. "Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." *Id.*

Here, Mr. Rodriguez was in custody as he was arrested at his home pursuant to a warrant, brought into the FBI office, and handcuffed to the wall of the interrogation room. When the FBI agents began their interrogation, they did not start by reading Mr. Rodriguez his *Miranda* rights.[42]  While the first few minutes

---

[42] *See* Ex. A at 1-5.

were spent introducing themselves, the FBI agents immediately transitioned into informing Mr. Rodriguez what information they expected to hear from him.[43]

Agent Armenta began by confirming Mr. Rodriguez "seemed to have a pretty good idea why we're here."[44]  He went on to state that this was Mr. Rodriguez's "opportunity" to address "what went down and what happened" on the day he allegedly assaulted an officer at the capitol.[45]  The agents stressed to Mr. Rodriguez he was "an important person," that they did not "understand exactly what happened" when Mr. Rodriguez was at the capitol on January 6, and that now was the time to "talk about [what happened]" and "get it off [his] chest."[46]

In response to this prompting, Mr. Rodriguez conceded that, even if he agreed to speak, it was not "going to reduce [his] sentence" and that "whatever happens to [him] is going to happen to [him]."[47]  This implicit concession of guilt was in direct response to the FBI agents start of the interrogation.  "The privilege against self-incrimination 'not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.'"  *United States v. Bourdet*, 477 F. Supp. 2d 164, 181 (D.D.C. 2007) (quoting *Ohio v. Reiner,* 532 U.S. 17, 20 (2001)).

---

[43] *Id.* at 4.

[44] *Id.*

[45] *Id.* at 4-5.

[46] *Id.*

[47] *Id.* at 5.

14

Because Mr. Rodriguez made these statements before he was informed of his *Miranda* rights, these concessions, and any other statements made prior to receiving *Miranda* warnings, must be suppressed.

### B.   Mr. Rodriguez did not waive his *Miranda* rights.

*Miranda* itself provided that a defendant's statements can be used against him if he "voluntarily, knowingly and intelligently" waives his rights.  *Miranda,* 384 U.S. at 444.  "Whether such a waiver occurred has generally been thought to depend on two "distinct" questions: was the waiver "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was it "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *United States v. Bradshaw*, 935 F.2d 295, 298 (D.C. Cir. 1991) (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)).  "Only if both questions are answered affirmatively 'may a court properly conclude that the *Miranda* rights have been waived.'"  *Id.*

As discussed below, neither of these two questions can be affirmatively answered.  Mr. Rodriguez's waiver was not made "with a full awareness" because the *Miranda* warnings were not legally sufficient, and they failed to properly advise Mr. Rodriguez of his rights.  Additionally, Mr. Rodriguez's waiver of those legally insufficient rights was not made voluntarily, knowingly, and intelligently.

### 1.   The Miranda warnings were inadequate.

To be sufficient, a *Miranda* warning must generally include four distinct warnings:  "(1) that he has the right to remain silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an

15

attorney, and (4) that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Florida v. Powell*, 559 U.S. 50, 59-60 (2010).  While the agents read from a form and provided Mr. Rodriguez with a form that included the four distinct warnings, they created ambiguity and diminished the warning's clarity by telling Mr. Rodriguez that if the agents "ask[ed] a question or something [that] makes [him] uncomfortable, just to let [the agent] know."[48]  By instructing Mr. Rodriguez to identify if a question makes him uncomfortable and then let the agents know that the question has made Mr. Rodriguez uncomfortable, agents changed the meaning of the *Miranda* warnings that were initially read to him.

Telling Mr. Rodriguez to let the agents know when they ask a question that makes him uncomfortable erroneously narrowed the scope of Mr. Rodriguez's rights. *Miranda* protects the rights of defendants to stop questions *at any time*.  Whether a defendant feels comfortable or uncomfortable by the questions being asked has no effect on the scope of the rights protected by the Fifth Amendment.  Agents improperly narrowed the scope of Mr. Rodriguez's *Miranda* protections when they tied his right to stop answering questions and to remain silent to questions that made him feel "uncomfortable."  *Miranda* makes clear that the right to remain silent can be invoked at any time—it is not contingent on the substance of the question or the emotional response it elicits.

---

[48] *Id.* at 6.

Further, the warnings were inadequate because, even when Mr. Rodriguez told agents he did not want to or feel comfortable answering questions about the alleged assault of Officer Fanone,[49] agents ignored him and eventually pursued that line of questioning.  Mr. Rodriguez invoked his right to remain silent on questions related to the assault, based on how agents told him to—by letting them know he did not feel comfortable or want to answer questions.  Because the warning did not accurately and completely inform Mr. Rodriguez of his rights, Mr. Rodriguez's responses to agents after invoking his right to remain silent on the assault charges cannot be taken as an implicit waiver.

## 2.   The Miranda waiver was not knowing, intelligent, and voluntary.

"[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.  Courts determine the validity of a *Miranda* waiver by looking at the totality of the circumstances.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

---

[49] *See id.* at 37-38.

"Miranda prohibits the inference that a waiver was made simply from the fact that a confession was eventually obtained." *Mitchell v. United States*, 434 F.2d 483, 487 (D.C. Cir. 1970). "[W]hen the only evidence is that at the start of the interrogation the warnings were given, and at the conclusion of the interrogation a confession had been obtained, courts would do well to require clear evidence of the vital connecting link, i.e., did the interrogated person in fact waive his rights?" *Id.* "In the absence of this evidence, Miranda is clear that a waiver has not been proven." *Id.*

Here, the totality of the circumstances show Mr. Rodriguez did not validly waive his *Miranda* rights. As discussed above, any waiver was not made with "a full awareness" of the right being abandoned because agents inaccurately narrowed the scope of Mr. Rodriguez's *Miranda* protections. Additionally, that the *Miranda* warnings came several minutes after the interrogation started impacted the voluntary nature of the waiver. Having succumbed to the agent's urging that this was Mr. Rodriguez's opportunity to address what happened on January 6, Mr. Rodriguez implicitly conceded guilt when he told agents that talking would not "reduce [his] sentence."[50] At this point, Mr. Rodriguez had already been pressured into making this unwarned concession. Because the damage was done, he opted to waive his *Miranda* rights. Considering the totality of the circumstances, this was not a knowing, intelligent, and voluntary waiver.

---

[50] *Id.* at 5.

### C.   Mr. Rodriguez's Post-*Miranda* Statements must be suppressed because they resulted from an impermissible "Two-Step" interrogation.

The knowing and intelligent quality of a waiver is threatened when police obtain inculpatory statements through interrogation of an in-custody suspect, provide a "midstream recitation" of *Miranda* warnings, and then resume questioning.  The Supreme Court therefore held in *Missouri v. Seibert*, 542 U.S. 600, 601 (2004) (plurality), that any post-warning confessions obtained through use of this "two-step questioning technique" are inadmissible unless the warnings effectively apprised the defendant of his *Miranda* rights.  Only by excluding such statements can courts prevent the government from achieving the two-step's evident purpose: "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 542 U.S. at 611.

There is a dearth of instructive caselaw in the D.C. Circuit addressing the contours of an impermissible two-step interrogation under Seibert.  *See, e.g.*, *United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015) (holding that "there was no two-step interrogation because (i) the Trinidadian police and the FBI were not acting in concert and, in any event, (ii) both gave warnings the adequacy of which under *Miranda* Demerieux and Sealey do not challenge").  However, construing *Seibert*, the Ninth Circuit has said "a trial court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did

not effectively apprise the suspect of his rights." *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006).

The Ninth Circuit has established a presumption that use of the two-step gambit is deliberate. "Once a law enforcement officer has detained a suspect *and subjects him to interrogation*—as was the case in *Seibert* and is the case here—there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed." *Williams*, 435 F.3d at 1160. An officer's "deferral of the warning until after a suspect's incriminating response [thus] further supports an inference of deliberateness." *Id.* at 1160. Other factors that counsel in favor of deliberateness are: the same interrogator's involvement in both pre- and post-warning questioning; temporal proximity between the pre- and post-warning interrogations; and "play[ing] down the[] importance" of *Miranda* warnings. *Reyes v. Lewis*, 798 F.3d 815, 831–33 (9th Cir. 2015).

When police deliberately delay providing *Miranda* warnings, the court must determine whether the warnings eventually given were effective, i.e., "whether the midstream warning adequately and effectively apprised the suspect that he had a genuine choice whether to follow up on his earlier admission." *Williams*, 435 F.3d at 1160 (cleaned up). Whether the agents took sufficient "curative measures" is relevant to this inquiry. Justice Kennedy's concurrence in the judgment in *Seibert* described "curative measures" as follows:

> Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial

20

> break in time and circumstances between the prewarning
> statement and the Miranda warning may suffice in most
> circumstances, as it allows the accused to distinguish the
> two contexts and appreciate that the interrogation has
> taken a new turn.  Alternatively, an additional warning
> that explains the likely inadmissibility of the prewarning
> custodial statement may be sufficient.

542 U.S. at 622 (Kennedy, J., concurring in the judgment) (citation omitted).

Here, the officers violated *Seibert* by obtaining incriminatory information from Rodriguez before administering any *Miranda* warnings.  As discussed above, Mr. Rodriguez conceded guilt and involvement when, in direct response to the FBI agents' pre-*Miranda* questions, he told them that even if he agreed to speak, it was not "going to reduce [his] sentence" and that "whatever happens to [him] is going to happen to [him]."[51]  After obtaining this inculpatory information, the agents read Mr. Rodriguez *Miranda* warnings, obtained his signature on the form, and continued to solicit incriminating information from him.  They did not employ any curative measures.  They did not pause the interrogation, they did not move to a different location, and the same officers continued the questioning.  Accordingly, all statements made post-*Miranda* must be suppressed.

### D.   Regardless of any attempts to give *Miranda* warnings, Mr. Rodriguez's statements were involuntary and, therefore, must be suppressed.

Whether preceded by *Miranda* warnings or not, statements that are coerced, or given involuntarily, violate due process and cannot be used at trial for any

---

[51] *Id.* at 5.

purpose. *New Jersey v. Portash*, 440 U.S. 450, 459 (1979).  "[C]onfessions which are involuntary, *i.e.,* the product of coercion, either physical or psychological," are inadmissible.  *Rogers v. Richmond,* 365 U.S. 534, 540–41 (1961).  "[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

The appropriate test for the voluntariness of a statement is whether a defendant's will was overborne by the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  It requires an examination of the characteristics of the accused and the interrogation itself.  *Dickerson v. United States*, 530 U.S. 428, 434 (2000).  Relevant considerations include "the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Schneckloth,* 412 U.S. at 226 (citations omitted). "Apparent compliance with the Miranda procedures does not automatically assure the voluntariness of a statement." *United States v. Bernett*, 495 F.2d 943, 949 (D.C. Cir. 1974).

Here, the totality of the circumstances shows Mr. Rodriguez's statements during the interrogation were involuntary in light of the coercive pressures to which he was subjected.  Coercive pressures can include "the shock of being arrested and questioned after being yanked from familiar surroundings in the outside world and cut off from [one's] normal life and companions; the hope that speaking will allow

22

the interviewee to leave and go home; and a reason to think that the interrogating officers have authority to affect the duration of the interviewee's confinement."   *United States v. Hallford*, 756 F. App'x 1, 6 (D.C. Cir. 2018) (citing *Howes v. Fields*, 565 U.S. 499, 511 (2012)).

Officers executed the arrest at 5:00 a.m., and Mr. Rodriguez had been asleep for only three hours.  Following the traumatic morning at his home, he was immediately taken to the FBI office and subjected to a three-hour interrogation. The already coercive circumstances leading into the interrogation made Mr. Rodriguez particularly susceptible to any further psychologically coercive interrogation tactics, which Agents Armenta and Elias relied upon heavily.

The agents repeated the same questions to Mr. Rodriguez, accusing him of lying when they did not receive the answers they wanted.[52]  They consistently reminded him that this was his one "opportunity" to tell his side of the story, and that only "honest" answers would allow the agents to help Mr. Rodriguez with the prosecutors.[53]  Agents capitalized on the unique media attention of this particular incident, conveying to Mr. Rodriguez that his story had already been written, and that this was his only chance to help himself out of the situation.[54]  Additionally, agents pushed Mr. Rodriguez into believing he would receive help and leniency with

---

[52] *See, e.g.*, Ex. A at 74, 97.

[53] *See, e.g.*, *id.* at 4-5, 39 43, 51, 70, 76-77, 97.

[54] *See, e.g.*, *id.* at 7, 38, 45-46.

his prosecution—telling him they were "his advocates"—but only if he answered

their questions.[55]

These psychologically coercive tactics, combined with the inadequacy of

Mr. Rodriguez's *Miranda* warnings, resulted in statements that were involuntary.

Accordingly, statements from the March 31, 2021 interrogation must be suppressed.

## III.   Conclusion

Mr. Rodriguez requests this Court suppress all statements made during the

March 31, 2021 interrogation as they were obtained in violation of his Fifth

Amendment right to be free from self-incrimination.


**Dated:** October 15, 2021.

<div style="margin-left:40%">

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

*/s/ Rebecca A. Levy*
*/s/ Margaret W. Lambrose*
*/s/ Katherine Tanaka*
By: */s/ Aarin E. Kevorkian*
REBECCA A. LEVY
MARGARET W. LAMBROSE
KATHERINE TANAKA
AARIN E. KEVORKIAN
Assistant Federal Public Defenders

Attorneys for Daniel Rodriguez

</div>

---

[55] *See,* e.g*., id.* at 76-77, 97, 178, 182.

**Certificate of Electronic Service**

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on October 15, 2021, she served an electronic copy of the above and foregoing **MOTION TO SUPPRESS** by electronic service (ECF) to the person named below:

> CHANNING D. PHILLIPS
> United States Attorney
> Kimberly L. Paschall
> Risa Berkower
> Tara Ravindra
> Assistant United States Attorneys
> 555 4th Street, NW
> Washington, DC 20530

> */s/ Cecilia Valencia*
> Employee of the Federal Public
> Defender