## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 21-CR-0246 (ABJ)** |
| | : | |
| **DANIEL JOSEPH RODRIGUEZ,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress Statements. Because the defendant knowingly and voluntarily waived his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436 (1966), the defendant's motion should be denied.

## PROCEDURAL BACKGROUND

The defendant is charged by indictment with violations of 18 U.S.C. §§ 1512(c)(2), 2 (obstructing an official proceeding, aiding and abetting); 18 U.S.C. § 231(a)(3) (certain acts during a civil disorder); 18 U.S.C. §§ 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers); 18 U.S.C. § 641 (theft of government property); 18 U.S.C. § 1361 (destruction of government property); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (unlawful entry and remaining on restricted grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct on restricted grounds with a deadly and dangerous weapon); and 18 U.S.C. § 1752(a)(3) and (b)(1)(A) (impeding ingress and egress in restricted buildings and grounds with a deadly or dangerous weapon). The obstruction charge carries a maximum statutory penalty of twenty years.

The defendant has been detained pending trial since the date of his arrest on March 31, 2021. On October 15, 2021, the defendant filed his Motion to Suppress Statements (hereinafter "the defendant's motion"). ECF No. 38. The government hereby opposes.

## BACKGROUND[1]

On January 6, 2021, the defendant unlawfully entered the grounds of the U.S. Capitol during the riot taking place while the Joint Session of Congress attempted to certify the results of the 2020 Presidential Election. While on the grounds, the defendant interfered with U.S. Capitol Police and Metropolitan Police Department officers who were protecting the entrance to the Capitol building at the Lower West Terrace. Specifically, over the course of approximately 35 minutes, the defendant tossed a flagpole at the police line, used a fire extinguisher to spray officers, worked with a mob to heave against the police line, and ultimately applied an electroshock weapon to the neck of a Metropolitan Police Department officer, causing severe injuries. Subsequently, the defendant entered the Capitol building through a broken window, used a large pole to smash a second window inside the Capitol to enable other rioters to enter the building, and stole items from an office inside the Capitol, including an emergency escape hood. The defendant committed these acts for the purpose of interfering with the certification of the 2020 Presidential Election results.

On March 31, 2021, at approximately 6:00 a.m., special agents from the Federal Bureau of Investigation ("FBI"), executed an arrest warrant for the defendant at his home in Fontana, California. At approximately 6:12 a.m., FBI Special Agents Nate Elias and Enrique Armenta took custody of the defendant and transported him from his home to the Riverside office of the FBI,

---

[1]     This factual summary is being provided only as background information to aid the Court in considering the defendant's motion at issue and the government's response in this pleading. It is not a complete description of all the facts and evidence that might be established and admitted at a hearing on the defendant's motion or at trial. This factual description is a summary only, not a complete description of all the details of the encounter and the statements made therein.

where he was subsequently interviewed. See Exhibit 1, Transcript Defendant Interview. At approximately 7:09 a.m., the defendant was placed in an interview room and was restrained via handcuffs, which kept his right hand affixed to the wall. Special Agent Armenta came into the room and spent approximately two minutes asking the defendant questions regarding COVID-19 safety protocols. Exhibit 1, Tr. 3:3-21. Special Agent Elias then entered the room, and both agents introduced themselves formally. Exhibit 1, Tr. 4: 4-11. After approximately three minutes of introductory questions and explanation as to why everyone was present, Special Agent Elias told the defendant this was an opportunity for him to help the agents understand what happened from his perspective. Exhibit 1, Tr. 5: 18-23. The defendant interrupted him by stating, "If I do that, I don't think it's going to reduce my sentence or something." Exhibit 1, Tr. 5:24-25. Immediately, Special Agent Elias responded, "Well, let us read you some paperwork here and then we can talk about how you might be able to help yourself out of your situation, okay?" Exhibit 1, Tr. 6: 1-3.

Special Agent Armenta then began to read the defendant his rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), stating, "Let me know if you understand everything and then if you have any questions, you know?" Exhibit 1, Tr. 6:9-11.  While Special Agent Armenta read the *Miranda* warnings, Special Agent Elias removed the handcuffs restraining the defendant's right hand to the wall. Exhibit 1, Tr. 6: 5- 7:1. Then, Special Agent Armenta asked the defendant, "Do you understand those rights?" and the defendant nodded his head in affirmation. Exhibit 1, Tr. 7: 1-3. Special Agent Armenta then handed the defendant a written copy of the *Miranda* warnings for him to read to himself and acknowledge that he understood them. Exhibit 1, Tr. 7: 4-6. The defendant took the paper, read the warnings silently to himself, and then stated that he did want to talk, but in the past, lawyers had told him not to say anything. Exhibit 1, Tr. 7: 7-9. Special Agent Elias responded:

> Well, look. By signing this, you're just acknowledging that you were read
> your rights and that you're willing to talk to us at this time. Just because you
> signed it doesn't mean any of these rights go away. These rights are always
> with you throughout the entire process that you're in the legal system, okay?
> Does that make sense?

Exhibit 1, Tr. 7: 10-16. The defendant responded "yeah," signed the paper with the warnings on
it, and pushed it back towards Special Agent Armenta. Exhibit 1, Tr. 7: 17; see also, Exhibit 2,
signed Advice of Rights. The defendant then proceeded to answer questions for approximately the
next two hours. At approximately 9:32 a.m., the agents took a six-minute break and let the
defendant get up and leave the room. Exhibit 1, Tr. 127: 2-12. The defendant then answered
questions for approximately one hour and fifteen minutes more, and the interview concluded at
approximately 10:50 a.m.

The defendant never requested a lawyer. The defendant never invoked his right to remain
silent. The defendant remained out of handcuffs for the entire interview. The agents and the
defendant spoke calmly, and practically without interruption, for three and a half hours. During
the course of the examination, the defendant admitted to tasering Metropolitan Police Department
Officer M.F. (Tr. 73: 2- 74:1; 82: 12-22; 121:15-24), illegally entering the United States Capitol
building (Tr. 102: 5-8; 107:3-11), and attempting to break a window once inside the Capitol
building (Tr. 106: 15-24).

## LEGAL STANDARD

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal
case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, the police
must warn a suspect who is going to be questioned while in custody that he "has the right to remain
silent, that anything he says can be used against him in a court of law, that he has the right to the
presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior
to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). While Fourth

Amendment waivers need only be voluntary, *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), a Miranda waiver must be both intelligent and voluntary. *Miranda,* at 471-72.

These rights need not be word for word from the *Miranda* ruling. Substance, not form, is the test. See, e.g., *Florida v. Powell*, 559 U.S. 50, 64, (2010) ("We decline to declare its precise formulation necessary to meet *Miranda*'s requirements. Different words were used in the advice [the defendant] received, but they communicated the same essential message."); *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) ("We have never insisted that Miranda warnings be given in the exact form described in that decision."); *California v. Prysock*, 453 U.S. 355, 359, (1981)("*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures.").

A suspect who wishes to invoke his rights must do so unambiguously. See *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."); *Davis v. United States*, 512 U.S. 452, 461-62 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). This requirement "results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity." *Berghuis*, 560 U.S. at 381. Where a suspect says something ambiguous or equivocal, it is not only permissible but often "good police practice" to clarify whether he wants to invoke his rights. *Davis*, 512 U.S. at 461; *accord Berghuis*, 560 U.S. at 381. Where the suspect decides to talk, his statements may be admitted without violating the Fifth Amendment if the government shows by a preponderance of evidence that he knowingly, intelligently, and voluntarily waived his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

The Supreme Court has indicated that the inquiry into whether a statement is obtained voluntarily should be determined with reference to the totality of the circumstances. In determining whether a defendant's will was overborne in a particular case, the Court has "assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Bustamonte*, 412 U.S. at 226. The ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). *Compare United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (no coercive police conduct where defendant agreed to an interview with agents, agents asked "straightforward" questions in "conversational tones"; defendant was not restrained; interview lasted less than an hour; defendant questioned in a hospital and not in a police-dominated atmosphere; defendant was not tricked into answer questions; defendant's refusal to consent to a search of his vehicle showed his will was not overborne), *with Little v. United States*, 125 A.3d 1119, 1133 (D.C. 2015) (defendant chained to the ground and chair, denied counsel when requested, threatened that he would be raped if he went to jail, and accused of crimes officers knew he did not commit, was coerced into confessing).

## ARGUMENT

The defendant argues that the defendant's statements were taken in violation of his Fifth Amendment rights and in violation of *Miranda* and its progeny. His claims lack merit for the reasons described below.

### I.   The Statement Made Prior to the *Miranda* Warnings Was Spontaneous and Not In Response to Questioning.

"Volunteered and spontaneous statements made without *Miranda* warnings are admissible if they were not made in response to police questioning." *United States v. Williamson*,

181 F. Supp. 3d 41, 43 (D.D.C. 2014); see also *United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991)(holding that volunteered statements made without prompting from the police are admissible without *Miranda* warnings). Law enforcement "surely cannot be held accountable for the unforeseeable results of their words or actions," and therefore interrogation under the *Miranda* decision "can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).

Here, the defendant points to nothing to suggest that his statement "If I do that, I don't think it's going to reduce my sentence or something," which was made in response to the statement from Special Agent Elias "And I think that there's an opportunity here for us to get clarity on what went down and what you see happened," before *Miranda* warnings were given, was involuntary nor made in response to questioning from law enforcement. First, the statement was made before the agents even mentioned January 6, 2021, the U.S. Capitol, the tasing of Metropolitan Police Department Officer M.F., or any illegal activity at all, or asked any questions about the defendant's involvement. Second, during the defendant's recorded statement to the FBI Special Agents, nothing the agents did before the *Miranda* warning was characterized by the sort of pressure that would have overborne the defendant's will. The statement was made approximately six minutes into the interaction with the agents, (Exhibit 1, Tr. 5:24-25), the agents spoke to the defendant in a non-threatening conversational tone, and they did not use physical force, punishment, or threats. The fact that the defendant asked questions and answered the preliminary questions posed to him suggests the opposite—the defendant was in full command of his faculties. Accordingly, the defendant's statement before *Miranda* was merely spontaneous,

was volunteered not in response to law enforcement questioning, and should not be suppressed.[2]

## II.   **The Defendant was Given Valid *Miranda* Warnings by the FBI Agents.**

The agents gave warnings almost identical to the language from *Miranda*. The *Miranda* decision states that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444. Special Agent Armenta first read the defendant the following warnings:

> You have the right to remain silent... Anything you say can be used against you in court... You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time, okay? Do you understand those rights?

Exhibit 1, Tr. 6:13 - 7:2. Then, Special Agent Armenta gave the defendant the same warnings in writing, which the defendant signed after reviewing. Exhibit 2.

The validity of these warnings was not diminished by Special Agent Armenta's subsequent, additional statement "if I ask a question or something makes you uncomfortable, just to let me know." Exhibit 1, Tr. 7: 18- 20.  Despite the defendant's argument that this statement somehow "narrowed the scope" of the defendant's rights—for which they provide no legal citation (ECF No. 38, at 16)—the agent's additional statements go *beyond* what is legally required by *Miranda*,

---

[2] Should the Court find otherwise, the government submits the statements are still admissible as impeachment because the statement was voluntary, as discussed *infra* at Section V. See, e.g. *Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."); *Oregon v. Hass*, 420 U.S. 714, 723 (1975)(holding that defendant's statements that did not involve coercion or duress may be used as impeachment, as "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.")

giving the defendant the option let the agents know he no longer wants to answer questions about which he feels uncomfortable. See, e.g., *Florida v. Powell*, 559 U.S. at 64 (2010) (holding that communicating the same essential message as the warnings in *Miranda* is sufficient). Nothing in the agents' statements nor in the written document provided to the defendant was obfuscated by Special Agent Armenta's statement, and the warnings were nearly verbatim from *Miranda*. Therefore, the warnings, and the subsequent statement, were legally sound under *Miranda* and its progeny.

### III.   The Defendant's Waiver Was Voluntary, Knowing and Intelligent, and Was Never Revoked During the Custodial Interview.

The procedural safeguards in place after *Miranda* require that not only that the defendant receive proper warnings about his rights, but that "after such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda,* 384 U.S. at 479. "The waiver inquiry has two distinct dimensions: waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

A review of the defendant's behavior during the interview makes plain that his waiver was voluntary, knowing and intelligent. The defendant expressed a desire to speak with the agents, but knew, from previous interactions with lawyers, that may not inure to his benefit. Exhibit 1, Tr. 7: 7-9. The fact that the defendant mentioned that he had previously spoken to attorneys about the exact situation in which he found himself—in custody and faced with answering questions by law enforcement—indicated that he was fully aware of ability to invoke his right to remain silent and was choosing not to make that invocation. Exhibit 1, Tr. 7: 7-9 ("MR. RODRIGUEZ: I want to

talk to you guy[s] and, in the past, lawyers have always told me, you know, you don't say anything. They're not going to help you.") The defendant understood the rights read to him, as evidenced by the fact that he affirmatively nodded in response when Special Agent Armenta finished and that he signed the paper containing the written warnings. Exhibit 1, 7: 3. The defendant even admitted to previous contacts with the law enforcement and other arrests, which provides evidence of prior knowledge with the workings of the legal system. Exhibit 1, Tr. 18: 12-14. ("MR. RODRIGUEZ: -- and I have, like, a bad, you know, history of getting arrested with tickets and stuff, right? You saw my record.") The defense does not allege any mental illness, language barrier, or other defect that would have made it difficult for the defendant to understand the warnings given to him and waive the rights therein intelligently. Barring such evidence, the statements made subsequent to a valid waiver, after both oral and written *Miranda* warnings were given, should be admissible.

Additionally, at no point during the defendant's interview did he refuse to give a statement or unambiguously invoke his right to remain silent. *See*, *Berghuis*, 560 U.S. at 381-82. An ambiguous colloquy is not a sufficient invocation of the defendant's right to remain silent. The Supreme Court requires "an unambiguous invocation of Miranda rights" such that it "'avoid[s] difficulties of proof and ... provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Id.*, at 381(quoting *Davis*, 512 U.S. at 458-59). If an ambiguous act, omission, or statement could require police to end the interrogation, "police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression." *Id.*, at 382.

A simple "no," approximately 40 minutes into the interview, in response to a question about whether the defendant wanted to talk about the specific assault on the officer is not an

unambiguous invocation,[3] particularly when the defendant *immediately* responded to the follow up statement by Special Agent Elias that "Everybody else is going to talk about it, " by stating "Yeah. I'm pretty ashamed." Exhibit 1, Tr. 37: 23- 38:6. It is also notable that the defendant routinely speaks at great length during the interview, with little prodding from the agents, a strong indication of the voluntariness of his statements and his willingness to continue. As such, the defendant knowingly, intelligently, and voluntarily waived his rights under *Miranda* and his statements should be admitted.

## IV.   The Agents Did Not Perform an Impermissible Two-Step Interrogation By Speaking to the Defendant Before the *Miranda* Warnings.

Contrary to the defendant's argument that the agents gave an impermissible "midstream recitation" of the *Miranda* warnings, the agents gave the defendant his *Miranda* warnings after merely six minutes of interacting with the defendant, and before any substantive questioning had begun. The defendant's reliance on the plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004) is unpersuasive when viewed in light of this jurisdiction's case law after *Seibert* and the facts of this case.

---

[3] The D.C. Circuit has found that a simple "no" can be an unambiguous invocation of the right to remain silent in some factual circumstances in *United States v. Murdock*, 667 F.3d 1302, 1304 (D.C. Cir. 2012). The government believes the facts in this case are distinct from the "no" in *Murdock*, which was given multiple times in response to the law enforcement officer's explanation to the defendant that he had no obligation to speak, but asked him whether he wished to talk anyway. The "no" in this case does not come in response to the *Miranda* warnings, or in response to the general question of whether the defendant wants to waive his right to speak to law enforcement at all. The defendant's "no" comes in response to a specific question about the most violent allegation in the case, and was subsequently abandoned. The defendant also stated during the course of the questioning that he did not want to talk about how he got to D.C. because he "[didn't] want to get anyone in trouble," but subsequently addressed the agents' questions on that point as well. Exhibit 1, Tr. 36: 8-10. The agents cannot be put in a position to guess as to whether a simple "no" is actually an invocation of the defendant's right to remain silent, or whether it is a momentary hesitation to a difficult question, which is ultimately abandoned.

The plurality and concurrence opinions in *Seibert* are primarily concerned with a "question-first, warn-second" tactic that could be coercive. *Id*. at 604. Two tests emerge from the *Seibert* decision: the plurality approach, which focuses on the effectiveness of the warnings, (*id.* at 611-612) and Justice Kennedy's approach, which focuses on the intent of the interrogating officer (*id.* at 621). Though the D.C. Circuit has not opined on which test it may apply, see *United States v. Straker*, 800 F.3d 570, 617 (D.C. Cir. 2015)("We need not pick sides in that debate"), it is clear that the totality of the circumstances must be considered to determine if "the manifest purpose behind such a tactic is to 'get a confession the suspect would not make if he understood his rights at the outset.'" *United States v. Hitselberger*, 991 F. Supp. 2d 130, 141 (D.D.C. 2014) (citing *Seibert*, at 613). No tactic is *per se* unconstitutional, *id.* at 141, and indeed, several cases in this District have rejected arguments that *Miranda* warnings given "midstream" were ineffective or warranted suppression. See, e.g., *Hitselberger*, at 134 (holding there was no impermissible two-step interrogation where, in the 38 minute conversation before *Miranda* warnings were given, the agents did not ask the defendant any questions about the precipitating incident.); *United States v. Apodaca*, 275 F. Supp. 3d 123, 146 (D.D.C. 2017)(holding no violation of defendant's rights when, six minutes into the conversation, the defendant was given the advice of rights form and there was no questioning of the defendant before he had reviewed the form.); *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 64 (D.D.C. 2017) (holding that, regardless of which *Seibert* test is applied, a two-day break between the two sets of interviews and clearly distinct subject matters does not create an impermissibly coercive interview.)

Furthermore, this case is factually distinct from *Seibert* in several ways. First, the officer interrogating the defendant in *Seibert* was following explicit instruction to refrain from giving *Miranda* warnings. *Seibert*, at 604. No such allegation can be made here, especially given the

swiftness with which the agents moved from rapport-building to giving *Miranda* warnings once the defendant started to discuss his possible criminal exposure. Exhibit 1, Tr. 5:24 – 6:3.[4] Second, the officer in *Seibert* questioned the defendant for 30 to 40 minutes before warnings were given. *Seibert*, at 604. The agents here interacted with the defendant for approximately six minutes before warnings were given, including the time it took to complete a COVID-19 questionnaire. Third, the officer in *Seibert* squeezed the defendant's arm and repeated "Donald was also to die in his sleep," a statement directed at the heart of the criminal case against the defendant. *Seibert*, at 605. Here, the agents never laid a hand on Rodriguez, except to assist in removing his handcuffs, and never asked a single question about January 6, 2021, the United States Capitol, or the tasing of Officer M.F. during the introductory statements. Finally, it is not even clear that, unlike in *Seibert*, the defendant gave any kind of inculpatory statement before the warnings were given. "If I do that, I don't think it's going to reduce my sentence or something," (Exhibit 1, Tr. 5:24-25), in response to agent's statements to the defendant regarding their intention to give him the opportunity to help them understand the situation, is hardly a confession. Indeed, the defendant's later statement that "lawyers have always told me, you know, you don't say anything. They're not going to help you," (Exhibit 1, Tr: 7: 7-9) indicates that the first statement was more a general concern that the talking to law enforcement never helps anyone in a legal case, not that the defendant specifically will be serving a sentence because he indeed committed a crime. There is no reason to believe that, with this statement alone, the "damage was done," as defense suggests (ECF No. 38 at 18), and therefore

---

[4] Agent Elias was in the midst of providing a roadmap for the interview when the defendant interjected and began to acknowledge criminal liability while questioning the utility of providing a fulsome statement. Agent Elias quickly interrupted to say, "Well, let us read you some paperwork here and then we can talk about how you might be able to help yourself out of your situation, okay?" Exhibit 1, Tr. 5:9-6:4. Thus, it appears that defendant's eagerness to speak got out in front of the agents' plan.

the defendant felt the cat was out of the bag and he had to waive his *Miranda* rights. *Oregon v. Elstad*, 470 U.S. 298, 311(1985)(rejecting the "cat out of the bag" theory when voluntary unwarned admissions were made and proscribed official coercion played no part in either the warned or unwarned confessions.) And it is certainly not a statement the agents relied upon during the rest of the interview to coerce a confession only after *Miranda* warnings were given.

Much like in *Hitselberger*, the agents asked only general questions with the purpose of establishing a rapport with the defendant, not to elicit a confession. *Hitselberger*, 991 F. Supp. 2d at 141. The moment the defendant said anything that could possibly be construed as inculpatory— when he mentioned a potential jail sentence—the agents immediately turned to the "paperwork," read his *Miranda* rights aloud, and had him sign the advice of rights. Exhibit 1, Tr. 6:1 – 7:22. Nothing in the six minutes before the defendant was given his *Miranda* warnings should cause this Court to believe those warnings were functionally ineffective, nor that the agents intended to coerce any inculpatory response from the defendant.

**V.     The Defendant's Statements Were Voluntary, Not Coerced, and Should be Admissible at Trial.**

The defendant's argument that his confession was involuntary is not factually accurate nor legally sound. When reviewing voluntariness and possible coercion, the Court must look to the totality of circumstances, including both the characteristics of the accused and the details of the interrogation. *Bustamonte*, 412 U.S. at 226. The Supreme Court has held that the ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). If a suspect gives a statement solely as a result of an internal condition, e.g., insanity or intoxication, there also is no constitutional violation. *Connelly*, 479 U.S. at 167. It has long been

14

the rule that the mere fact that an accused is in custody and subjected to police questioning is not sufficient to raise a voluntariness issue. *United States v. Bernett*, 495 F.2d 943, 956 (D.C. Cir. 1974). Rather, something besides custody and ordinary questioning must come into play. *Id.*

Here, the defendant alleges "coercive pressures" forced the involuntary statements made during the interview. ECF No. 38, at 22. Yet, the allegedly coercive tactics the defendant cites are anything but. Review of the transcript shows the agents asking typical questions about why the defendant committed the acts in question (Tr. 114:3-5), showing the defendant videos and giving the defendant the opportunity to correct their misimpressions about what the videos showed (Tr. 74:19-75:22; 78:20-82:21), and reassuring the defendant that they were not there to judge him or look at him as anything other than a fellow human being (Tr. 16: 25- 17:13). The defendant cites to no case explaining why any of these questioning tactics could be construed as coercive.

Yet, the D.C. Circuit has given guidance on what is considered coercive and noncoercive tactics such that the will of a defendant is either overborne or freely exercised. For instance, a law enforcement officer's "nonthreatening behavior" militates "towards a noncoercive encounter." *United States v. Hall*, 969 F.2d 1102, 1108 (D.C. Cir. 1992). In *Hall*, the Court found the officer who questioned the defendant applied a minimal level of pressure when the officer was dressed in plain clothes, his weapon was concealed, he spoke in a conversational tone, and no threats or force were used. *Id.* at 1107. In *United States v. Murdock*, 667 F.3d 1302, 1307 (D.C. Cir. 2012), the Court found that the questioning detective's statements that he would investigate any claims made by the defendant, which could affect his charging, did not undermine the evidence of voluntariness. In *United States v. Hallford*, 816 F.3d 850, 858 (D.C. Cir. 2016), the Court rejected the trial court's assessment that there was substantially coercive police conduct when the defendant agreed to an interview, the agents asked straightforward questions in conversational tones, and he was deprived

of no essentials. In *United States v. Cooper*, 949 F.3d 744, 749 (D.C. Cir. 2020), the Court found statements were given freely and voluntarily when no weapons were brandished and no handcuffs were used, the defendant was "cooperative," the agents employed a "professional and cordial tone," and at no point did the defendant ask to end the questioning.

The same is true of the agents in this case. Special Agents Elias and Armenta were dressed in casual clothes, were cordial and professional, and never brandished their weapons or used force or threats of any kind. Special Agent Elias removed the defendant's handcuffs (Exhibit 1, Tr. 6: 5-7:1) and the defendant was allowed to leave the room, unshackled, for a bathroom break (Exhibit 1, Tr. 127: 2-12). Perhaps most importantly, the defendant stated from the beginning that he wanted to speak with the agents (Exhibit 1, Tr. 7: 7), and never stated otherwise throughout the interview that he wished to terminate the interaction. Because the statements were voluntary and not the result of coercive police tactics, they should not be suppressed.

## CONCLUSION

WHEREFORE, for the reasons stated above and for any other reason presented at the hearing or in the record, the United States respectfully requests that the defendant's Motion to Suppress be DENIED.

Dated: OCTOBER 29, 2021                Respectfully submitted,

                                       CHANNING D. PHILLIPS
                                       Acting United States Attorney

                              By:      _____/s/_____
                                       Kimberly L. Paschall
                                       Tara Ravindra
                                       Assistant United States Attorneys
                                       D.C. Bar No. 1015665 (Paschall)

D.C. Bar No. 1030622 (Ravindra)
555 4th Street, N.W.
Washington, D.C. 20530
(202 252-2650 (Paschall)
(202) 252-7672 (Ravindra)
Kimberly.Paschall@usdoj.gov
Tara.Ravindra@usdoj.gov