IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 21-cr-246 |
| Plaintiff, | ) | |
| | ) | MOTIONS HEARING |
| vs. | ) | |
| | ) | Washington, DC |
| Daniel Joseph Rodriguez, | ) | December 9, 2021 |
| | ) | Time:  3:00 p.m. |
| Defendant. | ) | |

_____

TRANSCRIPT OF MOTIONS HEARING
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For the Plaintiff:      Kimberly Paschall
                        Tara Ravindra
                        U.S. Attorney's Office
                        555 Fourth Street, NW
                        Washington, DC  20530

For Defendant
  Rodriguez:            Margaret Lambrose
                        Katherine Tanaka
                        Federal Public Defender - Nevada
                        411 E. Bonneville Avenue, Suite 250
                        Las Vegas, NV  89101

  Badalian              Tigran Martinian
                        Martinian & Associates
                        2801 Cahuenga Boulevard West
                        Los Angeles, CA, 90068

_____

Court Reporter:         Janice E. Dickman, RMR, CRR
                        Official Court Reporter
                        United States Courthouse, Room 6523
                        333 Constitution Avenue, NW
                        Washington, DC  20001
                        202-354-3267

1             THE COURTROOM DEPUTY:  Your Honor, this afternoon we

2     have a video proceeding.  We have the continuation of a motions

3     hearing and the initial status conference for defendant No. 2.

4     We have in front of us criminal case No. 21-246, the *United*

5     *States of America v. Daniel Joseph, DJ, Rodriguez and Edward*

6     *Badalian*.  Will counsel for the government please identify

7     herself and her colleague for the record?

8             MS. PASCHALL:  Good afternoon, Your Honor.  Kimberly

9     Paschall for the United States, with my colleague AUSA Tara

10    Ravindra.

11            THE COURT:  All right.  Good afternoon.

12            THE COURTROOM DEPUTY:  Counsel for defendant

13    Rodriguez?

14            MS. LAMBROSE:  Good afternoon, Your Honor.  Maggie

15    Lambrose, with my co-counsel Katie Tanaka, and my client Danny

16    Rodriguez.  Mr. Rodriguez is appearing today by way of video,

17    and he consents to do so.

18            THE COURT:  All right.  And this is reminding me, I

19    think this was the day that Ms. Levy said that she couldn't be

20    here, but she was happy to have you all appear in her absence,

21    is that correct?

22            MS. LAMBROSE:  That's correct.  Thank you, Your

23    Honor.

24            THE COURT:  All right.  I had forgotten about that

25    until this moment.

```
 1              All right.  And counsel for the second defendant?
 2              MR. MARTINIAN:  Good afternoon, Your Honor.  Tigran
 3    Martinian appearing on behalf of Mr. Badalian, who is present
 4    in my office, via Zoom on this hearing, on my right.
 5              THE COURT:  I'm sorry, can you repeat your name
 6    again?
 7              MR. MARTINIAN:  My name is Tigran Martinian.
 8    Martinian, like the drink.  And Mr. Badalian is present with me
 9    in my office, on my right.
10              THE COURT:  Okay.  All right.  Let me first go back
11    to Mr. Rodriguez.  I believe he's also appearing by video, is
12    that correct?  Yes?
13              MS. LAMBROSE:  That's correct.
14              THE COURT:  I want to have confirmation.  Have him
15    put his name on the record, and that he can hear and see.
16              THE COURTROOM DEPUTY:  Mr. Rodriguez, please state
17    your name.
18              THE COURT:  Mr. Rodriguez, I just want to confirm
19    that you've talked to your lawyers about the fact that you have
20    the right to be here in person for a proceeding of this nature
21    and that you agree to proceed by video this afternoon.
22              DEFENDANT RODRIGUEZ:  Yes, I do.  Thank you, Your
23    Honor.
24              THE COURT:  Okay.  Now, Mr. Martinian, as I
25    understand it, there is still -- I've permitted you to appear
```

1    today so that we can move forward, but there's still questions

2    about your admission to this court's bar or admission pro hac,

3    so that you could appear and speak on his behalf in the future.

4         MR. MARTINIAN:  Yes, Your Honor.  My application is

5    with the D.C. bar.  We were told by email that D.C. bar looks

6    at these things once a month -- every three months, and they're

7    going to be looking at this on January 3rd.  So I wanted to

8    inquire with you, Your Honor, to understand whether you would

9    like me to initiate the process before January 3rd or January

10   3rd should be sufficient, for me to wait for admission then?

11        THE COURT:  I'm confused.  You say you have an

12   application with the D.C. bar, are you seeking to become a D.C.

13   bar member?

14        MR. MARTINIAN:  Yes.

15        THE COURT:  Or is your application to become a member

16   of the bar of this court, which is different from the D.C.

17   court?

18        MR. MARTINIAN:  The court, Your Honor.

19        THE COURT:  So you have a pending application with

20   this court and you're expecting to hear in January?

21        MR. MARTINIAN:  Yes.

22        THE COURT:  All right.  Well, I don't know that we're

23   going to have a hearing again between now and then, at least

24   with respect to Mr. Badalian; we might, once I finish talking

25   to you.  If we do between now and then, I think it would be

1    advisable to have someone move you in pro hac, so that we can

2    have your appearance on the record and everything we need to go

3    forward.

4           But for purposes of today, have you spoken with your

5    client about his right to be present in person and does he

6    agree to proceed this morning -- this afternoon by video

7    conference?

8           MR. MARTINIAN:  Yes, Your Honor, and he agrees.

9           THE COURT:  And, Mr. Badalian, is that correct, that

10   you've discussed with your lawyer the fact that you do have the

11   right to be here in person this afternoon?

12          DEFENDANT BADALIAN:  Yes, Your Honor.

13          THE COURT:  All right.  So with respect to both

14   defendants, given the fact that the court still has a standing

15   order calling for its closure to in-person proceedings as much

16   as possible to protect the health and safety of the

17   participants, given the risk to everyone to attending in person

18   and to the folks who are in California to travel here, and

19   given the fact that this is largely, at least with respect to

20   defendant No. 2, a scheduling conference, I think it's in the

21   interest of justice to proceed by video conference this

22   afternoon, and I'm going to do that.

23          In defendant No. 2's case, I want to read into the

24   record the following order.  I know I've already read it with

25   respect to Mr. Rodriguez, but I think it's important that every

1      defendant understand that he has these rights.  And, so,

2      Ms. Paschall and Ms. Ravindra, I want to remind you that

3      pursuant to the Due Process Protections Act, I've ordered that

4      all government counsel who have entered their appearances in

5      this case or who do so in the future must review their

6      disclosure obligations under *Brady versus Maryland*, 373 U.S.

7      83, and it's progeny and, also, our Local Criminal Rule 5.1 and

8      comply with those provisions.  The failure to comply could

9      result in the dismissal of the indictment or information,

10     dismissal of individual charges, exclusion of government

11     evidence or witnesses, continuances, bar discipline, contempt

12     proceedings, or sanctions, or other remedies that are just

13     under the circumstances.  So that order is already in the

14     docket in this case, but it applies now specifically to the

15     second defendant as well.

16             Now, with respect to Mr. Badalian, has any discovery

17     taken place so far?

18             MR. MARTINIAN:  Your Honor, if I may.

19             THE COURT:  Yes.

20             MR. MARTINIAN:  We have received access to databank

21     with discovery and my co-counsel is working with Ms. Paschall

22     and her office into going over this discovery, yes.

23             THE COURT:  All right.  And have you taken care of

24     the protective order and things like that?  I believe there is

25     a protective order in this case with respect to Mr. Rodriguez.

1     Has that been taken care of?

2              MR. MARTINIAN:  That is -- that has been taken care

3     of, yes.

4              THE COURT:  And has a plea offer been extended in

5     this case?

6              MR. MARTINIAN:  Not yet.

7              THE COURT:  I think, Ms. Paschall, with respect with

8     the individual Rodriguez, there was a time when the government

9     was holding off because of the potentiality of the superseding

10    indictment, which has now taken place.  Has there been a plea

11    offer now extended to Mr. Rodriguez?

12             MS. PASCHALL:  Not at this time, Your Honor.  But we

13    have reengaged with defense counsel about what that plea offer

14    would potentially look like.  So, I think we are on the road to

15    that offer.

16             THE COURT:  Seems like, given how long his case has

17    been pending, it would be fair to move along that road

18    practicably.

19             MS. PASCHALL:  Yes, Your Honor.

20             THE COURT:  So, Mr. Badalian, have you and

21    Ms. Paschall talked about what needs to happen next, when

22    you're looking to have the next status conference in this case

23    or where we are in terms of moving this case along?

24             MR. MARTINIAN:  Your Honor, it would be between me

25    and Miss Paschall, not Mr. Badalian.  But we are in constant

 1     contact with Ms. Paschall.  We don't have specific dates, but

 2     my understanding is there is significant discovery that would

 3     require significant time for us to go over it and understand

 4     what we're dealing with.  So we don't have any dates or times,

 5     but I would -- but I would like Ms. Paschall to opine, as well.

 6               THE COURT:  All right.  Well, are you expecting that

 7     you want 60 days to do that, 30 days to do that?

 8               MR. MARTINIAN:  I would -- I would imagine at least

 9     90 days.

10               THE COURT:  And what's your position --

11               MS. PASCHALL:  And, Your Honor --

12               THE COURT:  Go ahead, Ms. Paschall.

13               MS. PASCHALL:  Sorry, Your Honor.  I want to place on

14     the record why a delay of that amount of time might be helpful

15     for Mr. Badalian and his counsel.

16               We have disclosed the global discovery for the

17     January 6 cases to him.  We are helping his office get all of

18     the access they need through the federal public defender

19     service.  So, they have a large amount of discovery to go

20     through there.  We have also disclosed what we believe is

21     relevant from Mr. Rodriguez's earlier case, as well as have

22     begun to disclose what is pertinent to the conspiracy

23     indictment.  We have been in communication about making sure

24     that larger discovery items -- things like cell phone

25     downloads, social media downloads -- are turned over, things of

1    that nature.  They have provided us with a large device that we

2    can start that process.

3          So, I think 90 days may be appropriate.  The

4    government would ask for tolling of the Speedy Trial Act during

5    that time to make sure that we are completing the discovery

6    process and engaging in plea discussions during that time.

7          THE COURT:  All right.  Well, if we're going to keep

8    tolling the Speedy Trial Act so that people engage in plea

9    discussions, that means the government is going to have to make

10   plea offers.

11         In terms of the case specific discovery, is that

12   complete with respect to Mr. Rodriguez?

13         MS. PASCHALL:  For the new indictment, Your Honor,

14   no.  We have started that process as well.  I have told

15   counsel, both for Mr. Rodriguez and for Mr. Badalian, that

16   there are certain matters that still remain under seal.  The

17   government has moved to unseal those items, but we are still

18   waiting in that respect.  If those items become unsealed, we

19   want to make sure that we provide discovery in a redistricted

20   form so they are getting all of that discovery as soon as

21   possible.  We hope to do that in the very near future.  But we

22   have started the process of disclosing new discovery to

23   Mr. Rodriguez's attorneys for this new superseding indictment.

24         THE COURT:  All right.  Now, speaking of the

25   superseding indictment, we have already arraigned Mr. Rodriguez

1   on it, but we need to take care of that with respect to

2   Mr. Badalian.  So let's do that now.

3              THE COURTROOM DEPUTY:  He's been arraigned, Your

4   Honor.

5              THE COURT:  He has been arraigned by the magistrate

6   court.  Okay.  So that's all been taken care of.

7              Well, then before we turn to the continuation of the

8   motion to suppress in the Rodriguez case, is there anything

9   further, besides setting the next date and talking about the

10  Speedy Trial Act, that I need to do in Mr. Badalian's case?

11             Mr. Martinian?

12             MS. PASCHALL:  Not for the government.

13             MR. MARTINIAN:  No, Your Honor.

14             THE COURT:  Okay.  So, at this point -- let's see,

15  December 9th, I think.  So, you're talking about late February,

16  early March for the next status conference in this case?

17             MR. MARTINIAN:  I would say early March would be

18  appropriate.

19             THE COURT:  And what's your position with respect to

20  the Speedy Trial Act on your client's behalf between now and

21  then?

22             MR. MARTINIAN:  We're fine with that.  We'll

23  stipulate.

24             THE COURT:  Now, with respect to Mr. Rodriguez, the

25  speedy trial clock is currently frozen as we continue the

1       motions process.  But, we also have the development of the new

2       charges and the additional discovery related to that charge.

3       So, what is the position on behalf of Mr. Rodriguez as to when

4       we should be getting together again for a status conference in

5       that case, and with respect to the speedy trial?

6               MS. LAMBROSE:  Thank you, Your Honor.  Given the age

7       of this case, we would request a status check much sooner than

8       March.  We have, obviously, made our record on the speedy

9       trial.  I understand it is tolled right now, given the fact

10      that we have a pending motion to suppress.  But, we do have

11      speedy trial issues once that motion is decided, as long as

12      there are no other motions filed.

13              So given that, I would request a status check for our

14      case the beginning of January, or as soon in the beginning of

15      January as this Court's calendar would allow; maybe the second

16      week or the third week.

17              THE COURT:  Well, what's your understanding about the

18      impact of the superseding indictment on the speedy trial

19      calculation for your client?  We still don't even have one of

20      the two defendants joined yet, so I don't think we can have a

21      intelligent conversation about a trial date when your client

22      has new charges; there's one new lawyer who just stepped up for

23      one defendant and the other one isn't even here yet.  So, I

24      understand you've made your record before based on the record

25      before, but things have happened since then.  So how does that

1    affect the calculation, in your view?

2           MS. LAMBROSE:  Thank you, Your Honor.  You're

3    absolutely correct.  We are in a very, very difficult

4    situation, given the fact that Mr. Rodriguez's case is so much

5    older than the other two cases that are being brought in, which

6    is very likely going to be the basis of additional litigation

7    going forward.  But as of right now, it's our position that a

8    trial date in this case should be set.

9           THE COURT:  Well, what do you mean, that's going to

10   be the subject of additional litigation?  Are you planning to

11   file a motion to severe?

12          MS. LAMBROSE:  I believe, Your Honor, we will be.  We

13   still want to know, you know, when the additional defendant is

14   going to be brought in.  We don't really have any understanding

15   as to that, as Your Honor just mentioned.  But I would imagine

16   we will be filing a motion to severe.

17          THE COURT:  All right.  Well, I think if -- that's

18   something you should probably do sooner, rather than later,

19   then, if your concern is expedition and that would affect the

20   timing of Mr. Rodriguez's trial.  So, when -- are you saying

21   you need the apprehension of the third defendant to even file

22   it?

23          MS. LAMBROSE:  I believe so, Your Honor, because as

24   of right now we don't know -- we have no idea who that person

25   is.  We have no idea how that person's role plays into our

1      defense or into the alleged conspiracy as a whole.

2              THE COURT:  All right.  That's fair.  Why don't we do

3      this:  I'm going to set, given -- does it make sense to set a

4      status conference, Mr. Martinian, on Wednesday, March 2nd, at

5      2 p.m., given the time zone differences here?

6              MR. MARTINIAN:  I appreciate that, Your Honor.  If

7      possible, March 3rd.  I have two matters on March 1st and 2nd.

8      March 3rd is better for me, if possible.

9              THE COURT:  All right.  Thursday, March 3rd, at

10     2 p.m., we'll set this down for another status conference in

11     defendant Badalian's case.  And I will exclude the time from

12     the speedy trial calculation, with his consent, from now until

13     that date, given the volume of discovery that needs to be

14     reviewed in that matter.

15             With respect to Mr. Rodriguez, I would include him in

16     that status conference, but that doesn't mean we won't have an

17     interim one.  But I'm going to put him down for that date, as

18     well, in the event we're all still joined at that point.

19             And then with respect to Mr. Rodriguez, what I was

20     going to tell you when we turned to the evidentiary ruling, is

21     that I'd hoped to rule today.  I didn't know, as of the time of

22     the last hearing, when I set today for a continued hearing and

23     ruling on the motion, that the transcript was going to be such

24     an inadequate representation of what actually took place during

25     the questioning and, indeed, that there were going to be issues

1      regarding its accuracy that would require supplemental

2      briefing.  I also didn't have all the briefing in hand, and so

3      didn't know how much research I was going to need to do on my

4      own into these very narrow and unique issues.  And my review of

5      the law was also complicated in some circumstances by cases

6      that were cited as standing for one thing that turned out to

7      stand for something else.

8              That, combined with the time involved in the exercise

9      of reviewing the entire video and taking notes on it for

10     purposes of the voluntariness inquiry, means that to give you

11     the kind of detailed and thorough analysis that I want to give

12     when I rule on the two remaining issues that we have,

13     particularly the *Miranda* issue, which I think is complicated,

14     I'm not prepared to do that this afternoon.

15             So, what I'm going to need to do is set another date

16     for that, and then when that happens, at that date, then we'll

17     set down the next date for Mr. Rodriguez.  I think that makes

18     more sense than trying to figure it out today.

19             But I do want to note, with respect to that hearing,

20     in even the supplemental memorandum the defense asks for an

21     evidentiary hearing.  So one question is:  You've already

22     cross-examined Special Agent Elias, is there any other evidence

23     that Mr. Rodriguez is seeking to introduce with respect to the

24     two questions that remain for me to consider?

25             MS. LAMBROSE:  Your Honor, in our supplemental

1   briefing I believe that we asked for the opportunity to file a

2   reply to the government's supplement that they were just able

3   to provide based on the Court's order from December 3rd.  So as

4   the Court is well aware, we had supplemental briefing that was

5   due on November 30th.  The defense filed a ten-page

6   supplemental brief, the government opted not to file anything,

7   and then this Court issued a subsequent order allowing the

8   government additional time to file a supplemental briefing

9   because the government raises issues for the first time in its

10  supplemental briefing that were never raised in its response to

11  its motion to suppress and that were never raised at the

12  evidentiary hearing; namely, that Mr. Rodriguez purportedly

13  mumbled the word "No," which the government never said in its

14  response and the government never elicited any testimony at the

15  evidentiary hearing as to that.  We would now ask for --

16          THE COURT:  They played the video at the hearing.

17          MS. LAMBROSE:  They played the video, Your Honor, but

18  they never elicited any testimony from the agent that the "No"

19  was unclear.  There was never any testimony from the agent that

20  the "No" was a mumble, that the "No" was just an "N" word that

21  trailed off, or anything having to do with the "No."

22          So, because this is a brand new position that the

23  government has taken in response to this Court's order, we

24  would like the opportunity to file a reply, because it's our

25  position that they have not met their burden to show that

1    Mr. Rodriguez voluntarily, knowingly waived his right to remain

2    silent as to this very specific issue having to do with

3    questioning surrounding the others assaults.

4            THE COURT:  Is that the test?

5            MS. LAMBROSE:  It's the government's burden to prove

6    that the waiver is valid.

7            THE COURT:  The waiver was valid at the beginning.  I

8    ruled that at the last hearing.  What's the test with respect

9    to what happens during questioning?  You briefed -- I mean, I

10   asked --

11           MS. LAMBROSE:  During questioning --

12           THE COURT:  I asked for simultaneous briefing.  And

13   you're right, I gave the government additional time because I

14   didn't think the government had given me enough the first time.

15   But you, as you said, gave me ten pages.  So are you telling me

16   that there's law that you didn't cite that you want to give me

17   now, more?

18           MS. LAMBROSE:  I'm sorry, Your Honor.  Are you

19   talking about whether or not the waiver was unambiguous?

20   I'm --

21           THE COURT:  I asked you -- okay.  He waived -- we had

22   a hearing about -- you moved to suppress the entire confession

23   because you said they hadn't complied with *Miranda* at the

24   outset.  And I ruled on that.  I ruled that he had a knowing

25   and intelligent and voluntary waiver and, therefore, everything

1    after that complied with *Miranda*.  But I thought that you had

2    raised a legitimate question that needed more briefing as to

3    whether the exchange -- which is poorly captured on page 37 of

4    the transcript -- presented a new *Miranda* issue, which is the

5    scrupulously honored issue when someone asserts their right to

6    remain silent or to cut off questioning during questioning.

7         And so you just said to me the government didn't meet

8    its burden to have a knowing and intelligent waiver.  I'm

9    asking you, is that the question?  I thought the question

10   was --

11        MS. LAMBROSE:  Because obviously --

12        THE COURT:  Go ahead.

13        MS. LAMBROSE:  It's our position that he

14   unequivocally re-invoked.  And there was the initial waiver and

15   then unequivocally invoked his right to remain silent with

16   regard to the specific questioning with regard to the assaults.

17   So that unequivocal invocation, at that point the questioning

18   should have ended.  He said, "No."

19        THE COURT:  So that's the question, is did they

20   scrupulously honor an assertion of his right to cut off

21   questioning, and that's what you briefed.

22        MS. LAMBROSE:  Right, Your Honor.

23        THE COURT:  So what else do you need to brief?

24        MS. LAMBROSE:  My point is, Your Honor, the

25   government never said that the "No" was unclear.  The

1    government never said that the "No" was a mumble.  The agents

2    never testified that the "No" was unclear.  So because there's

3    a lack of evidence from the government at the evidentiary

4    hearing, and their papers never argued that the "No" was

5    unclear, it's our position that they have not met any threshold

6    evidentiary standard to now show that the "No" was equivocal.

7    There was an unequivocal "No."  They've waived the argument at

8    this point, Your Honor.

9            THE COURT:  I don't think they've waived because you

10   both gave me a transcript, that I then watched the video,

11   probably 40 times -- I've probably watched it 70 or 80 times by

12   now -- I never heard "No."  I recently -- while Special Agent

13   Elias is talking, you can hear the "Nn--," and that's the most

14   I've ever heard.  So to say that the government introduced the

15   transcript and the videos -- it played the video in the

16   hearing, so that's in the record.  So, it is their --

17           MS. LAMBROSE:  Correct, Your Honor --

18           THE COURT:  -- if you have evidence of an

19   unambiguous, unequivocal assertion -- re-assertion,

20   essentially, his right to cut off questioning, his right to

21   remain silent, then they have to prove it was scrupulously

22   honored.  There's no question in my mind that if what he did

23   was unambiguous and unequivocal, it wasn't scrupulously

24   honored; they kept talking to him, they kept encouraging him to

25   explain more.

1          So it seems to me the question I have to decide is

2     whether there was an ambiguous statement by your client or on

3     unambiguous assertion of his right to cut off questioning.  And

4     I don't understand what the government needs to do or didn't do

5     or waived with respect to that issue, when the transcript and

6     the video were in evidence --

7          MS. LAMBROSE:  Thank you, Your Honor.

8          THE COURT:  -- why did they have to ask, did he say

9     "Nn--"?

10         MS. LAMBROSE:  Because the transcript is clear, both

11    of the transcripts --

12         THE COURT:  The transcript is --

13         MS. LAMBROSE:  He says, "No."

14         THE COURT:  The transcript, I think, doesn't tell the

15    story.  The only thing that tells the story is the video.  The

16    transcript does not capture the fact that, just like you and I

17    are, they were talking over each other.  The transcript does

18    not capture the fact that you can barely -- I don't even think

19    you can.  I understand you have a transcriber who heard the

20    word "No," but I haven't, and not anyone who has ever listened

21    to it with me has heard it.  So I'm going to base my

22    determination on the video.  I'm going to tell the Court of

23    Appeals, when you listen to my decision, whichever way it goes,

24    it's going to be based on the video.

25         So I just don't understand what it is you want to put

1    in writing to complain about the government because the issue

2    to be decided is whether there was an unambiguous assertion,

3    not whether he -- what did you say?  Whether they met their

4    burden to prove that he had a knowing and voluntary waiver.

5    That was the test at the beginning; that's not where we are.

6    The question is --

7            MS. LAMBROSE:  No, Your Honor --

8            THE COURT:  The question is:  Did he assert?  If he

9    asserted, they had to honor; they most certainly did not honor.

10   But if he didn't assert, they didn't have to, right?

11           MS. LAMBROSE:  Correct, Your Honor.  So, when he --

12   when he invoked partway through the interrogation, his "No" was

13   unambiguous.  And the set of facts that the parties were

14   operating under, up until this Court's minute order, were such

15   that everybody was on the same page, that he said "No."  "No."

16   Whether him saying "No" was an unambiguous invocation of his

17   right, that is what the government and the defense disagreed

18   about.  But, if the Court is now going to base its decision

19   based on facts that the government never raised in its briefing

20   and facts that were never borne out through testimony of its

21   agents, it is our position that the government has now waived

22   that argument and, at the very least, we would like to have the

23   opportunity to respond to the government's new argument in

24   writing for the Court, so that we can have it on the record.

25           THE COURT:  But, forget the waiver argument.  If you

1    want to brief -- which I could swear you already did when you

2    gave me your answer -- I asked you both the same question:

3    Please tell me if the transcript is accurate.  And you filed

4    something and it had cases cited in it.  So, I think you've

5    addressed the same issue which they addressed, which is:

6    Looking at it again, was it ambivalent or wasn't it?  If you

7    want to tell me -- if there's something that you need to tell

8    me that you haven't told me yet, I want you to tell me.  So,

9    when can you get it filed?

10           MS. LAMBROSE:  I appreciate that, Your Honor.  And

11   just so the Court is aware, we were not given the opportunity

12   to file a supplemental briefing after the government was given

13   opportunity on whether this issue --

14           THE COURT:  You were given the opportunity, you took

15   it, they didn't.  And I was --

16           MS. LAMBROSE:  No.  I apologize, Your Honor.

17           THE COURT:  And I was dismayed by that because I

18   thought it needed more briefing.  You did --

19           MS. LAMBROSE:  No --

20           THE COURT:  You didn't wait.  They were supposed to

21   be simultaneous anyway, so you were never going to have an

22   opportunity -- but, stop complaining.  I just told you, if you

23   want to file it, file it; if you want it to be 100 pages long,

24   make it 100 pages long.  But I will tell you one thing:  You do

25   not need to cite again a single case you cited before because

1    I've read them all.  Okay?

2              MS. LAMBROSE:  I appreciate that, Your Honor.  And I

3    was referencing your December 3rd order, when you gave the

4    government --

5              THE COURT:  My December 3rd order --

6              MS. LAMBROSE:  -- additional time.

7              THE COURT:  I read what you filed.  I went back to

8    the original government brief, I thought the government needed

9    to do more to address the issue, and they didn't.  So I told

10   them, if you're going to, you can have additional time.  I

11   didn't need to give you additional time because you addressed

12   it.  Thoroughly.  I don't --

13             MS. LAMBROSE:  We didn't have the opportunity --

14             THE COURT:  We didn't assume you left anything out.

15   Are you telling me you left something out and now you want to

16   put it in?

17             MS. LAMBROSE:  No, Your Honor.  What we didn't have

18   the opportunity to address was your new finding, essentially,

19   that the transcript was wrong.

20             THE COURT:  Yes, you did.  You both filed something

21   the day I said, "Please address the fact that the transcript

22   doesn't appear to be accurate."

23             MS. LAMBROSE:  Correct, Your Honor.  Just the notice

24   about whether we believed it was accurate.  But we didn't get

25   the opportunity to do additional briefing on the legal issues

1    and how the facts would apply to the law.

2                    THE COURT:  Okay.

3                    MS. LAMBROSE:  That's the only thing I'm --

4                    THE COURT:  Okay.  I'm saying that if you feel that

5    you've got something to tell me that you haven't had the chance

6    to tell me, I am going to give you that opportunity.  I want

7    you to have it.  I want to have everything that everybody wants

8    to say about this.  But, to say that the government has waived

9    this because I'm now deciding this based on something they just

10   said for the first time, that's not happening.  I am deciding

11   this based on what happened in the interview, which is captured

12   on video.  That's what I'm going to decide it on.

13                   So, doesn't matter what the government told me

14   happened on the video, doesn't matter what you tell me happened

15   on the video; the video told me what happened on the video and

16   all I need from you is any additional argument that you feel,

17   for some reason, you need to give me based on the video that

18   you've had all along because the government has now re-looked

19   at the video and gave me something new.  So, if you feel that

20   your position has not been fully briefed, brief it.  And, so,

21   when would you like to do that?  Because that would, obviously,

22   affect when we get back together again.

23                   MS. LAMBROSE:  Court's indulgence, Your Honor.  I

24   don't think this will take long.

25                   THE COURT:  Okay.  But I can specifically recall that

1   that specific portion of the interview was played in the last

2   hearing, so it's in the record already, so you didn't waive it.

3   And --

4            MS. LAMBROSE:  How about December 17th?  Would that

5   be okay for Your Honor?

6            THE COURT:  Yes.  You're welcome to file it on

7   December 17th.  That rules out December 17th, which was the day

8   I was going to set as the day to rule on this.  And I'm not

9   sure there's really -- it's fair to me, to say that I'll do it

10  on the 23rd, which is the only day I have available the

11  following week.  So --

12           MS. LAMBROSE:  Your Honor, we could also have our

13  filing to you by the 16th, if the Court would prefer.

14           THE COURT:  Oh, good, and then I can read all the new

15  cases and still be ready to roll on the 17th?

16           MS. LAMBROSE:  I'm sorry, Your Honor.  I was just

17  trying to --

18           THE COURT:  I appreciate it.  Look, you seem

19  chagrined about the fact that I asked the government, gave the

20  government a later date to file; not more, but something.  It

21  hadn't filed anything.  And so you're concerned about fairness,

22  and you gave them time, you didn't give us time, and I need to

23  give you time because you did what you were supposed to do the

24  first time.  But I want you to have every minute that you want

25  to brief this as thoroughly as you can because I don't want to

 1    hear that I didn't give you enough time.  Okay?  So, if you

 2    would like to have until December 17th, then you should have

 3    it.

 4              As I said, I don't think -- I mean, didn't you brief

 5    cases involving -- cite cases involving head shakes in your

 6    initial pleading and not just the use of the word "No"?

 7              MS. LAMBROSE:  Yes, I'm sure we did, Your Honor.

 8              THE COURT:  Okay.  So, I'm not sure that there's that

 9    much more you need to say.  But if there's something else you

10    want to say, you can say it.  But, I thought both sides gave me

11    cases involving shakes of heads, in addition to the use of the

12    word "No."

13              But, you are welcome to take some time and look at

14    this and figure out what else you need to say and say it, which

15    I feel like you're asking me to do, not because you have

16    something new to say, but just because you don't think it's

17    fair that the government got to say something later than you

18    did.  So, it's your motion, you want the last word, you can

19    have it.

20              And then how about December 22nd, at 2 p.m.?  Can we

21    get back together at that time?

22              MS. LAMBROSE:  That works for the defense.

23              THE COURT:  If --

24              MS. PASCHALL:  I think that should be fine for the

25    government, as well, Your Honor.  I expect to be in a motions

1    hearing starting at 11 a.m. before Judge Sullivan, but I would

2    be surprised if we were still going by 2 p.m.  So that should

3    be fine.

4              THE COURT:  All right.  The other option would be

5    January 3rd, if that's better for people.  But I'd like to have

6    it done by then because I've got a lot of trials in January.

7              MS. PASCHALL:  I think the 22nd is fine, Your Honor.

8              THE COURT:  All right.  So, we'll set this down then

9    in the Rodriguez matter for continued motions hearing at that

10   time.

11             Obviously, now that you're in this case,

12   Mr. Martinian, you're welcome to attend the hearing as well,

13   and your client is as well, but I don't plan to address

14   anything with respect to him.  The point of the hearing is for

15   me to rule on the pending -- what's still pending in the motion

16   to dismiss.

17             MR. MARTINIAN:  Thank you.

18             THE COURT:  I want to make it clear that there's only

19   two issues that are till pending:  One is the voluntariness of

20   the entire confession and the other is the scrupulously honored

21   issue with respect to the exchange that is captured poorly on

22   page 37 of the transcript, and whether at that -- what happens

23   thereafter needs to be suppressed under *Miranda*.  And, so,

24   those are the only two issues that we have left to address, and

25   I'm going to address them at that time.

1           One question I do have for the defense, though, is

2     ordinarily the way voluntariness comes in is if a court finds

3     that the government did not comply with *Miranda*, then you have

4     to go on and determine if the confession was voluntary, because

5     if it's not voluntary, you could not even use it for

6     impeachment.  But, if it's voluntary, you can use it for

7     impeachment, even if you violated *Miranda*.

8           Here we've already found that he knowingly and

9     voluntarily waived his rights at the beginning.  So, once --

10    assuming, let's say -- let's take the *Miranda* issue that arose

11    45 minutes into the interview off the table for a minute.  If

12    there's a valid *Miranda* waiver, that I found was voluntary

13    under all the law that you all cited, why are we talking about

14    voluntariness, if I already made those findings?  Is this only

15    if I decide that there is a violation on page 37, then we have

16    to get to voluntariness, as to whether it could be used in

17    impeachment?  Or are you saying that --

18           MS. LAMBROSE:  Yes, Your Honor.

19           THE COURT:  -- even if I find that *Miranda* was

20    complied with, I still have to rule on voluntariness?

21           MS. LAMBROSE:  No, Your Honor.  I think that our

22    position is -- we understand that the Court has already ruled

23    on voluntariness when it comes to the entire interrogation.

24    Our position is if we are able to show that his invocation was

25    not scrupulously honored, at that point the Court could then

1    decide that everything after that, because it was not

2    scrupulously honored, cannot be admitted at trial.  If the

3    Court wants to know, then, whether the standard for

4    voluntariness applies for impeachment -- is that what you're

5    asking for, everything --

6              THE COURT:  No, I know that it does.  I was asking

7    you, your pleading took a position that even if I found that

8    *Miranda* was complied with at the outset, that I still had to go

9    on and make an independent ruling on the question of

10   voluntariness.  You cited cases for that proposition that

11   didn't actually stand for that proposition.  And I'm not used

12   to the situation where, if there was a voluntary waiver of

13   *Miranda*, where we're talking about voluntariness -- because it

14   usually only comes up if there's a *Miranda* violation and the

15   government says, well, we want to use it anyway for

16   impeachment, then you have to show that it was voluntary.  So

17   now it sounds like that's what you're saying, that I do have to

18   take it up if I find a *Miranda* violation, but otherwise it's

19   already been covered by finding the voluntary waiver; is that

20   correct?

21             MS. LAMBROSE:  Yes.

22             THE COURT:  Okay.  All right.  Well, you'll be glad

23   to know I've watched all three hours of it anyway and I'm ready

24   to address the voluntariness issue, if I have to.

25             All right.  Ms. Paschall, I do want to ask you, you

1      made an argument initially that I can consider that he wasn't

2      invoking his right to remain silent on page 37 because, after

3      all, he continued to answer lots of questions thereafter, just

4      look at the next several hours of questioning, and how can that

5      possibly bear on the question of whether what he said was

6      ambiguous or not?  And isn't there case law that says you can't

7      consider that?

8                  MS. PASCHALL:  So, Your Honor, I think that goes more

9      towards the voluntariness prong.  I don't -- I don't think -- I

10     think Your Honor is correct, that we need to look at the moment

11     in time of the invocation.  But, I believe there is case law

12     that we have cited about clarification -- and I can pull up the

13     government's supplemental brief.  I think at least one of the

14     cases that we cited spoke a little bit about this.  It may be

15     our head nod case.  It may be the *Stewart* case, that when a

16     person gives a head nod of that type and then does not clarify

17     the meaning of the gesture.  And then in the *Stewart* case he

18     goes on to continue to answer questions for, I think, it's

19     maybe 16 to 20 minutes, that the Court need not find that that

20     was an unambiguous invocation.  So I think that it -- while the

21     invocation itself, we're looking at that specific moment in

22     time, I think we can look at the totality of the circumstances

23     as well to determine whether that waiver was -- or that

24     invocation, rather, was unambiguous --

25                  THE COURT:  But what's the test -- what's the test

1     for whether it's an unambiguous and unequivocal invocation?

2          MS. PASCHALL:  I think the *Stewart* case addresses

3     that as well, that it has to be the objective -- that whether

4     the objective viewer -- not the subjective viewpoint of the

5     agent -- but whether the objective viewer could believe that

6     that is an unambiguous invocation.

7          THE COURT:  All right.  So that moment in time then,

8     that determination can only be based on the circumstances that

9     happened at that time and before, but it can't be based on

10    circumstances that happened after, right?

11         MS. PASCHALL:  Yes.  Yes, but.  Yes, because that's

12    the moment that we're looking at and that is the moment that

13    objectively we need to decide whether there was an invocation

14    there.  However, I think the case law indicates that in order

15    to determine what an objective, unambiguous invocation is

16    includes more than that moment.  Which, I understand, as I'm

17    saying this out loud to Your Honor, is conflicting.  But

18    because we are allowed to look at the totality of the

19    circumstances to determine what an objective person would view

20    as an invocation, I think it's relevant.  But the most relevant

21    moment is the moment Your Honor had asked for clarification on,

22    with respect --

23         THE COURT:  I'm not sure.  I think there's a *Smith*

24    case that the defense cited that makes it pretty clear that it

25    absolutely would be ridiculous to look at something that

1    happened after they continued to question him and say, "See, he

2    meant to keep talking after all," when the obligation is on the

3    government to scrupulously honor.

4         But do you agree that if I found that that was an

5    unambiguous invocation, that at that point it was not

6    scrupulously honored?

7         MS. PASCHALL:  Yes, Your Honor.  And our supplement

8    notes that, in the alternative, should Your Honor find that

9    this is an unambiguous invocation, that it is selective only as

10   to that line of questioning, and that Your Honor could suppress

11   only those questions and answers that are selective to the

12   assault on law enforcement, as opposed to everything past that

13   moment in time in its entirety.

14        THE COURT:  Okay.  Now, with respect to what we saw

15   in the video on behalf of the defense, is it possible that what

16   we saw and what he said in the video could have more than one

17   possible meaning?

18        MS. PASCHALL:  Well, I think --

19        THE COURT:  I'm sorry, I was asking that to the

20   defendant.  I'm trying to figure out, given -- I had asked you

21   a couple of times what the test was for ambiguity, and what I

22   wanted was what Ms. Paschall just said, which is:  What would

23   an objective police officer reasonably believe was an

24   unambiguous and unequivocal assertion of his rights?  And I

25   guess I'm asking you, is that -- can that -- does that

1     categorize, in your mind, what we saw on the video?

2              MS. LAMBROSE:  Absolutely, Your Honor.  Because the

3     question was, "Do you want to talk about that?"  And the answer

4     was "No."

5              THE COURT:  Well, that's my question.  Was the answer

6     "No"?

7              MS. LAMBROSE:  Yes, the answer was "No."

8              THE COURT:  Okay.  And what are you basing that on?

9     The transcript?  The video?

10              MS. LAMBROSE:  Both of the transcripts and the video.

11     You know, I listened to the video countless times, obviously.

12     My office listened to the audio countless times, as did my

13     co-counsel.  And, you know, we hear a "No."  And both of the

14     transcribers hear "No."  And our position is that Mr. Rodriguez

15     said "No," he stopped speaking, and then he was immediately

16     asked another question by agents.

17              THE COURT:  Most of the cases you cited involved

18     people who said "No" or made some sort of gesture with their

19     head at the start, when they were asked if they wanted to speak

20     at all.  What is your best case for what is an unambiguous

21     statement after waiver?  I think we're really in a different

22     fact situation when it's during questioning; it's the right to

23     cut off questioning by someone who's already received valid

24     *Miranda* warnings and waived them.  So what is your best case

25     that covers that situation, that you think is most analogous to

1       this defendant's situation?

2               MS. LAMBROSE:  I apologize, Your Honor.  I'm pulling

3       up my supplemental briefing, because there are so many cases

4       that we cited.

5               The D.C. Circuit case that we cited, and also that

6       has been cited by the government, obviously, on a number of

7       occasions, the *Berghuis* case.  In that case the defendant

8       invoked during the interrogation.  He was asked if he wanted to

9       talk about a specific issue and he said "No."  There was an

10      invocation partway through and that was an unambiguous "No."

11      We also have a number of other cases that we cited, Your Honor.

12      And I apologize, but I just don't have all of these cases in

13      front of me.

14              But, we do -- we did cite a number of cases in our

15      supplemental briefing where there was a direct answer partway

16      through and the response was "No."  And for those -- that --

17      those cases, the proposition is you can invoke for a specific

18      issue partway through and then that invocation has -- as long

19      as it's unambiguous, has to be scrupulously honored for that

20      specific issue.  And so we are in agreement with the government

21      to the extent that --

22              THE COURT:  Everybody agrees that that's what the law

23      is.  And what I have to determine, based on the standard that

24      we all agree applies, is whether what happened in this case was

25      unambiguous and unequivocal.  And I'm having a lot of trouble

1   with the notion that just because the court reporter wrote down

2   the word "No," that that was -- that that's the way it came

3   across, because it doesn't really come across that way on the

4   video.

5            MS. LAMBROSE:  Your Honor, I mean, our position is

6   that court reporters are highly trained.  The first transcript

7   that we received was transcribed by the FBI.  This is an FBI

8   transcript.  You know, if there was any mumbling or if there

9   was any inaudible portions, then normally the transcriber will

10  note that in the transcript.  That was not notated.  That was

11  not notated in the transcript that we just ordered from a

12  national reporting service.

13           So, I -- you know, I mean, reasonable minds can

14  differ and I understand that, but I think when reasonable minds

15  differ, then the Court should err in favor of the defense,

16  given that it's the government's burden.

17           THE COURT:  What is the government's burden?  You

18  keep saying it's the government's burden and I don't know what

19  the "it" is in that sentence.

20           MS. LAMBROSE:  The government has to show that

21  *Miranda* was scrupulously honored.  And if the government

22  cannot --

23           THE COURT:  Isn't it the defendant who has to show

24  that he unambiguously and unequivocally asserted his rights?

25           MS. LAMBROSE:  The burden shifts to the defense?

1              THE COURT:  I'm just asking you.  You filed a motion.

2     Don't you have to show that the -- who has to show what?  Who

3     has the burden on whether it's ambiguous or not?

4              MS. LAMBROSE:  Your Honor, it's my position that it's

5     the government's burden.  But the issue is, this is something,

6     again, that just came up on the December 3rd order, as to

7     whether or not the video was accurate or inaccurate.  And

8     because this is a new issue, I have not had the time to

9     research the extent of what the Court is now raising in its

10    order.  And I know that the Court did provide us with the

11    opportunity to state whether or not the "No" was actually a

12    "No," which we did, but that's why I do want to have some more

13    time to brief.  I cannot provide the Court with that answer

14    right now.

15             THE COURT:  Okay.

16             MS. LAMBROSE:  And I don't want to give bad

17    information.

18             THE COURT:  That's fine.  You were the one who said

19    to me, ten times, the government had the burden, so I thought

20    you were relying on something.  If you want to look up whether

21    the government has the burden, you're welcome to do that.  And,

22    frankly, I think that's an interesting question.  I mean, what

23    I see when I read *Davis* is that the onus during the questioning

24    is on the defendant to unambiguously and unequivocally assert.

25    If there was then an obligation, if it's ambiguous, for the

1    officers to inquire further, to clarify, then they failed to do

2    it.  But it turns out, if you look at all the Supreme Court

3    precedent, *Davis* and the *Tompkins* case, the officers don't have

4    the burden to clarify; they're allowed to keep going.  It falls

5    to the defendant to be unambiguous and unequivocal.

6            So, the question is, now you're saying that the

7    government has the burden to prove that it was ambiguous?  Is

8    that what you're saying --

9            MS. LAMBROSE:  Your Honor, what I'm --

10           THE COURT:  -- that you think that's what the law is

11   going to show?  I understand you haven't looked up that

12   specific issue.

13           MS. LAMBROSE:  I have not looked up that specific

14   issue.  And what I am saying is that this issue, because it was

15   never raised by the government, because it was never briefed by

16   the government, that for the first time we are now looking into

17   an issue that was never before this Court until the Court

18   issued the December 3rd order.

19           THE COURT:  Okay.  You've said that, like, at least

20   20 times.  And I'm not ruling today, I'm just asking questions.

21   And my question about the burden was prompted by your telling

22   me, at least 20 times, that the government had the burden on

23   this issue.  So, I won't ask you the question again and you

24   don't need to tell me again that you didn't start thinking

25   about it until December 3rd.  I realize that the reason I sent

1    the order is because I was watching this thing over and over

2    and over again, and not only did I feel like I had to decide

3    whether somebody is saying "No," had unambiguously announced

4    something, but I couldn't even find the "No" sufficiently

5    audible and clear.  And so that gave rise, to me, to the

6    question of whether it was ambiguous.

7           But, people could argue that just shaking your head

8    is unambiguous; and, indeed, you did.  I thought you briefed

9    that.  You can brief it again.  The government argued that

10   shaking your head -- there's cases that say it is ambiguous.

11   And I can tell you that there are cases that say it is and

12   there are cases that say it isn't, and that's because every

13   head shake is different and it arises in the particular

14   circumstances in which it happened and it can be different

15   based on the vigorousness of it, the face the person is making,

16   the speed of it.  There's a lot of things that are going to

17   affect it.

18          So, I don't think there's going to be one case that's

19   going to say, as a matter of law, that's binding on me, that a

20   head shake is, by nature, unambiguous, or that a head shake is,

21   by nature, ambiguous.  Some courts have found them to be and

22   some courts have found them not to be.  And, so, what we have

23   to figure out is what ours is.

24          Now, is anybody of the view that additional testimony

25   is required?

1          MS. PASCHALL:  Your Honor, the government does not

2    believe additional testimony is required.  If Your Honor would

3    like to hear from the agent again, we are happy to provide him.

4    But because it is an objective standard and the video can be

5    the most objective capturer of what happened at that point in

6    time, we think Your Honor has sufficient information to make

7    that determination, based on the video that is in evidence.

8    With that said --

9          THE COURT:  And the defense had an opportunity to

10   cross-examine him about that portion of the video, and did, as

11   I understand it, at the hearing.

12         MS. PASCHALL:  Yes, Your Honor.

13         THE COURT:  All right.  Well, I -- I'm going to

14   continue to look into this between now and the time we get

15   together.  If, when I get the defendant's pleading, it's

16   sufficiently complicated or a sufficient number of new cases

17   that I don't think I'm going to be ready on the date we pick,

18   then I'll let you know.  But, I'm going to do my best.  I've

19   pretty much done nothing but think about this for a while, and

20   I'll keep thinking about it.  I think it's a close question.

21   But I think there are two things that are clear in the law, and

22   one of them is that if it is ambiguous, the officers do not

23   have an obligation to clarify, to follow up, to make sure;

24   they're allowed to keep going.  And that is Supreme Court case

25   law that follows *Miranda*.  And the other thing that's clear

1    that if it's unambiguous, they have to stop, and they didn't.

2          So the whole motion comes down to that determination,

3    it seems to me.  And so whatever you want to file on that, I

4    will read it and I will consider it and we'll have another

5    hearing on the date we set.

6          Mr. Haley?  You're looking at me like you want to ask

7    something.

8          THE COURTROOM DEPUTY:  Just looking at the calendar.

9    Northern Neck already has a 2 o'clock on the 22nd.  I'm not

10   sure how much capacity they have.

11         THE COURT:  Okay.  Well, let's keep it on that date

12   right now and you can follow up and find out whether we can

13   keep it at 2 because they have two rooms or, if they have one

14   room, if we have to move it to 3.

15         So I don't know if you all heard that, but at the

16   facility where Mr. Rodriguez is, there's someone already

17   scheduled for a 2 p.m. hearing on the date that I scheduled it.

18   So we'll continue to set it for 2, but if it has to be moved to

19   3, you'll get a minute order to that effect.

20         All right.  I'll see everybody in a little bit more

21   than a week.  Thank you very much.

22         MS. PASCHALL:  Thank you, Your Honor.

23         MR. MARTINIAN:  Thank you, Your Honor.

24         MS. LAMBROSE:  Thank you.

25                          *   *   *

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                        Dated this 14th day of December, 2021

9

10

11                        _____

12                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
13                        Room 6523
                          333 Constitution Avenue, N.W.
14                        Washington, D.C.  20001

15

16     This hearing was held telephonically in compliance with the
       COVID-19 pandemic orders and is, therefore, subject to the
17     limitations associated with the use of current technology,
       including but not limited to telephone signal interference,
18     static, signal interruptions, and other restrictions and
       limitations associated with remote court reporting via
19     telephone, speakerphone, and/or videoconferencing.

20

21

22

23

24

25