```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,      .
                                  .
             Plaintiff,           .   CR No. 21-0246 (ABJ)
                                  .
        v.                        .
                                  .
   01 DANIEL RODRIGUEZ,           .   Washington, D.C.
   02 EDWARD BADALIAN,            .   Wednesday, April 27, 2022
                                  .   2:11 p.m.
             Defendants.          .
   . . . . . . . . . . . . . . . ..


                    TRANSCRIPT OF STATUS HEARING
             BEFORE THE HONORABLE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE


      APPEARANCES:

   For the Government:            KIMBERLY L. PASCHALL, AUSA
                                  U.S. Attorney's Office
                                  601 D Street NW
                                  Washington, DC 20530
                                  (202) 252-7566

   For Defendant Rodriguez:      REBECCA A. LEVY, AFPD
                                  KATHERINE A. TANAKA, AFPD
                                  Federal Public Defender
                                  District of Nevada
                                  411 E. Bonneville Avenue
                                  Suite 250
                                  Las Vegas, NV 89101
                                  (702) 388-6577

   For Defendant Badalian:       TIGRAN MARTINIAN, ESQ.
                                  Martinian & Associates, Inc.
                                  2801 Cahuenga Boulevard West
                                  Los Angeles, CA 90068
                                  (323) 850-1900

   Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                                  U.S. Courthouse, Room 4704-A
                                  333 Constitution Avenue NW
                                  Washington, DC 20001
                                  (202) 354-3186
```

1                    P R O C E E D I N G S

2                    (Via Videoconference)

3           THE DEPUTY CLERK:  Your Honor, this afternoon this is

4    a video status conference.  We have criminal case 21-246-1,

5    United States of America versus Daniel Joseph Rodriguez, and

6    21-246-2, United States of America versus Edward Badalian.

7       Would counsel for the government please identify herself

8    for the record.

9           MS. PASCHALL:  Good afternoon, Your Honor.  Kimberly

10   Paschall for the United States.

11          THE COURT:  Good afternoon.

12          THE DEPUTY CLERK:  Counsel for Defendant Rodriguez,

13   please identify yourself and your colleagues for the record.

14          MS. LEVY:  Good afternoon, Your Honor.  Rebecca Levy,

15   Katherine Tanaka for Mr. Rodriguez.  He's present via video

16   technology.  He is in custody, Your Honor.

17          THE DEPUTY CLERK:  Will Mr. Rodriguez please place his

18   name on the record and verify that he is able to both see the

19   judge and the attorneys and hear everybody as well.

20          DEFENDANT RODRIGUEZ:  Yes.  I hope everyone is doing

21   well.  My name is Daniel Joseph Rodriguez.

22          THE COURT:  Good afternoon, Mr. Rodriguez.  I just

23   want to make sure that you have had the opportunity to talk

24   to your lawyer about the fact that you have a right to be here

25   in person right now and that you agree to proceed by video

1    given the risks involved in transportation back and forth.

2    DEFENDANT RODRIGUEZ:  Yes, I do.  Thank you, Your

3    Honor.

4    THE COURT:  All right.  And I find under the CARES

5    Act given his consent, and particularly since, with respect to

6    him, this is more of a scheduling matter than anything else,

7    that it's appropriate to proceed in that fashion.  Our court

8    standing order still requires us to try to reduce in-person

9    proceedings as much as possible.

10   THE DEPUTY CLERK:  Counsel for Defendant Badalian,

11   please identify yourself for the record.

12   MR. MARTINIAN:  Good afternoon, Your Honor.  Tigran

13   Martinian on behalf of Mr. Badalian who is present in my

14   office on my right, appearing via Zoom for this appearance.

15   THE DEPUTY CLERK:  Will Mr. Badalian please state

16   his name for the record and verify that he is able to see

17   and hear the judge and the attorneys.

18   DEFENDANT BADALIAN:  Good afternoon, Your Honor.

19   I can see you, yeah.  My name is Edward Badalian.

20   THE COURT:  Okay.  And has your lawyer also told

21   you that, since this is a hearing on a motion that you filed,

22   you have the right to be here in court in person?

23   DEFENDANT BADALIAN:  Yes.

24   THE COURT:  And do you agree to proceed by video this

25   afternoon?

 1          DEFENDANT BADALIAN:  Yes, Your Honor.

 2          THE COURT:  All right.  So I want to take up the

 3     motion to sever today, and I plan to, unless something

 4     extraordinary that I'm not expecting comes up, rule on it

 5     today.  I've thought a lot about it, but I do have a few

 6     questions I want to ask each side before I rule.

 7        With respect to Mr. Rodriguez's case, we already have

 8     a schedule set up for the filing of dispositive motions, and

 9     no one has informed me prior to today that his case has been

10     resolved.

11        I don't know if there's anything further anybody wants to

12     say to me about scheduling in this case, but since the rest

13     of this case is going to relate largely -- the hearing's going

14     to relate largely to Mr. Badalian, I just want to find out if

15     there are any issues or scheduling matters we need to discuss

16     with respect to Mr. Rodriguez.

17          MS. PASCHALL:  Not on behalf of the government,

18     Your Honor.

19          THE COURT:  All right.  Anything further, Ms. Levy?

20          MS. LEVY:  No, Your Honor.  Thank you.

21          THE COURT:  All right.  We do have a motions schedule

22     in place in this case.  If there comes a time when -- if the

23     parties have decided that there is going to be a disposition

24     in this case, should reach out to Mr. Haley; we will set the

25     date for that to take place.  I need the paperwork two days

1    in advance.  Same goes for you, Mr. Badalian.  But otherwise,

2    is there a reason to set another status date right now as to

3    Mr. Rodriguez that would be helpful?

4            MS. PASCHALL:  I don't think so, Your Honor.

5         (Audio disruption.)

6            THE COURT:  I'm very sorry.  We're having an issue

7    we thought maybe had been fixed.  I guess not.

8         Go ahead, Ms. Paschall.

9            MS. PASCHALL:  I think the plan that Your Honor has

10   laid out --

11           THE COURT:  We've lost our audio with the attempt

12   to make the noise go away.

13           MS. PASCHALL:  Can you hear me, Your Honor?

14           DEFENDANT BADALIAN:  I can hear you.

15           MS. PASCHALL:  Okay.

16           THE DEPUTY CLERK:  Can anybody say anything so we can

17   see if we've got it?

18           MR. MARTINIAN:  We are here.

19           MS. PASCHALL:  I think we can hear.

20           THE COURT:  We lost our sound.

21           MS. PASCHALL:  I think the Court cannot hear.

22           THE COURT:  It's the public phone line that tends to

23   be the problem that's acting up.

24           THE DEPUTY CLERK:  Do you want me to disconnect it,

25   Your Honor?

1          THE COURT:  Well, if that's what's giving us the

2     problem.  This courtroom is open to the public if members of

3     the press are listening and they want to come in.  But we need

4     to be able to proceed with this hearing.  So does anybody have

5     any objection to my turning off the public line right now so

6     we can consider the motion to sever and hear Ms. Paschall's

7     answer about whether we need another status date in the case

8     involving Mr. Rodriguez.

9          MS. PASCHALL:  No objection, Your Honor.

10          THE COURT:  Everybody seems to be smiling at me and no

11     one is shaking their heads.  So I don't believe anybody has

12     objections.  So we need to turn that off.  I am here in the

13     courtroom and it is open to the public.

14        And then maybe, do we need --

15          THE DEPUTY CLERK:  Do we have anybody now?

16          MS. PASCHALL:  Can you hear us?

17          THE COURT:  Yes.  Yes, we can.

18        Okay.  So we were talking about another status conference

19     in Mr. Rodriguez's case.

20          MS. PASCHALL:  I don't think that's necessary.  The

21     plan Your Honor has laid out if we do reach a disposition, we

22     can reach out to Mr. Haley.  Otherwise, we can set an

23     in-person hearing or Zoom hearing to deal with any motions

24     filed by the Rodriguez team when that comes about.

25          THE COURT:  All right.  Then what I'd like to do is

talk to you and Mr. Martinian about motion to sever.

Ms. Levy, and Mr. Rodriguez, and Ms. Tanaka, I know you have an interest in this case, so you're certainly welcome to remain, but I'm not actually going to hear argument from you all since you all did not file a motion.

On March 25, though, Defendant Badalian did file a motion to sever his case from the codefendants pursuant to Federal Rule of Criminal Procedure 14.  That's docket 96.  Government opposed it at docket 99.  I don't believe a reply was filed.

Rule 14 says, "If the joinder of offenses or defendants in an indictment, an information or a consolidation for trial appears to prejudice a defendant or the government, the Court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

In arguing that there is prejudice in this case, the defendant points out on page 4, paragraph 7 of his motion, that the law permits severance in the case of mutually antagonistic or irreconcilable defenses.  Then he does not argue at any point that there are actually irreconcilable defenses in this case, and it doesn't seem to be a basis for the motion.

He also argues, though, in paragraph 8, that evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together on a complex case and

they have markedly different degrees of culpability, this
risk of prejudice is heightened.  That seems to be the gist
of the motion here and it seems largely to relate to Defendant
Rodriguez.  Nothing in the motion refers to the other
codefendant at all, although the allegations against him are
fully laid out in the indictment.

In paragraph 4 of the motion Mr. Badalian argues that the
indictment alleges that Rodriguez told a person that he would,
quote, assassinate Joe Biden, close quote, if he got the
chance and that he "would rather die than live under a Biden
administration;" that Rodriguez pushed against Capitol police
officers, repeatedly tased another police officer, caused the
officer to lose consciousness and be hospitalized for his
injuries; threw a flagpole at the police line in the doorway
and deployed a fire extinguisher at the officers; attempted to
break a window in an office in the Capitol building by
slamming a flagpole repeatedly into the window, causing damage
to the window in excess of $1,000; verbally encouraged other
rioters to look for "intel" in the office; opened bags in the
office, rifled through papers on the desks, and subsequently
removed emergency escape hoods from the bags; carried and used
a deadly and dangerous weapon: an electroshock weapon and a
flagpole.

In paragraph 9, then he argues that the scope and level
of the violence threatened, encouraged and used by Rodriguez

prior to and during the attack on the Capitol, particularly his tasing of a Capitol police officer and his posts threatening to hang members of Congress and assassinate the president were extreme, extensive and shocking.

There's neither evidence of nor any allegations that Mr. Badalian participated in any of Rodriguez's acts or threats of violence against the president and the Capitol Police. The worst that can be said of him is that he claimed to have attacked a rioter who he believed was a member of antifa.

Given the gravity of Rodriguez's violence and threats, its shocking effect on any reasonable person, it's highly likely that the trier of fact will associate Rodriguez's acts and his degree of culpability with Mr. Badalian, and that, as a consequence, could lead the jury to conclude that Mr. Badalian is guilty.

That is the sum and substance of the motion.  There's no motion to sever counts.  There's nothing about the third defendant, and no *Bruton* issue has been raised.

I would say to counsel as we move forward in these cases, there are going to be a lot of complex issues we have to decide, and generally I'd say that I expect a little more depth in terms of a legal analysis, but the motion certainly conveyed what your concerns were.  And I agree that there is no question that it is Rodriguez and Rodriguez alone who is charged with the most serious count in the indictment.

1    But Mr. Badalian and Rodriguez together are both named

2    in multiple counts.  Count 1, indeed they're charged with

3    conspiring with each other to commit an offense against the

4    United States:  First, to corruptly obstruct and impede the

5    certification of the election, and to corruptly obstruct and

6    conceal evidence from the grand jury.

7    The manner and means of this particular conspiracy that is

8    alleged includes paragraph 21, not just encouraging each other

9    to attend the rally and being a part of their group chat, but

10   paragraph 21(b) alleges that they were "collecting weapons and

11   tactical gear including a Taser, pepper spray, baseball bat,

12   gas masks and walkie-talkies."

13   There are also a number of violent threatening statements,

14   as counsel for Badalian pointed out, made by Rodriguez within

15   the confines of their group, but he's not the only one

16   posting.  In paragraph 24 it's alleged that Badalian posted

17   his own statements online, "we need to violently remove

18   traitors."

19   In paragraph 33, he's confirming what he's gathered for

20   the group, respirators, masks, goggles, baseball helmets.

21   Paragraph 34, he rents the car to go from California to D.C.

22   Paragraph 36, he posts that he doesn't just want to fight

23   antifa, he wants to fight traitors.  They walk to the Ellipse

24   together, they walk to the Capitol together.

25   Paragraph 55, it's alleged that they entered a room of

the Capitol building with all three codefendants after rioters broke a window.

In paragraph 64 and after, it is the footage of Badalian taken by Person One that makes its way to Infowars.  Defendant Badalian is interviewed about it and learns that Person One has referred to him by his name, or at least part of his first name.  Then he and the codefendants allegedly go to see Person One in person to encourage that person to destroy the evidence, take it down from Facebook, and the defendant reminds Person One not to use his name.

Badalian is also charged with the other two defendants in Count 2, obstruction of an official proceeding; Count 3, tampering with documents to make them unavailable for the grand jury; Count 10, entering and remaining on restricted grounds, although it is only Rodriguez who is alleged to have done so armed with a deadly weapon, dangerous weapon.

Mr. Badalian is not charged in Count 4, obstruction of a law enforcement officer during a civil disorder.  That's Rodriguez.  Count 5 is a similar count involving defendant No. 3.  Count 6, Rodriguez is charged with inflicting injury on an officer.  Count 7, it is Rodriguez and defendant No. 3 that are charged with theft of government property, and there they're talking about the hoods and protective material that they found.  Count 8, Rodriguez is charged with destruction of government property; and Count 9, defendant No. 3 is charged

1   with destruction of government property.

2      So my question for you, Mr. Martinian, is given the overlap

3   in charges and evidence, why doesn't the circuit preference

4   for joint trials carry the day?

5      MR. MARTINIAN:  Your Honor, at this point, we'll submit

6   to our motion and expect that decision based on the submitted

7   motion to you.

8      THE COURT:  You don't have anything you want to say?

9      MR. MARTINIAN:  No.

10     THE COURT:  Can you just tell me, because I have not

11  re-listened to the entire interview of Mr. Rodriguez with the

12  government, whether there are any *Bruton* issues here that I

13  need to consider?

14     MS. PASCHALL:  Your Honor, there are occasional

15  mentions of the codefendant.  I think the government at this

16  point would be willing to say that we would not intend to use

17  any of those statements to avoid any *Bruton* issues.

18     THE COURT:  Okay.  Well, then I have a question for

19  you, which is important to me in terms of how to decide this

20  motion, which I seem to be taking more seriously than counsel.

21     The indictment alleges that this defendant and

22  Mr. Rodriguez talked about and prepared for a violent

23  encounter in advance.  In particular, paragraph 21(b) talks

24  about collecting weapons and tactical gear for the trip,

25  including and especially a Taser, but also pepper spray,

1    baseball bats, gas masks and walkie-talkies.

2       And I want to know what is this defendant's, Badalian's

3    alleged involvement in that?  Because when you get to

4    paragraph 33, it talks about masks, goggles and helmets, all

5    of which clearly seem to be equipment that would be needed in

6    anticipation of some sort of engagement with the police or

7    with someone else.  But they are all more I would say

8    protective equipment than offensive equipment.

9       So I want to know what the evidence is about Mr. Badalian

10   and the collection of weapons and tactical gear.

11      MS. PASCHALL:  Yes, Your Honor.  So in addition to what

12   you can see in the indictment about discussion of collection

13   of weapons, Mr. Badalian is also alleged to have collected

14   specific items from other people who are not named in this

15   indictment but who also traveled to the District of Columbia

16   for January 6.

17      Some of those items include a Taser, pepper spray, and some

18   things like goggles and things of that nature.  There's also

19   indication that Mr. Badalian purchased some additional items

20   on his own and that these are items that were collected by

21   Defendant Badalian, put in the van that was then driven across

22   the country.

23      There is not evidence, and I want to be clear, that the

24   Taser that Mr. Badalian collected is necessarily the Taser

25   that is alleged to have been used by Defendant Rodriguez.

1    That is not something that we think is evidence in the case,

2    but that a Taser was collected by Defendant Badalian for

3    transport across the country for January 6.

4        THE COURT:  Okay.  Is this case, in your view,

5    different from the typical conspiracy case where you have

6    higher-ups or gunmen joined with the others?  I mean, if you

7    look at the face of the indictment, maybe not, but what about

8    the fact that the most serious charge in the case is highly

9    inflammatory and highly emotional, it's going to involve --

10   the centerpiece of your case is going to be the testimony of

11   Officer Fanone.  It's going to be compelling.  It's going to

12   be moving.  It's going to occupy a significant portion of the

13   trial, as will Mr. Rodriguez's interview about the subject.

14       Why does that not make the case more like *Sampol* and the

15   few cases where the D.C. Circuit has said well, actually, that

16   time there was a risk of prejudice?  Why should we not be

17   concerned about that?

18       I mean, the last thing I want to have happen is to have the

19   court of appeals tell me afterwards that this case should have

20   been severed because, if you don't want to try it twice back

21   to back early on, you really don't want to try it twice years

22   later.

23       MS. PASCHALL:  Absolutely, Your Honor.  I think there

24   are a couple of things that are worth noting.  The government

25   has noted several times in its opposition the *Straker* case.

1    And that citation is 800 F.3d 570.  And we think that this

2    case is particularly akin to that case because it was a

3    conspiracy case, but it also involved some much more escalated

4    conduct by one defendant over another during the context of

5    the hostage-taking and the kidnapping.  And what we believe is

6    laid out in the *Straker* decision is a couple of things that

7    basically puts up some guardrails that keep any of that

8    inflammatory evidence of one defendant over another being so

9    prejudicial that that defendant couldn't get a fair trial.

10   And we think that these can be put in place here.

11       First of all, of course as Your Honor has noted, there

12   will be extensive testimony about Mr. Rodriguez's activities.

13   However, there is quite a bit of pre-January 6 and post-

14   January 6 activities that require coordination between these

15   two.  So we think that that is important.

16       We also believe that there are several instructions that

17   the Court could pretty easily give that would guide any jurors

18   in making sure that they are not considering the evidence

19   against Mr. Rodriguez.  And Judge Lamberth has recently --

20   actually, I guess it's not that recently.  That's from 2001.

21       But Judge Lamberth did discuss that in *United States v.*

22   *Gray*, which was affirmed by the D.C. Circuit in 2011, that

23   unless there is a great disparity in the evidence, that a

24   curative instruction and appropriate voir dire is available

25   to make sure that no prejudice is disbursed to the second

1    defendant.

2        Quite a bit of the general January 6 evidence is also going

3    to be required.  So I think while Your Honor is absolutely

4    correct that some of the more inflammatory, I suppose,

5    testimony will come about the assault on the police officer,

6    there is so much that we expect to present in this case that

7    will talk about both defendants.

8        And that event, the tasing of the officer, plus the other

9    charges that Mr. Rodriguez is charged in that are different,

10   that don't apply to Mr. Badalian, to include the attempted

11   breaking of the window and the theft, are so unique and easily

12   identifiable that we will be able to make clear who is doing

13   what.

14       I believe it's the *Celis* case that addresses that if the

15   government is using some more complex securities regulations,

16   tax documents, financial documents, that can be more difficult

17   for a jury to separate out, whereas when the government is

18   presenting tape recordings, video recordings, live evidence,

19   that that is much easier.

20       As we noted in our motion, the defendants are wearing

21   different things on January 6, they're in different areas

22   except when they are all together in the same room of the

23   Capitol.  And we believe that is going to make it clear to

24   the jury exactly who is being charged with what.

25       Your Honor mentioned the *Sampol* case.  That one does

1    represent a much greater disparity because I believe the only

2    charges against Defendant Sampol were making false statements

3    and the other defendants were conspiring to assassinate I

4    believe the Chilean ambassador.  So that is a much greater

5    disparity when that defendant himself is not charged with

6    taking any of the proactive steps that we would normally see

7    in a conspiracy indictment.

8        That is just not the case here.  Defendant Badalian is

9    tasked with many of the proactive steps in the conspiracy.

10   He's tasked with being on the grounds on January 6, with

11   entering the building itself, and then with everything that is

12   in the second obstruction count after the fact.  So we don't

13   think the disparity is so great as it is in *Sampol* to warrant

14   severance here.

15           THE COURT:  All right.  It is your motion,

16   Mr. Martinian.  Is there anything you would like to say in

17   response?

18           MR. MARTINIAN:  No, Your Honor.

19           DEFENDANT BADALIAN:  I would like to say something.

20           THE COURT:  Well, actually, you have to discuss that

21   with your lawyer before you talk to me, because he may have a

22   point of view about whether you should directly address the

23   Court.  But I'll give you two a chance to mute your video and

24   mute your audio and talk to each other, and then you can come

25   back and let me know if there's anything further you want to

1    say.

2            MR. MARTINIAN:  Thank you, Your Honor.  If I may.

3            THE COURT:  Go right ahead.

4        (Defendant and counsel conferring.)

5            MR. MARTINIAN:  Thank you, Your Honor.

6            THE COURT:  All right.  Is there anything further you

7    would like to add?

8            MR. MARTINIAN:  No, Your Honor.

9            THE COURT:  All right.  I need to take a very brief

10   break, about five minutes, just to organize my thoughts and

11   plug some of what's been said into what I was going to say.

12   I would really appreciate it if no one cuts off their

13   connection; but you're welcome to sort of continue to do

14   other things while I'm missing, and I will be back shortly.

15   Thank you.

16       (Recess from 2:36 p.m. to 2:51 p.m.)

17           THE DEPUTY CLERK:  Your Honor, recalling Criminal Case

18   No. 21-246-1 and -2, United States of America v. Daniel

19   Rodriguez and Edward Badalian.  We have Ms. Paschall for the

20   government.  Representing Mr. Rodriguez we have Ms. Levy and

21   Ms. Tanaka.  And representing Mr. Badalian we have Mr.

22   Martinian.

23           THE COURT:  All right.  Thank you for your patience.

24   According to the law in this circuit as set forth in *United*

25   *States v. Perry*, 731 F.2d 985 at page 989, the indictment or

information may charge two or more defendants if they are
alleged to have participated in the same act or transaction,
or in the same series of acts or transactions, constituting
an offense or offenses.  That's Federal Rule of Criminal
Procedure 8(b).  When there are two or more defendants, Rule
8(b) controls the joinder of both offenses and defendants.

There is a preference in the federal system for joint
trials of defendants who are indicted together, as joint
trials promote efficiency and avoid inconsistent verdicts.
The Supreme Court said that in *Zafiro v. United States*, 506
U.S. 534 at page 537 in 1993.  D.C. Circuit also reiterated
in *United States v. Tucker*, 12 F.4th 804, at page 824.

It also said in *United States v. Wilson*, 605 F.3d 985 at
page 1016, in 2010, "this preference is especially strong when
the respective charges require presentation of much of the
same evidence, testimony of the same witnesses, and involve
multiple defendants who are charged with participating in the
same illegal acts."

The D.C. Circuit has consistently held that parties who are
properly indicted together should normally be tried together.
Said that in *Tucker*, 12 F.4th at 824, *United States v. Mason*,
951 F.3d 567 at 576, and the *United States v. Robinson*, 432
F.2d 1348 at 1351, when the circuit said "joinder expedites
the administration of justice, reduces the congestion of trial
dockets, conserves judicial time, lessens the burden upon

citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once."

But even where joinder is proper under Rule 8(b), a court may grant a severance if joinder "appears to prejudice either a defendant or the government," according to Rule 14(a) and also *Zafiro* at page 538.

However, the rule in this circuit is that a district court should grant severance "sparingly." Circuit said that in *United States v. Celis*, 608 F.3d 818 at page 844 in 2010, and the Supreme Court said you should do it in *Zafiro* at page 539 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence."

A joint trial may be inappropriate where the party moving for severance shows that the evidence against one defendant is "far more damaging" than the evidence against the other defendant because the prejudicial spillover may deprive a defendant of a fair trial. That's *United States v. Tarantino*, 846 F.2d 1384, 1398, from 1980.

But even if prejudice can be shown, Rule 14 doesn't require severance. *Zafiro* makes that clear as well at pages 538 to 39, and the *Tucker* court said in 12 F.4th at 825, "even in cases where the risk of prejudice is high, less drastic

measures, such as limiting instructions, often will suffice
to cure any risk of prejudice."

The decision to sever falls within the discretion of the
trial court, and the balance is generally to be struck in
favor of joint trials.  The circuit laid that down in *United
States v. McGill*, 815 F.3d 846 at page 924 in 2016.

Here the defendants were properly joined pursuant to
Rule 8.  There is evidence to support the existence of the
alleged conspiracy, and a properly charged conspiracy is a key
fact the D.C. Circuit has considered when upholding decisions
not to sever defendants, as in *Tarantino* or *Straker*.

There is significant overlap among the charges and the
evidence, and the Court is also -- the circuit has also found
that to be a factor in upholding decisions not to sever.  For
instance, the *United States v. Sutton*, 801 F.2d 1246 from the
D.C. Circuit in 1986.

Here the two defendants planned to go together, decided
what needed to be bought together, both obtained necessary
equipment, or at least Mr. Badalian did.  Both were stoking
themselves up and members of the group up with threats to do
violence.  I don't find that aspect of the case, that is that
Rodriguez made a statement about the president, to be
particularly differentiating since Badalian is talking about
attacking traitors too.

They go to D.C. together.  They go to the Capitol together.

1   They enter the Capitol together.  They depart D.C. together.

2   And there's considerable overlap in the charges and the

3   evidence that would be introduced for the purposes of the

4   obstruction count involving the obstruction of the official

5   proceeding, that is, the certification of the votes, and

6   there's absolutely no daylight between the defendants

7   whatsoever for purposes of the evidence that's going to

8   be introduced for the obstructing the grand jury count.

9       So the decision to be made comes down to the assault on

10  the police officer.  After reading the motion and considering

11  the motion, I was actually divided in my own mind.  I find

12  the evidence concerning the tasing to be particularly

13  inflammatory, and I was concerned about the prejudice that it

14  could generate, notwithstanding the fact that I believe that

15  the case law pretty clearly establishes that a denial of the

16  motion to sever would be upheld on appeal.

17      So critical to me was the question that I asked

18  Ms. Paschall about whether Defendant Badalian was personally

19  involved in the acquisition of offensive weapons, in which

20  case he would have not only taken active steps to prepare for

21  entering the Capitol, but to prepare in a way that anticipated

22  and enabled the potential use of force, not just protecting

23  yourself from force, and indeed the type of force against

24  which those that the defendants deemed to be "traitors" as

25  opposed to antifa.  It's quite clear who it was that they

1    thought they were going to get into a tussle with.

2        And here we find that there's evidence not just of

3    preparation being made to protect themselves from the

4    deployment of chemical weapons against them with such things

5    as goggles and masks, or even the deployment of physical

6    weapons against them by the use of helmets, but we have the

7    acquisition of something that could be used as a weapon

8    against someone else.

9        So I have to resolve, knowing that, the question of whether

10   there's a "serious risk that a joint trial would compromise a

11   specific trial right of one of the defendants, or prevent the

12   jury from making a reliable judgment about guilt or

13   innocence."

14       It is not unusual to have a case in which one defendant

15   is charged with doing something more serious that the others

16   didn't, a robbery or a drug conspiracy where one was the

17   gunman or even assaulted someone and no one else did.

18       In *United States v. Celis*, 608 F.3d at 844, the Court

19   upheld the denial of one defendant's motion for severance,

20   which was based on the fact that his codefendant was a member

21   of the FARC while he was not, and the Court rejected the

22   argument that the evidence related to the atrocities that

23   that group had perpetrated was prejudicial because it said,

24   "Juries are capable of determining the guilt or innocence

25   of an individual tried alongside others when the prosecution

presents independent and substantial evidence regarding each

defendant's culpability."

It noted that the jury could assess the moving defendant's

personal culpability because it heard a significant amount of

evidence related to his own unlawful acts separate and apart

from the evidence about the codefendants and the FARC,

including "ample evidence" of the defendant's "personal

involvement in the conspiracy," such as arranging an important

meeting, conveying important information, participating in the

plan to ship and the shipping of cocaine to the United States.

Plus the trial court had instructed the jury to base its

evaluation of each defendant's guilt on his or her own

conduct, not that of the FARC.

Similarly, in *United States v. Mejia*, 448 F.3d 436 at pages

446 to 447, the D.C. Circuit upheld the trial court's denial

of a motion to sever because while "the bulk of the trial

evidence concerned the codefendant Mejia rather than the

moving defendant, the Court concluded "a jury could reasonably

compartmentalize the evidence introduced against each

individual defendant" and the government introduced

"independent and substantial evidence" against the moving

party.  The Court instructed the jury to "give separate

consideration and to render separate verdicts with respect to

each defendant."

Here we have a situation where this defendant was as much

a cheerleader for violence in advance as Rodriguez, he engaged
in some violence of his own on the site, although it was not
directed at an officer, and he was actively engaged in
gathering supplies needed for a violent encounter.

We are required to presume that jurors will follow
instructions, and they will be clearly instructed here, as
codefendants always are in this courtroom, that they must
consider the evidence against each individual defendant
separately.  And jury instructions are not the only guardrail.
We also have the verdict form which will make it very clear
exactly what it is the jurors are supposed to do.

The strongest case for the defendant here is *United States
v. Sampol*, 636 F.2d 621 from the D.C. Circuit in 1980.  It was
the prosecution involving the murder of Orlando Letelier, the
leader of the opposition to the reign of Augusto Pinochet of
Chile, and his colleague Ronni Moffitt, on the streets of the
District of Columbia.

Several defendants were charged in a joint trial, and the
D.C. Circuit held that Defendant Ignacio should have been
severed from the others.  It said that his joint trial "on
counts of false statements to the grand jury and misprision
of a felony with the codefendants" who were charged with the
conspiracy to commit the assassination and the murders was
improperly prejudicial to Ignacio.

Why is that?  Well, what you've just heard is the charges

themselves all involved activity that took place after the significant aspect of the case; the crime itself, the murder itself, the planning of the murder, and the implementation of it had already taken place.

The trial court -- the court of appeals held that trial court should have severed Ignacio when "during the trial it became apparent that Ignacio's guilt or innocence might well be confused with that of his codefendants," and the Court held that "not only the weight of the evidence, but also the quantity and type of evidence to be adduced against codefendants, is a vital consideration." So here we do have the problem of a certain type and quantity that's different.

But, what were the reasons for the holding by the D.C. Circuit? First of all, the Court noted that although Ignacio was not charged with the murder or the conspiracy, his name and his role as a leader of the member of the Cuban Nationalist Movement was repeated prominently during the conspiracy count, and there was a lot of evidence that implicated that organization, and it led to some confusion about whether the defendant, that defendant, was being charged with conspiracy or he wasn't.

But here the defendant is alleged to be a member of the conspiracy. So we're not talking about confusion of that nature.

Second of all, the court of appeals found that the joint

trial involved grossly disparate charges and evidence.
The other defendants were charged with a violent bombing that
killed two people, "the gory details of which were described
with extreme accuracy to the jury."  Yet Ignacio was only
charged with false statements and misprision of a felony.

The Court also relied heavily on the Watergate case of *United
States v. Mardian*, 546 F.2d 973, where one of the defendants had
been charged jointly with three of the principal members of the
Watergate conspiracy, all of whom had played much more
substantial roles in the crime over much longer periods.

I feel like I'm giving everybody a history of this courthouse
and what has happened here before January 6th ever got here.
We've had a lot of big-time stuff before.

The circuit court reversed the conviction of the defendant
because "his alleged involvement was very minimal in the early
days of the conspiracy" -- not the situation here -- "and he was
not charged with any activity during the last two years of the
conspiracy," and characterized his role as "far smaller" than
the role of the others.  Also, there was considerable testimony
about events that occurred after Mardian had voluntarily
withdrawn from the conspiracy, if he'd ever been a member -- and
none of that is a factor here.

So we don't have the danger of association with a murderous
group, no allegation of acts done by a co-conspirator after this
defendant withdrew, and that decision was made after the trial,

1    but right now no one has indicated that I could anticipate a

2    point where the jury could become confused by the defendant's

3    role.

4        As the government noted, unlike the extraordinary event that

5    took place on Embassy Row in 1976, we have the defendants on

6    video.  The jury will always know who we're talking about and

7    who is who.

8        And when you talk about the spillover effect, it will always

9    be very clear in this case that the only person charged with

10   assaulting Officer Fanone is Danny Rodriguez and not

11   Mr. Badalian.

12       So I don't find, while I think this motion was worth filing

13   and it bore close consideration, I don't find that the acts are

14   grossly disparate as in *Sampol*.  This defendant is an alleged

15   co-conspirator and his activities at the beginning were as

16   significant if not more significant than those of Defendant

17   Rodriguez.  Both defendants engaged in the pre-planning, the

18   acquisition of the necessary equipment for dangerous engagement

19   with the police.

20       And one factor in the appellate ruling in *Sampol*, in that

21   case there was a lack of "a clear distinction between the

22   different defendants and the evidence against them."  We are not

23   going to have that problem.  I think it will be clear that

24   Mr. Badalian isn't being charged with the attack on Officer

25   Fanone.  The jury will be properly instructed.  There will be a

1    properly crafted verdict form.  And therefore the motion will

2    be denied.

3       Given the strong preference in this circuit and all of the

4    case law favoring keeping joined defendants joined, and all of

5    the evidence and particularly the evidence about the preparation

6    beforehand, the acquisition of weapons, and specifically a

7    Taser, even if it is not alleged to be the Taser, these all

8    affected my ruling and would have affected my ruling whether

9    counsel had argued and repeated what he put in his motion or

10    whether he submitted on his papers.

11       So, therefore, the motion is denied.  I believe we have

12    schedule for moving forward for other dispositive motions.

13       Is there anything further I need to do in the government's

14    view with respect to Mr. Badalian at this time?

15       MS. PASCHALL:  Your Honor, I just wanted to reiterate

16    that we believe the reason for tolling STA that has been

17    present for the last few months, as we look for the third

18    codefendant, is still in play here now that this motion is

19    no longer tolling STA for Defendant Badalian.

20       THE COURT:  All right.  I agree with that, but I do

21    think it would be appropriate for you to file another status

22    report with me about what's going on with that situation.

23    I'll give you a week to do it.  And if you need to file it

24    under seal, you can, and then we can figure out what portions

25    can and should be disclosed to the defendants, because I think

1    they're entitled to know if there's information that might

2    prompt them to take some action or file some motion.

3                MS. PASCHALL:  Yes, Your Honor.

4                THE COURT:  Mr. Martinian, is there anything further

5    that I need to take up on behalf of Mr. Badalian at this time?

6                MR. MARTINIAN:  No, Your Honor.

7                THE COURT:  All right.  And I think I already asked you

8    this, Ms. Levy, but is there anything further I need to take

9    up on behalf of Mr. Rodriguez at this time?

10               MS. LEVY:  No, Your Honor.

11               THE COURT:  Okay.  All right.  Thank you very much,

12   everybody.

13               DEFENDANT BADALIAN:  Thank you, Your Honor.

14          (Proceedings adjourned at 3:10 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter. *

_/s/ Bryan A. Wayne_
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance
with U.S. District Court standing order(s) during the COVID-
19 pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion or audiovisual interference.