UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-CR-246 (ABJ)** |
| | : | |
| DANIEL RODRIGUEZ, et. al., | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS COUNTS TWO, THREE AND TEN OF THE INDICTMENT

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this omnibus opposition to the defendants' motions

to dismiss several counts in the Indictment. ECF No. 65. Specifically, the defendants challenge the

counts charging them with Obstruction of an Official Proceeding, in violation of 18 U.S.C.

§ 1512(c)(2); Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1);

and Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C.

§§ 1752(a)(1). ECF Nos. 106 and 108.

Several courts in this district have recently written opinions rejecting many, if not all, of

the challenges defendants raise here. *See United States v. Griffin*, 549 F. Supp. 3d 49, 54 (D.D.C.

2021) (denying motion to dismiss 18 U.S.C. § 1752(a)(1)); *United States v. Sandlin,* 21-cr-88

(DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021)(denying motion to dismiss 18 U.S.C.

§ 1512(c)(2)); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20,

2021) (same); *United States v. Montgomery,* 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec.

28, 2021) (same); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec.

21, 2021) (denying motion to dismiss 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1752(a)(1)); *United*

*States v. Nordean,* 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021)(same); *United*

*States v. McHugh,* 21-cr-453 (JDB), 2022 WL 296304 (D.D.C. Feb. 1, 2022) (same); *United States v. Andries*, 21-cr-93 (RC), 2022 WL 768684 (D.D.C. Mar. 14, 2022) (same); *United States v. Puma*, 21-cr-454 (PLF), 2022 WL 823079 (D.D.C. Mar. 19, 2022) (same); *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163 (D.D.C. May 25, 2022) (same); *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 1302880 (D.D.C. May 2, 2022)(denying motion to reconsider the motion to dismiss 18 U.S.C. § 1512(c)(2)); *but see United States v. Miller*, 21-cr-119 (CJN), 2022 WL 823070 (D.D.C. March 7, 2022) (granting motion to dismiss obstruction count). There is no reason for this Court to differ here. The Court should deny all the pending motions to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants Rodriguez and Badalian are charged in a ten-count indictment, charging them with acts before, during, and after the January 6, 2021 siege on the U.S. Capitol building and grounds. ECF No. 65. A recitation of the relevant facts as can be found in the Indictment, in the Government's Opposition to Badalian's Motion to Sever (ECF No. 99), and in the Government's Memorandum in Opposition to Rodriguez's Motion to Suppress (ECF No. 42).

Consistent with the Scheduling Order in this case (Minute Order February 24, 2022), defendant Badalian filed a motion to dismiss Counts Two, Three and Ten on May 20, 2022 (ECF No. 106) ("Badalian Mot.") and defendant Rodriguez filed a motion to dismiss Counts Two and Three on May 27, 2022 (ECF No. 108) ("Rodriguez Mot."). The government now opposes each motion.

## ARGUMENT

Defendants' challenges to Count Two (Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2)), Count Three (Tampering with Documents or Proceedings, in violation

of 18 U.S.C. § 1512(c)(1)), and Count Ten (Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)) all lack merit.

## I.      Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An "indictment's main purpose is to inform the defendant of the nature of the accusation against him." *United States v. Ballestas*, 795 F. 3d 138, 148–49 (D.C. Cir. 2015) (citation omitted). Because dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury," however, "dismissal is granted only in unusual circumstances." *Ballestas*, 795 F. 3d at 148 (internal quotation marks omitted). "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

## II.     The Court Should Deny Defendants' Motion to Dismiss Count Two (Obstruction of an Official Proceeding, in Violation of 18 U.S.C. § 1512(c)(2)) and Count Three (Tampering with Documents and Proceedings, in Violation of 18 U.S.C. § 1512(c)(1))

Defendants argue that Count Two, charging a violation of 18 U.S.C. § 1512(c)(2), should be dismissed for two primary reasons: 1) Congress's certification of the Electoral College vote is not an "official proceeding," Badalian Mot. at 9-14; Rodriguez Mot. at. 18-25, and 2) the statute is unconstitutionally vague as applied, particularly with respect to the word "corruptly." Badalian Mot. at 14-19; Rodriguez Mot. at 45-52. Therefore, they argue, the conduct of these defendants does not fall within the scope of the statute. Badalian Mot. at 8; Rodriguez Mot. at 19, 38. Further, to the extent these arguments regard statutory language that is duplicated in 18 U.S.C.

§ 1512(c)(1), Count Three should similarly be dismissed. Badalian Mot. at 14-19; Rodriguez Mot.
at 45-52.   As set forth below, and as this Court and other judges in his district have held, these
arguments lack merit.

### A.      The certification of the Electoral College vote is an official proceeding

Section 1512(c)(2) of Title 18 of the U.S. Code provides that "[w]hoever corruptly . . .
obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under
this title or imprisoned not more than 20 years, or both." The defendants argue that Congress's
certification of the Electoral College vote on January 6, 2021, does not qualify as an "official
proceeding" for purposes of 18 U.S.C. § 1512(c)(2) because it does not concern the
"administration of justice." Badalian Mot. at 9-13; Rodriguez Mot. at 24-25. Their arguments are
contrary to the plain text of the statute and every decision in this district considering the issue. *See
Sandlin,* 2021 WL 5865006, at *3–*10; *Caldwell*, 2021 WL 6062718, at *4–*7; *Mostofsky*, 2021
WL 6049891, at *9–*10; *Montgomery*, 2021 WL 6134591, at *4–*10; *Nordean,* 2021 WL
6134595, at *4–*6; *McHugh,* 2022 WL 296304, at *7-*8; *Miller*, 2022 WL 823070, at *5; *Andries*,
2022 WL 768684, at *6- *7 ; *Puma*, 2022 WL 823079, at *7 - *9;   *Bingert*, 21-cr-91, ECF No.
67, at 7-8.

### 1.      Background

The Constitution and federal statutory law require that both Houses of Congress meet to
certify the results of the Electoral College vote. Two separate provisions in the Constitution
mandate that the Vice President while acting as the President of Senate "shall, in the Presence of
the Senate and House of Representatives, open all the Certificates, and the Votes shall then be
counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a
Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock
in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C.

§ 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House (who are required to read them "in the presence and the hearing of the two Houses"), ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which the defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined, in relevant part, as "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B) (emphasis added).

### 2.    Certification of the Electoral College vote is a proceeding before the Congress

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. *See Caldwell*, 2021 WL 6062718 at * 4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral College vote."). Skipping past the text, the defendants argue that Congress's intent and other language and structural features of the obstruction statute import a requirement that the proceeding be adversarial

in nature and related to the administration of justice. Badalian Mot. at 11; Rodriguez Mot. at 24-25. That argument is incorrect.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com). The defendants do not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding under that broad definition. And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly. While subsection (B) refers only to proceedings "before the Congress," other subsections encompass judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance." 18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies. *See Puma*, 2022 WL 823079, at *5 (collecting cases). This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "proceeding" (11th ed. 2019). Taken with its modifier "official," the term proceeding thus

"connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512"). For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including some cases relied upon by the defendants—courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (holding that FBI investigation was not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170–72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (holding that internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (holding that internal investigation conducted by Customs and Border Patrol was not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (holding that investigation conducted by Bureau of Alcohol, Tobacco, and Firearms was not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added); *Montgomery*, 2021 WL 6134591, at *9 (concluding that "the most sensible reading of Section 1515 is that the term 'official proceeding' refers to "the business conducted by an official body that has formally convened for the purpose of conducting that business") (citation omitted).

   Defendants cite *Ermoian* and *Ramos,* but claim that what these cases actually require is

that the conduct interfere with the proceeding that affects the "administration of justice." Badalian Mot. at 10; Rodriguez Mot. at 23. Defendants misinterpret their own citations, which hold that ongoing law-enforcement or internal agency investigations are not "official proceedings" not because they do not involve the "administration of justice," but because "[t]hey are not formal hearings conducted before official bodies." *Sandlin*, 2021 WL 5865006, at *3. Moreover, none of these cases involved "a proceeding before the Congress," and they do not undermine the government's position because "an ongoing law enforcement investigation of a criminal enterprise bears no resemblance, as a matter of form or content, to the official process mandated by the Twelfth Amendment and the Electoral Count Act for certifying the electoral vote for President and Vice President." *Montgomery*, 2021 WL 6134591, at *6.

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true of the certification of the Electoral College vote, which is expressly mandated by the Constitution and federal statute.

Required by law to begin at 1 p.m. on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the

"Hall." *See* 3 U.S.C. § 16 (describing where various officials must sit). The certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).[1] Judges in this district have accordingly concurred. *See, e.g., Montgomery,* 2021 WL 6134591, at *10; *Sandlin,* 2021 WL 5865006, at *3–*4; *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2)); *Caldwell,* 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets the definition of an 'official proceeding.'"); *Nordean,* 2021 WL 6134595 at *5 ("the certification is therefore a 'series of actions' that requires 'some formal convocation,' making it a 'proceeding before the Congress,' 18 U.S.C. §1515(a)(1)(B), and thus an 'official proceeding.'"); *Andries*, 2022 WL 768684, at *7 ( holding a "'proceeding before the Congress,' 18 U.S.C. § 1515(a)(1)(C), extends to formal convocations of Congress for the purpose of conducting official business…and that the January 6th, 2021 joint session of Congress to certify the electoral vote was such a proceeding.")

---

[1] Defendants contend that the certification is "merely ceremonial," an argument that should come as a surprise to the thousands of rioters who descended on the Capitol believing otherwise. Badalian Mot. at 11; Rodriguez Mot. at 25. Chief Judge Howell recently rejected this claim in an oral ruling denying a January 6 defendant's motion to dismiss. *United States v. DeCarlo*, 1/21/22 Tr. at 35–36. So did Judge Bates. *McHugh,* 21-cr-453, ECF No. 51, at 17–18. Contrary to defendants' arguments, "it is inaccurate to characterize the Certification that occurred on January 6 as a purely ministerial, legislative vote-counting event." *Caldwell,* 2021 WL 6062718*,* at *7 (citation omitted). That is because, as explained above, Congress convenes to render judgment on the votes cast by electors; parties may lodge objections, and each House must consider the objection and make a decision whether to overrule or sustain it.

### 3.   The proceeding before the Congress is not limited to proceedings "affecting the administration of justice"

The defendants improperly ask this Court to add a limitation to the definition and interpret "official proceeding" to mean only proceedings that "resemble a formal tribunal." Badalian Mot. at 11; Rodriguez Mot. at 23. As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of Congress.

Defendants claim that the statute's title, "Tampering with a victim, witness, or informant" (Badalian Mot. at 11; Rodriguez Mot. at 38), supports their position, but that title pre-dates the passage of Section 1512(c)(2) by almost 20 years. *See* Victim and Witness Protection Act of 1982 (VWPA), Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249–50. "When Congress enacted Section 1512(c)(2), that title was already included in the codification." *Montgomery*, 2021 WL 6134591, at *15 (citing 18 U.S.C. § 1512 (2000)). "The title of the section of the legislation that added Section 1512(c), in contrast, was 'Tampering with a record *or otherwise impeding an official proceeding.*'" *Id.* (citing Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (emphasis added)). As Judge Moss found, "Section 1512(c)(2)'s title in the U.S. Code is unenlightening, and the title under which it was enacted arguably supports a broader reading of the statute." *Id.*

Defendants' argument finds no textual support when applied to Section 1515(a)(1)(B), moreover, which speaks broadly of a proceeding "before the Congress." Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency.   Further, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and

subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to limit the obstruction prohibition under Section 1505 to congressional investigations, it could have done so in the text of Section 1515(a)(1)(B). *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.") But "Congress did not select this narrow construct when it enacted section 1512(c)." *Caldwell*, 2021 WL 6062718, at *5. Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505. "That Congress decided to incorporate into section 1512(c) an existing definition of 'official proceeding' that broadly includes 'a proceeding before Congress,' as opposed to one limited to its 'power of inquiry,' is therefore consequential." *Id.*

Defendants argue that other provisions in Chapter 73 relate to the administration of justice, such as 18 U.S.C. § 1503 (influencing or injuring a juror), and that Section 1512(c)(2) should be similarly limited. Badalian Mot. at 13; Rodriguez Mot. at 24-25. This only proves the government's point: Congress knows how to draft statutes that relate to the administration of justice, and it did not do so here. Even *Yates v. United States,* 574 U.S. 528 (2015), upon which defendants rely, contradicts their argument: the *Yates* plurality observed that Section 1512(c)'s placement within chapter 73 was consistent with its role as a "broad proscription" on obstructive acts, not a narrowed reading. *Yates,* 574 U.S. at 541 (plurality opinion).

Defendants' arguments cannot overcome the plain and unambiguous meaning of the statute. The broader reference to a "proceeding before the Congress" in Section 1515 includes the Electoral College vote certification. All the courts in this district who have recently considered the

issue have so held. *See, e.g., Caldwell*, 2021 WL 6062718 at *5 ("Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at *4 ("[T]he Court will not read an "administration of justice" requirement into "official proceeding."); *Puma*, 2022 WL 823079, at *8 ("[I]f Congress had intended to limit Section 1512(c)(2) to adjudicative or court-like proceedings, it would have used different words to do so.").[2]

### 4.      *Yates v. United States* and legislative history do not limit the meaning of Section 1512(c)(2) to proceedings involving document destruction or "the administration of justice"

The defendants rely on flawed legislative history and misread *Yates v. United States* to argue that the Electoral College vote is not an "official proceeding" under the misguided belief that Section 1512(c), in its entirety, is aimed at "preventing corporations from destroying records relevant to a federal hearing related to the administration of justice." Badalian Mot. at 13; Rodriguez Mot. at 35. Defendants again err by avoiding Section 1515's text. To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). And because construing Section 1512(c)(2) to reach defendants' conduct would neither "frustrate Congress's clear intention" nor "yield patent

---

[2] Moreover, "even if there were a quasi-adjudicative or quasi-judicial requirement, the certification would 'pass the test.'" *Nordean,* 2021 WL 6134595, at *12. The certification is "one of the very few congressional proceedings that actually is adjudicative." *McHugh,* 21-cr-453, ECF No. 51, at 17.

absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted). The defendants offer no rationale for looking past the statute's plain text to reach for other interpretive tools. *See McHugh,* 21-cr-453, ECF No. 51, at 16 (declining to use "vague notions of a statute's basic purpose" or Congress's "expectations" to impose an "extra-textual limitation" on the actual text of Section 1515 and 1512(c)(2)).

One of those tools is legislative history, which should be given little weight here, and which defendants mischaracterize in any event. Defendants quote from the Senate Judiciary Committee's description of the "Act's purpose," as punishing persons "who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations," Badalian Mot. at 12; Rodriguez Mot. at 10, (quoting S. Rep. No. 107-146, at 2 (2002)), but fail to mention that the version of the legislation the committee was discussing did not include Section 1512(c)(2) (which was added two months after the act was reported out of committee, as a floor amendment). *Montgomery,* 2021 WL 6134591, at *15–*16 (citing 148 Cong. Rec. S6542 (daily ed. July 10, 2002)). Relatedly, defendants argue that "nothing in the legislative history" supports that Section 1512(c)(2) applies to the broader purpose that would bring the offense conduct within scope, Badalian Mot. at 12; Rodriguez Mot. at 43, but they fail to mention that the legislative history regarding Section 1512(c)(2), regarding *any of its applications,* is scant in general and of little value here, given that Section 1512(c)(2) was not added until after the bill was reported out of committee. *See Montgomery,* 2021 WL 6134591, at *15 (observing that "[b]ecause Section 1512(c)(2) did not originate in a committee, there is little legislative history that sheds light on the purposes of that particular provision. And what little history exists should not be given much

weight").[3] After Senator Lott offered the floor amendment that included Section 1512(c), Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence." 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). This passing reference is not a basis to limit the statute.

Relying on the Supreme Court's decision in *Yates*, defendants also contend that Section 1512(c)(2) targets only corporate malfeasance and is "trained [] attention on corporate and accounting deception and cover-ups." Badalian Mot. at 12. As Judge Moss recently found, *Yates* is "inapt." *Montgomery,* 2021 WL 6134591, at \*13–\*15 (distinguishing *Yates*). The statute at issue in *Yates* was 18 U.S.C. § 1519, which prohibits altering, destroying, and concealing records, documents, and tangible objects. *See Yates*, 574 U.S. at 532 (plurality opinion). *Yates* held that the term "tangible object" as used in Section 1519 included only an object "used to record or preserve information," and thus did not encompass the undersize red grouper that the defendant in *Yates* had discarded. *Id.* In reaching that conclusion, the plurality compared Section 1519 with Section 1512(c)(1), which similarly prohibits altering, destroying, or concealing evidence in connection with an official proceeding. Congress enacted both Sections 1519 and 1512(c) as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745, but drafted Section 1512(c)(1) to reach more broadly than Section 1519. *See Yates*, 574 at 543–45; *see also Id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it."); *Caldwell*, 2021 WL 6062718 at \*15–\*18 (rejecting defendants' arguments that *Yates* narrows the reach of Section 1512(c) based, in part, on the statute's legislative history, title, and placement within Chapter 73 of Title 18)).

---

[3] The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, relates to limitations under the pre-existing prohibition in Section 1512(b), which made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally." S. Rep. No. 107-146, at 6–7.

Section 1512(c)(2) expands the obstruction prohibition beyond the focus on document destruction in Sections 1519 and Section 1512(c)(1). *See United States v. Ring*, 628 F. Supp. 2d 195, 225 (D.D.C. 2009) ("[Section] 1512(c)(2)'s application is not limited to the destruction of documents."). Its application to a defendant who "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding," § 1512(c)(2), "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (affirming conviction under Section 1512(c)(2) for false statements) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)). Courts have repeatedly upheld its application to obstructive acts that reach beyond the impairment of financial records. *See id.* (collecting cases concerning violations of Section § 1512(c)(2) by virtue of the use of false statements); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (upholding conviction under Section 1512(c)(2) for disclosing the identity of an undercover federal agent to thwart a grand jury investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (upholding conviction under Section 1512(c)(2) for providing false testimony to a grand jury); *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (upholding conviction under Section 1512(c)(2) for the burning of building to conceal two bodies of murder victims).

Moreover, to the extent that defendants suggest that the outcome in *Yates* was dictated by the general purpose of the Sarbanes-Oxley Act, Badalian Mot. at 12-13, that is incorrect: the plurality used a range of tools of construction to narrow the statute at issue, of which legislative history was only one, and Justice Alito, the decisive fifth vote, did not refer to Sarbanes-Oxley's

purpose at all.[4] As Judges Mehta and Moss have recently explained, the contextual features, including legislative history, that influenced the *Yates* plurality to narrow Section 1519, are absent in Section 1512(c)(2). *See Caldwell,* 2021 WL 6062718, at *15–*18; *Montgomery,* 2021 WL 6134591, at *13–*18.

Furthermore, while Section 1512(c) may have been enacted due to concerns over document destruction and corporate malfeasance, "[s]tatutes often reach beyond the principal evil that animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means *other than* document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

### B. The defendants' conduct falls squarely within the scope statute, despite the ruling in *United States v. Miller*.

Defendants argue that 18 U.S.C. 1512(c)(2) proscribes discrete conduct, and their conduct falls outside the scope of the statute—an argument based primarily on Judge Nichols's holding in

---

[4] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's narrower concurrence represents the binding holding as the narrowest opinion among those concurring in the judgment. *See Id.* at 193. In *Yates,* Judge Alito relied on "the statute's list of nouns, its list of verbs, and its title," but did not discuss the purpose of the Sarbanes-Oxley Act. *See* 574 U.S. at 549. Defendants thus err by suggesting that the plurality's reasoning in *Yates*, such as its reference to the purpose of the Sarbanes-Oxley Act, is binding. *See* ECF No. 54, at 18 (citing plurality opinion).

*United States v. Miller*, 21-cr-119 (CJN), 2022 WL 823070 (D.D.C. March 7, 2022). Rodriguez

Mot. at 27-43. This argument, too, must fail.

Focusing on the word "otherwise" in Section 1512(c)(2), Judge Nichols identified "three

possible readings" of Section 1512(c)(2)'s scope. 2022 WL 823070, at *6. After considering

Section 1512(c)'s structure, "historical development," and legislative history, and dismissing the

"clean break" approach that some Circuits have used to contextualize the word "otherwise," (*Id.*

at *6), Judge Nichols found "serious ambiguity" as to which of the two "plausible" readings—that

Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2) or that

Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1)—Congress

intended. *Miller*, at *15. Applying what Judge Nichols described as principles of "restraint," he

then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or

she "take[s] some action with respect to a document, record, or other object in order to corruptly

obstruct, impede, or influence an official proceeding" (the "residual" reading).  *Id.* at *15.

Because, in Judge Nichols's view, the indictment did not encompass an allegation that *Miller* took

any such action, Judge Nichols dismissed Count Three.  *Id.* at *15.

Before the ruling in the *Miller* case, several judges on this Court had rejected a document-

focused interpretation of Section 1512(c)(2). See *Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5-

*6 (D.D.C. Dec. 10, 2021) (Section 1512(c)(2)'s terms are "expansive and seemingly encompass

all sorts of actions that affect or interfere with official proceedings" and determined that the use of

the word "otherwise" in Section 1512(c)(2) "clarifies" that it "prohibits obstruction by means other

than document destruction."); *Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-19  (D.D.C.

Dec. 20, 2021) (Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or

availability of evidence in a proceeding."); *Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11

(Dec. 21, 2021) (agreeing with the analysis in Sandlin); *Nordean*, 21-cr-175, 2021 WL 6134595, at *6-9 (D.D.C. Dec. 28, 2021)(an interpretation of Section 1512(c)(2) limiting it to "impairment of evidence" could not "be squared with" Section 1512(c)(2)'s "statutory text or structure."); *Montgomery*, 21-cr-46, 2021 WL 6134591, at *10-18 (D.D.C. Dec. 28, 2021)(same, with an extended discussion of Section 1512(c)'s text, structure, and legislative history, as well as the Begay and Yates decisions.); *Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.) (reaching the same conclusion on the scope of Section 1512(c)(2)); *Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.) (same).

Following Judge Nichols's decision in *Miller*, seven judges on this Court have disagreed with the *Miller* analysis. See Exhibit 1, *United States v. Reffitt*, 21-cr-32 (DLF), Trial Tr. 1502-05 (Mar. 8, 2022) (denying a defendant's post-trial motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, Judge Friedrich indicated that she was "not inclined to reconsider" her ruling in Sandlin and described her points of disagreement with *Miller*); Exhibit 2, *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Tr. 5: 8-14 (D.D.C. May 6, 2022) (holding that the plain reading of the statute "to say that (c)(1) is about interfering with the evidence used in an official proceeding, and (c)(2) is about interfering with the proceeding itself" is proper, and "avoids many of the superfluidity concerns raised by the defendant and by Judge Nichols in his opinion in *United States v. Miller*."); *Puma*, 21-cr-454 (PLF), 2022 WL 823079, at *12 (D.D.C. Mar 19, 2022) (concluding that the word "otherwise" in Section 1512(c)(2) "clarifies" that a defendant violates that section "through 'obstruction by means other than document destruction.'"); *McHugh*, 21-cr-453 (JDB), 2022 WL 1302880, at *8 (D.D.C. May 2, 2022) (holding that "[n]othing about § 1512(c)(2)'s context or purpose justifies departing from the provision's ordinary meaning; on the contrary, the context, structure, and legislative history of § 1512 bolster the Court's conclusion that

§ 1512(c)(2) is a broad prohibition on all forms of corrupt obstruction."); *United States v. Hughes*, No. 21-cr-106 (TJK), Minute Order denying motion to dismiss count charging Section 1512 (D.D.C. May 9, 2022) (rejecting the "narrow reading" of Section 1512(c)(2) and agreeing with an opinion that "directly responded to and rejected the logic employed in *Miller*"); *Bingert*, 21-cr-91 (RCL), ECF No. 67, at 14 (D.D.C. May 25, 2022) (holding that the narrow interpretation of the statute in *Miller* "strains the statute beyond its ordinary meaning," and that the Supreme Court decision in Begay does not compel the defendant's requested reading of the word "otherwise."); *United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063, at *6-*12 (D.D.C. May 26, 2022) ("In sum, contrary to *Miller*, § 1512(c)(2) unambiguously means that a crime will occur in a different ('otherwise') manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents[,] records[,] or types of evidence.")(cleaned up);

The ruling in *Miller* is flawed for two reasons. First, Judge Nichols erred by applying the rule of lenity to Section 1512(c)(2) because, as every other judge on this Court has concluded after examining the statute's text, structure, and history, there is no genuine—let alone "grievous" or "serious"—ambiguity. Second, even if Judge Nichols's narrow interpretation of Section 1512(c)(2)'s scope were correct, he erred by dismissing the Section 1512(c)(2) count in full because the indictment's allegations, by charging defendant using the statutory text, validly encompassed that narrower theory, particularly in light of proffered evidence that the government would adduce at trial. *See, e.g., United States Firtash*, 392 F.Supp.3d 872, 887 (N.D. Ill. 2019) (upholding money laundering charge in indictment based in part on government's proffer of evidence regarding the nature of the financial transaction).

### 1.    The Court's ruling erroneously applied the rule of lenity.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."   *Bell v. United States*, 349 U.S. 81, 83 (1955).  That principle underlies the "venerable" rule of lenity, *Miller*, at *5 (quoting *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring)), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community."   *United States v. Bass*, 404 U.S. 336, 348 (1971); see *Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity, however, does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."   *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019); see also Exhibit 2, *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Tr. 8: 1-21.   In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork.   *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted).   "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'"   *Wooden v. United States,* 142 S. Ct. 1063, 1074 (2022) (Kavanaugh,

J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Judge Nichols erroneously applied the rule of lenity in *Miller*. He referred to the "'grievous' ambiguity" standard when initially discussing the rule, see *Miller*, at *5, and found "a serious ambiguity" regarding the conduct that Section 1512(c)(2) reaches, *Id.* at *15; see also *Id.* at *12 ("[T]he Court does not believe that there is a single obvious interpretation of the statute."). But Judge Nichols's interpretation of Section 1512(c)(2)'s scope places undue emphasis on a single word ("otherwise") and a single Supreme Court decision (*Begay*) that interpreted that word as used in an entirely different statute and statutory context. A proper reading of Section 1512(c)(2)'s text, structure, and history demonstrates that Section 1512(c)(2) prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding, not merely where a "defendant ha[s] taken some action with respect to a document, record, or other object," *Id.* at *15, to corruptly obstruct an official proceeding.

Simply put, the rule of lenity is "inapplicable" here. *Puma*, WL 823079, at *12 n.4. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. See *Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by

ensuring that an individual's liberty always prevails over ambiguous laws.").   It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so."   18 U.S.C. § 1512(c)(2). Confirming the absence of ambiguity—serious, grievous, or otherwise—is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including eight judges on this Court considering the same law and materially identical facts.   See supra at 5-6.

> **a.**     **Section 1512(c)(2)'s text and structure make clear that it covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

While Section 1512(c)(1) prohibits the corrupt destruction or alteration of documents, records, and other objects in connection with an official proceeding, Section 1512(c)(2) prohibits corrupt conduct that "otherwise" obstructs, influences, or impedes an official proceeding. Before Judge Nichols's decision to the contrary, every reported case to have considered the scope of Section 1512(c)(2), *see* Gov't Supp. Br., *United States v. Miller*, No. 21-cr-119, ECF 74 (*Miller* Supp. Br.), at 7-9,   and every judge on this Court to have considered the issue in cases arising out of the events at the Capitol on January 6, 2021, see supra at 5-6, concluded that Section 1512(c)(2) "prohibits obstruction by means other than document destruction."   *Sandlin*, 2021 WL 5865006, at *5.   That conclusion follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," Montgomery, 2021 WL 6134591, at *12 (internal quotation marks omitted).

22

Judge Nichols was thus mistaken in concluding that this interpretation either "ignores" that "otherwise" is defined with reference to "something else," namely Section 1512(c)(1), or fails to "give meaning" to the term "otherwise." *Miller*, at *6.  Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *Id.* at *7, "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1).  See *Miller* Supp. Br. at 8.  That understanding of "otherwise" is both fully consistent with each definition Judge Nichols surveys, see *Miller*, at *6 (noting that "otherwise" in Section 1512(c)(2) may plausibly be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *Id.*, at *7.  In sum, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

The fact that some cases "could be brought under either or both prongs of Section 1512(c)," *Montgomery*, 2021 WL 6134591, at *12, does not imply that Section 1512(c)(2) "would have the same scope and effect . . . if Congress had instead omitted the word 'otherwise,'" *Miller*, at *12. For one thing—and as noted in the government's supplemental brief in *Miller*, see *Miller* Supp. Br. at 11-13—overlap is "not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).  Moreover, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a

defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1).   To be sure, practical considerations may militate against seeking such a potentially Pyrrhic victory—where success leads to reindictment under Section 1512(c)(1)—but those practical considerations provide no reason to reject the straightforward interpretation of Section 1512(c) as divided between a provision that targets evidence destruction (Section 1512(c)(1)) and a provision that applies to "otherwise" obstructive conduct (Section 1512(c)(2)).   And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either."   *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Judge Nichols further concluded that interpreting "otherwise" in the manner described above is "inconsistent" with *Begay*, where, in the Court's view, analysis of what "'otherwise' meant" was "[c]rucial" to the Supreme Court's analysis. *Miller*, at *7.   That conclusion is flawed in several respects.   First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2).   *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples."   *Ring*, 628 F.Supp.2d at 224 n.17.   In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes,"

553 U.S. at 147, is "absent" in Section 1512(c)(2).  *Caldwell*, 2021 WL 6062718, at *14. Although Judge Nichols recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), see *Miller*, at *9, he offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

Second, describing the Supreme Court's interpretation of "what 'otherwise' meant" as "[c]rucial" to that Court's decision in *Begay* is an inaccurate description of *Begay*'s analysis. The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 142-43.  The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples.  *Id.* at 143-44.  In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, *cf. post* at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others."  *Id.* at 144.

A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot be described as "crucial."  The majority's

"remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; see *Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*).   In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case."   *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why no court should embark on imposing an extra-textual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct."   553 U.S. at 144-45.   But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause."   *Johnson v. United States,* 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too Judge Nichols engrafted onto Section 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, *Miller*, at *15.   In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted Judge Nichols's interpretation, and for good reason.   That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding.   *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see*

*also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [sic] through his conduct in relation to a tangible object").    In brief, Judge Nichols's interpretation is likely to give rise to the very ambiguity it purports to avoid.

Judge Nichols's observation that only "certain courts of appeals," *Miller*, at *7, have interpreted Section 1512(c)(2) to reach conduct that obstructs an official proceeding other than document destruction significantly understates the case law.   Every reported case—both in the courts of appeals and in district courts—has interpreted Section 1512(c)(2) in that manner.   *See Miller* Supp. Br.at 7-9 (discussing cases).    Moreover, the Court's effort to distinguish one of those cases, *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015), misses the mark. That *Petruk* did not cite or discuss *Begay* (*Miller*, at *8), says nothing about the logic of its analysis, particularly given how "remarkably agnostic" *Begay*'s discussion of "otherwise" is.   *See Montgomery*, 2021 WL 6134591, at *11.   The Court likewise faulted *Petruk* for misreading the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), where the Supreme Court interpreted the omnibus clause in 18 U.S.C. § 1503 to require a "relationship in time, causation, or logic," *Id.* at 599, between the obstructive conduct and the proceeding—a grand jury investigation—at issue in the defendant's case.   But the restraint the Supreme Court exercised by interpreting Section 1503 to require that "nexus" is paralleled by interpreting the same nexus requirement to apply to Section 1512(c)(2)—as other judges on this Court have done, see *Miller* Supp. Br. at 20-22 (explaining that the nexus requirement applies to Section 1512(c)(2)); Montgomery, 2021 WL 6134591, at *20-*21—and not by imposing an additional, atextual requirement that a defendant must "have taken some action with respect to a document" for his conduct to fall within the scope

27

of Section 1512(c)(2).

        **b.**      **Other tools of statutory interpretation do not undermine that straightforward reading**.

Because Section 1512(c)(2)'s text and context make clear that it reaches conduct that obstructs, influences, or impedes an official proceeding in a manner other than document destruction or evidence tampering, resorting to other tools of statutory interpretation is not necessary.   In any event, those tools reinforce that straightforward interpretation of Section 1512(c)(2)'s scope.   See *Miller* Supp. Br. at 9-17.   In reaching a contrary conclusion, Judge Nichols erred in several respects.

First, Judge Nichols suggested that reading Section 1512(c)(2) consistently with its plain language and structure as described above would "introduce something of an internal inconsistency" because Section 1512(c)(2) would have greater breadth than neighboring provisions in Section 1512.   *Miller*, at *12; see *Id.* (describing Section 1512(c)(2) as an "elephant[] in [a] mousehole[]").   That reasoning is inconsistent with *Yates*, where a plurality of the Supreme Court recognized that Section 1512 consisted of "broad proscriptions," not "specialized provisions expressly aimed at corporate fraud and financial audits."   574 U.S. at 541 (plurality opinion).   Moreover, the narrowing construction Judge Nichols imposed on Section 1512(c)(2) fails to consider that Section 1512(c)(2) reaches more broadly precisely because other provisions within Section 1512 leave gaps that Section 1512(c)(2) fills. *Cf. Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949) ("The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.").

Second, Judge Nichols worried that a reading of Section 1512(c)(2) that encompasses

obstructive conduct unrelated to documents or records would give rise to "substantial superfluity problems." *Miller*, at *12. But even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable." *Sandlin*, 2021 WL 5865006, at *8; *accord Nordean*, 2021 WL 6134595, at *8. More troubling, by interpreting Section 1512(c)(2) to require "some action with respect to a document," *Miller*, at *15, Judge Nichols risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1), *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted). Moreover, because Section 1512(c)(1) includes both completed and attempted evidence tampering, *see* 18 U.S.C. § 1512(c)(1) (reaching "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so) (emphasis added), it is unlikely that a defendant who "take[s] some action with respect to a document, record, or other object," *Miller*, at *15, has not also taken a "substantial step" toward altering, destroying, mutilating, or concealing that document sufficient to fall within the scope of Section 1512(c)(1). *See United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (explaining that the "general meaning of 'attempt' in federal criminal law" is "an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent").

The canon against superfluity, which is "strongest when an interpretation would render superfluous another part of the same statutory scheme," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013), is even stronger when it renders superfluous "other provisions in the same enactment." *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted); *cf. Yates*, 574 U.S. at 543 (plurality opinion) ("We resist a reading of § 1519 that would render superfluous an entire provision passed . . . as part of the same Act."). That principle

comes into play here because Sections 1512(c)(1) and 1512(c)(2) were enacted together as part of the Sarbanes-Oxley Act.   *See Miller* Supp. Br. at 15-16.

Third, Judge Nichols's discussion of statutory and legislative history, *Miller*, at *12-13, provides no sound reason to deviate from the straightforward interpretation of Section 1512(c)(2) described above.   For example, Judge Nichols suggested that Congress would have had no reason to add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the latter provision were construed broadly.   *Miller*, at *13. Section 1512(a)(2)(B) prohibits the use or threatened use of physical force against "any person" with the intent to "cause or induce any person" to take one of four actions, including "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] an object with intent to impair the integrity or availability of the object for use in an official proceeding." 18 U.S.C. § 1512(a)(2)(B)(ii).   But as Judge Nichols noted, *Miller*, at *12, unlike Section 1512(a)(2)(B), Section 1512(c) aimed generally to impose "direct" liability for obstructive conduct that was not directed at intimidating or influencing another person, *see Miller* Supp. Br. at 16. Understood in that light, Section 1512(a)(2)(B) operates harmoniously with both subsections in Section 1512(c): Section 1512(a)(2)(B)(ii) reaches a defendant's use of force or threatened use of force at another person in order to cause that person to destroy documents in connection with an official proceeding; Section 1512(c)(1) reaches a defendant's direct destruction of documents in connection with an official proceeding; and Section 1512(c)(2) reaches a defendant's non-document-related conduct that obstructs or impedes an official proceeding. And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, *see Miller*, at *13-*14; *accord Miller* Supp. Br. at 15 (noting floor statements addressing concern about document shredding in the Arthur Andersen prosecution), "it is unlikely that Congress was concerned with only the type of document destruction at issue in the

Arthur Andersen case." *Montgomery*, 2021 WL 6134591, at *16.   In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'"   *Id.*

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results.   *See* Exhibit 2, *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Tr. 8:16-22; *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify Electoral College vote results by "drag[ging] lawmakers out of the Capitol by their heels with their heads hitting every step," Exhibit 1, *United States v. Reffitt*, No. 21-cr-32, Trial Tr. 1502, carrying a gun onto Capitol grounds, *Id.* at 1499, and then leading a "mob and encourag[ing] it to charge toward federal officers, pushing them aside to break into the Capitol," *Id.* at 1501-02, unless he also picked up a "document or record" related to the proceeding during that violent assault.   The statutory text does not require such a counterintuitive result.

**C.     The word "corruptly" in 18 U.S.C. § 1512(c)(2) is not unconstitutionally vague and the defendants had fair notice that thier actions are punishable under 18 U.S.C. § 1512(c)(2)**

The defendants argue (Badalian Mot. at 14-19; Rodriguez Mot. at 45-52) that Section 1512(c) is unconstitutionally vague because of the term "corruptly." Again, several other judges in this district have recently rejected this same argument. *Sandlin,* 2021 WL 5865006, at *10–14; *Caldwell*, 2021 WL 6062718, at *8–*13; *Mostofsky*, 2021 WL 6049891, at *11; *Montgomery,*

2021 WL 6134591, ay *18-*22; *Nordean,* 2021 WL 6134595, at *9; *McHugh,* 21-cr-453, ECF No. 51, at 19–28; Exhibit 2, *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Tr. 8: 23 – 9:23. The void for vagueness doctrine is narrow, and does not apply here, where the statute gives defendants fair notice and is not "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.

The defendants rely on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which addressed a separate statute, 18 U.S.C. § 1505, that prohibited "corruptly" obstructing a congressional inquiry. Badalian Mot. at 16-17; Rodriguez Mot. at 49-52. *Poindexter* is inapposite, and does not show that Section 1512(c)(2) is vague as applied here, as Judge Mehta explained in depth in *Caldwell.*[5]  *See Caldwell*, 2021 WL 60626718, at *8–*11. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629–30. Moreover, "[i]n the 30 years it has been on the books, courts have not applied *Poindexter* widely to render impotent the many obstruction statues that use the word 'corruptly.' Rather . . . courts have recognized 'the narrow reasoning used in *Poindexter*' and 'cabined that vagueness holding to its unusual circumstances.'" *Nordean,* 2021 WL 6134595, at *10 (quoting *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017)); *see also, e.g*., *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998)

---

[5] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement." (emphasis added.)

(rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). They have not "read *Poindexter* to mean, as Defendants seem to urge, that the term 'corruptly' in any obstruction statute is fatally vague." *Caldwell*, 2021 WL 6062718, at *9.

*Poindexter* also predated the Supreme Court's decision in *Arthur Andersen v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

Courts have encountered little difficulty when addressing Section 1512(c)'s elements following *Arthur Andersen*. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing"); *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007) (upholding instruction defining "corruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice."); *see also Mostofsky, supra,* at 23 ("corruptly" requires that a defendant act "'unlawfully, and with the intent to obstruct[,]' impede, or influence an official proceeding") (citing *Sandlin, supra,* at 26); *Caldwell, supra,* at 23 (noting that, "at the very least," corruptly "requires Defendants to have acted with consciousness of wrongdoing"). The reach of the term "corruptly" in Section 1512(c)(2) is also limited by the "nexus" requirement, namely, that the "the obstructive conduct be connected to a specific official proceeding." *United States v. Young*, 916

F.3d 368, 386 (4th Cir.), *cert. denied*, 140 S. Ct. 113 (2019) (citation omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

Badalian also argues (Mot. 17-18) that the government's charging decisions demonstrates that Section 1512(c)(2) is unconstitutionally vague.  As an initial matter, the facts here are significantly different than in the listed cases.  But even "accepting Defendants' premise that some individuals charged with misdemeanors for breaching the Capitol or engaging in similar conduct could have been charged under Section 1512(c)(2), 'the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague.'"  *Montgomery*, 2021 WL 6134591, at *22 (citing *Kincaid v. District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017) (Kavanaugh, J.)).

This Court should follow the ruling of all other judges in this District in rejecting the *Miller* approach and denying the defendants' motions to dismiss Counts Two and Three.

### III. The Court Should Deny Defendant's Motion to Dismiss Count Ten, Alleging a Violation of 18 U.S.C. § 1752.

Badalian contends that Count Ten—which charges a violation of 18 U.S.C. § 1752—is deficient for three reasons. First, Badalian contends the charge fails to state a claim because the Vice President was not "temporarily visiting" the Capitol on January 6. Badalian Mot. at 20-21. Second, Badalian argues that because the Secret Service did not restrict the Capitol grounds on January 6, 2021. Badalian Mot. at 21-22.   Finally, Badalian argues that the indictment lacks the specificity needed to charge him with a crime. Badalian Mot. at 22-24. Each argument is incorrect.

As several judges in this District have held, the Vice President's office in the U.S. Capitol does not mean he could not temporarily visit the grounds and those grounds need not be restricted by Secret Service exclusively to meet the strictures of Section 1752. *See United States v. Griffin*,

549 F. Supp. 3d 49, 54 (D.D.C. 2021) (holding that there is no requirement that Secret Service establish the restricted area); *United States v. Griffin,* 21-cr-92, Minute Entry (D.D.C. Mar. 22, 2022)(McFadden, J.) (denying motion for judgment of acquittal arguing that Vice President was not temporarily visiting the Capitol on January 6, 2021); *United States v. Bingert*, 1:21-cr-91, 2022 WL 1659163, at *14-15 (D.D.C. May 25, 2022)(Lamberth, J.) (holding that the Capitol Police may properly designate restricted areas under Section 1752 and the former Vice President was temporarily visiting the Capitol Building on January 6, 2021); *United States v. Puma*, --- F.Supp.3d ---, 2022 WL 823079, at *14-*19 (D.D.C. Mar. 19, 2022) (Friedman, J.) (holding that Section 1752 does not require that Secret Service restrict the area and that secret service protectees were temporarily visiting); *United States v. Andries*, 21-cr-93, 2022 WL 768684, at *16-*17 (D.D.C. Mar. 14, 2022) (Contreras, J.)(same); *United States v. McHugh*, --- F.Supp.3d ---, 21-cr-453, 2022 WL 296304, at *18-*22 (D.D.C. Feb. 1, 2022) (Bates, J.) (same). The Court should therefore deny Badalian's motion to dismiss Count Ten of the indictment.

### A. Section 1752's text, purpose, and history make clear that the statute covers the Vice President's Visit to the Capitol on January 6, 2021.

Count Ten charges Badalian with violating of 18 U.S.C. § 1752(a)(1).[6]   Section 1752 prohibits certain conduct in any "restricted building or grounds."   *See* 18 U.S.C. § 1752(a)(1)-(5). As relevant here, a "restricted buildings or grounds" is "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where . . . [a] person protected by the Secret Service is or will be temporarily visiting."   18 U.S.C. § 1752(c)(1)(B).   Badalian's arguments that the Vice President was not temporarily visiting the U.S. Capitol on January 6 are "laughable" because any plausible definitions of the relevant terms confirm that the Vice President was temporarily visiting

---

6 Badalian's motion seems to suggest he is also charged with 18 U.S.C. § 1752(b)(1)(A). He is not. Only defendant Rodriguez is charged with violating the deadly or dangerous weapon portion of Section 1752. *See* ECF No. 65, at ¶ 91.

the Capitol building on January 6, 2021.  *Bingert*, 2022 WL 1659163, at *15 (D.D.C. May 25, 2022).

The term "temporary" means "[l]asting for a time only; existing or continuing for a limited time; transitory."  *Temporary*, Black's Law Dictionary (11th ed. 2019). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."  *See* https://www.merriam-webster.com/dictionary/visit.  Taken together, therefore, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while nonetheless remaining 'temporary.'"  *McHugh*, 2022 WL 296304, at *20.  It is, moreover, "quite natural to say that a person 'temporarily visits' a place where she has an office."  *Andries*, 2022 WL 768684, at *16.  Applying these definitions, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification."  *Puma*, 2022 WL 823079, at*17; *accord McHugh*, 2022 WL 296304, at *21 ("[T]he Vice President went to the Capitol for a particular purpose—in this case, an official business purpose—and stayed there for only a brief time; his sojourn at the Capitol was 'for a period relatively short' and set to 'terminate upon the occurrence of an event having a reasonable possibility of occurring within a short period of time,' namely the completion of the certification vote.").

Simply because Vice President Pence presided over the Senate Chamber on January 6 to count the electoral votes does not mean he could not "temporarily visit" the Capitol to accomplish that task.  The President or Vice President frequently "temporarily visit" various locations for work-related purposes, as they fulfill various official duties.  "[O]ne can "visit" a location for the

business purpose of working and meeting there."  *Andries,* 2022 WL 786684, at *16.   As a definitional matter, part of what it means to "temporarily visit" a location is to go there "for a particular purpose"—which, in this case, was the Certification of the Electoral College vote. *McHugh*, 2022 WL 296304, at *20.   The definitions of "visit" do not include a limitation "based on a trip's purpose," and including such a limitation "flies in the face of the ordinary usage" of the ordinary words.  *Id.* at *21.   Under Badalian's logic, someone who travels for a business trip, including an appellate judge traveling out of town to hear an oral argument, would not be "temporarily visiting," even though describing such conduct as a temporary visit "would be perfectly natural."  *Id.*; *accord Andries*, 2022 WL 768684, at *16.   That fact that Vice President Pence traveled to the Capitol for a particular purpose on January 6 in fact *strengthens* the argument that he "temporarily visited" there.

Under the plain language of Section 1752, then, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification."  *Puma*, 2022 WL 823079, at *17; *accord Andries,* 2022 WL 786684, at *16 ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only.  Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."). Badalian's argument is contrary to this "commonsense conclusion."  *McHugh*, 2022 WL 296304, at *21.   His conduct accordingly falls within Section 1752's plain sweep because he unlawfully entered a restricted area while the Vice President was "temporarily visiting" that area.

Moreover, even if it were "'awkward . . . to describe an ordinary commute from home to

one's regular workplace as 'temporarily visiting' the office,' this case does not present such a situation." *Andries*, 2022 WL 768684, at *17 (quoting *McHugh*, 2022 WL 296304, at *22).   The Capitol "is not the Vice President's regular workplace, nor was Vice President Pence's trip to the Capitol on January 6, 2021 analogous to a regular commute to the office." *McHugh*, 2022 WL 296304, at *22.   At trial, the government could offer evidence that Vice President Pence had four offices within the District of Columbia: an executive office in the West Wing of the White House, a legislative office in the Dirksen Senate Office Building and ceremonial offices for functions related to his role in each branch.   *See* Congressional Directory of the 116th Congress (2019 – 2020), *Officers and Officials of the Senate* at 397 (February 12, 2016) (available at https://www.govinfo.gov/app/collection/cdir/cdir_114/2016-02-12/F1); "The Vice President's Residence & Office" (available at https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/).   Senate 212, the office set aside in the Capitol Building for the Vice President, is known as a "ceremonial office," and testimony would show that Vice President Pence visited this office at the Capitol only a handful of times during his four-year tenure.   Calling this a "permanent office," as the defendant suggests (ECF 256 at 3), is thus "more than a little misleading."   *McHugh,* 2022 WL 296304, at *22; *see also Andries*, 2022 WL 768684, at *17 ("Like a President who maintains an office at his home-state residence, and like the CEO who maintains a reserve office at her firm's satellite location, Vice President Pence held an office at the Capitol, but did not use that office as his primary, regular workspace.").   Additionally, trial evidence would also show that the Secret Service considered the Vice President's trip to the Capitol on January 6 a "visit" by a Head of State.   *See* Exhibit 3, Secret Service Head of State Worksheet (Redacted).

Statutory purpose and legislative history also support that plain-text interpretation.

Badalian's interpretation of "temporarily visit"—which urges the Court (Badalian Mot. at 21) to carve out an exception for a protectee performing an official duty in a building where he or she has an office—"is not supported by the statutory text and is out of step with the statutory context." *Puma*, 2022 WL 823079, at *17. Sections 1752 and 3056, which is cited in Section 1752(c)(2), are principally designed to protect certain high-level Executive Branch officials and their families. Section 1752 aims to deter attacks on these protectees by criminalizing attacks on these individuals either in their official residences, *see* 18 U.S.C. § 1752(c)(1)(A), in any "restricted building or grounds" where they are or will be temporarily visiting, 18 U.S.C. § 1752(c)(1)(B), or in any "restricted building or grounds" that is restricted for a "special event of national significance,"[7] 18 U.S.C. § 1752(c)(1)(C).  Badalian's narrowed interpretation of the "temporarily visiting" prong would protect a protectee for brief visits—but not work trips—outside of Washington, D.C., but not at "any location in Washington, D.C. (other than an official residence) where the protectee maintains an office." *Puma*, 2022 WL 823079, at *17.  Such an interpretation would "leave an arbitrary gap in the application of the law." *Id.*  "The much more sensible reading is that subsection (c)(1)(B) applies to those areas not covered by subsections (c)(1)(A) and (c)(1)(C) where a Secret Service protectee may nonetheless face security risks." *Id.* at *18.

While the Court need not resort to legislative history to find that Vice President Pence was temporarily visiting the Capitol on January 6, the straightforward reading of Section 1752's context and purpose finds support in its legislative history. That history explains that Section 1752 "was designed to remedy the fact that 'there is, at the present time, no Federal statute which

---

[7] Although the Presidential Inauguration was designated as a "special event of national significance," the Certification proceeding on January 6, 2021, was not.  *See* Congressional Research Service, *National Special Security Events: Fact Sheet* (Jan. 11, 2021), available at https://sgp.fas.org/crs/homesec/R43522.pdf.

specifically authorizes [the Secret Service] to restrict entry to areas where the President maintains temporary residences *or offices*.'" *Andries*, 2022 WL 768684, at \*17 (citing S. Rep. No. 91-1252 at 7S. Rep. No. 91-1252 at 7 (1970) (emphasis added). Indeed, Congress recognized that the Secret Service's "protective mission" encompasses "securing the buildings and grounds where those protected *work or visit*."   112 Cong. Rec. H1,373 (daily ed. Feb. 28, 2011) (emphasis added); *see Puma*, 2022 WL 823079, at \*17 (noting that the relevant legislative history "suggests that Congress intended Section 1752 to apply broadly and comprehensively, reinforcing the security of Secret Service protectees at a number of locations").

As every judge in this District has concluded, Section 1752 thus applies to the Vice President's visit to the Capitol on January 6, 2021.

### B.    The fact that Capitol Police set the boundary of the restricted area does not invalidate the charge.

Badalian argues that the indictment should be dismissed for failure to state an offense because the Secret Service did not designate the "restricted area" under 18 U.S.C. §1752, and therefore the government cannot allege that the Secret Service restricted the Capitol Grounds on January 6. Badalian Mot. at 21-22. That argument misunderstands Section 1752's text.

Section 1752 provides in relevant part:

(a)  Whoever—

> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(c)  In this section—

> (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

>> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;

18 U.S.C. § 1752. In short, Section 1752 "prohibits persons from knowingly entering without

lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020).

Section 1752's text is not complex. *United States v. Griffin*, 549 F. Supp. 3d 49, 54 (D.D.C. 2021). It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and Badalian does not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President and his family. § 1752(c)(2); *see* § 3056(a)(1).

"The statute focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 549 F. Supp. 3d at 54. This "flexible approach" reflects the various temporary and permanent ways an area may be restricted depending on where the protectee happens to be and the security threats he faces. *Id.* It also reflects "the reality that while the Secret Service has primary responsibility for guarding its protectees, see 18 U.S.C. § 3056, it invariably relies on other law enforcement agencies for support." *Id.*

Looking outside Section 1752's language, Badalian urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. Badalian Mot. at 22. This argument fails. Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see*

*also Griffin,* at 55 ("[T]he only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting."); Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). Second, the statutory history undercuts Badalian's argument. An earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). But Congress's decision in 2006 to "eliminate reference to regulations" indicates that the statute no longer depends on whether the Secret Service has defined an area as "restricted." *See, e.g., Griffin*, at 56 ("[T]he Court cannot reconstitute provisions that Congress has jettisoned.")

More simply, however, there is no support for the claim that the literal application of the statute would be at odds with Congressional intent. The language of the statute is the best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of Secret Service protectees. If Congress intended to give Secret Service sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent.

### C.    The charging language provides adequate notice to defendant Badalian.

Finally, Badalian challenges the § 1752(a)(1) charge because "the government mass produced indictments identical in language with little exception" and the Indictment lacks any specifics regarding the presented charge. Badalian Mot. at 22. Badalian cites *Stirone v. United States*, 361 U.S. 212 (1960) for the argument that the Fifth Amendment's presentment provision requires more facts to be elucidated to support the grand jury's finding of probable cause. *Id.,* at 23.

First, it is difficult to claim, as Badalian has, that the 19-page conspiracy indictment in this case is an "assembly-line indictment[]" without "*any* description of Mr. Badalian's actual conduct or the specific circumstances involved." Badalian Mot. at 23 (emphasis original). With respect to the 18 U.S.C. § 1752(a) charge, the Indictment states that "[o]n January 6, 2021, the exterior plaza of the United States Capitol was closed to members of the public." ¶ 12; "Vice President Michael R. Pence presided, first in the Joint Session and then in the Senate Chamber." ¶ 13; "[t]he crowd was not lawfully authorized to enter or remain inside the Capitol." ¶ 14; "[o]n or about January 6, 2021, after the rally, RODRIGUEZ and BADALIAN, bearing walkie talkies, walked down Pennsylvania Avenue to the Capitol." ¶ 43; "[a]t approximately 2:40 p.m., on or about January 6, 2021, RODRIGUEZ, BADALIAN and [DEFENDANT THREE] gathered with thousands of others at the Lower West Terrace of the Capitol building." ¶ 46; "[a]t approximately 3:45 p.m., on or about January 6, 2021, rioters broke the window to the left of the tunnel on the Lower West Terrace. After the window was broken, [DEFENDANT THREE] climbed through the window and into the Capitol building, followed shortly by RODRIGUEZ and BADALIAN, uniting the three co-conspirators in room ST2M." ¶ 55. ECF No. 65.

Count Ten itself re-alleges those paragraphs, and adds "[o]n or about January 6, 2021, within the District of Columbia, the defendants, DANIEL RODRIGUEZ, EDWARD BADALIAN, and [DEFENDANT THREE], did unlawfully and knowingly enter and remain in a restricted building and grounds, that is any posted, cordoned-off, and otherwise restricted area within the Capitol and its grounds, where the Vice President was temporarily visiting, without lawful authority to do so." ¶ 91. The text of the indictment clearly alleges the crime charged therein.

Second, there is no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Kaley v. United States*, 571 U.S. 320, 328 (2014) (quoting *Costello v. United States*, 350 U.S. 359, 362-63 (1956)). "The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Id.*

Third, an indictment that charges an offense by tracking the statutory language and identifies all the elements is generally sufficient to call for a trial on the merits. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established."). The indictment need not identify the particulars of how the offense is committed. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108-09 (2007) (indictment charging attempted unlawful entry into the United States, in violation of 8 U.S.C. § 1326(a), was not defective because it did not allege whether the substantial step was satisfied by defendant walking into an inspection area, presenting a misleading identification card, or lying to the customs inspector); *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (indictment was sufficient where it alleged that defendant mailed "obscene" material in violation of 18 U.S.C. § 1461 but did not identify the allegedly obscene materials).

Here, the indictment adequately alleges facts in support of the charge and tracks the statutory language of 18 U.S.C. § 1752(a)(1). The indictment leaves nothing to be desired with respect to notifying the defendant as to the charge against him. Therefore, the Court should deny the motion to dismiss Count Ten.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to dismiss.

Date: June 10, 2022

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:  _____/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
Capitol Siege Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov