UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 21-CR-246 (ABJ) |
| | : | |
| **DANIEL RODRIGUEZ, et. al.,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S NOTICE OF EXPERT TESTIMONY**

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the United States provides the following disclosures concerning expert testimony that the United States will seek to introduce pursuant to Rules 702, 703, and 705 of the Federal Rules of Evidence. The United States reserves the right to offer additional testimony by these experts, or other expert witnesses, and for the experts to amend or adjust their opinions and bases therefor, based on information perceived by or made known to the experts before or during trial.

A. **Cellular Phone Technology and Records Expert**

The government intends to call FBI Special Agent John Hauger as an expert in the fields of cellular phone technology, cellular towers, and the analysis of historical cellular phone records for the purpose of determining the approximate location from which a phone was used at the particular time or ranges of times.

As explained in the disclosed curriculum vitae, Agent Hauger is a member of the FBI's Cellular Analysis Survey Team (CAST). Agent Hauger has undergone training with the FBI, private companies, and major U.S. cell phone providers to analyze cell phone call and cell tower data to locate cell phones for the purpose of locating missing persons and suspected criminals. Agent Hauger will testify at trial that locating cellular phones is accomplished by determining the locations of the cellular tower or towers used by a cellular phone to transmit or receive a phone call.

Agent Hauger will discuss how the towers operate, how cellular signals are sent and received, and how cellular towers are used in cellular phone calls. Agent Hauger will testify that cellular phones use radio frequencies to communicate. When a cellular phone is "on," the cellular phone constantly scans its environment, evaluating and ranking which towers have the strongest signal. When a cellular phone places or receives a call, it will use the cellular tower and sector with the strongest signal. The tower with the strongest signal generally comes from the tower that is closest to the phone, or in its direct line of sight.

Cell towers (sometimes referred to as cell sites) come in a variety of shapes and sizes. They also can be located in a variety of places, including but not limited to church steeples, chimneys, water towers, or the sides of buildings. A typical cell tower has three 120-degree sectors, which are typically labeled numerically.

At trial, Agent Hauger will explain how cell phones interact with cell towers, as well as interpret the call detail records in this case. Agent Hauger will testify that cell phone companies maintain databases that capture and store information related to the usage of each customer's cellular phone. These databases generate call detail records (CDRs). The CDRs document the network interactions to and from the cell phone, to include the date, time, duration, number called, and calling number. Additionally, the CDRs capture the cell tower and cell sector ("cell site") which served the cell phone when contact was initiated with the network. An analysis was performed on the CDRs obtained for the subject cell phone. Used in conjunction, the call detail records and a list of cell site locations illustrates an approximate location of the subject cell phone when it initiated contact with the network. A graphical representation has been prepared by Agent Hauger which shows the approximate geographic areas of the subject cell phone when the cell phone initiated contact with the network.

With respect to this case, Agent Hauger conducted an analysis of the call detail records and associated cellular tower records for phone calls and messages placed and received by the phone number ending in 5176 during the time period of January 3, 2021 to January 12, 2021. These records, along with additional records of calls and messages in the surrounding days, from T-Mobile are provided along with this notice.

Agent Hauger made a number of conclusions about the cell site records for that phone number on the date and times noted. Agent Hauger will testify regarding the cell site records and his attached analysis of those records. For example, Agent Hauger concluded that, at the following times between January 3, 2021 and January 12, 2021, the following coverage areas of cellular towers were utilized by the phone number associated with your client:

- On January 3, 2021, between approximately 1:24 p.m. and 3:04 p.m., the phone number

      utilized four towers near the Los Angeles International Airport in Los Angeles, California;

- On January 3, 2021, between approximately 5:58 p.m. and 6:25 p.m., the phone number placed four outgoing phone calls that utilized towers along Interstate 10 in Arizona;

- On January 3, 2021, at approximately 10:23 p.m., the phone number placed an outgoing call that utilized a tower in Phoenix, Arizona;

- On January 5, 2021, at approximately 1:53 a.m., the phone number utilized a tower west of Nashville, Tennessee;

- On January 5, 2021, at approximately 12:34 p.m., the phone number utilized a tower in east Kentucky, near Huntington, West Virginia;

- On January 5, 2021, between approximately 7:45 p.m. and 7:55 p.m., the phone number made four outgoing calls that utilized a tower near Interstate 66 in Northern Virginia;

- On January 6, 2021, at approximately 1:37 p.m., the phone made an outgoing call that utilized a tower near The Ellipse in Washington, D.C.;

- On January 6, 2021, between approximately 4:18 p.m. and 4:38 p.m., the phone number utilized three towers near the United States Capitol building;

- On January 10, 2021, January 11, 2021 and January 12, 2021, the phone number utilized a tower near Beverly Hills, California.

We intend to introduce the CAST analysis as an exhibit at trial, which the expert will use to explain the analysis and conclusions. Agent Hauger's conclusions and analyses are captured in more detail in the attached draft presentation.

      The agent will accordingly opine that for the phone interactions within the periods stated above that the defendant's cellular phone hit towers near the relevant locations noted in the

indictment, particularly the United States Capitol and the home of Person One. Please refer to the presentation slides and images regarding the cell phone, and movement going towards the Washington, D.C. area on January 6, 2021.

SA Hauger's CV, the report concerning the cell site analysis he performed, and the records from which he conducted his analysis have been produced in discovery. SA Hauger has not authored any publications in the previous 10 years. SA Hauger has testified as an expert at trial or by deposition in the following cases during the previous 4 years:

| U.S. vs. Charles Browne | Federal - District of New Jersey (Trenton) | 20-CR-965 (MAS) |
|---|---|---|
| Texas vs. Freddie Lee Smith | Texas - Bastrop County | 16-977 |
| New Jersey vs. Darius Bolden | New Jersey - Hudson County | 19-019H |
| New Jersey vs. Harewood, Ashman, & Harry | New Jersey - Bergen County | 395-18 (2nd defendant) |
| U.S. vs. Wiley, Harry, & Watson | Federal - District of Connecticut | 321CR98 |
| New Jersey vs. Rivera-Rojas | New Jersey - Monmouth County (Frye Hearing) | 19-00-04342 |
| U.S vs. Elliott Jacobs | Federal - DC Superior Court | 2020-CF36658 |
| U.S. vs. Kenston Harry | Federal - District of Connecticut | 21-CR-00098-JBA-2 |
| U.S. vs. Jose Soto | Federal - District of New Jersey (Newark) | 20-CR-903 |
| New Jersey vs. Ronald Teschner | New Jersey - Monmouth County | 19003774 |
| New Jersey vs. Rashad Zeigler | New Jersey - Essex County | 19003669 |
| New Jersey vs. Timothy Wright | New Jersey - Atlantic County | 19001537 |
| New Jersey vs. Dwayne Littlejohn | New Jersey - Essex County | 18007611 |
| New Jersey vs. Michael May | New Jersey - Essex County (Frye Hearing) | 2019-12-3552 |
| Massachusetts vs. Kenneth Roark et.al. | Massachusetts - Bristol County (re-trial) | 1873CR00191 |
| New Jersey vs. Darryl Watson | New Jersey - Essex County | 190100294 |

_____
JOHN HAUGER
SA Federal Bureau of Investigation

## B. Electrical Shock Weapons

The government intends to call Mr. David Wright as an expert in the fields of self-defense and energy weapons training. Mr. Wright is a private contractor and Chief Master Instructor for Axon, a public safety technology company that sells, among other things, energy weapons including Tasers. Before his current position, Mr. Wright was the officer in charge of use-of-force and defensive tactics at the Pittsburgh Bureau of Police for over 25 years. Mr. Wright was primarily responsible for reviewing, developing, and implementing trainings that encompassed lethal force, less-lethal force, firearms, Taser, OC defensive pepper spray and impact weapons.

Mr. Wright will testify that the strength of electrical shock weapons is measured in microcoulombs, which is a measurement of energy. As an example, a Taser brand Taser-7 model weapon emits 62 microcoulombs; Mr. Wright will testify this amount of energy is typically sufficient to incapacitate a person without causing permanent damage. When manufacturers advertise an electrical shock weapon with an "up-to" microcoulomb rating, this generally means the weapon can deliver a shock from 0 to no more than that level of microcoulombs. If a device produces too many microcoulombs, there would be too much damage to the body; if there are too few microcoulombs, the device would not be effective. Microcoulombs do not necessarily correlate to the amount of pain a person may feel when touched with an electrical shock weapon.

While Mr. Wright will not testify as to the precise model of electrical shock weapon used in this case, he believes it is a cheap stun gun that could be purchased at a store, possibly for less than $15. Based on his review of still shots of the video evidence in this case, it could be a Sabre model, but it is a common-looking weapon, meant to be held in the hand. The light that can be seen emitted from the weapon in some of the images could be from the positive-negative connection, or it could have a low-intensity flashlight in the device itself.

Mr. Wright will testify that an electrical shock weapon's effect on the body is determined by the type of weapon, how and where it is used, and how it is deployed. He will testify that if a stun gun or Taser were used on certain parts of the body—such as the neck, face, or groin—severe pain, serious harm, or incapacitation could occur. For instance, if an electrical shock weapon were used on the eyes, it could cause permanent blindness. Areas such as the eyes, throat, face, and groan are particularly sensitive to the use of electroshock weapons because the nerves are "surface" bound, and more reactive to the effects of the weapon. By contrast, a weapon deployed in other, less sensitive areas may not incapacitate someone, but could cause pain or irritation. Mr. Wright would testify that, if he were being attacked with an electrical shock weapon in his capacity as a police officer, his immediate concerns would be avoiding a shock to these vulnerable areas, as it could cause incapacitation, and providing access to the officer's weapons, whether or not he was incapacitated by the weapon.

Mr. Wright will base these opinions on his training and experience, and review of the video evidence in this case. Mr. Wright has been shocked multiple times with police-issued electrical shock weapons in his capacity as a use-of-force trainer and instructor. He has also conducted multiple validation studies on electrical shock weapons during which he used these weapons on himself.

Mr. Wright's interviews regarding his opinions of stun guns and tasers potentially used on January 6, 2021 have been produced in discovery. Mr. Wright has not authored any publications in the previous 10 years. Mr. Wright has testified as an expert at trial or by deposition in the following cases during the previous 4 years in Pennsylvania State Court, and the government will provide a case list to the defense.

*David C. Wright*

_____
DAVID WRIGHT
Use of Force Master Instructor

### C. Cardiology

The government intends to call Dr. Micheas Zemedkun as an expert in the field of cardiology. Dr. Zemedkun is a currently practicing non-invasive cardiologist at MedStar Washington Hospital Center and MedStar Health at Lafayette Centre.

Dr. Zemedkun treated Officer M.F. on January 12, 2021, after a referral from the emergency center at Washington Hospital Center on January 7, 2021. Dr. Zemedkun saw Officer M.F. for follow up on abnormal troponin levels and creatine kinase (CK) levels noted during testing done on Officer M.F. on January 6 and January 7, 2021. When Officer M.F. was admitted to Washington Hospital Center on January 6, 2021, his initial blood work revealed elevated creatine kinase (CK) levels up to 325 u/L and troponin levels that began at 11 ng/L upon admission, elevated to 154 ng/L by 7:09 pm on January 6, 2021, peaked at 225 ng/L at 6:12 am on January 7, 2021, and then trended downward back to 103 ng/L at 1:25 pm on January 7, 2021. Dr. Zemedkun will testify to troponin, a type of protein found in both heart and skeletal muscle, and CK an enzyme found in the skeletal and heart muscle. Elevated levels of troponin and CK could be signs of muscle damage, to include cardiac damage.

Due to these test results, Dr. Zemedkun ordered a cardiac magnetic resonance imagining (MRI) with and without contrast and a Stress Echo examination. Dr. Zemedkun also reviewed an electrocardiogram (EKG) and echocardiogram which were done while at the Washington Hospital Center. The MRI did not indicate evidence of any significant cardiac muscle or structural damage to Officer M.F.'s heart. In Dr. Zemedkun's assessment, the elevated troponin level was either due to skeletal muscle damage due to trauma, or some degree of strain to the heart in the setting of a situation with significant stressor, including elevated blood pressure levels. Dr. Zemedkun also suspected the likelihood that the elevated troponin was due to flow-limiting coronary disease or

acute coronary syndrome was low, given the pattern of troponin elevation, level of troponin elevation, and absence of symptoms or EKG to indicate such a pathology.

Dr. Zemedkun based his assessment on meeting with the patient, reviewing the medical records and tests from January 6 and January 7, 2021, and the imaging studies and tests he performed, including an MRI Cardiac with and without contrast and Stress Echo AMB. Dr. Zemedkun also based his assessment on his years of training and experience as a practicing cardiologist.

Dr. Zemedkun graduated from Harvard Medical School in 2010.  He completed an internship at New York Presbyterian-Weill Cornell Medical Center in 2011.  He completed residency at New York Presbyterian-Weill Cornell Medical Center in 2013.  He completed a fellowship program with Georgetown University and MedStar Washington Hospital Center in 2016.  He is board certified by the American Board of Internal Medicine for Internal Medicine and Cardiovascular Disease. His full CV has been disclosed to defense counsel, which included his certifications, licensure, teaching experience, work experience, and publications.

Dr. Zemedkun's publications include the following, non-exhaustive list:

Case BC, Zemedkun M, Sangkharat A, Taylor AJ, Srichai MB. Pulmonary Embolism Diagnosed From Right Heart Changes Seen After Exercise Stress Echocardiography. Circ Cardiovasc Imaging. 2015 Aug;8(8):e003506. doi: 10.1161/CIRCIMAGING.115.003506. PMID: 26198162. https://pubmed.ncbi.nlm.nih.gov/26198162/

Zemedkun M, LaBounty TM, Bergman G, Wong SC, Lin FY, Reynolds D, Gomez M, Dunning AM, Leipsic J, Min JK. Effectiveness of a low contrast load CT angiography protocol in octogenarians and nonagenarians being evaluated for transcatheter aortic valve replacement. Clin Imaging. 2015 Sep-Oct;39(5):815-9. doi: 10.1016/j.clinimag.2014.08.010. Epub 2014 Oct 16. PMID: 25982494.https://pubmed.ncbi.nlm.nih.gov/25982494/

Lin FY, Zemedkun M, Dunning A, Gomez M, Labounty TM, Asim M, Horn E, Aurigemma G, Maurer MS, Roman M, Devereux R, Min JK. Extent and severity of coronary artery disease by coronary CT angiography is associated with elevated left ventricular diastolic pressures and worsening diastolic function. J Cardiovasc Comput

Tomogr. 2013 Sep-Oct;7(5):289-96.e1. doi: 10.1016/j.jcct.2013.08.008. Epub 2013 Sep 26. PMID: 24268115. https://pubmed.ncbi.nlm.nih.gov/24268115/
Dr. Zemedkun has not testified in the last four years.

The government has discussed this testimony with Dr. Zemedkun, but has not obtained his signature for this notice. As the doctor will not be testifying under any contract with the government, will be equally available to both sides, and has signed the medical records containing this assessment, the government would ask that the Court ratify these exceptions under Federal Rule of Criminal Procedure 16(a)(1)(G)(v) to the signature requirement.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:  /s/*Kimberly L. Paschall*
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov

BY: /s/ *Anthony W. Mariano*
ANTHONY W. MARIANO
MA Bar No. 688559
Trial Attorney, Detailee
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov