**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-246-1 (ABJ)** |
| **DANIEL JOSEPH RODRIGUEZ,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

"*There will be blood. Welcome to the revolution.*"

- Telegram Message from Daniel Joseph Rodriguez to the PATRIOTS[45]MAGA Gang group, January 5, 2021, 11:44 p.m.

For the defendant who conspired for weeks to travel across the country to stop the official proceeding on January 6, 2021, who battled members of law enforcement on the steps of the U.S. Capitol, tasing one of them in the neck, and who obstructed justice by conspiring with others to get rid of key evidence from January 6th, the government requests that this Court sentence Daniel Joseph Rodriguez to 168 months' incarceration, 36 months' supervised release, restitution in the amount of $98,927.18, and special assessment of $400. The government recommends this upward departure from the government's calculated advisory Guidelines' range of 97-121 months to reflect the gravity of Rodriguez's conduct as one of the most violent defendants on January 6, 2021, whose planning and preparation for the attack on the U.S. Capitol on January 6th was clearly calculated to influence and affect the conduct of the United States government.

1

I.      **FACTUAL BACKGROUND**

A.      **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 160, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.      **Rodriguez's Role in the January 6, 2021 Attack on the Capitol**

*Preparing for Violent Revolution Before January 6th*

In the fall of 2020, Rodriguez was the administrator of a Telegram group chat titled PATRIOTS[45]MAGA Gang. The group, initially created to bring together supporters of former President Trump in the lead-up to the 2020 Presidential election, became a breeding ground for Rodriguez's plans for violence against the seat of the federal government. In that group, Rodriguez and his co-conspirator, defendant Edward Badalian, wrote hundreds of messages about war and revolution, about traitors and tyrants. *See generally* Exhibit 1 (Folder of Telegram Messages). Before the group's plans to come to the Capitol on January 6th solidified, Rodriguez began advocating in the group chat to travel to Washington, D.C. to participate in some kind of violent fight on behalf of the former president. On November 8, 2020, one day after Joe Biden was announced the winner of the 2020 Presidential election by major news outlets, Rodriguez texted the group about the Biden supporters outside the White House, stating, "Well that's where the battle will be decided. Will there be more of us or them?" Exhibit 1 (2020.11.08 2133). On November 11, 2020, Rodriguez announced the group's "mission" like a military tactical plan,

saying that they need to go to D.C. for the inauguration for "Operation fire fight save the White House bring a fire extinguisher." Exhibit 1 (2020.11.11 1953).



*Exhibit 1 (2020.11.08 2133) and (2020.11.11 1953)*

The reason for this violent rhetoric and extensive planning was also clear: Rodriguez believed the 2020 Presidential election had been stolen, and those responsible should be in prison or dead. And this mistaken belief gave him the authority, in his mind, to plan an assault on anyone who stood in his way. *See* Exhibit 1 (2020.11.06 0350), (2020.11.17 1922), (2020.12.14 1408).

Rodriguez's statements reveal he was prepared to die for the cause: "We won't allow criminals to run this country anymore. 1776[45]Forever! If it's the last thing some of us ever do." Exhibit 1 (2020.12.14 1408).



*Exhibit 1 (2020.11.06 0350), (2020.11.17 1922), and (2020.12.14 1408)*

Rodriguez also understood the importance of the Electoral College process to getting his preferred candidate in office, a topic that was discussed often in the Telegram group. Rodriguez was not merely a passive political observer; he was deeply enmeshed in the coverage of the post-election legal fights and the battleground states. *See* Exhibit 1 (2020.12.01 2035), (2020.12.06 1147), (2020.12.14 1149).



*Exhibit 1 (2020.12.01 2035), (2020.12.06 1147), and (2020.12.14 1149)*

**The Crystallizing Moment: Trump's Tweet on December 19, 2020**

Rodriguez's violent rhetoric and rallying cries crystallized on December 19, 2020, when a time and place for Rodriguez's purported revolution presented itself in the form of a Tweet from the former president: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Another member of the chat sent the Tweet to the group, sparking Rodriguez and his group into action. *See* Exhibit 1 (2020.12.19 0002).



*Exhibit 1 (2020.12.17 0002)*

This tweet galvanized Rodriguez and his efforts to recruit members of the Patriots[45]MAGA Gang to come to Washington, D.C., armed and ready. On December 21, 2020, Rodriguez had a urged another member to go to D.C., stating that they must "put their differences aside and fight." Exhibit 1 (2020.12.21 1915), (2020.12.21 1917).



*Exhibit 1 (2020.12.21 1915) and (2020.12.21 1917)*

On December 23, 2021, Rodriguez asked the group if they wanted to rent an RV to go to Washington, D.C., and explained his preference for driving over flying because group members would be carrying weapons: "some of us want to take things not great on airplanes." Exhibit 1 (2020.12.23 1946). In preparation for the upcoming violence, he encouraged members of the group to "get a large knife," told them where they could buy bear spray cans, "highly recommended" goggles without breath holes, and told them where to get an axe handle. Exhibit 1 (2020.12.23 1949), (2020.12.23 1951), (2020.12.23 1953).



*Exhibit 1 (2020.12.23 1946) and (2020.12.23 1949)*



*Exhibit 1 (2020.12.23 1951) and (2020.12.23 1953)*

Rodriguez also questioned the loyalty of members of the group, expressing his desire to remove members that were not completely onboard with the "team efforts" to "save America" that he was espousing. Exhibit 1 (2021.01.01 1352). For example, knowing his intentions for the trip to D.C., Rodriguez stated he would need to have people removed, so that he could discuss their actions in D.C. "secure[ly]." Exhibit 1 (2021.01.02 1551). There was no dispute about what conversations Rodriguez wanted to conceal, as his co-defendant Badalian responded, "[Y]ou cant say we should kill traitors on a radio show but you can say it here legally." *Id.*



*Exhibit 1 (2021.01.01 1352) and (2021.01.02 1551)*

All the while, leading up to January 6th, Rodriguez made his target clear: Rodriguez was focused on Congress and politicians who stood in his way. *See* Exhibit 1 (2020.12.23 2022), (2020.12.28 1717). And when another member of the group brought up the Electoral College

certification, and how Trump supporters have been "called" into action by the former president on January 6th, Rodriguez made plain his plan: "Congress can hang. I'll do it. Please let us get these people dear God." Exhibit 1 (2020.12.28 1717).



*Exhibit 1 (2020.12.23 2022) and (2020.12.28 1717)*

And by the time Rodriguez arrived in the D.C. area on January 5, 2021, he had made his mind up: violence was the answer for dealing with these "crooked politicians," or, as fate would have it, anyone else who stood in his way. Exhibit 1 (2020.12.23 2022).



*Exhibit 1 (2020.12.23 2022)*

### *Rodriguez's Violence on January 6th*

<u>Rodriguez at the Stop the Steal Rally</u>

On the morning of January 6, 2021, Rodriguez and his group attended the Stop the Steal rally on the National Mall. There, while listening to the former president speak, Rodriguez took the opportunity of a nearby camera to make a gesture, slashing his finger across his throat, while saying the name "Joe Biden." *See* Exhibit 2, Holder Documentary Video Clip. Rodriguez is easily identifiable throughout January 6th footage by his red Make America Great Again hat with distinctive pins and a large blue and red elephant sticker on the bill, large glasses, and facial hair. *See id.*



*Still shots from Exhibit 2, Holder Documentary Clip, at 00:34 and 00:55*

<u>Rodriguez Arrives at the Lower West Terrace Tunnel</u>

Rodriguez made his way from the speeches at the Ellipse to the Capitol building, illegally traversing the West Front of the Capitol grounds and entering the Lower West Terrace tunnel at approximately 2:46 p.m. *See* Exhibit 3A, Lower West Terrace Tunnel CCV. There, he met with fellow rioter Gina Bisignano, and screamed, "Yeah! We're fucking doing it!" when he saw her. *See* Exhibit 4, Gina Bisignano Cellphone Video.



*Still shot Exhibit 3A: Lower West Terrace Tunnel CCV (lightened) at 2:46:24 p.m., Rodriguez and Bisignano meet in the tunnel*



*Still shots from Exhibit 4: Gina Bisignano cellphone video 5062 at 00:10 and 00:17, depicting Rodriguez entering the tunnel and yelling*

By this time, the tunnel was flooded with rioters, who were attempting to break past the police line standing in the double doors, guarding the Capitol building and the people remaining inside. *See* Exhibit 5, Statement of MPD Commander Ramey Kyle. Rodriguez made his way to the front of the line of rioters battling the officers, yelling into his bullhorn at the beleaguered line. *See* Exhibit 3A, at 2:47:45 p.m.

### Rodriguez Deploys a Fire Extinguisher at the Police Line

At 2:49:08 p.m., another rioter entered the tunnel with a fire extinguisher. *See* Exhibit 3B, Lower West Terrace Tunnel CCV. After that rioter dispersed some of the contents of the fire extinguisher at the ceiling of the tunnel, Rodriguez doubled back from the front of the line, came face to face with that rioter, and escorted that rioter to the front of the police line, out of view of the CCV camera. *See* Exhibit 3B, at 2:49:19 p.m. The rioter originally holding the fire extinguisher then exited the tunnel approximately 13 seconds later without the fire extinguisher. *See* Exhibit 3B, at 2:49:31 p.m.

Meanwhile, fellow rioter Geoffrey Sills was filming at the police line.[1] *See* Exhibit 3B, at 2:49:54 p.m. A six-second video obtained from Geoffrey Sill's cellphone depicts Rodriguez at the first set of double doors, facing the police line, deploying the fire extinguisher at the line of officers. *See* Exhibit 6, Geoffrey Sills Cellphone Video.

---

[1] Geoffrey Sills was convicted at a stipulated trial in case number 21-cr-40 (TNM) of violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1) and (b), and 18 U.S.C. § 2111.



*Still shot from Exhibit 6: Geoff Sills Cellphone video at 00:03 depicting Rodriguez deploying a fire extinguisher at the police officers in the tunnel*

At 2:50 p.m., while Rodriguez was still at the front of the line of rioters, and had not re-appeared on the CCV camera, the rioters in the tunnel participated in a coordinated heave-ho against the police line. *See* Exhibit 3B, Lower West Terrace Tunnel CCV at 2:50:51 p.m. At 2:51:31, rioters started to retreat from the tunnel after the unsuccessful push, and Rodriguez reappeared on camera. *Id.* Despite others retreating, Rodriguez acquired a long wooden pole and shoved it at the police line. *See id.*, at 2:51:43 p.m.



*Still shot from Exhibit 3B: Lower West Terrace CCV (lightened) at 2:51:43 p.m., depicting Rodriguez pushing a wooden pole towards the police line.*

<u>Rodriguez Acquires Electroshock Weapon and Uses It on Police Line</u>

At 2:52:24 p.m., Rodriguez waved his arms towards the rioters outside the tunnel, encouraging them to push forward towards the police line. *See* Exhibit 3B, Lower West Terrace Tunnel CCV at 2:52:24 p.m. It is then that fellow rioter Kyle Young[2] tapped Rodriguez on the shoulder, and provided him a small, black, rectangular object. *See* Exhibit 3B, at 2:52:25 p.m. Young then assisted Rodriguez in turning the object on, which activated with a visible electrical charge. *See* Exhibit 3B, CCV at 2:52:34 p.m.

---

[2] Kyle Young was convicted of one count of 18 U.S.C. 111(a) in 21-cr-291-3 (ABJ).



*Still shot from Exhibit 3B: Lower West Terrace CCV (lightened) at 2:52:25 p.m., depicting Young handing Rodriguez a black rectangular item.*



*Still shots from Exhibit 3B: Lower West Terrace CCV (lightened) at 2:52:34 p.m., depicting Young helping Rodriguez activate the electroshock device*

After activating the weapon, by 2:53 p.m., Rodriguez returned to the front line of rioters once again. Between 14:53:40 and 14:53:44, Rodriguez is captured in the body worn camera of MPD Sergeant Jason Mastony. *See* Exhibit 7A. Sergeant Mastony testified at the trial in Rodriguez's co-defendant's case that, when watching his body worn camera, he observed what appeared to be a handheld taser or stun gun in the defendant's hand and heard the "rat-a-tat-tat" sound consistent with a taser or electroshock weapon being arced. *See* Exhibit 7A, Mastony Body Worn Camera 1; 03/01/23 Trial Testimony 283:25-284:6. This sound can be heard on Exhibit 7A at the same time Rodriguez can be seen lunging towards the police line, with the small black, rectangular electroshock weapon in his outstretched hand. Exhibit 7A, at 14:53:43-45. Subsequently, Rodriguez left the tunnel at 14:54:45. *See* Exhibit 3B, Lower West Terrace Tunnel CCV.



*Still shots of Exhibit 7A: Mastony BWC at 14:53:40 depicting Rodriguez with taser in hand at the front of the police line.*

18



*Still shots of Exhibit 7A: Mastony BWC at 14:53:41 and 14:53:43 depicting Rodriguez with taser in hand lunging towards the police line.*

<u>Rodriguez Returns to the Tunnel and Participates in a Second Heave-Ho Against Police</u>

At 3:15 p.m., Rodriguez made his way back to the mouth of the Lower West Terrace Tunnel. Rodriguez then ran to the front of the line of rioters to join in a second heave-ho effort against the police line at 3:16 p.m. *See* Exhibit 3B, Lower West Terrace CCV at 3:16:00 to 3:17:20 p.m.



*Still shot Exhibit 3B: Lower West Terrace Tunnel CCV (lightened), depicting Rodriguez re-entering the tunnel.*

Fellow rioter Lewis Cantwell,[3] was also present in the tunnel at this time and was filming from above while the rioters pushed on the line; Rodriguez can be easily identified among those participating in the heave-ho by his distinctive hat. *See* Exhibit 8, Cantwell 316 Video. At 00:06 in the video, Rodriguez can be seen once again holding the black electroshock weapon in his hand. *See* Exhibit 8, Cantwell 316 Video.

---

[3] Cantwell was convicted of one count of 18 U.S.C. §§ 231(a)(3) and 2 in case 21-cr-089 (CKK).



*Still shots of Exhibit 8: Cantwell video at 00:04 and 00:07 seconds, depicting Rodriguez in the heave-ho, holding the electroshock weapon in his hand.*

<u>Rodriguez's Assault on Officer Fanone</u>

At 3:18 p.m., after over 37 minutes of intense, close-contact fighting, police finally succeeded in pushing back the rioters and clearing the Lower West Terrace Tunnel. At this time, MPD Officer Michael Fanone was at the front of the police line, helping push the rioters back. When he arrived at the mouth of the tunnel, rioter Albuquerque Head[4] wrapped his arm around Officer Fanone's neck and dragged him out on to the steps of the Lower West Terrace, into the

---

[4] Head was convicted of one count of 18 U.S.C. 111(a) in 21-cr-291-2 (ABJ).

riotous mob. As Head wrestled Officer Fanone down the steps, Rodriguez moved through the crowd, towards the captured officer. With his electroshock weapon in hand, Rodriguez reached his arm towards the side of Officer Fanone's neck, landing the device on the side of Officer Fanone's neck, below the left ear of Officer Fanone's helmet. *See* Exhibit 9, Go Pro Video and Exhibit 10, YouTube Patriots Storm. Officer Fanone screamed in pain. *See* Exhibit 11, Fanone Body Worn Camera, at minute markers 15:19:15-15:19:16.



*Still shot Exhibit 9: Go Pro Video (lightened) at 00:32 depicting Rodriguez with electroshock weapon in hand*



*Still shot Exhibit 9: Go Pro Video (lightened) at 00:37 depicting Rodriguez with electroshock weapon to side of Officer Fanone's neck*



*Still shot Exhibit 10: YouTube Patriots Storm US Capitol at 00:36 depicting Rodriguez with electroshock weapon to side of Officer Fanone's neck*



*Still shot Exhibit 10: YouTube Patriots Storm US Capitol at 00:37 depicting Rodriguez with electroshock weapon to side of Officer Fanone's neck*

Officer Fanone then jerked his head back, recoiling from the shock, and pulled his face away from Rodriguez briefly. Despite Officer Fanone's efforts to get away, Rodriguez struck again, placing the electroshock weapon on the back of Officer Fanone's neck, below the "M" of the "MPDC" logo on his helmet. *See* Exhibit 9, Go Pro Video and Exhibit 12, RF Angle Video. The electrical spark of the weapon rang out (Exhibit 9 at 00:41 and on Exhibit 12 at 00:04), and Officer Fanone screamed again. *See* Exhibit 11, at 15:19:17- 15:19:21.

24



*Still shots Exhibit 9: Go Pro Video at 00:40 (lightened) depicting Rodriguez with electroshock weapon to back of Officer Fanone's neck*



*Still shots Exhibit 12: The RF Angle Video at 00:02 and 00:03 depicting Rodriguez with electroshock weapon to back of Officer Fanone's neck*

On his body worn camera, right after Officer Fanone can be heard screaming at 15:19:17-

15:19:18, Rodriguez can be seen, turning away from Officer Fanone. *See* Exhibit 11, at 15:19:20.



*Still shot from Exhibit 11: Officer Fanone Body Worn Camera at 15:19:20, depicting Rodriguez's after Officer Fanone screamed out in pain.*

Despite his injuries, Officer Fanone was able to retreat back to the police line at the mouth of the Lower West Terrace Tunnel. He collapsed there, unconscious, at the feet of Sergeant Mastony, who helped drag his lifeless body to safety inside the Capitol. *See* Exhibit 7B, Mastony Body Worn Camera 2, at 15:21:12-15:22:30. Once inside, when officers were able to revive him after 2 minutes and 21 seconds, the first thing Officer Fanone asked was "did we take back that door?" *See* Exhibit 11, Fanone Body Worn Camera, at 15:23:33. Officer Fanone was taken then to a local hospital where he was treated for his traumatic injuries, as discussed herein. *Infra*, at 32.

<u>Rodriguez Entered the Capitol Building</u>

The assault on Officer Fanone was not the end of Rodriguez's day at the Capitol, however. While he remained on the grounds of the U.S. Capitol, Rodriguez was beaming with pride about his conduct. With the riot still underway,[5] he took the time to boast to his Telegram group: "omg

---

[5] The Telegram messages are captured in Pacific Standard Time, three hours behind the time in Washington, D.C.

I did so much fucking shit rn and got away tell you later" and "Tazzzzed the fuck out of the blue." Exhibit 1 (2021.01.06 1259).



*Exhibit 1 (2021.01.06 1259)*

Emboldened following the assault, Rodriguez remained on the grounds, and ultimately entered the building through a broken window to the left of the Lower West Terrace Tunnel at approximately 4:58 p.m., with his co-defendant, Badalian, entering room ST2M inside the Capitol. *See* Exhibit 13, News2Share Clip, at 00:02.



*Still shot of Exhibit 13: News2Share Clip (lightened) at 00:04, depicting Rodriguez climbing through Lower West Terrace window*

Inside, Rodriguez and Badalian were united with their third co-defendant, who was urging the group inside the room to move forward further into the building. Rodriguez stood upon a chair in the room, and attempted to rile up the room of rioters, shouting that "they have shot and killed a girl." *See* Exhibit 14, JLQ Unblocked Video at 6:38-6:53. Other rioters took the door of ST2M off its hinges and passed it out to the crowd on the inaugural platform. Rodriguez walked through the open door and continued into a hallway connecting to two other offices. Once in the adjacent room—ST4M—Rodriguez took a long pole-like object and tried to smash the window of that office, to allow another entry point into the building for the rioters on the plaza outside. After ramming the window at least twelve times, Rodriguez then screamed at rioters still outside to "get in here!" as tear gas and flash bombs were deployed by law enforcement outside. *See* Exhibit 14, JLQ Unblocked Video, 10:11-11:17.



*Still shot from Exhibit 14: JLQ Unblocked at 11:06, depicting Rodriguez breaking the window with large pole-like object*



*Still shots from Exhibit 14: JLQ Unblocked Video at 11:08, depicting Rodriguez breaking the window with large pole-like object.*

The Architect of the Capitol estimated the window damages by Rodriguez cost an estimated $8,000 to repair. *See* Exhibit 15.

Next, Rodriguez and other rioters broke into the third office within the suite—ST6M—where Rodriguez and the third co-defendant rifled through bags and desks. Rodriguez instructed others to open things up and "look for intel." *See* Exhibit 16, LOBS Short Docs at 0:00-1:00, 4:44-5:40. During his ransacking of the room, Rodriguez found an emergency escape hood, which he

stole and removed from the building. *See* Exhibit 16, LOBS Short Docs at 5:01. Shortly thereafter, law enforcement, who had gained control of the rioters on the inaugural platform, ordered rioters inside the office suite to leave. Rodriguez then sprinted out of ST6M, back through the broken window, and on to the inaugural platform.



*Still shot from Exhibit 16: LOBS Short Doc at 05:01 Rodriguez with Emergency Escape Hood*

Eventually, Rodriguez reunited with other members of his group and they left the Capitol grounds, well over two hours after arriving. Before leaving the area for the day, Rodriguez sent a final image and text to the group chat: a gallows, with the U.S. Capitol in the background, and the text "No Democrats found unfortunately." Exhibit 1 (2021.01.06 1856).



*Exhibit 1 (2021.01.06 1259) and (2021.01.06 1856)*





███████████████████████████████████

███████████████████████████████████

███████████████████████████████

### *Rodriguez's Attempts to Destroy Evidence After January 6th*

On January 8th, Rodriguez, Badalian, and others who drove with them across the country started their return trip to California. This time, their third co-defendant, was present in the vehicle. During the trip, those traveling in the van continued to communicate over Telegram with the PATRIOTS[45]MAGA Gang. Rodriguez, aware that his actions at the Capitol were criminal, feared being caught by law enforcement. On January 8th, while driving back home to California through Tennessee, Rodriguez posted to the group, "What's going on in Nashville FBI raiding several law makers we are heading to Nashville rn! We need help. Where can we go? We have tons of Trump flags." Exhibit 1 (2021.01.08 818).

During the trip, Badalian appeared on the Internet streaming show "War Room" by InfoWars, along with fellow rioter, Gina Bisignano. Bisignano provided InfoWars with some videos she had taken at the Capitol. Upon arriving back in California, Rodriguez drove to Bisignano's house. While there, Rodriguez and his co-defendants told Bisignano to delete all of her videos from the Capitol, and the third co-defendant left a note asking her to move all of her evidence to a secure hard drive. Exhibit 19, Bisignano notebook. Rodriguez did this with the understanding that these videos could be used as evidence in future prosecutions of the Capitol riot.



*Exhibit 19: Gina Bisignano Notebook*

But the realization that he had committed criminal acts did not deter Rodriguez from continuing to use the Telegram group chat and stoke the ideas of continued war and violence against the United States government: "We must be ready next time for Pence's body guard. Hang together or we hang separately. The best way for them to win this war is if there's never a battle. We must do much more next time. Plan on not failing and don't fail the plan." Exhibit 1 (2021.01.11 2128).

35



*Exhibit 1 (2021.01.11 2128)*

## II.    THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a superseding indictment charging Rodriguez with eight counts, including Count One (Conspiracy, in violation of 18 U.S.C. § 371); Count Two (Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2); Count Three (Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1)); and Count Six (Inflicting Bodily Injury on Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1), (b)).

On February 14, 2023, Rodriguez was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement. The remaining charges, which the government will move to dismiss at the time of sentencing, were Count Four (Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)); Count Seven (Theft of Government Property, in violation of 18 U.S.C. § 641); Count Eight (Destruction of Government Property, in violation of 18 U.S.C. § 1361); and Count Ten (Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)). In his Plea Agreement, the defendant agreed that these charges "were based in fact." ECF No. 159 at 2.

## III.    STATUTORY PENALTIES

Rodriguez now faces sentencing on Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1); and Inflicting Bodily Injury on Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1), (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office [¶8], the defendant faces a maximum sentence of 5 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count One; a maximum sentence of 20 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count Two; and a maximum sentence of 20 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count Three; and a maximum sentence of 20 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count Six.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Guidelines Calculations

The government submits that the calculation laid out in the plea agreement is correct. That calculation is as follows:

<u>**Count 1: 18 U.S.C. § 371:**</u>

| | | |
|---|---|---|
| U.S.S.G. § 2C1.1(a)(2) | Conspiracy Base Offense Level | **12** |
| U.S.S.G. § 2C1.1(c)(1) | Cross Reference to Obstruction Guidelines | **29 (See Below)** |

<u>**Count 2: 18 U.S.C. § 1512(c)(2), § 2**</u>

| | | |
|---|---|---|
| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(1)(B) | Cause/Threat Injury or Damage | **+8** |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with Justice | +3 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | +2 |
| U.S.S.G. § 3B1.1(c) | Aggravating Role | +2 |
| | Total | **29** |

<u>**Count 3: 18 U.S.C. § 1512(c)(1)**</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Obstruction Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(c) | Cross Reference to Obstruction Guidelines | **23** |
| | Total | **23** |

<u>**Count 6: 18 U.S.C. § 111(a)(1), (b)**</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Aggravated Assault Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | **+4** |
| U.S.S.G. § 2A2.2(b)(3)(B) | Serious Bodily Injury to Victim | **+5** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction Under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(b), (c) | Victim Was a Government Officer | +**6** |
| U.S.S.G. § 3A1.3 | Restraint of Victim | **+2** |
| | Total | **33** |

### B.  Applicable Enhancements

The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein, with the exception that the agreement permits the defense to challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense did not involve the victim being physically restrained in the course of the offense. ECF No. 159, at 3-4. Therefore, the government will address only that enhancement here.

The Court should reject Rodriguez's challenge to the Probation Office's determination that the enhancement for restraint of a victim under U.S.S.G. 3A1.3 applies in this case. ECF 180, at 30. In other cases addressing the exact same attack on Officer Fanone, *United States v. Kyle Young and Albuquerque Head*, 21-cr-291 (ABJ), this Court applied the enhancement for Young's and Head's restraint of Officer Fanone over the defendants' objections. The government would incorporate the arguments made there (ECF No. 139 and 161) and ask this Court to now apply that enhancement against Rodriguez.

In determining whether anyone was "physically restrained" under the Guidelines, the Third Circuit recently developed an approach incorporating various considerations adopted by other Circuits, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *United States v. Bell*, 947 F.3d 49, 56 (3d Cir. 2020) ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here"). The five factors identified by the Third Circuit are:

1. Use of physical force;

2. Exerting control over the victim;

3. Providing the victim with no alternative but compliance;

4. Focusing on the victim for some period of time; and

5. Placement in a confined space.

*Bell*, 947 F.3d at 56.[8]

Each factor is met in this instance. First, Rodriguez used physical force against Officer Fanone by assaulting him not once but twice with an electroshock weapon. The D.C. Circuit Court has found that "physical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) (finding no physical restraint pursuant to U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C. Cir. 1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)). Here, Rodriguez made direct bodily contact with Officer Fanone—deploying his weapon twice to keep the officer deep in the violent mob.

---

[8] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54-55), *Bell* and similar cases help interpret the meaning of "physically restrained" as it is used in § 3A1.3.

Second, Rodriguez exerted control over Officer Fanone. Consistent with the definition of "restrained" and examples of being physically restrained provided in the Guidelines ("being tied, bound or locked up"), "a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner." *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *United States v. Foppe*, 993 F.2d 1444, 1452-53 (9th Cir. 1993) ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls. 'Forcible' means effected by the use of force") (internal citations omitted). Twice applying a taser to the neck of a victim immobilizes that person such that his movement is restricted. *See, e.g.*, *United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990) ("We have no difficulty in concluding that a victim who is held around the neck at knifepoint is denied freedom of movement so as to be physically restrained [pursuant to § 3A1.3]."). Here, Rodriguez literally stunned Officer Fanone while he was out of the Lower West Terrace tunnel in the midst of a violent mob, preventing Officer Fanone from being able to return to the relative safety of being surrounded by his fellow officers still holding their line in the Lower West Terrace Tunnel.

Third, Rodriguez provided Officer Fanone with no alternative but compliance. In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the defendant had stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint."

41

*Id.* at 320-21 (internal citations omitted). Here, Rodriguez's restraint forced Officer Fanone to comply with exactly what Rodriguez and the riotous mob wanted—for the Officer to remain isolated from the police line and the Capitol doors, so that other rioters would have a better chance at successfully storming the Capitol building. And like the victim in *Rosario*, Officer Fanone similarly could do nothing about his situation because of Rodriguez's physical restraint. Rodriguez left Officer Fanone with no alternative but compliance.

Another consideration is the duration of the defendant's restraint of the victim. *Bell*, 947 F.3d at 59. While sustained restraint may militate in favor of applying the enhancement, it is not required. *See, e.g.*, *United States v. Coleman*, 664 F.3d 1047, 1050-51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Checora*, 175 F.3d 782, 791 (10th Cir. 1999) ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape. . . . The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d at 1452-53 ("The Guidelines do not distinguish between long and short-term restraint, and neither will we."). Even under the Third Circuit's analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines. *Bell*, 947 F.3d at 56. Here, while Rodriguez's restraint of Officer Fanone was brief, context matters greatly. Not only did Rodriguez stun Officer Fanone twice with an electroshock weapon, but this restraint occurred in the middle of a riot—

leaving him vulnerable to additional assaults as he was surrounded by other hostile rioters. Consequently, the brevity of the restraint should not preclude application of the enhancement.[9]

The final consideration noted by the Third Circuit is whether "the perpetrator's act . . . enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947 F.3d at 60 (internal quotation marks and citations omitted). Rodriguez immobilized Officer Fanone in the midst of an angry and violent mob of people who surrounded him and prevented him from escaping. Such behavior—blocking egress—is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § lBl.1. For instance, in *United States v. DeLuca*, 138 F.3d 24 (1st Cir. 1998) the court found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator],

---

[9] The application of the enhancement to the facts here are not in tension with the holding in *United States v. Mikalajunas*, 936 F.2d 153, 155 (4th Cir. 1991) (holding that § 3A1.3 sentencing enhancement did not apply when defendant briefly held a victim during a fatal stabbing). While the court in *Mikalajunas* did consider duration of the restraint as a factor, the court ultimately held that the restraint was not sufficient because the act of fatally stabbing a victim generally involves restraint:

> Stabbing, however, is of a different nature. The very act of stabbing normally will involve some physical restraint…Every murder involves the ultimate restraint. Such terminal restraint is simply an element of the crime of homicide… An upward adjustment for restraint is to be made in the context of an act which adds to the basic crime. Furthermore, the examples of physical restraint in the guidelines, while not all inclusive, imply that the guidelines intend an enhancement for something other than a brief holding as part of a stabbing.

*Mikalajunas*, 936 F.2d at 156. Plainly, that reasoning does not apply here, where Officer Fanone was very fortunately not the victim of a homicide. And unlike homicide, an assault does not always involve a restraint.

43

throughout the encounter, stood at the hallway door barring egress by [the victim]." Rodriguez stunned Officer Fanone in a space where innumerable other rioters could successfully confine the officer, preventing his escape.

Here, the application of the enhancement is supported by the *Bell* factors. Rodriguez purposely tased Officer Fanone not once, but twice, to subdue him in the violent mob of rioters, trapped him away from his fellow officers and potential help. Such behavior, calculated not just to hurt the victim but to incapacitate him in the crowd, justifies application of the restraint enhancement.

In the context of Capitol Riot assault cases, three judges have applied this restraint enhancement. In *United States v. Thomas Webster*, 21-cr-208, Judge Mehta found the enhancement applicable when the defendant tackled an officer on the West Plaza during an assault. In *United States v. Patrick McCaughey*, 21-cr-40-1, Judge McFadden found the enhancement applicable when the defendant crushed MPD Officer Daniel Hodges with a stolen police riot shield, pinning him in the door frame of the Lower West Terrace entrance to the Capitol. Additionally, this Court applied the restraint enhancement to both Kyle Young and Albuquerque Head, who restrained Officer Fanone, before and during the assault by Rodriguez. *See* Young Sent. Hearing Tr. 8:5-11:13 ("He used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm. . . . The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.").

44

### C. Grouping

The revised PSR includes one error, with regard to the grouping of these offenses. Per U.S.S.G. § 3D1.2, Application Note 8, when a defendant is convicted of conspiring to commit several substantive offenses, and also of committing one or more substantive offenses, the parties must treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses (cross reference to U.S.S.G. § 1B1.2(d)), then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature. In this instance, the defendant was convicted of Count One, which has as its object the substantive violations charged in Counts Two and Three. Count One will cross reference to the substantive obstruction counts, per U.S.S.G. § 2C1.1(c)(1), and groups with Count Two. Count Two and Count Three do not group because they involve separate victims. *See* U.S.S.G. § 3D1.2(b) & application note 2.

The 18 U.S.C. § 111(a)(1), (b) conviction in Count Six "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count Two offense of violating 18 U.S.C. § 1512(c)(2). Therefore, Count Six should group with Count One and Count Two ("Group One"). Count Three is a separate group, as explained above ("Group Two"). The PSR did not group Count Six with Count Two, and therefore created a third Group because of the different harms and victims. PSR ¶ 56-61. This resulted in an additional unit added, and an offense level increase of two, which the government does not include. PSR ¶ 86-89.

The base offense level for Group One is the offense level for the most serious count, per U.S.S.G. § 3D1.3, which is Count 6. Therefore, the offense level is 33.

The base offense level for Group Two is 23.

Since the offense level for Group Two is "9 or more levels less serious than the Group with the highest offense level," no units are added and the combined offense level is 33. U.S.S.G. § 3D1.4(c).[10]

### D. Criminal History Category

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 96. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 30, Rodriguez's Guidelines imprisonment range is 97 to 121 months' imprisonment.

### E. Application of 3A1.4 n.4 Upward Departure

Pursuant to paragraph 5(C) of the plea agreement, the government has reserved the right to seek an upward departure pursuant to U.S.S.G. § 3A1.4 application note 4. ECF No. 159, at 5. A three-level departure is appropriate here because Rodriguez's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

---

[10] If the restraint enhancement were not applied, then an additional point would be added under § 3D1.4(b). The combined offense level then would be 32.

### 1. Legal Standard

An adjustment for terrorism applies where the offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1; s*ee United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying adjustment where the offenses themselves were not enumerated but the underlying conduct was meant to promote an enumerated offense). Here, the government is not seeking application of the Section 3A1.4(a) adjustment, though it arguably applies.

Rather, the government seeks the application of Note 4 to Section 3A1.4, which provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.*, cmt. n.4. When it adopted Note 4, the Sentencing Commission explained that it is "an encouraged, structured upward departure," the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002).

A defendant's offense is "calculated to influence or affect the conduct of government by intimidation or coercion," as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See, e.g.*, *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's

47

narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as defendant's crime was "calculated to have such an effect." *Khatallah*, 314 F. Supp. 3d at 199. Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist). Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of a defendant's claimed magnanimous intent. *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants who professed to try to "sav[e] our earth," because "the purpose

behind defendants' actions was to further [their] political agenda: the end to industrial society"). While Rodriguez may claim that, despite the absence of any legitimate evidence, he had a genuine belief that the election was fraudulent, that is irrelevant. "[I]t doesn't matter why the defendants oppose . . . the United States government—if they use violence and intimidation to further their views, they are terrorists." *Id*.

### 2. Rodriguez's Conduct and Convictions

Rodriguez's conduct constituting his convictions of conspiracy to obstruct an official proceeding (Count One), obstruction of an official proceeding (Count Two), and inflicting bodily injury on certain officers using a dangerous weapon (Count Six) are not enumerated under 18 U.S.C. § 2332b(g)(5), but were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). As his convictions and the underlying evidence reflects, Rodriguez conspired to, attempted to, and temporarily did prevent Congress from certifying the 2020 Electoral College vote, through planned, threatened, and actual use of force.

The convictions on Counts One and Two (conspiracy to obstruct and obstruction of an official proceeding) carry with them the finding that Rodriguez intended to obstruct or impede the certification proceeding. ECF No. 160, ¶ 20. And the conviction with respect to Count Six (inflicting bodily injury on certain officers using a dangerous weapon) necessarily means that Rodriguez used "force" or "intimidation" against Officer Michael Fanone, a person assisting the Capitol Police in defending the U.S. Capitol, in the performance of his official duties. ECF No. 160, ¶ 20.

Beyond merely his guilty plea, however, there is ample evidence that Rodriguez's offenses were "calculated to influence or affect the conduct of government, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A).[11]

*First*, Rodriguez made extensive preparations to support the use of force in order to intimidate or coerce Congress and stop the certification proceeding. Almost immediately after the November 2020 election, in the Telegram group chat, Rodriguez began recruiting other members to the Stop the Steal Caravan and to the "the battle" in D.C. *See* Exhibit 1 (2020.11.08 2051 ("We should rent a car and go? Infowars California Caravan to the capital")); (2020.11.08 2133 ("Well, that's where the battle will be decided. Will there be more of us or them?")). Rodriguez and his co-conspirators also began accumulating weapons, and planning for their transport to Washington, D.C. *See* Exhibit 1 (2020.12.23 1946 (telling the group that he will be driving instead of flying because they want to "take things not great on airplanes")); (2020.12.23 1949 (telling people to get a large knife)); (2020.12.23 1951 (encouraging members to get bear spray and goggles without breath holes)). Rodriguez and his co-defendant also encouraged members of the group to prepare for war by going paintballing, to train together as a group. *See* Exhibit 1 (2020.12.09 1013 (sharing

---

[11]  While there is direct evidence of Rodriguez's state of mind, his preparations for and engagement in an attack on Congress in and around the Capitol on January 6 also allows a "natural inference" that is sufficient to satisfy the "calculation" requirement of Section 3A1.4. *Wright*, 747 F.3d at 408-09 (citing *United States v. Dye*, 538 F. App'x 654, 666 (6th Cir. 2013)); *see also Mohammed*, 693 F.3d at 202 (court may draw "plausible inferences" to find requisite "calculation"); *United States v. Arcila Ramirez*, 16 F.4th 844, 854 (11th Cir. 2021) ("[B]ecause a defendant often will not admit his full knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts.").

Patriots Paintball flyer and encouraging others to join)): (2020.12.09 1812 ("Now is the time. Who is going to stay alive?")).

*Second*, consistent with these prior plans, evidence of Rodriguez's conduct on January 6 itself demonstrates his intent to use violence as needed to impede Congress and stop the certification proceeding. While on the grounds of the Capitol, Rodriguez deployed a fire extinguisher at the police line, participated in multiple heave-hos against the police in an attempt to break into the building, used an electroshock weapon successfully on Officer Fanone, attempted to use it on other officers guarding the Lower West Terrace door, and smashed a window inside the building with a long wooden pole. He attempted to and did, in fact, cause significant injury and damage at the Capitol—and to law enforcement.

*Third*, there is ample evidence of Rodriguez's numerous statements before, during, and after January 6 confirming that he intended for his actions to influence or affect government conduct. For example, on December 14, 2020, he wrote to the group chat "we won't allow criminals to run this country anymore. 1776[45]Forever! If it's the las thing some of us ever do. Something Glorious is about to happen." Exhibit 1 (2020.12.14 1408). On December 23, 2020, Rodriguez wrote "[w]e gotta go handle this shit in DC so the crooked politicians don't have an army of thugs threatening violence to back their malevolent cabal ways." Exhibit 1 (2020.12.23 2022).

Confirming Rodriguez's knowledge of Congress's process for certifying the election results, and improper purpose in later breaching the Capitol building, he posted several messages about the Electoral College and the importance of the battleground states in the Telegram group

chat. *See* Exhibit 1 (2020.12.01 2035 (discussion about then-Attorney General William Barr and the Electoral College)); (2020.12.06 1147 (Rodriguez responding to another member of the chat talking about the Electoral College sending their votes on December 14th)); (2020.12.14 1149 (Rodriguez responding to Badalian message about Trump winning Nevada)).

Rodriguez's statements during and after breaching the Capitol further indicates that his intent had been to coerce and intimidate the government—and that he sought to continue doing so. While fighting in the Lower West Terrace Tunnel and breaching inside the Capitol, the defendant sent several messages to the group chat, including "omg I did so much fucking shit rn and got away tell you later" and "Tazzzzed the fuck out of the blue." Exhibit 1 (2021.01.06 1259). At the end of the day, Rodriguez sent a picture of the gallows constructed by other rioters, with the Capitol in the background, accompanied by the text "No Democrats found unfortunately." Exhibit 1 (2021.01.06 1856). And after he had returned to California, had processed all that had happened at the Capitol, he messaged the group chat "[w]e must be ready next time for Pence's body guard. Hang together or we hang separately. The best way for them to win this war is if there's never a battle. We must do much more next time. Plan on not failing and don't fail the plan." Exhibit 1 (2021.01.11 2128).

These are just a sample of the numerous statements made by Rodriguez indicating his intent to coerce and intimidate. These statements, combined with his violent actions, demonstrate that Rodriguez sought to affect— that is, obstruct—Congress by stopping the certification proceeding, and by using violence against those who protected the Capitol and all those inside. Rodriguez thus evinced an intent both to influence and affect government conduct through intimidation and

coercion. That is so even if there is evidence that Rodriguez held "many false beliefs," had "incoherent" political motivations, or would characterize his statements as "mere venting." *Van Haften*, 881 F.3d at 544-45. Rodriguez's many statements expressing his intent fit "within a context of plans" that "implicate government interests" even if any one statement, alone, would be insufficient. *Wright*, 747 F.3d at 410.

Finally, Rodriguez's choice of target itself further demonstrates his intent to intimidate and affect the government. A defendant's specific intent to influence and retaliate against government conduct for purposes of Section 3A1.4 can often "be inferred from the defendant's choice of target." *Khatallah*, 314 F. Supp. 3d at 198. Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases). Clearly, attacking the seat of our government while the entire complement of legislators and the Vice President of the United States were inside performing their constitutional and statutory duties is a strong indication of intent to influence or affect the government, or to retaliate against government conduct.

Rodriguez's violent actions elevate the need for this upward departure, even though violence is not required for the application of the enhancement. Courts applying Section 3A1.4 have found that engaging in violent conduct may be relevant to a defendant's terroristic "calculation" to affect the conduct of government through "intimidation or coercion," but actual violence is not necessary. *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 325 (4th Cir. 2004)

(affirming application of Section 3A1.4 enhancement for defendant convicted of providing money laundering services to Hezbollah); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (affirming application of Section 3A1.4 enhancement to defendant convicted of perjury and obstructing justice by lying to investigators and grand jury about terrorist associates). In this instance, however, Rodriguez stands convicted of actually using violence against a police officer who was defending the seat of the government while the peaceful transfer of power was occurring. Rodriguez also admitted to smashing a window of the U.S. Capitol in an attempt to get more rioters inside the building to stop the proceedings. While not necessary, where a defendant's violent conduct is as stark and as shocking as it is here, the Court should weigh it heavily.

In short, Rodriguez's conduct displayed a clear intent to stop Congress from certifying the results of the election, including through the organized use of force and destruction of government property. That conduct—calculated to stop the peaceful transfer of Presidential power for the first time in the nation's history—is a quintessential example of an intent to influence government conduct through intimidation or coercion and warrants an upward departure pursuant to Note 4. Indeed, the terrorism enhancement in Section 3A1.4 is meant to "punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes." *Benkahla*, 530 F.3d at 313. Daniel Rodriguez's conduct on January 6 was egregious, and the Court should acknowledge it as such.

### 3. Prior Applications of Note 4 in the January 6th Cases

In *United States v. Elmer Stewart Rhodes, et.al.*, 22-cr-15, Judge Mehta found 3A1.4 n. 4 applicable to the eight defendants convicted of seditious conspiracy and/or conspiracy to obstruct

the official proceeding, in varying degrees.

| Defendant | Sentencing Date | U.S.S.G. § 3A1.4, Note 4 Upward Departure |
|---|---|---|
| Rhodes | May 25, 2023 | 6 offense levels |
| Meggs | May 25, 2023 | 3 offense levels |
| Watkins | May 26, 2023 | 3 offense levels |
| Vallejo | June 1, 2023 | 2 offense levels |
| Harrelson | May 26, 2023 | 1 offense level |
| Minuta | June 1, 2023 | 1 offense level |
| Moerschel | June 2, 2023 | 1 offense level |
| Hackett | June 2, 2023 | 1 offense level |

At sentencing, Judge Mehta noted that "Mr. Rhodes and his compatriots' objective was to affect the conduct of government, specifically Congress, and to do so through intimidation and coercion by means of force, both through the stockpiling of weapons in the event that they needed to be brought across the river -- there was an agreement as to that -- and then, of course, the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day." 05/25/2023 Sentencing Hearing Tr. 78:19-79:2. While those defendants were charged with seditious conspiracy, which includes an element of intimidation and coercion by means of force, ***none*** of these defendants were actually convicted of assaulting a member of law enforcement with a deadly or dangerous weapon, as Rodriguez is here. *See* 05/25/2023 Sentencing Hearing Tr. 111:10-13 ("It is true that neither Mr. Rhodes nor any of one of his conspirators used a weapon against a police officer, maimed a police officer that day, and there were those who did worse in terms of physical assaults."). The use of force is therefore inherent in Rodriguez's conviction, just as it is in the Oath Keepers' convictions.

Judge Mehta further elaborated as to the appropriateness of Note 4 enhancement in the

Oath Keepers case, by saying:

> I think the way I get there is the nature of the conduct, and let me be clear . . . . [I]t's a separate and more serious conduct than what's captured by the Guideline. And I say that because the Guideline itself does not necessarily require the level of intimidation and calculation and targeting that the terrorism enhancement -- what we will call the terrorism enhancement in the note requires.

> This is an additional level of calculation. It is an additional level of planning. It is an additional level of purpose. It is an additional level of targeting, in this case, an institution of American democracy at its most important moment, the transfer of power. That's pretty significant.

05/25/2023 Sentencing Hearing Tr. 79:12-25. The same is true here. Rodriguez and his co-

conspirators spent weeks planning an attack on the United States Capitol on the day that the

peaceful transfer of power was meant to take place. That, as the Court noted, is pretty significant.

The Court also highlighted the particularly insidious nature of a conviction for a count of

conspiracy. He referenced *Callanan v. United States,* 364 U.S. 587 (1961), which states:

> Collective criminal agreement, partnership in crime presents a greater potential threat to the public than individual dealings. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.

> Group association for criminal purposes, often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish, nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense, which is the immediate aim of the enterprise.

05/25/2023 Sentencing Hearing Tr. 111:17-112:7. Unlike other defendants for whom the

government had sought this enhancement, but ultimately were denied in that request, the Oath

Keepers and Rodriguez have been convicted of a conspiracy whose object was to obstruct the normal functioning of the government. As with the Oath Keepers, this places these defendants in a different category—one presenting a "greater potential threat to the public than individual dealings."

The application of Note 4 here would not lead to any "*unwarranted* sentence disparities," 18 U.S.C. § 3553(a)(6) (emphasis added), because no court in the January 6 context has confronted a defendant "who ha[s] been found guilty of similar conduct," *id*. While Section 3553(a)(6) "does not allow unwarranted sentencing disparities between codefendants, *warranted* disparities are allowed." *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) (internal citations omitted) (emphasis added); *see also United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (explaining some of the circumstances that warranted a disparity in sentencing defendants convicted of the same conduct, even among coconspirators); *Mejia*, 597 F.3d at 1343 (same). While other January 6th defendants may have engaged in heinous, assaultive conduct, their conduct did not involve the same level of organizational planning or action as Rodriguez did, nor cause the level of injury to the officers defending the building as Rodriguez did. Even the defendants in *Rhodes* did not commit the type of violent and destructive acts that underlies Rodriguez's convictions. His case is unique, in its level of violence, in its conspiratorial conduct, and in its wide-ranging planning and execution.

Here, the government is seeking an upward departure by three offense levels for Rodriguez. This is consistent with what Judge Mehta ruled was applicable in *Rhodes* for those convicted of counts of conspiracy, and who were particularly active in the planning and execution of the events

of January 6th—Kelly Meggs[12] and Jessica Watkins.[13]  This request is measured, compared to the 12-point enhancement, and Criminal History Category VI, under an application of 3A1.4(A), which, given Rodriguez's destruction of property, is arguably applicable here. The government believes a sentence of 168 months, at the top of the elevated Guidelines range, is an appropriate application of the upward departure in § 3A1.4 Note 4, that aligns more with the conduct of this defendant than his advisory Guidelines reflect.

---

[12] Defendant Kelly Meggs led the military-style stack of Oath Keepers into the U.S. Capitol building on January 6th. In advance of that date, he stoked the members of his chapter of the Oath Keepers with rhetoric shockingly similar to Rodriguez's, by, for instance, telling a Signal group that it was "easy to chat here" but the "real question is who's willing to DIE[.]" On January 6th, Meggs wrote to a group chat, "When Trump said those words earlier this week. He wasn't talking to the soccer moms, the rah rah trumpers, or the stop the steal people. He was talking to US!! The 3%, the PB, and most importantly the Oath Keepers!!!!" *United States v. Elmer Stewart Rhodes, et. al.,* 22-cr-015 (APM), ECF No. 5656, at 101-104. Meggs was convicted of Seditious Conspiracy (18 U.S.C. § 2384); Conspiracy to Obstruct an Official Proceeding (18 U.S.C. § 1512(k)); Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)); Conspiracy to Prevent U.S. Officers from Discharging Duties (18 U.S.C. § 372); and Tampering with Documents or Other Objects (18 U.S.C. § 1512(c)(1)). The government sought a four offense level enhancement under Note 4 for defendant Meggs; Judge Mehta granted a three offense level enhancement.

[13] Defendant Jessica Watkins drove with a group of Oath Keepers from Ohio to attend January 6th, who intended to provide weapons for the quick reaction force in Virginia. On January 6th, Watkins joined with the other individuals comprising Stack One, forcing her way inside the Capitol, and disrupting the certification proceedings takings place. Once inside, Watkins led the group that moved north toward the Senate Chamber. *United States v. Elmer Stewart Rhodes, et. al.*, 22-cr-015 (APM), ECF No. 5656, at 120-126. Watkins was convicted of Conspiracy to Obstruct an Official Proceeding (18 U.S.C. § 1512(k)); Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)(2)); Conspiracy to Prevent U.S. Officers from Discharging Duties (18 U.S.C. § 372); and Interference with law Enforcement During a Civil Disorder (18 U.S.C. § 231). The government sought a three offense level enhancement under Note 4 for defendant Watkins; Judge Mehta granted a three offense level enhancement.

### 4. Prior Applications of Note 4 Across the Country

Application of Note 4 to this defendant's conduct is consistent with the application of Note 4 by other courts around the country. In *United States v. Doggart*, the sentencing court imposed a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate." No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6. The Sixth Circuit recently affirmed the application, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion." *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021). There, the sentencing court upwardly departed from an otherwise applicable Guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal History Category I). *Id.* After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment. *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4(A) when sentencing multiple co-conspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016 armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies. These co-conspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then

set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other federal agencies. As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land. Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia. The court applied a Note 4(A) upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant). *See United States v. Patrick*, No. 16-cr-51 BR-9 (D. Or. Feb. 18, 2018), Sent. Tr. at 43-45. The court then applied four- and two-level departures to two defendants convicted at trial. *Id.* at 46; *United States v. Thorn*, No. 16-cr-51- BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

Other sentencing courts have also upwardly departed under Note 4, although under a different subsection, Note 4(B), where defendants' convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B) but the "terrorist motive was to intimidate or coerce a civilian population" rather than to influence or retaliate against government conduct. *See United States v. Harpham*, 11-cr-42 (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level Note 4(B) departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day

parade targeting parade participants); *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds in* 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application of Note 4(B), defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4(B), defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1-5 (finding that Note 4(B) applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance").

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rodriguez's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Rodriguez planned with others for weeks to obstruct the official proceeding, and did so through extremely violent means, as described above. The nature and

circumstances of Rodriguez's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 168 months.

### B.  The History and Characteristics of the Defendant

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. While the defendant has no criminal history, his messages in the group chat indicate he is no stranger to the criminal justice system. Exhibit 1 (2020.11.19 1149 ("Prison and jail is extremely serious. I probably have the most experience in our group with that…maybe entire BH rally. Please don't experience it yourself.")). The PSR notes previous arrests for Assault with a Dangerous Weapon in 2011 (¶ 99), Disorderly Conduct in 2013 (¶ 100), and Second Degree Robbery and Assault with a Deadly Weapon in 2015 (¶ 101), when Rodriguez was well past the age of youthful indiscretions. These arrests suggest that the defendant is not simply an individual who got swept up in the mob on January 6th; rather, they show that Rodriguez has acted violently throughout his adult life, and is unlikely to reform at this juncture. Finally, Rodriguez himself stated in the group chat that he is a violent person, and he knows how and when to direct that violence: "I've got too much violence in me that needs to come out at an appropriate time." Exhibit 1 (2020.11.05 1201).

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rodriguez's criminal conduct on January 6 was the epitome of disrespect for the law; he battled with law enforcement at the U.S. Capitol for hours, nearly costing one officer his life, in order to stop the official proceeding happening inside. It is hard to conceive of an offense that more warrants a harsh sentence to promote respect for the law more than those.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol and the defendant's conduct in particular certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although the defendant has a criminal history category of I, his history of arrest and conviction shows a clear pattern of assaultive behavior and the use of weapons. *See* Section V(B) *supra.*

Second, although the defendant has accepted responsibility for his actions, his continued adherence to the violent beliefs that brought him to the District on January 6th is highly concerning. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he

---

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Far more important than anything he may say now, when he is facing sentencing, are Rodriguez's own statements, discussed above, when he was expressing himself freely. These statements demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from ever again using or promoting violence in pursuit of his political goals.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here—the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.[16]

In *United States v. Peter Schwartz*, 21-cr-178, Judge Mehta sentenced the defendant to 170 months after he was convicted at trial of 11 counts, including three counts of 18 U.S.C. § 111(a)(1) and (b), one count of 18 U.S.C. § 231, one count of 18 U.S.C. § 1512(c)(2), and four misdemeanors. On January 6th, Schwartz armed himself with a wooden tire knocker and battled officer on the Lower West Terrace. Schwartz threw a chair at the police line, creating an opening in that line which enabled hundreds of rioters to flood the terrace and force overwhelmed officers to retreat. He stole chemical munitions, and sprayed officers who were retreating and those who ultimately defended the Lower West Terrace Tunnel. The government sought a sentence of 294 months, based on the Guidelines calculation raised significantly by Schwartz's significant criminal

---

overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan). The government believes that is the case here, but the recommendation for an upward departure would not create an unwarranted sentencing disparity.

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

history score of 25. However, Schwartz was not convicted of conspiracy, and the assaults against the officers did not lead to significant injuries.

This Court has also sentenced two other defendants who assaulted Officer Fanone, in *United States v. Albuquerque Head*, 21-cr-291-2, and *United States v. Kyle Young*, 21-cr-291-3. Both defendants were convicted of one count of violating 18 U.S.C. 111(a); Kyle Young received 86 months and Albuquerque Head received 90 months. Both defendants had far more extensive criminal histories than Rodriguez, but their assaults were significantly less vicious given they did not involve a deadly or dangerous weapons. Neither defendant was convicted of conspiracy or obstructing the official proceeding, like Rodriguez. Therefore, a significantly higher sentence for Rodriguez would not be an unwarranted sentencing disparity when compared with Young and Head. Moreover, neither of these defendants engaged in prolonged conduct that necessitated and warranted the application of U.S.S.G. § 3A1.4 n.4.

## VI.     RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rodriguez must pay at least $2,000 in restitution, which reflects in part the role Rodriguez played in the riot on January 6. Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.*

Rodriguez should also be required to pay restitution for the injuries he caused to Officer Fanone. Because Rodriguez's assault on Officer Fanone was the same as the one this Court addressed in *United States v. Head and Young*, 21-CR-291 (ABJ), the government incorporates by reference its supplemental restitution memorandum from that case (21-CR-291, ECF No. 173-1), which discusses the standards applicable to restitution in a case where, as here, multiple defendants caused harm. While the government withdrew its supplemental restitution request for Head and Young because their respective plea agreements did not provide sufficient notice, there is no such impediment here, because Rodriguez acknowledged in his plea agreement that Officer Fanone suffered substantial injury, requiring the Metropolitan Police Department to pay $96,927 for his medical bills and leave, and the plea agreement contemplates that Rodriguez will pay some or all of that amount. ECF No. 159, at ¶ 13.

Consistent with the extent of loss that resulted from Rodriguez's criminal offense, and because Rodriguez played a more significant role in the attack on Officer Fanone than either Head or Young, the government submits Rodriguez should be ordered to pay the full $96,927.11 to MPD, jointly and severally with any other individuals who also harmed Officer Fanone and who are adjudicated guilty and sentenced in the future. Such an order is authorized by law, and similar restitution awards have been upheld by the D.C. Circuit. *See, e.g.*, *United States v. Bikundi*, 926 F.3d 761, 791-92 (D.C. Cir. 2019) (upholding district court order that two health care fraud defendants pay restitution in the full amount of the victim's losses, jointly and severally with each other and with other defendants).

Rodriguez's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and the Metropolitan Police Department. *See* PSR ¶ 177.

## VII.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 168 months' incarceration, 36 months supervised release, and $98,927.18 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    _____/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665

69

ANTHONY W. MARIANO
Trial Attorney, Detailee
Capitol Siege Section
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov
202 476-0319
Anthony.Mariano2@usdoj.gov