# United States District Court
## District of Columbia

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>v.<br><br>Daniel Rodriguez,<br><br>        Defendant. | Case No. 1:21-cr-00246-ABJ-1 |

## MEMORANDUM IN SUPPORT OF SENTENCING

Daniel Rodriguez came to Washington, D.C. because he believed he was doing the right thing after former President Trump made several claims attacking the security of mail-in ballots and telling the American public that the presidential election had been "stolen."  Indeed, then-President Trump spent the months leading up to the election stoking fear into the hearts of Americans that the presidential election would be "rigged" against him. Months prior to November 2020, the former president tweeted that this would be "the most corrupt Election in American history!" Trump's incendiary lies created a frenzy of anger and uncertainty in the United States during what was already an unprecedented time at the height of the Covid-19 pandemic. After losing the election—instead of using his authority to calm the American public—Trump doubled down on his lies and falsely declared that he had *won*. Millions of Americans believed his victory declaration because he was the President of the United States.

Mr. Rodriguez, who grew up without a father and who never completed high school, was someone who believed the former president's lies because Mr. Rodriguez deeply respected and idolized Trump. He saw the former president as the father he wished he had. He believed Trump was someone to be admired: a multimillionaire who graduated from Wharton Business School, with his name massively displayed in gold on buildings across the United States.

Mr. Rodriguez believed the former President's lies and manipulation, just as thousands of others did when they gathered at the Capitol on January 6, 2021, with the understanding they were there on behalf of the President of the United States to protect their government.  It was this atmosphere of fear, lies, and uncertainty, created by former President Trump, that compelled Mr. Rodriguez to take a stand against the claimed corruption that resulted in a "stolen" election. It was Mr. Rodriguez's unwavering belief in the words of the former president that drove him to lose all sense of right and wrong and led him to take part in the tragic actions that unfolded in Washington, D.C. on January 6th.

Mr. Rodriguez is not the first person to be sentenced for what happened that day, nor is he the first person to be sentenced for offenses involving Officer M.F. However, while Mr. Rodriguez is just one of thousands at the Capitol on January 6th, he is still an individual with his own distinct set of circumstances. Considering the nature and circumstances of the offense, his background, acceptance of responsibility, disparity in other sentences and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of 65

months—a sentence that is sufficient, but not greater than necessary to address his conduct in this case.

## I.   Background

On February 14, 2023, Mr. Rodriguez pleaded guilty to Counts One, Two, Three and Six of the of the Superseding Indictment.[1]  As part of the plea agreement, the government will move to dismiss the remaining counts at sentencing.  ECF No. 159 at 2.  In the plea agreement, the parties stipulated to a total offense level of either 32 or 30, as the government reserved the right to argue that a two-level enhancement for restraint of victim applies pursuant to U.S.S.G. § 3A1.3.[2]  *Id.* at 3-4.  With a three-level reduction for timely acceptance of responsibility, and a criminal history category I, the guideline range of imprisonment is either 78 to 97 months or 97 to 121 months.  Because the restraint enhancement should not apply, the applicable guideline range is 78 to 97 months.  Although U.S. Probation calculated a different total offense level, it ultimately recommended a low-end guideline sentence.

The plea agreement allows Mr. Rodriguez to ask for a downward variance from the guideline range.  Considering the sentencing factors under 18 U.S.C. § 3553(a), a sentence of 65 months in custody is an appropriate sentence in this case.

---

[1] Count 1: 18 U.S.C. § 371, Count 2: 18 U.S.C. § 1512(c)(2), Count 3: 18 U.S.C. § 1512(c)(1), Count 6: 18 U.S.C. § 111(a)(1), (b).

[2] Without any legal or factual analysis, the PSR found a two-level enhancement for restraint of the victim applies pursuant to U.S.S.G. § 3A1.3, simply noting that Kyle Young and Albuquerque Young received those enhancements.  PSR ¶ 81.

## II.   A sentence of 65 months in custody sufficiently meets the goals of sentencing under 18 U.S.C. § 3553(a).

The Guidelines are "the starting point and initial benchmark" for determining an appropriate sentence. *Molina-Martinez v. United States*, 678 U.S. 189, 198 (2016). A reasonable sentence is one that is sufficient but not greater than necessary to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 USC § 3553(a)(2).

In determining a reasonable sentence, courts must also consider: the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the sentencing guideline range and any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentence disparities, and the need to provide restitution to any victims of the offense. 18 USC 3553(a)(1), (3)-(7).

### A.   Mr. Rodriguez's background and circumstances support a variance under § 3553(a).

"*More than anything, Mr. Rodriguez is lonely.*" Exhibit A, Psychiatric

Evaluation of Daniel Rodriguez, Dr. Mark Mills.

It is hard to understand what drives someone to end up where Mr. Rodriguez finds himself. Particularly given that Mr. Rodriguez's criminal history places him in the lowest criminal history category and given that he has been a model inmate

in pretrial detention over the past two years.[3]  PSR ⁋ 96.  Unlike many clients

facing serious charges, Mr. Rodriguez has been nothing but respectful, kind, and

accepting of the consequences of his actions.

Looking into his past gives insight into Mr. Rodriguez.  What stands out the

most is how lost he was without a father figure. It was his unguided floundering

that drove his desire for belonging.  As Officer M.F. himself wrote, Mr. Rodriguez

was "so desperate for a sense of belonging that he became an easy mark for a cult."

M.F., *Hold the Line*, 143 (2022).

Despite his absent father, Mr. Rodriguez has the support of his mother,

Yolanda Gill.  Prior to the arrest, she was his constant companion.  Unfortunately,

Ms. Gill has not been able to see her son in over two years since his arrest.  Exhibit

B, Letter from Yolanda Gill.  Without Mr. Rodriguez's income, Ms. Gill lost her

home and has been working as a home health aide at 72 years old.

Growing up, Mr. Rodriguez had no relationship with his father.  His mother

was raising two children on her own and juggling several jobs to keep the family

afloat.  Ms. Gill taught Mr. Rodriguez to be independent from an early age—doing

his own laundry, cooking, and cleaning.  At ten years old, Mr. Rodriguez was the

father figure in his home.  Because of the time he spent helping at home,

Mr. Rodriguez was not able to spend time focusing on his education.

---

[3] Mr. Rodriguez has *zero* criminal history points.  Mr. Rodriguez further
maintains that he does not have a problem with alcohol and the only alcohol
related arrest, noted in PSR ⁋ 102, was dismissed.

5

After his mother remarried, the family was uprooted to Arizona where Mr. Rodriguez suffered academically. Though he was visibly struggling, his family was too busy with work and surviving day to day to address Mr. Rodriguez's academic struggles and give him the support he needed. Mr. Rodriguez was left alone as a child to handle his difficulties on his own, which ultimately led him to drop out of high school.

Mr. Rodriguez grew up so isolated even from family that his half-sister, 11 years older, was under the false impression he had graduated from high school. Exhibit D, Letter from Deborah Monreal. Despite his isolation, Mr. Rodriguez has family and friends who support him. Ms. Monreal emphasizes that her brother is a hard worker, someone who is very close with their mother. *Id.* And Mr. Rodriguez's childhood friend, Breanna Throckmorton, describes Mr. Rodriguez as a man who has a desire to "make a difference in this world for the better." Exhibit E, Letter from Breanna Throckmorton.

Though he was not able to succeed in school, Mr. Rodriguez has always committed himself to maintaining steady employment to support himself and assist his mother. For the last twenty years, Mr. Rodriguez has held jobs in retail, factories, and other low-level employment. This employment was steady enough to enable him to contribute to his mother's mortgage and other bills.

Mr. Rodriguez's former boss, Robert Vigil, was the closest thing he had to a father figure. On weekends Mr. Rodriguez would spend time fishing with Mr. Vigil's family—treating his children like he would his own. Exhibit F, Letter

from Robert Vigil.  Mr. Vigil reiterated that Mr. Rodriguez is a great employee and someone he would not hesitate to hire.  *Id.*  In his letter to this Court, Mr. Vigil asks our justice system to do something incredibly challenging: "I'm asking that you understand him as a person and not by his mistakes."  *Id.*

Though Mr. Rodriguez was able to main stability at work, he was never able to find the connection he was craving. Mr. Rodriguez never married or had children. He struggled to find a place where he felt he truly belonged.  But once he found President Trump and the "Make America Great Again" movement, that all changed. He found a cause that gave his life meaning and a group of people that finally made him feel accepted.  Most importantly, he found former President Trump—a man who quickly became the father figure and leader Mr. Rodriguez never had in his life.[4]  Mr. Rodriguez trusted Trump blindly and admired Trump so much that he referred to him as "dad" in his social media chats leading up to Jan. 6th.

> **DJ Rodriguez**                    admin
> Dad's big day.
> Gotta get ready to save America.
>                                    9:55 PM

During the course of this prosecution, Dr. Mark Mills was retained to conduct an evaluation of Mr. Rodriguez.  He interviewed Mr. Rodriguez and administered various personality tests.  Exhibit C, Dr. Mark Mills CV.  Dr. Mills found

---

[4]  The clipped image of a text message is from a social media group chat between Mr. Rodriguez and other former-President Trump supporters.

Mr. Rodriguez "is neither psychotic nor delusional." Exhibit A at 4. What Mr. Rodriguez wanted more than anything was to belong. Dr. Mills found that these "groups [Mr. Rodriguez joined] not only provided him with companionship and activity where he could join in with others, they also provided him with a sense of social utility, mission and belonging. With them, he was a fellow player, not merely another employee working a factory shift." *Id.* at 5. Testing and interviewing by a psychiatrist confirmed Mr. Rodriguez is a "rather ordinary man of limited education who endeavored, wrongfully, to belong to a group whose goals he only partially appreciated and whose conduct he only temporarily accepted." *Id.* at 6.

According to Ms. Gill, Mr. Rodriguez became a different person when he started getting involved in right-wing Make America Great Again rallies. Exhibit B. The MAGA rallies gave him a sense of purpose, a place to belong, and a person (former President Trump) to replace his missing father. The rallies introduced him to new people—people who had a strong influence over him during President Trump's re-election campaign. It was ultimately these negative connections that led to his participation in the events of January 6.

## B.   The harsh custodial conditions under which Mr. Rodriguez has been serving his time support a variance under § 3553(a).

Mr. Rodriguez has been in custody since his arrest in March of 2021. His time in custody was during the height of Covid-related restrictions, which required him to be in almost complete lockdown without access to any programming. Compounding this, Mr. Rodriguez has been subjected to several moves across different detention facilities far from his home, largely due to overcrowding issues

8

caused by the January 6 cases.  These restrictions and frequent uprooting made the time in custody particularly harsh.

Mr. Rodriguez was initially placed in a facility in Warsaw, Virginia.  This facility did not allow for visitation, so Mr. Rodriguez was never able to visit with his mother.  The facility was located almost two hours outside of Washington, D.C., which made visitation with counsel very challenging.  In December of 2022, right after counsel received the first written plea agreement, Mr. Rodriguez was unexpectedly, and without notice to counsel, moved to a BOP facility in Lewisburg, Virginia.

Mr. Rodriguez remained in Lewisburg (aside from being transported back to Alexandria, Virginia for the change of plea) for the last six months.  While in Lewisburg, Mr. Rodriguez had regular video visitation from counsel.  Counsel was in the process of scheduling an in-person visit with Mr. Rodriguez when he was again, unexpectedly and without notice to counsel, moved back to Washington, D.C. in early May 2023.[5]

Since Mr. Rodriguez has been in Washington, D.C., visitation has been impossible.  The first date counsel was able to secure a legal visit was on June 9, 2023, the day the instant Sentencing Memorandum is due.  This has prevented counsel from having in-depth conversations regarding the PSR in advance of sentencing.

---

[5] The sudden movement of Mr. Rodriguez prevented counsel from having continued meetings regarding informal objections to the PSR.

9

### C.    A 65-month sentence avoids unwarranted sentencing disparities.

In considering an appropriate sentence, 18 U.S.C. § 3553(a)(6) instructs courts to consider the need to avoid unwarranted sentencing disparities.  There are many individuals who have been sentenced for conduct on January 6, 2021.  A 65-month sentence for Mr. Rodriguez avoids unwarranted sentencing disparities considering the nature and circumstances of the defendants below.

### 1.    Kyle Young and Albuquerque Head

Particularly relevant here are two individuals who were involved with offenses relating to Officer M.F.:  Kyle Young and Albuquerque Head.  Mr. Rodriguez was not charged in the same indictment as Kyle Young and Albuquerque Head (and Thomas Sibick).  Nonetheless, the government specifically noted Mr. Rodriguez's conduct in relation to Mr. Young and Mr. Head.  *United States v. Sibick et al*, 1:21-cr-00291, ECF No. 173.

In discussing the restitution potentially owed by Mr. Young and Mr. Head to the Metropolitan Police Department, the government argued the two defendants were responsible for "70% of the total expenses ($67,849.03) given that they each played a significant role in the concerted attack on Officer M.F., but neither of them applied the taser to the back of Officer M.F.'s neck."  *Id.*  This statement makes clear that from the government's perspective, Mr. Young and Mr. Head were

responsible for 70% of what happened to Officer M.F., with Mr. Rodriguez being responsible for 30% or less.[6]

### a.   Kyle Young

Mr. Rodriguez did not arrive at the Capitol building with any weapons.[7]  It was Kyle Young who gave the hand-held device to Mr. Rodriguez.  Mr. Young had to show and instruct Mr. Rodriguez how to use the device.

Mr. Young's violent conduct during January 6th was significant and included a number of vicious acts.  He held a strobe light toward officers fighting in the tunnel, threw a large speaker towards officers (striking someone in the head), jabbed a pole toward the police line, and assaulted two police officers:  restraining Officer M.F. and pushing and hitting Officer M.M.  *United States v. Kyle Young*, 1:21-cr-00291-ABJ, ECF No. 140, Government's Sentencing Memorandum.  Even more troubling, Mr. Young brought his 16-year-old son with him, and the child had to witness these events.

Unlike Mr. Rodriguez, Mr. Young has a "significant criminal history," which includes a ten-year sentence for a drug offense.  *Id.* at 55.  During that prison sentence, Mr. Young was cited for misconduct involving violence, and ultimately had his parole revoked twice after his initial release from prison.  Shortly after his first parole on the drug offense, Mr. Young was convicted of a firearm offense and

---

[6] The government's Notice specifically notes that there is someone else responsible for "tasing" Officer M.F., ostensibly Mr. Rodriguez.

[7] Mr. Rodriguez truthfully provided this information to agents during his interrogation.

sentenced to five years in prison.  Mr. Young was revoked from his initial parole in that case as well.  During his parole on the firearm offense, Mr. Young was convicted of a second drug offense and sentenced to five years in prison.

As the government noted in its sentencing memorandum, Mr. Young was in a unique position having committed his instant offenses after serving three lengthy prison sentences.  The government recommended a sentence of 86 months in custody for Mr. Young, which is the sentence he received.

### b.    Albuquerque Head

Unlike Mr. Rodriguez, Mr. Head is in Criminal History Category VI, the highest criminal history category.  Mr. Head's criminal history encompasses twenty-nine pages in his PSR and, according to the government, "weighs heavily in favor of a lengthy term of incarceration."  *United States v. Albuquerque Head*, 1:21-cr-00291-ABJ, ECF No. 159, Government's Sentencing Memorandum.

In addition to his substantial criminal history, Mr. Head, unlike Mr. Rodriguez, was untruthful during his custodial interview, when he attempted to lessen his involvement by claiming he was merely trapped in the tunnel.  In reality, Mr. Head wrapped his arm around Officer M.F.'s neck and yelled out "I've got one" before forcibly dragging him out into the crowd.  Mr. Head is also seen in video wearing a gas mask and pushing other officers and he twice struck toward the police line with a shield.

The government recommended a sentence of 96 months in custody for Mr. Head, and this Court sentenced him to a term of 90 months in custody.

### 2.  Jeffrey Scott Brown

Mr. Brown was sentenced to 54 months in prison following a jury trial.  Like Mr. Rodriguez, Mr. Brown is also a resident of California who traveled to Washington, D.C. to participate in the events of January 6th.  *United States v. Brown*, 1:21-cr-00178-APM-2, ECF No. 201, Government's Sentencing Memorandum.  Mr. Brown was active on social media sites like Parler and Telegram, discussing his travels while other group members discussed what type of weapons to bring.

Once at the Capitol, Mr. Brown made his way to the LWT tunnel, participating in heave-ho's against the officers, which caused great distress and injured an officer who was crushed in the door frame.  Mr. Brown, like Mr. Rodriguez, was handed a weapon—specifically a canister of orange pepper spray—which he used to spray at officers in the line. While no officers were directly injured, an officer testified at trial that the pepper spray had a detrimental impact to the police officer's efforts.  Despite all the damage, Mr. Brown was unable to accept responsibility for his actions on January 6th, unlike Mr. Rodriguez who has pled guilty.

### 3.  Cody Mattice

Mr. Mattice was sentenced to 44 months in custody after pleading guilty to Assaulting an Officer on January 6th.  Mr. Mattice wrote text messages to his co-defendant indicating they anticipated violence at the Capitol.  *United States v. Mattice*, 1:21-cr-00657-BAH-1, ECF No. 60, Government's Sentencing

Memorandum.  When Mr. Mattice was at the entrance of the Capitol building, he pulled down a section of bike rack fencing separating the officers from the crowd.

Once inside the Capitol building, Mr. Mattice obtained a small canister of chemical spray from another rioter and sprayed the contents at police officers defending the tunnel. He held his thumb on the canister, discharging chemicals at police officers.  Unlike Mr. Rodriguez, during his custodial interview, he was untruthful with FBI agents.  Mr. Mattice is set to be released in November of 2024.

### 4.   Alan Byerly

On October 21, 2022, Alan Byerly was sentenced to 34 months in custody following his involvement in the events of January 6th.  Mr. Byerly had originally been charged with Assault on an Officer with a Deadly Weapon, in violation of 18 U.S.C. § 111(b), but the government subsequently agreed to dismiss that charge and allowed him to plead to Assault on an Officer, in violation of 18 U.S.C. § 111(a) and Striking another Person, in violation of 18 U.S.C. § 113(a)(4).

Prior to arriving in Washington, D.C., Mr. Byerly purchased a hand-held device, just like the one handed to Mr. Rodriguez in the tunnel.  At sentencing, the government stated that its own expert, Mr. Wright, had indicated the device was a low-level energy device.[8]  *United States v. Alan Byerly*, 1:21:cr-00527-RDM, ECF No. 157, Sentencing Transcript.

---

[8] Mr. Wright is the same expert retained by the government in Mr. Rodriguez's case and the assessment regarding the device used in this case is similar.

After hearing from the government and Mr. Byerly's attorneys, the Honorable

Randolph Moss stated the following about the handheld device:

> With respect to the particulars and Mr. Byerly, this is a little bit more complicated because I think that there's agreement that the device that Mr. Byerly actually used was not a harmful device; it was not anything that, even if deployed, would have resulted in any type of injury short of perhaps striking somebody with it, but that it was not a functioning stun gun. And that obviously is an important consideration. On the other hand, it certainly appeared to be a functioning stun gun, and I think that the police officers quite reasonably, and that anyone in their position would have, seen this as a functioning stun gun because of the sound that it emitted and they clearly thought it was a stun gun and they were clearly frightened by it. And it distracted them from the discharge of their responsibilities to protect the Capitol while they dealt with Mr. Byerly. And it undoubtedly added to the fear that the officers encountered that day.

*Id.* at 62.

The Court acknowledged that while the handheld device was not capable of

considerable damage, the loud noise would clearly cause fright and concern.  The

Court considered all of this in fashioning a sentence stating:

> In light of the fact that the device that Mr. Byerly used was not in fact a functioning stun gun and could not have inflicted any injury on somebody short of perhaps striking them with something in the nature of a flashlight, but at the same time cognizant that it invoked substantial fear and was designed to invoke fear in those officers, I'm inclined to vary downward by two rather than four levels, sort of giving half credit with respect to the nature of the device.

*Id.* at 65.

Mr. Byerly's guideline was between 37 and 46 months, the government

requested a high-end sentence. The Court varied down to sentence Mr. Byerly to 34

months in custody.

### D.     Mr. Rodriguez accepted responsibility for his conduct on January 6th when he chose to resolve his case and forego litigation over the use of a dangerous weapon.

Mr. Rodriguez has taken responsibility for his conduct on January 6, 2021.

Part of accepting responsibility required Mr. Rodriguez to admit to using what the

government characterized as an "electroshock weapon" as part of the assault

against Officer M.F.  Though the government characterizes this device as a weapon,

other experts characterize the device as a "sparkling flashlight."  Nonetheless, by

agreeing to define the device used against Officer M.F. as an "electroshock weapon,"

Mr. Rodriguez opted to plead guilty to Assault on an Officer with a Deadly Weapon,

in violation of 18 U.S.C. § 111(b).

By pleading guilty, Mr. Rodriguez accepted responsibility and did not require

the government to prove their case during a lengthy trial.  Additionally, as

discussed further below, agreeing to characterize the device as a weapon had a

substantial impact on Mr. Rodriguez's ultimate offense level and guideline range.

Though seriously considered, the issue regarding the hand-held device's

classification as a weapon was never litigated.  Instead, Mr. Rodriguez chose to take

responsibility by pleading guilty, saving the government and this Court time and

resources.

Before receiving the guilty plea from the government, and in preparation for

trial, Mr. Rodriguez retained an expert, Mark Kroll, to review the hand-held device,

that other courts have examined during January 6th sentencings (including the above referenced Alan Byerly).  Dr. Kroll determined several important things about the device: (1) the device used in this case was not a stun gun, (2) the device was best described as a "sparkler flashlight," (3) the device could not likely produce death, (4) the device didn't cause any of the markings on Officer M.F.'s neck, and (5) the device never weakened, immobilized or caused Officer M.F. to lose consciousness.  Exhibit H, Dr. Mark Kroll's Report.

The government also retained an expert in preparation for Mr. Rodriguez's trial, David Wright.  Mr. Wright agreed that the device Mr. Rodriguez used was a cheap store purchased item, bought for less than $15.  ECF No. 135, Expert Notice. He additionally concluded that if the device were used in an area aside from the throat, groan, eyes, or face it could not incapacitate someone, but could cause irritation or pain.  *Id.* at 7.

Based upon this issue of law—specifically, whether these handheld devices are dangerous weapons—several January 6th defendants have been unwilling to accept responsibility, choosing instead to proceed to trial.  One of those defendants is Vitali GossJankowski.

In March of 2023, Mr. GossJankowski was tried by a jury for several counts, including one count of Assault on an Officer with a Deadly Weapon, in violation of 18 U.S.C. § 111(b).  On January 6th, Mr. GossJankowski was at the Capitol when someone unknown to him handed him a handheld device, similar in nature to the

one that Mr. Rodriguez used.  *United States v. Goss-Jankowski*, 1:21-cr-00123-PLF, ECF No. 1.  As in Mr. Rodriguez's case, the device was never recovered.

In preparation for trial, Mr. Goss-Jankowski hired Dr. Kroll.  Dr. Kroll concluded, just as he did in Mr. Rodriguez's case, that the device was not dangerous or deadly, if used as intended.  The government moved to exclude his testimony, but ultimately Dr. Kroll testified.  *Id.*, ECF No. 112.  With regards to the assault charges, Mr. Goss-Jankowski was *acquitted* of assaulting, resisting or impeding Officer M.M. with a deadly/dangerous weapon.  Instead, the jury found him guilty of assault *without* a deadly/dangerous weapon.[9]  Ultimately, the jury believed that Mr. Goss-Jankowski committed the offenses charged by the government, but they did not find the handheld device was a deadly/dangerous weapon.

Mr. Goss-Jankowski required the government to prepare for and hold a jury trial—requiring Officer M.M. to testify along with at least five other Metropolitan Police Officers.  In proceeding to trial, Mr. Goss-Jankowski lost a significant benefit because he was not entitled to a three-level reduction for acceptance of responsibility pursuant to USSG §3E1.1(a) & (b).

----

[9] Similarly, the jury found Mr. Goss-Jankowski *not guilty* of the two remaining charges (Entering and Remaining in a Restricted Building or Grounds *with a Deadly or Dangerous Weapon*, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds *with a Deadly or Dangerous Weapon*, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A)).

They instead found him guilty of those charges, but *without* a deadly or dangerous weapon.

Had Mr. Rodriguez chosen to proceed to trial, a significant part of his defense would have involved litigation surrounding the deadly/dangerous weapon element. But, unlike Mr. GossJankowski, Mr. Rodriguez ultimately chose not to put the government to that same burden because he has been willing to accept responsibility for his offense.[10]  This Court can consider Mr. Rodriguez's acceptance, especially given this meritorious issue regarding the device that was used.

### E.    Mr. Rodriguez has demonstrated his remorse and acceptance of responsibility from the moment he was arrested.

As this Court is aware from the litigation of the motion to suppress, Mr. Rodriguez immediately took responsibility when he was arrested.  On March 31, 2021, Mr. Rodriguez gave a voluntary statement to FBI agents.  ECF No. 38, Motion to Suppress.  At that time, Mr. Rodriguez told agents that he did in fact use the handheld device against Officer M.F.  *Id.* at 77.  Not only did Mr. Rodriguez admit his conduct, but he was also emotional over his involvement and truly remorseful for his actions.  Mr. Rodriguez tells the agents that he is a "piece of sh*t" and that he is "sorry.  I don't know.  He's [M.F.] a human being with children, and

---

[10] While the government has not provided written notice that they intend to seek an upward departure pursuant to USSG § 3A1.4, n.4. in this case, the government has previously sought this enhancement for a defendant, Guy Reffitt, who did not accept responsibility by proceeding to trial.  The government further indicated that if Mr. Rodriguez proceeded to trial and was convicted on Destruction of Government Property, in violation of 18 USC § 1361, Mr. Rodriguez would face an upward departure pursuant to USSG § 3A1.4, n.4. at sentencing.

he's not a bad guy.  He sounds like he's just doing his job and he's –I'm an a\*\*hole."

*Id.* at 78.

He also gave some insight into his mindset on January 6th:

> **A.** Am I mental? Am I? Am I just that stupid? I mean, yes.
> **Q.** Listen, Danny. I think you just made some bad choices, man.
> **A.** Did we all really just -- are we all that stupid that we thought we were going to go do this and save the country and it was all going to be fine after? We really thought that. That's so stupid, huh?
> **Q.** You did think that, right?
> **A.** Yeah. Yeah. We really thought that we were doing the right thing, that we were going to -- yeah.
> **Q.** And those -- the officers that were there, they were getting in your guys' way.
> **A.** (Crying.) Yeah. We just -- yeah. We were just like, come on. Get out of the way, guys.

*Id.* at 173.

Mr. Rodriguez is not only remorseful for his actions on January 6th, but he is specifically sorry for how his actions impacted Officer M.F.  Exhibit G, Letter to Officer M.F.  At the beginning of Mr. Rodriguez's case, undersigned counsel reached out to the government to ask if Officer M.F. would be willing to sit-down with Mr. Rodriguez so that he could express his apology in person.  In the attached letter to Officer M.F., Mr. Rodriguez calls him a "brave man" and states that he wishes "for good things for [him] in the future."  *Id.* This is consistent with Mr. Rodriguez's sentiments and demeanor at his arrest over two years ago.

**F.    The applicable sentencing enhancements for use of a dangerous weapon, substantial bodily injury, and assault against an officer create an overly harsh sentence that should justify a downward variance under 18 U.S.C. § 3553(a).**

Sentencing courts have broad discretion to vary from the sentencing guidelines and may do so based on policy considerations, including disagreements with the Guidelines.  *See United States v. Booker*, 543 U.S. 220, 244 (2005); *Kimbrough v. United States*, 552 U.S. 85, 101, (2007).  In this case, the applicable guidelines to the conduct underlying the assault against Office M.F. in violation of 18 U.S.C. § 111(a)(1) and (b), create an unreasonably harsh sentence.  While Mr. Rodriguez does not object to application of the enhancements and base offense level agreed to in the plea agreement, this Court should vary downward because application of these enhancements and the resulting guideline range in this specific case over-punishes and over-represents the seriousness of Mr. Rodriguez's conduct. 18 U.S.C. § 3553(a)(1). Additionally, the guidelines' arbitrary application of U.S.S.G. § 2A2.2 for aggravated assault against an officer and U.S.S.G. § 2A2.4 for simple assault against an officer creates dramatic sentencing disparities for the exact same conduct.  As explained below, this Court should consider the harsh result of a strict guidelines sentence in this case and apply a downward variance to 65 months.

**1.    The applicable sentencing enhancements effectively results in double counting and overrepresents the severity of the conduct.**

There are three facts in this case that are used multiple times and in multiple ways to trigger an unreasonably high total offense level—(1) a dangerous weapon was used, (2) the assault was against a law enforcement officer, and (3) the

assault resulted in serious bodily injury.  These three facts dramatically increase Mr. Rodriguez's guideline range and arguably overrepresent and effectively double-count conduct to trigger a harsh sentence.

### a.    Base Offense Level

Under the terms of the plea agreement, Mr. Rodriguez agreed that U.S.S.G § 2A2.2 applied, and thus, he began at an elevated base offense level of 14 because the conduct against Officer M.F. amounted to an "aggravated assault."  Aggravated assault as defined by the Sentencing Guidelines means that the conduct constituted "a felonious assault that involved . . . a dangerous weapon with intent to cause bodily injury with that weapon" or "that involved . . . serious bodily injury."  USSG § 2A2.2, Application Note 1.[11]

In contrast and for context, simple assault of an officer under 18 U.S.C. § 111(a), which does not involve conduct resulting in serious bodily injury or a dangerous weapon with intent to injure, starts at a base offense level of 10 under U.S.S.G. § 2A2.4.  Thus, application of U.S.S.G. § 2A2.2 targets the fact that the assault resulted in serious bodily injury and use of a dangerous weapon, and it does so by adding four levels to the base offense level.

---

[11] "Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.  USSG § 2A2.2, Application Note 1.

### b.    Enhancements

In addition to the four-levels added to the base offense level for aggravated assault, Mr. Rodriguez agreed as part of his plea agreement that a four-level enhancement applied because a dangerous weapon was used, and that a five-level enhancement applied because the conduct caused serious bodily injury.  *See* U.S.S.G. §§ 2A2.2(b)(2)(B) and (3)(B).  Both the use of a dangerous weapon and the resulting serious bodily injury underlying these enhancements were already considered through application of the aggravated assault base offense level under § 2A2.2, which started Mr. Rodriguez's base offense level at 14, instead of 10. In addition to that nine-level enhancement, Mr. Rodriguez agreed as part of his plea agreement that two more levels applied because he was convicted under 18 U.S.C. § 111(b).  *See* U.S.S.G. § 2A2.2(b)(7).  Section 111(b) provides an enhanced penalty when the assault against the officer under § 111(a)(1) involves use of a dangerous weapon or results in bodily injury.[12]  Thus, 11 total levels are added to the already-elevated base offense level for conduct involving use of the same weapon, which resulted in the same injury, against the same single individual.

With these enhancements alone, Mr. Rodriguez's guideline range increased from 15-21 months (BOL 14) to 57-71 months (AOL 25).  Because the agreed upon

_____

[12] Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.  18 U.S.C. § 111(b).

guideline range already has an enhancement for use of a dangerous weapon, for serious bodily injury, and for the conviction under § 111(b), which punishes an assault on an officer that involved use of a dangerous weapon or serious bodily injury, these enhancements alone more than cover the conduct in this case.

### c.   Official Victim Adjustment

Nonetheless, on top of those 11-levels, Mr. Rodriguez agreed as part of his plea agreement that an additional six levels applied for an upward adjustment under U.S.S.G. § 3A1.2(c)(1), Official Victim.  Section 3A1.2(c)(1) permits an upward adjustment for conduct that creates "a substantial risk of serious bodily injury" to a law enforcement officer that the defendant knew or had reasonable cause to believe was a law enforcement officer.  Notably, § 111 specifically targets conduct against officers or employees of the United States while they are engaged in, or on account of, the performance of their official duties.  *See* 18 U.S.C. § 1114.  Thus, application of the Official Victim adjustment increases Mr. Rodriguez's base offense level by six levels even though the three prior enhancements already target and punish the same conduct—that a dangerous weapon was used and serious bodily injury caused to an officer while he was engaged in the performance of his official duties.

With this final adjustment, Mr. Rodriguez's total offense level rises from 25 to 31, and his guideline range almost doubles—jumping from 57-71 months to 108-135 months.

| U.S.S.G. § 2A2.2 *With* Official Victim Adjustment | | U.S.S.G. § 2A2.2 *Without* Official Victim Adjustment | |
|---|---|---|---|
| **Base Offense Level** | 14 | **Base Offense Level** | 14 |
| **2A2.2(b)(2)(B): Dangerous Weapon** | +4 | **2A2.2(b)(2)(B): Dangerous Weapon** | +4 |
| **2A2.2(b)(3): Serious Bodily Injury** | +5 | **2A2.2(b)(3): Serious Bodily Injury** | +5 |
| **2A2.2(b)(7): Conviction under 18 U.S.C. § 111(b)** | +2 | **2A2.2(b)(7): Conviction under 18 U.S.C. § 111(b)** | +2 |
| **3A1.2(c)(1): Official Victim** | +6 | | |
| **Total Offense Level** | 31 | **Total Offense Level** | 25 |
| 108 – 135 months | | 57 – 71 months | |

\* \* \*

Accordingly, application of the three enhancements—for serious bodily injury, use of a deadly weapon, and conviction under § 111(b)—in addition to the official victim upward adjustment results in enhancements that rely on the same three facts in multiple, redundant ways.

- The base offense level is 14 because the conduct involved a felonious assault that involved . . . a dangerous weapon with intent to cause bodily injury with that weapon" or "that involved . . . serious bodily injury."  U.S.S.G. § 2A2.2

- Four levels were added because a dangerous weapon was used.  U.S.S.G. § 2A2.2(b)(2)(B).

- Five levels were added because Officer M.F. sustained serious bodily injury.  U.S.S.G. § 2A2.2(b)(3).

- Two levels were added because, in assaulting an officer engaged in the performance of official duties, Mr. Rodriguez used a dangerous weapon or

inflicted bodily injury, in violation of 18 U.S.C. § 111(b).  U.S.S.G. § 2A2.2 (b)(7).

- Six levels were added because Mr. Rodriguez "create[ed] a substantial risk of serious bodily injury" to a "law enforcement officer."  U.S.S.G. § 3A1.2(c)(1).

Notably, the fact that the conduct involved physical injury to Officer M.F. was also used to substantially increase Mr. Rodriguez's guideline range for Count 2, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).  An eight-level enhancement was applied under U.S.S.G. § 2J1.2(b)(1)(B) because the obstruction offense involved "causing . . . physical injury to a person."  While this enhancement does not affect Mr. Rodriguez's final guideline range because Count 2 groups with Count 6 under U.S.S.G. 3D1.2(c), the fact that Mr. Rodriguez's actions resulted in bodily injury to Officer M.F. was used in multiple ways to severely increase Mr. Rodriguez's guideline range:  it triggered the elevated base offense level for aggravated assault; resulted in a five-level increase under U.S.S.G. § 2.2(b)(2)(B); supported an enhanced penalty under 18 U.S.C. § 111(b) and, therefore, caused a two-level increase under U.S.S.G. § 2A2.2 (b)(7); allowed for a six-level increase under U.S.S.G. § 3A1.2(c)(1) for creating a risk of serious bodily injury to a law enforcement officer; and justified an eight-level increase to the obstruction charge under U.S.S.G. § 2J1.2(b)(1)(B).  While Mr. Rodriguez does not minimize his actions that led to Officer M.F.'s injuries, the Sentencing Guidelines harshly punish him and subject his offense level to multiple large enhancements, resulting in a total of 21 additional levels—all based on the single action he took against Officer M.F.

Because the enhancements rely on the same three facts—that a dangerous weapon was used, serious bodily injury was caused, and the assault was committed against a law enforcement officer—to justify multiple enhancements, this Court should find that the resulting guideline sentence is overly harsh and over-represents Mr. Rodriguez's conduct.  Accordingly, a downward variance to 65 months is warranted.

>   **2.    The Guidelines' arbitrary distinction between simple assault under U.S.S.G. § 2A2.4 and aggravated assault under U.S.S.G. § 2A2.2 results in unwarranted sentencing disparities.**

The arbitrary distinction created by the Sentencing Guidelines between U.S.S.G. § 2A2.4 and U.S.S.G. § 2A2.2 has a dramatic effect on the punishment for identical conduct.  Simple assault or obstruction under U.S.S.G. § 2A2.4 instructs that the Official Victim enhancement under §3A1.2 should not be applied because "[t]he base offense level incorporates the fact that the victim was a governmental officer performing official duties."  USSG § 3A1.2, Application Note 2.

Application Note 2 instructs, however, that the Official Victim enhancement should apply to conduct that amounts to an aggravated assault under U.S.S.G. § 2A2.2.  It issues this instruction without any explanation or justification for the distinction.  As this Court already recognized in *United States v. Hamner*, it is troubling that "if you use only § 2A4.2, the guideline gives so much less weight to the official role of the victims."  *Hamner*, 1:21-cr-0689-ABJ, Sentencing Transcript at 24: 8-15.

Had Mr. Rodriguez been eligible to apply U.S.S.G. § 2A2.4—beginning at a base offense level of 10 and applying the applicable enhancements for use of a dangerous weapon and bodily injury—his total offense level would be 15, and the resulting guideline range would be 18-24 months.  Instead, under application of § 2A2.2, which permits the official victim adjustment and additional enhancements, he currently sits at a total offense level of 31, with a guideline range of 108-135 months.  The Guidelines' arbitrary approach between these two sections results in an eighteen-year difference for essentially the same conduct.

Considering this disparity, this Court should recognize the overly-harsh sentence application of U.S.S.G. § 2A2.2 creates and apply a downward variance to 65 months.

| U.S.S.G. § 2A2.2 Aggravated Assault on an Officer | | U.S.S.G. § 2A2.4 Simple Assault on an Officer | |
|---|---|---|---|
| Base Offense Level | 14 | Base Offense Level | 10 |
| 2A2.2(b)(2)(B): Dangerous Weapon | +4 | 2A2.4(b)(1): Dangerous Weapon | +3 |
| 2A2.2(b)(3): Serious Bodily Injury | +5 | 2A2.4(b)(2): Bodily Injury | +2 |
| 2A2.2(b)(7): Conviction under 18 U.S.C. § 111(b) | +2 | | |
| 3A1.2(c)(1): Official Victim | +6 | | |
| Total Offense Level | 31 | Total Offense Level | 15 |
| 108 – 135 months | | 18 – 24 months | |

III.   **Objections to the PSR**

A.   **This Court Should Decline to Apply the Physical Restraint of a Victim Enhancement under U.S.S.G. §3A1.3.**

The United States Sentencing Guidelines provide for a two-level increase "if a victim was physically restrained in the course of the offense." U.S.S.G §3A1.3. The commentary refers to §1B1.1, which defines "physical restraint" as "the forcible restraint of the victim such as by being tied, bound, or locked up." *Id.* Because assaultive conduct typically involves some level of physical restraint, this enhancement is intended to be applied when the defendant's actions during the offense are "beyond acts which are part and parcel" of the crime charged. *United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir. 1991). That is not the case here. What happened to Officer M.F. is terrible and Mr. Rodriguez's actions are inexcusable; however, the physical restraint enhancement is not warranted because Mr. Rodriguez's acts were limited to applying an electroshock device to Officer M.F.'s body which was "part and parcel" with the crime charged *i.e.* the assault.

While courts have held that the application of the enhancement is not explicitly limited to cases where the victim is tied, bound or locked up, most have considered whether the conduct at issue is entirely compatible with the Application Note's examples of physical restraint of being tied, bound, or locked up. *United States v. Anglin*, 169 F.3d 154, 163 (2nd Cir. 1999). In *Anglin*, the court noted that the examples in the application note, i.e., "tied" "bound" or "locked up" "while not imposing inflexible limitations upon the phrase 'physical restraint,' nonetheless are intended as meaningful signposts on the way to understanding the Sentencing

29

Commission's enhancement purpose." *Anglin*, 169 F.3d at 164. Thus, it is necessary to assess whether the conduct is "materially different from the guidelines examples, each of which involved a restraint of movement by the use of some artifact by which the victim is 'tied' or 'bound' . . . or by the use of a space where the victim is 'locked up.'" *Id.*

While the examples of tied, bound or locked up in the commentary are not exhaustive, the question sentencing courts consider is "whether the conduct involved [] falls within the concept illustrated by these examples, and is intended to be covered by Guideline § 3A1.3." *Mikalajunas*, 936 F.2d at 156. In *Mikalajunas*, the court considered whether a stabbing amounted to physical restraint under § 3A1.3 and held it did not. Specifically, the court opined, "[t]he very act of stabbing normally will involve some physical restraint" and "the examples of physical restraint in the guidelines, while not all inclusive, imply that the guidelines intend an enhancement for something other than a brief holding as part of a stabbing." *Id.*[13]

The court in *Mikalajunas* distinguished the holding in *United States v. Stokely*, 881 F.2d 114 (4th Cir. 1989), where the defendant placed the victim in a room with a bomb and prevented the victim from leaving, finding in part, "the victim [in Stokely] was *confined to a room for some time*." *Id.* at 156 (emphasis

---

[13] *See also United States v. Wilson*, 198 F.3d 467, 472-73 (4th Cir. 1999) (When conducting this inquiry, courts should consider whether "the act of physical restraint adds to the basic crime.")

added). The *Mikalajunas* court also distinguished *United States v Roberts*, 898 F.2d 1465 (10th Cir. 1990) where the defendant placed an arm around the victim's neck, held a knife to her throat and "held and threatened for a long enough period to accomplish the cash withdrawal; [which] appear[ed] to be some minutes." *Id*. Thus, the court's rationale in *Mikalajunas* centered on finding that "the physical restraint enhancement is intended to apply to something other than a brief holding as part of a stabbing" because the enhancement is designed to cover conduct which "adds to the basic crime." *Id*.

The same rationale used in *Mikalajunas* applies to the facts here. The encounter between Mr. Rodriguez and M.F. was limited to applying the electroshock device to M.F.'s body, similar to the limited physical contact that occurred during the stabbing in *Mikalajunas*. This Court should follow the reasoning in *Mikalajunas* and find that just as the very act of stabbing involves some physical restraint, so does the very act of applying an electroshock device to a person's body, and such conduct does not amount to physical restrain of a victim under §3A1.3.

Although there is a dearth of caselaw in the D.C. Circuit analyzing §3A1.3, this circuit has held that "physical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *United States v. Drew*, 200 F.3d, 871, 880 (D.C. Cir. 2000) (finding no physical restraint under U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave

her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical").[14]

Here, the record shows that Mr. Rodriguez took no action to physically restrain M.F. The contact between M.F. and Mr. Rodriguez was limited to the contact when Mr. Rodriguez applied the electroshock device to M.F.'s body. That contact was the extent of the physical interaction between the men. Mr. Rodriguez never restricted M.F.'s movements either by holding M.F., tackling him, or dragging him. Mr. Rodriguez also did not use physical strength to exert control over M.F.'s body or trap M.F. so he could not move. Because physical contact alone does not amount to physical restraint, the two-level enhancement under § 3A1.3 is inapplicable here. *See e.g. United States v. Rosario*, 7 F.3d 319, 321 ("[M]ere physical contact with the victim does not inevitably amount to physical restraint.").

Moreover, the brevity of the restraining action in this case matters because it relates to whether the action is *of the same nature* as the actions identified in the enhancement. In *Foppe,* for example, while the court noted that an enhancement for physical restraint does not differentiate from long-term or short-term restraint, the defendant in that robbery case grabbed the victim by the neck, shoved an object that felt like a gun into her back, "kicked the chair out from underneath her and dragged her by the neck toward a gate that led to the teller station." *See United*

---

[14] *Id.* (*citing United States v. Harris*, 959 F.2d 246, 265 (D.C. Cir. 1992) abrogated on other grounds by *United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)).

*States v. Foppe*, 993 F.2d 1444, 1448, (9th Cir. 1993). There, the defendant's actions obviously took more than mere seconds to complete and were similar to the actions delineated in the enhancement because the victim's movements were clearly controlled by the defendant, which is distinguishable from the transitory nature of Mr. Rodriguez's actions.

Courts have cautioned that § 3A1.3 was drafted "as a provision to deal with a specific circumstance" and "must be interpreted narrowly." *United States v. Taylor*, 961 F.3d 68, 77-78 (2nd Cir. 2020). In *Taylor*, the court reversed the district court's application of the two-level enhancement. *Id.* In reaching its holding, the court considered a three-factor test, "(1) whether the restraint was physical, (2) whether there was restraint rather than just use of force, and (3) whether the action in question was constitutive of the [offense charged] or whether it was an additional physical restraint that facilitated the [offense charged.]" *Id.* at 79.

When applying the *Taylor* factors here, it is clear the restraint enhancement does not apply. First, Mr. Rodriguez did not physically restrain M.F. Second, there was no restraint besides the use of force, i.e., the assault. Third, the action (application of the electroshock device to M.F.'s body) was constitutive of the assault and no additional physical restraint facilitated the assault. Again, while not minimizing Mr. Rodriguez's conduct, the physical restraint enhancement is typically applied in cases involving greater sustained contact with the victim than that which resulted from Mr. Rodriguez's limited contact with M.F.'s body, which

fully encompassed the act inherent in the assault, and where Mr. Rodriguez used no additional restraint to facilitate the assault.[15]

Application of § 3A1.3 is a fact sensitive inquiry and one that must recognize assaultive conduct almost always involves physical contact, which is why most cases that apply the physical restraint enhancement involve the offense charged *plus* something more, whether that additional act is physically holding someone so they cannot move, or dragging a person from one location to another, the victim's movement has been intentionally controlled so it is *separate* from that which is inherent in committing the offense charged.  Here, Mr. Rodriguez actions were limited to the offense charged. Apart from the physical encounter related to contacting M.F's body with the electroshock device, Mr. Rodriguez took no other action to facilitate the assault. Thus, this Court should decline to apply the two-level enhancement under § 3A1.3.

---

[15] *United States v. Cross*, 121 F.3d 234 (6th Cir. 1997) (physical restraint enhancement applied when defendant locked up victim, held him down and tortured him, spending hours burning victim with hot scissors, pouring alcohol on his wounds and forcing him to eat dog feces); *United States v. Long Turkey*, 342 F.3d 856, 859 (8th Cir. 2003) (physical restraint enhancement applied when defendant held victim down by her arms and hair and pinned her beneath him during intercourse); *United States v. Waugh,* 207 F.3d 1098, 1101 (8th Cir.2000) (locking doors and pinning victim down with her arms behind her back constituted victim restraint);  *Arcoren v. United States,* 929 F.2d 1235 (8th Cir. 1991) (pulling victim into bedroom and physically abusing her while preventing her from leaving the room constituted victim restraint).

**B.    This Court Should Give Mr. Rodriguez the Benefit of his Plea Agreement and Decline to Apply the Two-Level Enhancement Probation Recommends Under U.S.S.G. § 3D1.4.**

The PSR does not comport with the plea agreement regarding the grouping calculation. Under the plea agreement, which was drafted by the government, the parties stipulate and agree that Counts One, Two, and Six group together ("Group One") and Count Three is in a separate group ("Group Two"). Counts One, Two, and Six group together because the Count Six conviction under 18 U.S.C. § 111(a)(1) and (b) "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" the Count Two offense of violating 18 U.S.C. § 1512(c)(2). *See* U.S.S.G. § 3D.1.2.[16]

The parties also stipulate that the base offense level for Group One is the offense level for the most serious count, which is count six. Therefore, the base offense level is 33. The base offense level for Group Two is 23. Thus, since the offense level for Group Two is "9 or more levels less serious than the Group with the highest offense level" no units were added, and the combined offense level is 33. § 3D1.4(c). Probation disagrees with the parties' guidelines analysis in the plea agreement and places Count Six in a separate group ("Group Three"), which results in units and adds two levels under U.S.S.G § 3D1.4(a), (b) and (c).

---

[16] *See* § 3D.1.2 "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another count."

Mr. Rodriguez asks this Court to follow the parties' agreement and decline to apply the two-level grouping enhancement proposed by Probation given the parties stipulated this enhancement should not apply when entering into this agreement. The parties' agreement is also in line with U.S.S.G. § 3D.1.2, which indicates that Count Six should group with Counts One and Two because Count Six "embodies conduct that is treated as a specific offense characteristic" in Count Two. § 3D.1.2. Specifically, Count Two includes an eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) for causing or threatening injury or damage, which represents the conduct in Count Six.

This Court should also follow the plea agreement because Mr. Rodriguez gave up fundamental rights in exchange for the benefit of this plea. He gave up his constitutional right to a trial by his peers, and numerous other trial, appellate and collateral challenge rights. The government also received a benefit by entering into this agreement as it saved the resources it would have expended at trial. As this Court is well-aware, this plea agreement was also the result of extensive negotiations by the parties after each weighed the strengths and weakness of their case and considered Mr. Rodriguez's history and background, including his lack of criminal history. Moreover, public policy favors following plea agreements because they play a central role in the criminal justice system with roughly 95% of cases resolving in guilty pleas.

Because the plea agreement is in accord with U.S.S.G. § 3D.1.2 and the parties stipulated that Count Six groups with Counts One and Two, this Court

should follow the plea and decline to add a two-level enhancement under U.S.S.G.

§ 3D1.4. *Class v. U.S.*, 138 S. Ct. 798, 807 (2018).

### C.   The Court should decline to apply the role adjustment under U.S.S.G. § 3B1.1(c) for Mr. Rodriguez's conduct violating 18 U.S.C. § 1512(c)(1).

The Probation Office added a two-level aggravated role adjustment under

U.S.S.G. § 3B1.1(c) for Mr. Rodriguez's conduct violating 18 U.S.C. § 1512(c)(1),

tampering with documents or proceedings.  PSR ⁋ 74.  The Probation Office found

that Mr. Rodriguez was "an organizer, leader, manager, or supervisor" in the

alleged criminal activity.  PSR ⁋ 74.  The plea agreement did not apply this

adjustment, and Mr. Rodriguez objects to its application as there is insufficient

evidence to support it.  Nothing in the record establishes that Mr. Rodriguez took an

organizational or leadership role in attempting to destroy "Person One's evidence"

on January 10, 2021.  PSR ⁋ 38.  *see United States v. Quigley*, 373 F.3d 133, 140

(D.C. Cir. 2004) (noting for the enhancement to apply, there must be "proof that [the

defendant] was hierarchically superior to her co-conspirators"); *United States v.

Singh*, 195 F. Supp. 3d 25, 34–35 (D.D.C. 2016) (Walton, J.) (finding the aggravated

role enhancement inapplicable because "nothing in the record before the Court

suggest[ed] that [the defendant] exercised control over any co-conspirator subject to

criminal liability").

Nevertheless, whether the two-level adjustment is applied or not, it does not

change the total offense level.  This is because the adjustment is applied to Group

Two/Count Three, which is "9 or more levels less serious than the group with the

highest offense level," and therefore not counted.  PSR ⁋ 86; U.S.S.G. § 3D1.4(c).

## IV.    Conclusion

Given Mr. Rodriguez's personal background, the nature and circumstances of the offense, and the remaining factor under 18 U.S.C. § 3553(a), a sentence of 65 months in custody is sufficient but not greater than necessary to achieve the goals of sentencing.


Dated: June 9, 2023

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

*/s/ Rebecca A. Levy*
*/s/ Margaret W. Lambrose*
By:    */s/ Katherine Tanaka*
REBECCA A. LEVY
MARGARET W. LAMBROSE
KATHERINE TANAKA
Assistant Federal Public Defenders
Attorneys for Daniel Rodriguez

## Certificate of Electronic Service

The undersigned hereby certifies that she is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on June 9, 2023, she served an electronic copy of the above and foregoing Memorandum in Support of Sentencing by electronic service (ECF) to the person named below:

CHANNING D. PHILLIPS
United States Attorney
Kimberly L. Paschall
Risa Berkower
Assistant United States Attorneys
555 4th Street, NW
Washington, DC 20530

*/s/ Cecilia Valencia*
Employee of the Federal Public
Defender