```
 1

 2                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 3

 4    United States of America,      ) Criminal Action
                                     ) No. 21-cr-246
 5                     Plaintiff,    )
                                     ) SENTENCING HEARING
 6    vs.                            )
                                     ) Washington, DC
 7    Daniel Joseph "DJ" Rodriguez,  ) June 21, 2023
                                     ) Time:  9:30 a.m.
 8                     Defendant.    )
      _____
 9
                    TRANSCRIPT OF SENTENCING HEARING
10                          HELD BEFORE
                 THE HONORABLE JUDGE AMY BERMAN JACKSON
11                    UNITED STATES DISTRICT JUDGE
      _____
12
                        A P P E A R A N C E S
13
      For Plaintiff:      Kimberly Paschall
14                        Anthony Mariano
                          U.S. Attorney's Office
15                        601 D Street, NW
                          Washington, DC  20530
16                        Email:  Kimberly.paschall@usdoj.gov
                          Email:  Anthony.mariano2@usdoj.gov
17
      For Defendant:      Rebecca Ann Levy
18                        Margaret W. Lambrose
                          Federal Public Defender
19                        411 E. Bonneville Avenue, Suite 250
                          Las Vegas, NV 89101
20                        Email:  Rebecca_levy@fd.org
                          Email:  Maggie_lambrose@fd.org
21

22    _____

      Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
23                             Official Court Reporter
                               United States Courthouse, Room 6523
24                             333 Constitution Avenue, NW
                               Washington, DC  20001
25                             202-354-3267
```

```
 1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

 2              THE COURTROOM DEPUTY:  Good morning, Your Honor, this

 3    morning we are here for sentencing, we have criminal case

 4    21-246-1, the United States of America V. Daniel Joseph

 5    Rodriguez.  Mr. Rodriguez is present and in the courtroom, Your

 6    Honor.  The probation officer present for this morning's

 7    proceedings is Officer Walters.

 8              Will counsel for the government, followed by counsel

 9    for the defense, please approach the lectern, identify yourself

10    for the record.

11              MS. PASCHALL:  Good morning, Your Honor.  Kimberly

12    Paschall for the United States, with my co-counsel Anthony

13    Mariano.

14              THE COURT:  Good morning.

15              MS. LEVY:  Good morning, Your Honor.  Rebecca Levy,

16    Margaret Lambrose, and Mr. Rodriguez, who is present.  He's in

17    custody.

18              THE COURT:  All right.  Good morning, Ms. Levy.

19              The final revised presentence report was filed in

20    this case on June 8th.  Have both you and your client had an

21    opportunity to review it?

22              MS. LAMBROSE:  Yes, Your Honor.

23              THE COURT:  All right.  And I take it -- I don't

24    believe there are any factual disputes with respect to the

25    presentence report that need to be resolved.
```

1          MS. LEVY:  Your Honor, there's only one issue which

2     I've already --

3          THE COURT:  If you're going to speak, you need to

4     come to the lectern so the court reporter can hear you.

5          MS. LEVY:  Your Honor, there's only one issue, which

6     I've already mentioned to the probation officer and to the

7     government, which is on page 8, it's paragraph 28.  And I think

8     it was just taken out from the plea agreement.  It indicates

9     that our client lived in Panorama City, California.  We

10    corrected this in the plea agreement, but it should be Fontana,

11    California.

12         THE COURT:  All right.  So with that correction, I'm

13    going to accept the presentence report in terms of the facts as

14    undisputed and part of the findings of fact at sentencing.

15         I understand that there are guidelines disputes that

16    the parties have carved out of the plea agreement and I will

17    take those up in a minute.  But I don't believe that there are

18    any other legal issues to be resolved.

19         In addition to the presentence report, I've received

20    a number of additional materials concerning the defendant,

21    including the government's memorandum in aid of sentencing and

22    the supplemental memorandum, defendant's memorandum in aid of

23    sentencing and a supplemental memorandum.  The defendant's

24    memorandum included a number of attachments, the government has

25    provided me with a number of exhibits.  The defendant's

1    attachments included letters from family members and a sealed

2    forensic psychiatric evaluation report from the defendant's

3    expert, a biomedical scientist specializing in bioelectricity

4    regarding electrical -- the electrical device involved in this

5    case and its effect on the human body.

6          I received a letter from the defendant's mother and

7    his sister; from his longtime friend who he's know since he was

8    14; from another friend of many years, a former co-worker and

9    supervisor, and; a letter of apology the defendant addressed

10   not to me, but to the officer he assaulted.  I read and

11   appreciated all of that material.

12         In a criminal case there's a statute that tells me

13   how I'm supposed to go about deciding what the sentence should

14   be, it's 18 U.S. Code § 3553.  It lists a number of important

15   factors, and the advisory sentencing guidelines are one of the

16   factors I must consider in determining the appropriate sentence

17   for any offense.  I'm required to calculate what the guidelines

18   would recommend in every case, and the purpose of that is to

19   arrive at a recommended sentencing range based on the offense

20   and various aggravating or mitigating factors.

21         So I'm going to begin with that calculation.  And in

22   this case there are a number of intricacies about that that

23   we're going to need to discuss.  But I want to note that once

24   we're finished with that, that is only one part of the

25   analysis.

1              Mr. Rodriguez pled guilty to four counts.  Count 1,

2    conspiracy, in violation of 18 U.S. Code § 371.  In particular,

3    a conspiracy to commit the crimes charged in Counts 2 and 3,

4    obstruction of an official proceeding, that is, Congressional

5    certification of the Electoral College vote, and tampering with

6    documents or proceedings to interfere with a grand jury

7    proceeding.  The maximum sentence for that offense is five

8    years.

9              He pled guilty to Count 2, obstructing an official

10   proceeding, the Congressional certification, and aiding and

11   abetting that offense, in violation of 18 U.S. Code §

12   1512(c)(2) and 2.  The maximum sentence for that offense is 20

13   years.

14             He pled guilty to Count 3, tampering with documents

15   or proceedings, this time referring to the grand jury

16   investigation into the attack on the Capitol on January 6, in

17   violation of 18 U.S. Code § 1512(c)(1).  The maximum sentence

18   for that offense is 20 years.

19             And he pled guilty to Count 6, inflicting bodily

20   injury on an officer using a dangerous weapon, in violation of

21   18 U.S. Code §  111(a)(1) and (b).  The maximum sentence for

22   that offense is 20 years.

23             It's important to note when comparing this sentence

24   to those received by the defendants involved in this same

25   assault, that those defendants were not armed and they pled

1      guilty to § 111(a) only, which had an eight-year maximum.

2           There are no mandatory minimum sentences prescribed

3      by any of these statutes.

4           The guidelines establish advisory sentencing ranges

5      for each count.  But since we're dealing with multiple counts

6      that may or may not overlap with one another, they're grouped

7      for sentencing purposes.

8           Under § 3D1.1(a), when a defendant has been convicted

9      of more than one count, the Court is required -- it says

10     "shall" -- group the counts by applying the rules specified in

11     § 3D1.2.  The government and the defendant agreed as to how

12     this should be done in the plea agreement, but the presentence

13     report took a different approach.  So we have to start there

14     with the grouping.

15          The defendant's insistence that I should just ignore

16     the presentence report and follow the plea agreement misstates

17     the law and it overlooks the language in the plea agreement in

18     which everyone agreed they understood that the ultimate

19     calculation was left up to the Court.

20          So the initial issue is how to group the charges for

21     guideline purposes under § 3D1.2, groups of related counts.

22     The guideline says all counts involving substantially the same

23     harm shall be grouped together into a single group.  Counts

24     involving substantially the same harm within the meaning of the

25     rule fall into four categories:

1          A., When the counts involve the same victim and the

2     same act or transaction.  Doesn't apply here.

3          B., When counts involve the same victim and two or

4     more acts of transactions connected by a common criminal

5     objective or constituting part of a common scheme or plan.

6          C., When one of the counts embodies conduct that is

7     treated as a specific offense characteristic in, or an

8     adjustment to, the guideline applicable to another count, and;

9          D., Which also doesn't apply -- when the offense

10    level is determined based on the total amount of harm or loss,

11    such as dollars, or the amount of drugs, et cetera.

12          The only case notes to this guideline explains that

13    counts are to be grouped together in a single group if any one

14    or more of the subsections provide for such grouping.  Under

15    subsection (a), counts are grouped together when they represent

16    essentially a single injury or part of a single criminal

17    episode or transaction involving the same victim.  That does

18    not apply here.

19          The victim of the obstruction count in Count 2 was

20    Congress, in Count 3 was the grand jury, and Count 6 we have a

21    human being who was the victim of the offense, Officer Fanone.

22          Count 8 says the defendant may be convict -- I'm

23    sorry, Note 8 says the defendant may be convicted of conspiring

24    to submit several substantive offenses, as here, and also

25    committing one or more of the substantive offenses.  In those

1   cases you treat the conspiracy count as if it were two counts,

2   each charging conspiracy to commit one of the substantive

3   offenses.  This provision makes it obvious that Count 1, the

4   conspiracy to commit the obstruction of an official proceeding

5   in Count 2, in addition to committing the tampering with a

6   witness in Count 3, is grouped in the first instance with Count

7   2.  But the probation office and the parties differ as to

8   whether Count 6, the assault on the officer, should be

9   included.

10          The probation office emphasizes that subsection (a)

11   doesn't apply.  The victim of the obstruction was Congress and

12   the victim of the assault was the officer.

13          The parties hang their hat, though, on subsection

14   (c), the fact that an assault can be a specific offense

15   characteristic of an obstruction charge under § 2J1.2(b)(1)(B),

16   you can increase the offense level for obstruction of justice

17   by eight levels if the offense involved causing or threatening

18   to cause physical injury to a person, or property damage in

19   order to obstruct the administration of justice.

20          If all three counts are grouped, the grouping rules

21   would assign to the group the highest offense level applicable

22   to one of the group defenses.  In this case, according to the

23   government and the defendant, that's the offense level for the

24   assault charge.

25          So whether we end up treating the assault charge as

1      its own group or as a count grouped in Count 1, we have to

2      figure out what its offense level is.

3              Notwithstanding the pages in the defendant's memo

4      dedicated to persuading me that the defendant did not have a

5      dangerous weapon after all, he pled guilty to that fact and the

6      agreed applicable guideline is § 2A2.2 for aggravated assault.

7      Base offense level for that is Level 14.

8              The specific offense characteristics include, under

9      § 2A2.2(b)(2)(b), if a dangerous weapon is used -- and it

10     was -- we add four levels.  Under § (b)(3)(b), if the victim

11     sustained serious bodily injury we add five levels.  Under

12     subsection (b)(7), if the conviction was under § 111(b), you

13     add two levels.  That is somewhat duplicative of the prior two

14     enhancements, since subsection (b) of § 111 is differentiated

15     by the presence of the weapon or the injury.

16             But there's also a victim-related enhancement under

17     § 3A1.2(a), (b), and (c) because the victim of the assault was

18     a government officer and the attack on him was motivated by

19     that status, and since it was done so in a manner creating

20     substantial risk of bodily injury, and the defendant knowing

21     that the officer was a law enforcement officer and assaulted

22     him during the offense, you add six levels, which brings us to

23     level 25.

24             So all of those -- wait.  It's not level 25.  All of

25     those are agreed and, therefore, the parties agree that the

1    offense level for Count 6 alone is level 31.

2         The defense notes its objections to the impact of

3    this calculation, despite its agreement to it.  It's true that

4    I've made comments in other cases raising questions about the

5    significant differences and outcome based on whether you use

6    the aggravated assault guideline or the obstruction or impeding

7    officers guideline and § 2A2.4, which in some cases might both

8    apply.  And it is a significant difference, but context

9    matters.

10        A big issue in those cases was the definition of

11   aggravated assault, and in several the circumstances being used

12   to bring the case within the definition was not the use of a

13   dangerous weapon, but the use in connection with the commission

14   of another felony.  And there was a lot of discussion about

15   whether impeding officers during a civil disorder could be the

16   other felony that transformed a conviction for interfering with

17   officers into an aggravated assault.

18        That is the problem here where the other felony is

19   the 1512(c)(2) count, and the defendant agrees that it's an

20   aggravated assault, and we have the use of a weapon directly

21   against an individual officer, causing bodily injury to that

22   officer, which is different from the circumstance in the *Hamner*

23   case the defense chose to highlight.  Also, in *Hamner*, in fact,

24   in the portion quoted by the defendant, while I noted that the

25   aggravating assault guideline produced a level that was high, I

1    added that the obstructing officers guideline produced an

2    offense level that was too low because it didn't give enough

3    consideration to the fact that the officer assaulted was doing

4    so in the performance of his official duties, and that his

5    status was the motive for the attack.

6           It's irrelevant when the defense argues that

7    Mr. Rodriguez had been eligible for § 2A2.4, the offense level

8    would have been lower because, yes, of course, if you commit a

9    different offense, you might be entitled to a lower guideline.

10   But this defendant wasn't eligible.  He used a weapon and he

11   rendered his victim unconscious.

12          The more salient question right now is the issue the

13   parties agreed to disagree about.  The victim-related guideline

14   in § 3A1.3 says if a victim was physically restrained in the

15   course of an offense, you add two levels.  The guideline points

16   to the commentary to application instructions in § 1B1.1 where

17   application note 1L states, "Physically restrained means the

18   forcible restraint of the victim such as by being tied, bound,

19   or locked up."

20          The guideline also says don't apply this adjustment

21   if the offense guideline specifically incorporates this factor,

22   or where the unlawful restraint of a victim is an element of

23   the offense itself.

24          The parties have briefed this issue fully, but if

25   either side wants to speak to add or emphasize anything before

1    I rule, I'll give you both the opportunity to do that.

2                Ms. Paschall?

3                MS. PASCHALL:  I don't think Your Honor needs to hear

4    anything additional from me, unless you have specific

5    questions.  We've addressed the *Mikalajunas* case for Your Honor

6    that the defense primarily relies on.  So we would rely on

7    those arguments that we've made previously.

8                THE COURT:  The one question I have is the guideline

9    says if the victim was restrained.  It uses the passive voice.

10   It doesn't say if the defendant restrained the victim.  You

11   relied primarily on the stunning effect of the weapon itself.

12   But does it have to be -- if he was being restrained by someone

13   else at the time he's assaulted by the defendant, does that

14   count?

15               MS. PASCHALL:  We think that that should count, Your

16   Honor, that that is the totality of the circumstances under

17   which this assault was committed.  It is not integral to the

18   count itself, as *Mikalajunas* guards against.  So we believe

19   that that should count.

20               THE COURT:  All right.  And I believe you cited some

21   cases, such as the *DeLuca* case in which it was the

22   co-conspirators that held him down.

23               MS. PASCHALL:  Yes, Your Honor.

24               THE COURT:  Let me hear from you, Ms. Levy, or

25   Ms. Lambrose.  And if you can answer that question as well,

1     that would be helpful.

2               MS. LAMBROSE:   Thank you, Your Honor.   The *DeLuca*

3     case, that I believe was cited by the government, addresses

4     co-conspirator's actions.   And what the government told the

5     Court in Mr. Young's sentencing hearing was that Mr. Young and

6     Mr. Rodriguez did not know each other at all before that

7     moment, and that they just happened to be in the same place at

8     the same time, but acting completely separately and apart from

9     each other.

10              So what my argument to Your Honor would be when

11    addressing that specific issue, is that *DeLuca* is

12    distinguishable, and cases involving co-conspirators generally

13    are distinguishable because there are a number of cases that

14    address co-conspirator's actions when they are acting in

15    concert.   Right?

16              You have a bank robbery where one of the bank robbers

17    is holding somebody down while the other person ties that

18    victim up.   Those co-conspirators have a plan, they have

19    intent, they're acting together to achieve a common goal, which

20    is to restrain the victim in furtherance of the act, whether

21    that be a robbery or assault.

22              Here, that situation does not exist.

23    Mr. Rodriguez --

24              THE COURT:   Does the language of the enhancement go

25    that far?   All it says is if he was physically restrained

1     during the offense.

2          MS. LAMBROSE:  That's fair, Your Honor.  And the

3     language does not -- in all candor, the language does not go

4     that far.  But what we do see in the case that was cited by the

5     government, in the *Bell* case, *Bell* is similar to the facts

6     here.  In *Bell* the defendant held a gun to the victim and the

7     defendant pushed the victim and held the victim down.  And

8     there the Court found that that was not sufficient for

9     restraint because of the fact that it was a momentary issue and

10    it lasted very, very briefly.

11         So that is much more in line with the facts of this

12    case.  Because what we have here -- and, Your Honor, this is

13    not at all to minimize the conduct.  This is not at all to take

14    away from the seriousness --

15         THE COURT:  I understand, you're just talking about

16    this guideline.

17         MS. LAMBROSE:  But the momentary aspect --

18         THE COURT:  We're going to talk about the entire

19    offense.

20         MS. LAMBROSE:  Thank you, Your Honor.  Thank you.

21    The momentary aspect of the guideline is something the Courts

22    have considered in deciding whether or not the enhancement

23    should apply.

24         THE COURT:  All right.

25         MS. LAMBROSE:  Thank you, Your Honor.

1    THE COURT:  Thank you.  No one is arguing that the

2    victim of this assault was tied, bound, or locked up.  But

3    binding circuit authority, *United States versus Drew*, 200 F.3d

4    871 at 880, from the D.C. Circuit, tells me that because the

5    list in the definition in the application note says, "such as"

6    being tied or bound, et cetera, it's meant to be illustrative

7    and not an exhaustive list.  These are meant to be examples,

8    not a limit on what the concept could entail.

9    In *Drew*, though, the Circuit resisted the notion that

10   even being ordered to go somewhere at gunpoint sufficed.  It

11   said, "Physical restraint requires the defendant either to

12   restrain the victim through bodily contact or to confine the

13   victim in some way.  The required restraint must, as the

14   language plainly recites, be physical."

15   The Third Circuit has attempted to distill case law

16   from all circuits, including this one, to create a list, again,

17   of facts to consider, not of factors that in each and every one

18   of them must apply.  It includes:  Use of physical force,

19   exerting control over the victim, providing the victim with no

20   alternative but compliance, focusing on the victim for some

21   period of time, and placement in a confined space.

22   Again, not all of these potential circumstances

23   applies.  The victim was not placed in a confined space.  And

24   whatever "some period of time" means, he was not restrained for

25   an extensive period of time.

1        But I would disagree with the characterization of

2   this as momentary.  We've watched videos a number of times and

3   a lot of things happened while this gentleman was being

4   restrained.  And the first three, physical force, exerting

5   control, providing him with no alternative, were all present.

6   The *Bell* factors aren't inconsistent with the plain meaning of

7   the words in the guidelines.

8        According to the *Oxford English Dictionary* to

9   restrain means, "To restrict, limit, confine; to check, hold

10  back, or prevent a person or thing from some course of action;

11  to keep a person or animal in check or under control; to

12  confine or imprison a person or thing; to restrict freedom of

13  movement or action using some means of restraint."  That

14  particular one is not it.

15       It's also important to remember that the guideline

16  requires that it be forcible restraint.  I find that the

17  government has met its burden to establish by a preponderance

18  of the evidence that this guideline applies.

19       A circumstance is not already an element of the

20  aggravated assault guideline and it is not necessarily inherent

21  in the § 111 offense.  The defendant was in fact physically

22  restrained here, not just, as in *Drew*, under compulsion due to

23  an armed person's instructions -- not the defendant, I'm

24  sorry -- the victim was in fact physically restrained here.

25       And it's notable that the guideline uses the passive

1    voice, "if the victim was physically restrained."  You can't

2    argue with that.  That happened in this case.  Neither side

3    specifically addressed, until now, whether it has to be the

4    defendant or co-conspirator who was doing the restraining in

5    the course of the offense, but I don't see why it would.  If

6    someone else is holding the victim down while another person

7    assaults him, the victim is being restrained.

8            And, for example, in the *DeLuca* case cited by the

9    government, 138 F.3d 24, it was the co-defendants and not the

10   defendant being sentenced who held the victim down.

11           The defense relies most heavily on the Fourth Circuit

12   case -- and Ms. Paschall pronounced it, but I'm not sure I know

13   how to.  You want to tell me that again?

14           MS. PASCHALL:  I'm making an educated guess that it's

15   *Mikalajunas*.

16           THE COURT:  All right.  We'll go with that.  At 936

17   F.3d 153.  The concern there was that the only restraint

18   supporting the enhancement was the limited restraint involved

19   in holding someone while he stabbed him.  I'm not basing the

20   enhancement on the defendant putting his hands on the officer

21   to hold him still or to enable himself to wield his weapon.

22   I'm not sure there's much evidence of that anyway.  The officer

23   was already restrained.

24           The government focuses on the nature of the armed

25   attack in this case, that the weapon literally stunned and

1     immobilized and, therefore, restrained him.

2          I do agree with the defense that there's some overlap

3     if you're saying that the assault, using the electroshock

4     weapon, and the restraint, mobilizing him with that weapon, are

5     both the same thing.  But, still, being immobilized is not an

6     element of every assault or every 111 violation.  And it was

7     the particular effect of this defendant's choice of a weapon.

8          It is the essence of the admitted electroshock weapon

9     to stun and immobilize the officer for more seconds than it

10    took to administer the shock, which is different than holding

11    someone for as long as it takes you to stab them.  And even if

12    someone stunned a person once -- and that would be hard to

13    differentiate from the temporary immobilization from the

14    assault itself -- this defendant did it twice, ensuring that

15    the officer couldn't get up, facilitating the theft by

16    Mr. Sibick, facilitating and enabling the threats from others

17    in the mob to steal his gun.

18          So the Fourth Circuit case involving holding someone

19    briefly while stabbing him is different from rendering someone

20    defenseless against a mob, a mob that included the defendant

21    and his second application of the weapon.

22          So the offense level for Count 6, then, is level 33.

23    And the offense level for Count 1 and Count 2, the conspiracy

24    to obstruct the Congressional proceeding and the substantive

25    offense of obstructing the official proceeding is, according to

1      the parties and the probation office, level 29.

2                  Count 2, 18 U.S. Code § 1512(c)(2) is brought under

3      the appendix to the guidelines under § 2J1.2, the obstruction

4      of justice guideline for which the base offense level is 14.

5                  The parties agreed there are eight levels added under

6      § 2J1.2(b)(1)(B) for causing or threatening injury or damage.

7      The probation office was thinking about the physical damage

8      inside the building.  But in either case.  There's an

9      eight-level enhancement there.

10                 The parties agreed that there would be a three-level

11     enhancement for substantial interference of justice.  The

12     parties agreed that there would a two-level enhancement for

13     extensive scope, planning, and preparation.  This is all

14     referring to Count 2.  And the parties agreed that it would be

15     enhancement by two levels for the defendant's role as an

16     organizer, leader, or manager.

17                 So that brings us to the total of 29.  29, the

18     guideline for Count 1 and 2, is less than 33, the offense level

19     for the assault on the officer.  So 33 would be the offense

20     level if you grouped Counts 1 and 2 with Count 6.  So then the

21     question becomes are we going to do that?

22                 § 3D1.2 says related if they're the same victim.  But

23     that's not the case.  But subsection (c) says they're related

24     when one of the counts embodies conduct that is treated as a

25     specific offense characteristic in another of the counts.  The

1   government says the physical harm to the officer was taken into

2   account as a specific offense characteristic under the

3   obstruction guideline.  § 2J1.2(b)(1)(B), if the offense

4   involved causing or threatening to cause physical injury to a

5   person, or property damage, in order to obstruct the

6   administration of justice, you increase by eight levels.

7          My first concern is that while there is no guideline

8   other than 2J1.2 assigned by the sentencing commission to the

9   1512(c)(2) violation, what we have in this particular case in

10  Count 2 is obstructing a proceeding before Congress, which is

11  not quite the same thing as obstructing the administration of

12  justice.

13         The government memo doesn't address whether, for

14  purposes of this enhancement, the administration of justice

15  includes obstructing any official proceeding, as defined by 18

16  U.S. Code § 1515(a)(1).  The application notes to the guideline

17  don't define administration of justice, it only says in the

18  background section that numerous offenses may constitute

19  obstruction of justice.  But the examples it gives involves

20  threatening witnesses in a trial or a civil or administrative

21  procedure.

22         Here, Count 3 charged obstructing an official

23  proceeding under § 1512(c)(2), which the statute defines as to

24  include a proceeding before Congress, and which this Court and

25  other Courts in this building have ruled over and over and over

1   again does not have to be an adjudicative, court-related

2   proceeding.  So it's not actually clear to me that the

3   guidelines related to the administration of justice, the

4   enhancements, would apply.  But the defendant has not raised

5   this objection and it agreed to the way the guideline for Count

6   2 was calculated.  So I don't have to rule on that question.

7         There is a greater concern, and I tend to share the

8   presentence report writer's instinct, that the assault on the

9   officer should not be grouped since it is a distinct victim;

10   the officer, not Congress.  While § 3D1.2 lists four ways in

11   which cases can be related, including the circumstance selected

12   by the parties, when the physical assault is a specific offense

13   characteristic, the general instructions in the commentary to

14   the grouping emphasize:  A primary consideration in this

15   section is whether the offenses involve different victims.

16         The application notes also recognize that the thin

17   distinctions and examples may raise more questions than they

18   answer, and even the application notes to the guidelines

19   written by the Commission concede the decision as to whether to

20   group counts together isn't always clear-cut.  I agree.

21         In that section, though, it refers you back to the

22   underlying policy of this part and the introductory commentary

23   to § 3D1.1, which says, "The rules in this part seek to provide

24   incremental punishment for significant additional criminal

25   conduct.  Some offenses that may be charged in multiple-count

1    indictments are so closely intertwined with other offenses that

2    conviction for them ordinarily would not warrant increasing the

3    guideline range."  And it gives the example of an injury to a

4    teller during a bank robbery.  And I'm not sure that's

5    completely analogous here.

6           In some ways, yes, the battle in the tunnel was all

7    about the mob's forcing its way into the building in order to

8    disrupt what was going on inside.  But the assault on Officer

9    Fanone seems distinct and gratuitous and not what the group of

10   co-conspirators were talking about doing when they got to DC,

11   and distinct from the rest of his behavior with his

12   co-conspirators in furtherance of the 1512(c)(2) conspiracy.

13   But it was alleged in the indictment to be an act in

14   furtherance of the conspiracy.

15          So in the end, given the parties' agreement, given

16   the fact that the government has not assumed the burden of

17   establishing that the grouping in the presentence report, which

18   would add an additional two levels for the additional units in

19   the group, is appropriate.  And given the fact that the

20   indictment specifically identified the defendant's

21   participation in the battle in the tunnel and his assault on

22   Officer Fanone as overt acts in furtherance of the Count 1

23   conspiracy to commit the obstruction of justice in Count 2, I

24   will find that the guideline calculation to which the parties

25   agreed is the appropriate guideline and group Count 6 with

1   Counts 1 and 2.

2          But for the purposes of figuring out in my

3   discretion, when we get to this, what the appropriate sentence

4   should be under all of the sentencing factors, I find that the

5   presentence report calculation treating this assault as a

6   distinct offense that was not so intertwined with the others to

7   be grouped to be instructive when I'm applying the statutory

8   directive that a sentence should reflect the seriousness of the

9   offense and to avoid unwarranted sentencing disparities.

10          And so the record should at least reflect, because

11   this is an important guide post also, that the presentence

12   report calculation resulted in an additional two levels, given

13   the additional group, and it brought us to level 35, and the

14   guideline range of 121 to 151 months.

15          But we still have to calculate the base offense level

16   for the other grouping, the conspiracy in Count 1 and the

17   tampering with witnesses and documents in Count 3.

18          The government, with the agreement of the defense,

19   came out two levels higher than the probation office.  It took

20   three pages to explain.  If you read document 196, which was

21   helpful, explaining things that weren't quite clear in either

22   the sentencing memo or the plea agreement, which just said

23   cross-reference to the obstruction guideline.

24          We start with the obstruction guideline, § 2J1.2

25   because Count 1 was the conspiracy to commit Count 3, Count 3

1    was the conspiracy to obstruct justice by telling a victim to

2    destroy evidence that was going to be foreseeability used in

3    the grand jury investigation.  The base offense level for that

4    is 14.  § 2J1.2(c)(1) says if the offense involved obstructing

5    the investigation or prosecution of a criminal offense, then

6    you apply § 2X3.1, which is not the obstruction guideline, but

7    the accessory after the fact guideline.  But then that tells

8    you you look at the offense level of the underlying offense,

9    which takes us back to obstruction, and then it says you

10   subtract six levels.  So since we found the obstruction to be

11   29, we ended up at 23.

12           The presentence report writer didn't follow the

13   cross-reference and it increased the offense level from 14 by

14   applying a number of enhancements that the government has to

15   try to prove, that the obstruction -- hasn't tried to prove:

16           That the obstruction in Count 3 resulted in

17   substantial interference with the administration of justice,

18   that the Count 3 offense was otherwise extensive in scope, and;

19   the defendant was an organizer, leader, manager of tampering

20   with witnesses and documents in Count 3.

21           As I just noted, the government hasn't pointed to

22   facts to establish those by a preponderance, and given what I

23   know about this incident based on the trial of the codefendant,

24   I'm not sure that I would find that any of those applied to

25   this defendant with respect to Count 3.

1          So the offense level for Count 3 will be 23.  And as

2     I understand it, although still no one has actually said this,

3     that means that the second group that consists of Count 1 and

4     Count 3 has an offense level of 23.

5          Pursuant to the grouping rules in § 3D1.4(c), since

6     the offense level for the first counts group 1, 2, and 6 is

7     nine or more levels more serious than the offense levels for

8     the second group, Counts 1 and 3, you just use the higher one

9     and no additional levels for additional units are added.  So

10    level 33 becomes the offense level for the entire case.

11         For comparison purposes, though, if I'd followed the

12    probation officer's recommendation and carved out Count 6

13    separately, it wouldn't have stopped at level 33, we would

14    increase by two levels to recognize the additional unit and we

15    would be at level 35.

16         But if we're at level 33, you would reduce that by

17    three levels for the defendant's acceptance of responsibility,

18    bringing us to a total offense level of 30.  The defendant

19    falls in criminal history category Roman numeral I since he has

20    no adult convictions, and the advisory sentencing guideline

21    range for that offense is 97 to 121 months for that offense

22    level.

23         Had I adopted the presentence report writer's

24    approach, which has a lot to be said for it under the

25    particular factual circumstances of this case, and we started

1   at level 35, if you subtracted three levels for acceptance of

2   responsibility, you would be at level 32.  And the advisory

3   sentencing guideline range for someone in category I would be

4   121 to 151 months.  In either case, the sentence for Count 1

5   cannot exceed the statutory maximum of 60 months.

6        But, according to the government, we're still not

7   finished with the guidelines.  The government has asked me to

8   depart upwards pursuant to the terrorism guideline, § 3A1.4,

9   which on its face does not apply.  It says if the offense is a

10  felony that involved, or was intended to promote, a federal

11  crime of terrorism, increase by 12 levels.  But if the

12  resulting offense level is less than 32, increase to level 32;

13  we're already at 33.

14       But this provision also calls for a significant

15  increase in the criminal history score as well, and it would

16  catapult the defendant into category VI, as opposed to category

17  I.  The problem is, on its face the guideline does not apply.

18  Pursuant to § 18 U.S. Code § 2332b, a federal crime of

19  terrorism is defined as an offense that is calculated to

20  influence or affect the conduct of government by intimidation

21  or coercion, or to retaliate against government conduct and is

22  a violation of a series of particular enumerated statutes, such

23  as those involving destruction of airplanes or mass

24  transportation systems, kidnapping of public officials, arson,

25  bombing, homicide.

1          Obstruction of a congressional proceeding, or any

2     official proceeding, is not one of the enumerated offenses.

3     It's not even particularly like the enumerated offenses, and

4     the sentencing commission knew that.  It said, in the

5     application note, "By the terms of the directive to the

6     commission in § 730 of the Antiterrorism and Effective Death

7     Penalty Act of 1996, the adjustment provided by this guideline

8     applies only to federal crimes of terrorism.  However, the

9     commission goes on:  There may be cases in which the offense

10    was calculated to influence or affect the conduct of government

11    by intimidation or coercion, or to retaliate against government

12    conduct, or was intended to promote an offense other than one

13    of the offenses specifically enumerated, and in such cases an

14    upward departure would be warranted.  Even in the commission's

15    view, then, this is plainly discretionary.

16         The government says apply it and then asks for a

17    sentence that is 47 months longer than the guideline range it

18    came up with.  The problem with that is the commentary expands

19    the scope of the guideline beyond the terms of the

20    Congressional mandate that led to the promulgation of the

21    guideline, which was 18 U.S. Code § 2332b(g)(5)(B).

22         And the D.C. Circuit has addressed that precise issue

23    in *United States versus Winstead*, 890 F.3d 1082, from the D.C.

24    Circuit in 2018.  When faced with § 4B1.1, the career offender

25    enhancement, the commission there, in its commentary, extended

1    the scope of the upward adjustment beyond what had been

2    mandated to do by Congress.  § 4B1.1, the guideline itself,

3    called for enhanced sentences if the defendant has two or more

4    prior adult convictions for crimes of violence or controlled

5    substance offenses as defined in 28 U.S. Code § 994(h), which

6    was the statute in which the Congress told the sentencing

7    commission to issue the guideline.  But then the guideline

8    commentary added a gloss that included aiding and abetting,

9    conspiring, and attempting to commit those offenses.

10          The Circuit concluded that the sentencing commission

11   had exceeded its authority by adding its own broader gloss in

12   the application notes when the guideline definition itself had

13   been promulgated in accordance with directions specified by

14   Congress.

15          It said, "The commentary's inclusion of such offenses

16   had no grounding in the guidelines itself and, thus, the

17   guideline and the commentary were inconsistent."  And the other

18   cases cited in the defendant's reply memo made the same point.

19          Here, the commission said, in paragraph 4 of the

20   application notes, that by the terms of the directive of the

21   statute the guideline only applies to federal crimes of

22   terrorism.

23          I am concerned why we would sew an appellate issue

24   into a sentencing when the sentencing statute and applicable

25   statutory maximums give the Court sufficient authority to

1    recognize the severity of this offense with a sentence that is

2    sufficient.

3              I also question, frankly, the factual predicate for

4    the application of the terrorism exception in this particular

5    case.  The defendant pled guilty to corruptly influencing and

6    impeding the official proceeding, that is, the certification of

7    the election results.  And the indictment alleged that the goal

8    of that conspiracy was to stop, delay, and hinder Congress's

9    certification of the Electoral College vote.

10             I'm not sure that aligns sufficiently precisely with

11   the language in the application note of an offense intended to

12   influence or affect the conduct of government by intimidation

13   or coercion, or that this case is on a parallel with the one

14   case in which this enhancement has been invoked, which involved

15   jury convictions for seditious conspiracy.

16             And it seems particularly problematic because the

17   government isn't suggesting that the defendant used force to

18   intimidate or coerce Congress, the governmental body, but in

19   its memorandum on page 49 it points to the force and

20   intimidation used against Officer Fanone.  And when you talk

21   about extensive preparation, yes, the defendant talked about

22   renting a truck and he encouraged people to bring weapons,

23   tasers, and bear spray and goggles, but there was little

24   calculation involved about who would use them and under what

25   circumstances, and whether and how they would be brought to the

1    Capitol.

2              I think the cases cited by the government involve not

3    only a lot of rhetoric in advance, as in the Telegram messages

4    here, but significant affirmative steps.  For instance, the

5    stockpiling of actual firearms and ammunition by the Oath

6    Keepers and practicing creating the stack to gain entry into

7    the Capitol.  And I think their level of sophistication and

8    organization exceeds a lot of the immature posturing here.

9              It's hard to liken Danny and Ed at paint ball with

10   what the jury convicted the Oath Keepers of doing and what

11   animated Judge Mehta's application of the enhancement.  And

12   it's hard to connect the pointless mayhem the defendant did

13   engage in with a calculated effort to achieve some sort of

14   governmental action.

15             So I'm not going to adopt the formal departure under

16   the guidelines, but I do agree that every single fact

17   marshalled by the government in support of this enhancement

18   bears directly on the nature and circumstances of the offense,

19   as well as what sort of sentence would be sufficient to serve

20   the purposes of punishment and deterrence, among others.

21             So we're now at the point where we know what the

22   guidelines would have us do or recommend that we do, but now we

23   talk about what we're going to do.  Would the government like

24   an opportunity to speak regarding the appropriate sentence in

25   this case?

 1          MS. PASCHALL:  Yes, Your Honor.  Before I speak,

 2    however, I would like to give our victim, Officer Michael

 3    Fanone, the chance to address the Court.

 4          THE COURT:  All right.  He's welcome to come to the

 5    lectern and to do so.

 6          MS. PASCHALL:  I'm just going to set up my PowerPoint

 7    quickly, Your Honor.

 8          THE COURT:  He's right behind you.  And I apologize

 9    for all this plexiglass between me and you.  I had specifically

10    asked that it not be here.

11          MS. PASCHALL:  New courtroom, Your Honor.

12          OFFICER FANONE:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          OFFICER FANONE:  As you know, my name is Michael

15    Fanone.  And for nearly two decades I served with distinction

16    as a Metropolitan police officer here in the District of

17    Columbia.  Prior to that I was an officer with the

18    United States Capitol Police.  I've dedicated my life and

19    service to this republic.

20          On January 6, 2021, I, along with hundreds of my

21    fellow MPDC officers, responded to the United States Capitol

22    Police department's calls for assistance as their officers were

23    overrun and assaulted by former President Donald J. Trump's

24    army of insurrectionists.

25          Upon my arrival, I made my way to the lower West

1    Terrace tunnel where a few dozen MPDC officers fought

2    relentlessly to hold back an onslaught of Trump's soldiers.  It

3    was here that I was dragged from the police line, restrained,

4    and beaten.  It was during these moments that Mr. Rodriguez

5    made the decision to strike me on my neck with a taser device;

6    not once, but multiple times.

7          Mr. Rodriguez's actions were intentional.  And he

8    later bragged about them on social media.  At the time I

9    sustained these injuries, I was dressed in my full uniform and

10   I posed no threat.  In fact, my back was turned to

11   Mr. Rodriguez.  I never saw his face.

12         I later watched his interview in which he confessed

13   his crimes, this time to authorities, not his social media

14   fans.  He sobbed, boring the agents with his pathetic life

15   story and self-realization that he was now, after having been

16   apprehended, a piece of shit.  I took no pleasure in his

17   remarks, though had it been several years earlier, they would

18   have been met with laughter as I relived them over beers with

19   my colleagues.  Those days are gone.  My career, my friends,

20   and my faith in the criminal justice system I dedicated my life

21   to serving extinguished because I did my job and I lived to

22   tell about it.

23         I don't give a shit about Daniel Rodriguez.  He

24   ceased to exist to me as a person a long time ago.  And any

25   compassion or empathy I felt toward those who laid siege to our

1    Capitol, whose actions I felt were at least in part influenced

2    by their leader Donald Trump and his lies has been eroded.

3    Eroded by the attacks directed at me and my family by

4    supporters of Donald Trump and the right wing media.

5            I will, however, take this opportunity to once again

6    demand that the Justice Department pursue an indictment against

7    Donald Trump and anyone else, regardless of their wealth or

8    current political position, criminally responsible for the

9    events both on and leading up to January 6th, 2021.  If it is

10   true that no one in this country is above the law, then those

11   responsible should be brought to justice, not because of public

12   sentiment, but because the law demands it.

13           Your Honor, we must all join the fight against Donald

14   Trump and the destructive, divisive movement he has come to

15   represent.  We must offer him no safe harbor to his enablers,

16   whether in business, in politics, or the media; give them no

17   quarter.  In the fight to preserve our republic, there can be

18   no spectators.  Thank you.

19           MS. PASCHALL:  Your Honor has heard a lot of January

20   6 allocutions in the past two years from myself and from many

21   of my colleagues, so I don't need to repeat much of the gravity

22   of the day and the importance of that event to this district,

23   you know it.  I want to take this time, instead, to focus

24   intensely on the actions of this defendant, as we are required

25   to do under 3553(a).

1          And, of course, as we consider the nature and

2     circumstances of the events and the conduct, the facts are

3     simply heinous.  Your Honor knows them well by now and I did

4     not spend a lot of time going over them.  But I do want to

5     address some things that are raised by defense that are in

6     contravention of the facts that Your Honor knows and has

7     accepted.

8          In their memo the defense talks a lot about this

9     defendant's loneliness, his desire to belong.  And while that

10    is understandable, it is not the government's position that

11    this Court should be incentivising lonely men to commit violent

12    acts by taking any break on him here because he happened to be

13    a lonely man.

14          In fact, the opposite appears to be true.  He was the

15    leader of this group chat where dozens of people engaged with

16    him on a daily basis and followed him to the United States

17    Capitol.  He took a van full of people here.  And, yes, it may

18    not be at the level of sophistication that we have seen from

19    the Oath Keepers and Proud Boys, but, nevertheless, his voice

20    mattered in that group.  He was not alone.  He was anything

21    but.

22          And one of the things that Judge Mehta focused on

23    heavily in the Oath Keepers' sentencings was the particularly

24    pernicious nature of a conspiracy conviction, whether those

25    people were convicted of seditious conspiracy or otherwise.

1    And we have in our sentencing memorandum what the Supreme Court

2    had said in the *Callanan* case from 1961 about collective

3    criminal agreement and how partnership in crime presents a

4    greater potential to the threat -- and threat to the public

5    than individual dealings.

6            That case goes on to say:  Group association for

7    criminal purposes often, if not normally, makes possible the

8    attainment of ends more complex than those which one criminal

9    could accomplish, nor is the danger of conspiratorial group

10   limited to the particular end toward which it has embarked.

11   Combination in crime makes it more likely that the commission

12   of crimes unrelated to the original purpose for which the group

13   was formed will take place.  In sum, the danger which a

14   conspiracy generates is not confined to the substantive

15   offense.

16           Your Honor has just spoken quite eloquently to that

17   point, given the concerns about the assault on Officer Fanone,

18   which does seem distinct and detached in some ways from the

19   original group plan, to stop the proceeding before Congress.

20   And we know in this case, what *Callanan* is concerned about

21   happened here.

22           Mr. Rodriguez and his coconspirators galvanized a

23   whole group of individuals to come to DC on January 6 and go to

24   the Capitol.  A van full of people carrying weapons to carry

25   out the scheme.  And then commission of the crimes unrelated to

1    the original purpose happened here.  Mr. Rodriguez had not been

2    in a concerted conspiracy to assault law enforcement officers,

3    but he did so.  He had not been in a concerted conspiracy to

4    break into the United States Capitol and damage property, but

5    he did so.  He was not in a conspiracy to steal government

6    property once inside that building, but he did so.  That is why

7    the government believes that any disparities that may arise

8    between this case and others that have been mentioned by the

9    defense are warranted disparities.

10            Reality is, Daniel Rodriguez is in a class of one.

11   There is no other January 6 defendant quite like Mr. Rodriguez.

12            The defense notes while Mr. Rodriguez does not

13   minimize his actions that led to Officer M.F.'s injuries, the

14   sentencing guidelines harshly punished him and the subject of

15   his offense level to multiple large enhancements are all based

16   on a single action he took against Officer M.F.

17            What single action?  If there was ever a time to be

18   punished harshly for an allegedly single action, this is it.

19   Litigants and judges are instructed not to create unwarranted

20   sentencing disparities.  Sometimes those disparities are

21   warranted.

22            The comparators that the defense puts in its memo the

23   government finds to be unconvincing.  And while we understand

24   Your Honor's ruling with respect to the application of the note

25   for enhancement, we would stand by our recommendation for 168

1    months because his closest comparators, imperfect as they are,

2    are still those members of the Oath Keepers who got that base

3    offense level enhancement.

4            It's incredibly clear when reading the Oath Keepers'

5    memo that they had the same intent:  To come here and affect

6    the business of Congress, that they felt that what was

7    happening as a part of the normal process of the peaceful

8    transfer of power was a coup, that there were criminals, and

9    that they had to come here, if it was the last thing that they

10   ever did.

11           Jessica Watkins in particular is a worthy comparator

12   because at trial Jessica Watkins was not convicted of seditious

13   conspiracy, her conspiracy count similar to the defendant's.

14   It's a 371 count, to obstruct the official proceeding.  And

15   when you look at the evidence in those cases and compare them

16   to Mr. Rodriguez, the government can agree with Your Honor

17   completely, that they lack the polish, they lack the large

18   group endeavor.  They don't lack the intent and they certainly

19   don't lack the effect.

20           In fact, none of the Oath Keepers who have been

21   convicted to date have any assault convictions, have any

22   allegations of destruction of property, any allegation of theft

23   of property.  This defendant has all of those things.

24           And, of course, one of those things in particular is

25   the most heinous, and that, of course --

 1              THE COURT:  I thought one of Judge Mehta's

 2    sentencings from the Oath Keepers conspiracy was someone who

 3    also assaulted an officer?  That was a separate case?

 4              MS. PASCHALL:  I believe it is a separate case, Your

 5    Honor.  I'm not 100 percent certain though, so I won't hang my

 6    hat on that.  I know at least for those two defendants that we

 7    believe are the comparators, that is not the case.

 8              THE COURT:  Okay.

 9              MS. PASCHALL:  The difference between Mr. Rodriguez

10    and all of those that he says in his memo are his comparators,

11    is that he used this deadly and dangerous weapon to cause

12    injury.  And despite any arguments to the contrary, we know

13    that that weapon caused the injury.  We know it from the

14    sentencing exhibit that we submitted to Your Honor that I would

15    like to play now, Sentencing Exhibit 11.

16              And I would ask the court, I would urge the Court to

17    take a minute to think not only the characteristics of the

18    defendant, but the characteristics of our victim, who two and a

19    half years later carries raw and visceral emotional scars.

20    You've heard it from him today, it is clear he will carry this

21    event with him for many years to come.

22              (Video played.)

23              Your Honor has seen and heard those screams of agony

24    many times now.  It is something that no one should have to

25    experience, specifically someone doing his job.  And ultimately

1     no one should have to suffer the two minutes that we see in

2     Government's Exhibit 11, starting at approximately 15:21:36.

3               (Video played.)

4               It's a little difficult to hear, but at 15:23:35,

5     "Did we take that door back?"  Did we take that door back.  He

6     has been unconscious for two minutes and all he can think about

7     is his duty, protecting the building that is emblazoned on his

8     badge.  "Did we take that door back?"  I don't think those

9     words will ever not be heartbreaking in this context.

10              And to have the defendants, like Mr. Rodriguez, drive

11    across this country to attack that building, to attack these

12    officers when they are doing nothing but protecting this city

13    and this democracy, it is almost too much to bear.  I warrant,

14    yes, that most MPD officers have been the victim of assault on

15    an officer during their tenure on the force.  It is,

16    unfortunately, not uncommon for them.  But no one that I'm

17    aware of has ever experienced anything quite like this.

18              And in the course of these events, as Your Honor

19    knows well, Officer Fanone's badge, with the United States

20    Capitol on it, was stolen.  The acts of this defendant on that

21    day also caused his identity to be stolen.  He told you that he

22    was a police officer for 20 years.  His adult life will never

23    be the same because that identity has been taken from him.

24              We've already addressed Your Honor's position on the

25    terrorist enhancement, so I don't want to go into that in this

1    context, but I do think Your Honor has mentioned and has in

2    your tool kit the ability to make a variance consistent with

3    the crime that took place here.  Violence and the threat of

4    violence with the goal of achieving fundamental pinnacle

5    change.  That's terrorism.  The root of the word terrorism is

6    terror.

7            This exhibit, Government's Exhibit 11, makes

8    abundantly clear that the victim of this defendant's crimes

9    felt terror.  And while sworn members of law enforcement will

10   never want to see themselves as anything other than a pillar of

11   strength, the reality here is inescapable:  Michael Fanone

12   experienced terror.  The unimaginable terror of a group of

13   people with a singular purpose, to get past him at any cost and

14   into the United States Capitol.

15           We refer to the Seventh circuit case, *Christianson*,

16   in our memorandum.  Again, I don't want to take this up in the

17   context of the enhancement, but I think what the Seventh

18   Circuit says about that group of defendants, who were

19   environmental terrorists, who destroyed hundreds of trees at a

20   research project at the United States Forest Service is

21   important here.  They noted that it doesn't matter why

22   defendants oppose the government of the United States, if they

23   use violence and intimidation to further their views, they are

24   terrorists.

25           The government wants this message to be incredibly

1    clear:  This defendant does not sit here today convicted

2    because of who he voted for or who he believes should be the

3    leader of this country.  The creed, the ideology does not

4    matter.  What matters is what this defendant did in furtherance

5    of that ideology.

6         The defendant has accepted responsibility in the

7    legal sense.  He is getting his three points for acceptance of

8    responsibility.  But he has been fighting and dragging his feet

9    every step of the way.  Your Honor saw that at the plea hearing

10   in this case where the defendant was nitpicking, refusing to

11   accept what multiple videos show, he tased Officer Fanone

12   multiple times.  And his litigation over the deadly and

13   dangerous weapon, with who we have now heard the agony that

14   caused, the photographs that we have seen of the damage, the

15   medical diagnosis that was received.

16        This is not someone who is accepting responsibility

17   willingly.  And as Judge Chutkan has noted in these cases,

18   acceptance of responsibility matters, but when it comes lately,

19   it carries less weight.  And we know from the messages that

20   we've submitted to Your Honor, that Mr. Rodriguez knew that he

21   had committed criminal acts at the Capitol, and instead decided

22   he wanted to trumpet those on the Telegram channel and to lay

23   low, for almost three months, until the FBI arrested him.

24        Even in that interview, while he begrudgingly accepts

25   what he did on video, he does not accept the entirety of what

1    Your Honor now knows to be the case; the depth of the plan, the

2    conspiracy, others who were galvanized to come with him.  Any

3    acceptance now is less than fulsome.

4         Finally, I want to speak a little bit to deterrence,

5    both to this defendant's specific deterrence and to general

6    deterrence, as 3553(a) requires us to do.

7         This defendant's lack of criminal history is not the

8    whole story.  He is not a stranger to the justice system.  We

9    know that both from the presentence report and from the

10   messages in the Telegram chat.  And he is someone who took that

11   knowledge, took an understanding of what it means to be in the

12   criminal justice system, cast caution to the wind and told his

13   fellow coconspirators not to forget about committing crimes,

14   but to commit crimes in a way that they wouldn't get caught.

15   That is what his interaction with the justice system has taught

16   him.  Not to stop before one even begins, but to do it in such

17   a way that he will not receive punishment.

18        It's no wonder then that he subsequently aimed to

19   destroy evidence against him.  He knew how bad it would be to

20   get caught and he did these crimes anyway.  That speaks to

21   someone who needs a heavy hand to deter them from future

22   crimes.

23        Of course, Officer Fanone is the victim of the

24   assault, he has suffered the slings and arrows of outrageous

25   fortune.  He will carry those scars with him for the rest of

1    his life.  But we, all of us, the citizens of this District and

2    this country, are the victims of this criminal conspiracy.  We

3    all now must live in a post-January 6 world.  We live in a

4    world that Mr. Rodriguez and his fellow rioters created.

5           At the Oath Keepers sentencing Judge Mehta said it

6    best when talking about the enduring legacies of January 6.  He

7    said, quote, I dare say we all now hold our collective breaths

8    every time an election is approaching.  Will we have another

9    January 6?  This remains to be seen.

10          That is the enduring legacy of Mr. Rodriguez's crimes

11   that we all must bear.  And it is in an attempt to keep us all

12   from holding our collective breath that the government finally

13   comes before this Court and asks for sentences that heavily

14   factor a general deterrence.  We need everyone to know nothing

15   like this can ever happen again.  The message from the justice

16   system must be clear.  Any defendant, regardless of their

17   creed, their belief, their political persuasion, their

18   ideology, should not come here again and do this type of harm

19   to this city and this democracy.

20          The country needs to see a sentence from this Court

21   knowing that the judicial system does not stand back.  The

22   judicial system does not stand by while our democracy and those

23   who defend it are attacked.  Daniel Rodriguez now knows his

24   actions have consequences.  And it's the government's hope,

25   with a strong sentence from this Court, everyone will know the

1    same.  That is why the government is asking for 168 months of

2    incarceration, 36 months of probation, restitution as noted in

3    our memorandum.

4          THE COURT:  Can I ask you a question about the

5    restitution?  I didn't want to interrupt you at the beginning

6    or in the middle.

7          MS. PASCHALL:  Yes.

8          THE COURT:  The plea agreement contemplated included

9    the $96,000 number, and it said that the defendant may be

10    required to pay some or all of that and that the victim himself

11    may have asked for more.  Do we know if there's going to be

12    additional damages requested?

13          MS. PASCHALL:  In talking with Mr. Fanone, there does

14    not appear to be any from him.  That damage amount comes from

15    our discussions with Metropolitan Police Department.  So, no,

16    we do not expect anything additional beyond what's noted.

17          THE COURT:  So is there any reason why I can't rule

18    on restitution today?  Or is this the case -- or is this a case

19    where I would have to order the $2,000 and then say this could

20    be amended and schedule a subsequent hearing?

21          MS. PASCHALL:  No, we believe you can rule on this

22    today, if Your Honor feels ready.  But if you hear arguments

23    from the defense that leads you to need additional time, Your

24    Honor can take, by statute, the additional -- I believe it's 90

25    days.  But from our perspective, you can rule on this today.

1          THE COURT:  And what's your position with respect to

2      the portion of the total amount expended by MPD that would be

3      an appropriate restitution amount to be ordered in this case?

4          MS. PASCHALL:  I think we've always believed that

5      this as a joint and several liability case, such as that comes

6      up in the criminal context.  So that's why we've asked for the

7      amount in its entirety.  Of course, Your Honor can make an

8      apportion accordingly, but our sole aim is to make the victim

9      whole and that's what we believe would do so here.  So that's

10     why we've asked for the entire amount from this defendant.

11         THE COURT:  Okay.

12         MS. PASCHALL:  Do I have anything else to address for

13     Your Honor?

14         THE COURT:  I don't think I have any other questions.

15         All right.  Ms. Levy, would you like to speak on the

16     defendant's behalf?

17         MS. LEVY:  Yes, Your Honor.

18         Your Honor, in this case we've filed extensive

19     sentencing memorandum.  We filed a reply to the government's

20     sentencing memorandum.  We also, as the Court noted, there are

21     reports that we filed.  We filed letters from not just my

22     client, apology letters, but also letters of support.  We also,

23     in our sentencing memorandum, outlined many comparison cases

24     for the Court to consider, and I know the Court has looked at

25     that already.

1            The only comparison case I would note is the Court

2    was asking about a case with Judge Mehta where there was a

3    defendant who committed an assault.  I'm not sure if that

4    occurred in the Oath Keepers case as well.  But I can tell the

5    Court, in our sentencing memorandum we noted the *Jeffrey Scott*

6    *Brown* case, and that was the same judge and there was

7    assaultive conduct in that case.

8            That defendant went to trial.  And in that case there

9    was activity on media sites like Parlor and Telegram discussing

10   travels.  That's a case where the defendant was handed a

11   weapon, almost similar to what occurred in our case, Your

12   Honor.  And in that case Mr. Brown was sentenced to 54 months

13   in custody after trial.

14           I would note, too, Your Honor, we discussed in our

15   sentencing memorandum the difficulties of confinement.  And I

16   know that's something that the Court has noted in prior

17   sentencings of other individuals.  It has been extremely

18   isolating for my client.

19           In addition, Your Honor, as a courtesy, the -- our

20   office took Mr. Rodriguez's case, of course to help not just

21   with the Washington office, but also with the administration of

22   these cases so they didn't get caught up.  That's been

23   challenging, of course, because we are so far away from our

24   client.  So we have had very limited in-person visitation.  And

25   when our client is transferred around, it can be challenging to

1    be in contact with our client.

2          I would tell the Court that we have not had any

3    problem with Mr. Rodriguez in terms of any complaints or

4    concerns or anything of the like that I have seen in many, many

5    other cases that I have looked at the dockets in these January

6    6 cases where defendants are concerned about what is going on

7    with their attorney.  Mr. Rodriguez has always shown us nothing

8    but respect and compassion, understanding that we are so very

9    far away from him.

10          I will tell the Court that not only is a

11    consideration to be that he has been in custody during this

12    difficult time, but we are also concerned about where he will

13    be placed in custody, Your Honor.  Because we reached out to

14    the attorney for the Bureau of Prisons who indicated that they

15    will take into consideration many of the things that are in the

16    PSR and, of course, many of the things that the Court may

17    determine at sentencing to determine what an appropriate

18    placement would be.

19          Our concern, of course, would be that there is a

20    facility that's an administrative maximum facility, and I can

21    think of the one in Colorado.  And we are concerned that that

22    might be where the Bureau of Prisons places our client,

23    particularly if the Court finds some type of variance would be

24    appropriate.  If that is the case, obviously, his time would be

25    significantly more challenging.  That's an almost full-time

1    lockdown facility, with very limited contact.  So I would just

2    notate that for the Court.

3           I think the Court has been clear that the Court has

4    noted some differences between the Oath Keepers' case and

5    Mr. Rodriguez's.  And we, of course, outlined that pretty

6    significantly in our reply.  I would echo those sentiments.

7    Mr. Rodriguez and his codefendant who went to trial and then

8    the other individuals on the Telegram chats, frankly, appear to

9    be a group of misfits.  There is a lack of planning, would not

10   coincide with how the Oath Keepers planned in terms of the

11   complexity.

12          And, of course, we know the Oath Keepers were -- in

13   charge of the Oath Keepers was an individual who went to Yale

14   Law School.  My client didn't graduate from high school, as we

15   notate in the sentencing memorandum.  So there are very

16   significant differences between my client and the Oath Keepers.

17          I would notate again that the probation department

18   has recommended a low-end sentence after looking at this case

19   and, frankly, other cases of similar natures.  So that's the

20   recommendation that they have made, a low-end sentence, without

21   any type of variance upward.

22          Just as a last note, Your Honor, I would talk about

23   my client's acceptance.  My client not only has accepted

24   responsibility by pleading guilty here, and of course we know

25   his codefendant went to trial, and as we notate in our

1     sentencing memorandum, there were issues to be litigated which

2     my client waived in lieu of entering a guilty plea.  We notate

3     that because of the significance of what my client would give

4     up in order to enter that guilty plea.  It shows that he is

5     taking responsibility, even if there are other issues out

6     there.

7            We did not litigate anything related to the device in

8     this case.  We agreed with the government in terms of the

9     device and --

10           THE COURT:  You can stop talking about it.  I got an

11    expert report, I got pages.  And you tell me we agreed, we

12    accepted responsibility, but don't take that weapon seriously,

13    it's a sparkler flashlight.  You can't push both of these

14    arguments at the same time; that he really didn't do it, he's

15    really not under the right guideline, it's really not fair, but

16    we accepted responsibility.  He agreed, he swore it was a

17    dangerous weapon.  So I don't actually understand the continued

18    emphasis on the battle you chose and he chose to concede.

19           MS. LEVY:  Yes, Your Honor.  We understand the

20    Court's position.  And the reason we brought that up is to just

21    show to the Court the significance of my client's guilty plea,

22    which is that he did give up something, similar to in a case

23    where a defendant files a motion to suppress.  The government

24    decides, you know what?  I'm going to give the defendant an

25    offer to withdraw the motion to suppress and resolve the case.

1    And the defendant may come up at sentencing and say, look, I

2    encourage the Court to follow the plea agreement.  We had a

3    motion to suppress, we withdraw it, we entered a guilty plea.

4    And that was part of the negotiation.  That shows you the

5    significance of my client entering the guilty plea.

6         And that's why we discussed it.  I'm not in a

7    position here that I'm going to litigate it, and we didn't

8    litigate it.  The purpose was to show his remorse, Your Honor,

9    and that he accepted responsibility.  And I know that this

10   Court also watched his interview in which he does take

11   responsibility and he is remorseful almost right away.

12        So I would also ask that the Court not punish

13   Mr. Rodriguez if there were any, as the government says, delays

14   in entering a guilty plea.

15        As I notated, it's been challenging being so far

16   away.  And he has not gone to trial, he has entered the guilty

17   plea, and he has maintained that position throughout.

18        If the Court doesn't have any other questions --

19        THE COURT:  I do want to ask you about the

20   restitution.  I didn't quite understand the surprise element

21   that you seem to be suggesting in your reply memorandum, when

22   the plea agreement plainly says your client understands that

23   MPD has reported losses in the amount of $96,927 for Officer

24   M.F.'s medical bills and medical leave.  Your client may be

25   required to pay some or all of that amount as restitution in

1     this case.

2            So you've known all along what the total was being

3     asked for.  So you've given me your position as to what percent

4     of that you think it would be appropriate for me to assess.  So

5     I understand that.  But I want to know if you think there's any

6     further hearing required before I can rule on restitution?

7     This is certainly something you've had the opportunity to

8     address now twice; in your initial memo where you asked for one

9     thing and then your reply memorandum where you asked for

10    something else.

11           MS. LEVY:  Yes, Your Honor.  And the issue was, we

12    haven't received any of the documentation.  All we knew was

13    from the plea agreement, in terms of what Metro might be asking

14    for.  I then reached out to the government and asked for the

15    supporting documentation and then they emailed it to us.  So we

16    did not have that previously.  And, no, I don't believe a

17    hearing is necessary.

18           THE COURT:  All right.  I don't I have any other

19    questions.

20           MS. LEVY:  Thank you, Your Honor.  I know my client

21    wants to speak, too.

22           THE COURT:  Yes.  Mr. Rodriguez, this is your

23    opportunity, if there is anything you would like to say, that

24    you would like me to hear before I impose sentence in this

25    case.  And you can come up to the lectern and speak.

1            THE DEFENDANT:  Good morning, Your Honor.

2            THE COURT:  Good morning.

3            THE DEFENDANT:  I hear what's going on here.  There

4     is a lot of people still hurt from January 6th.  I, on the

5     other hand, have a lot of time to think about what happened

6     that day.  I do have something written that I would like to

7     read.  And I just want to tell you, Your Honor, I've gone

8     through many versions of what I was going to say.  I started

9     writing something -- I started writing something years ago.  I

10    got rid of it, started changing my mind, and I ended up writing

11    this this morning.

12            I wasn't able to sleep.  I know this is a big day for

13    me.  And it's from the heart, it's not going to be from a book

14    that I read in prison and I'm not going to try to impress

15    anybody here with something that I learned, something about the

16    Constitution or Jefferson or Franklin or anything like that.

17            I would like to tell you, Your Honor, it's not going

18    to be any Thomas Paine here, it's just going to be my pain.

19            I grew up in East LA.  I was raised by a single

20    mother who I rarely saw because she worked, at many points, two

21    jobs usually.  And I can even remember living in a van at some

22    point in my early ages.  We never had vacations, I didn't have

23    really nice clothes.  I was raised in neighborhoods controlled

24    by gangs, graffiti and litter.  No real jobs, job opportunities

25    in these areas -- with the exception of committing crimes, I

1    guess.  There would be that.

2          But, I didn't do any of that.  I didn't join a gang

3    and I currently still have a clean record, with no felonies.

4    But at a young age I could -- I never -- I never wanted to do

5    anything to end up in jail.  I never wanted to be that kind of

6    loser that would end up in jail.

7          And, you know, growing up where I come from, we

8    listen to gangster rap.  This is the home of gangster rap,

9    N.W.A., "F tha Police," you know.  But I wasn't -- I didn't

10   adopt this mentality still.

11         I rode -- I rode my bike around these streets and I

12   still managed to keep out of trouble.  And I, at a young age,

13   saw that there was a unfairness somehow in the world, the haves

14   and the have not.  I didn't understand it.  And as I grew up I

15   started to try to understand it more, you know, how rich and

16   powerful people could rule things.  And I eventually decided

17   there was a lot of corruption going on.  That was my conclusion

18   somehow.  Just being honest.  It's not in the movies or in

19   other countries only, but it's an actual reality.

20         In my most recent years, I wanted to get involved.  I

21   did lack some sort of purpose.  And I didn't really have a

22   feeling that I belonged or fit in with who I was around.  And I

23   tried to make sense of the world and I started to follow

24   current events.

25         I saw that there was a politicized world out there

1    and there was a lot of protests happening, and these protests

2    were resulting in -- concrete results were happening because of

3    these protests.  So I wanted to join the fight, I wanted to

4    join in and try to fix the system, I guess.

5              There was one side that I knew I could not join.

6    There was burning of cities, lighting of police cruisers on

7    fire, police being shot or molotov cocktails being thrown,

8    vandalism, people blinded.  I saw that there was a side of

9    angry acts of hate and intolerance and I couldn't -- I couldn't

10   join this side.  They even took over a police precinct at some

11   point.  The police were following orders to stand down.  And,

12   you know, there was YouTube and other social media that showed

13   me what was happening and I was getting upset.

14             There was people being assaulted and nothing was

15   being done.  From all walks of life people were being hurt.

16   You can look at these videos, it looks like many people --

17   exactly like in this room.  They weren't prepared to defend

18   themselves, so to speak.  You know, eggs or rocks being thrown

19   at them, or punched and kicked.  Usually by young thugs wearing

20   masks.

21             So I started to attend rallies, sort of as an

22   ambassador or peacemaker.  And I felt obligated because, you

23   know, not enough people cared and they didn't have the

24   upbringing like I did, where I -- I felt comfortable engaging

25   and talking to these other people that may have wanted to

1     commit violence and assaults.  And there's proof of this

2     online, that, you know, if there was something going on, I

3     would try to go and build a bridge, I guess, between the two

4     sides and find some common ground and ultimately save my city

5     from burning down like Portland and Seattle did.  I knew it was

6     dangerous, but I knew doing nothing would be even worse.

7          By the time January 6, 2021 came, I had been to so

8     many different events and rallies I thought civil war was

9     coming, truly.  I really thought that this was going to be like

10    a battleground.  I thought that the President -- President

11    Trump, he was going to stay in office and his supporters would

12    protect DC.  And we drove from LA to DC with weapons, defensive

13    weapons, as you know, mostly like helmets and pepper spray and

14    whatnot.

15         Your Honor, as a child I watched Reginald Denny live

16    on TV as I ate dinner.  Reginald Denny got pulled out of his

17    tractor trailer during the LA riots.  And this man was beaten

18    by several people.  And you would see someone come along and

19    they would try to help him up and take him to safety.  But, you

20    know, they kicked him in his head.  They didn't -- and he was

21    bloody, in a pool of his own blood.  He was beaten with a

22    brick, hit in his head.  This was an innocent man.  And, Your

23    Honor, for us to not have any kind of weapons in -- in a

24    defensive nature, I couldn't -- I think that that would be just

25    stupid.

1          There was many incidents where people were shutting

2     down freeways and streets and blockades and there was people

3     being pulled out of their cars.  And I remember this as a

4     child, seeing this.

5          So, this stuff that we took never made it to the

6     Capitol.  It was never intended to go to the Capitol and it

7     didn't go there.  I went there with no -- no weapon at all, not

8     a pocket knife, nothing.

9          I lost my spot.

10          I'd like to address the people that I went with and

11     the people that I met at these rallies.  We were -- we were, I

12     guess, I would agree, we're sort of a group of misfits.  But

13     the reason I found these people is, Your Honor, we just were

14     smoking weed together, we found -- we found each other in that

15     way, to be honest with you.  There was a lot of intenseness at

16     these rallies and it turned into the point where it's like,

17     hey, this person, you know, let's go smoke, you know, relax,

18     calm down sort of thing.  And that's how the -- that's how we

19     got initially to get -- become friends.

20          I didn't -- I had never been in DC before.  Many of

21     the people that the prosecutor says I had to go to DC, I

22     didn't -- they had already been -- they had been before and

23     they had given warnings about how people supporting Trump would

24     get attacked, and that was -- that was reasons to go and

25     protect the city and -- from it being burned down.  And statues

1   or -- I didn't know the city, what the layout was, I don't know

2   what -- if there was monuments or statues going to be hit with

3   sledgehammers or burned down or what it was.

4          But from what I was seeing, is the police were always

5   being told to stand down and let this stuff happen, it seemed

6   like.  And that was part of the reason why the Proud Boys came

7   into existence and the Oath Keepers, I think.  That's just my

8   opinion.  I think that that was what it was.

9          Anyways, Your Honor, I do come from a violent place

10  and there is -- there is a lot of -- there is a lot of things

11  that I witnessed growing up, Your Honor.  And I did have -- I

12  had some bad experiences with run-ins with the police officers.

13  And I know that they don't always 100 percent do the right

14  thing.  George Floyd, for example.  There was convictions of

15  those officers.  So I'm just saying that sometimes, in my -- in

16  my mind, you got to see that with my upbringing, with what I've

17  seen, you don't know if somebody is going to start shooting and

18  what could -- what somebody would be charged for an assault on

19  an officer, you don't know what that officer might have ended

20  up doing himself.

21         I'm hopeful that Michael Fanone will be okay one day.

22  It sounds like he's still in a great deal of pain.  And I don't

23  wish any bad on that man.  He certainly served his country

24  and -- in the line of duty that day.

25         Your Honor, since I've been sentenced -- excuse me,

1    since I've been incarcerated I've been in seven different

2    facilities.  I was 19 months in the Northern Neck regional

3    jail.  I don't know if you've heard of this place, but 139

4    months, it just seemed like so long.  I just want to bring it

5    to the Court's attention, you know, that, you know, that this

6    place, you know, they were not issuing bedding or -- I

7    didn't -- they didn't issue me the proper bedding, uniform.

8    You couldn't get request forms.

9         There was no cameras in there to monitor.  They would

10   steal from you or threaten you.  I witnessed several fights,

11   several stabbings.  One man I saw get stabbed in his heart over

12   a bunk that somebody wanted because it was in a better

13   location.  I've been housed with child molesters there, trans

14   people with HIV.  The food had roaches and on several occasions

15   there was hair in my food.  There was even an incident of raw

16   sewage coming through the floor and we had to endure feces and

17   urine all over the unit, and we just had to deal with it.

18        Toilets would leak on the ground.  They were never

19   fixed in that whole time that I was there.  The TVs and phones

20   would be taken from us on almost a daily basis for known and

21   unknown reasons; it could be somebody was talking.  And, you

22   know, it's just -- it was -- the COs would just walk right by

23   you and ignore you.  They would wake you up in the middle of

24   sleep just to harass -- just to bother you because you were

25   asleep.

1          I do feel differently now, Your Honor.  I've been

2    through a lot of things.  And I have not looked at January 6

3    the same or my actions the same.

4          Real quick, I have met a racist Trump supporter.

5          THE COURT:  I'm sorry.  I didn't hear what you just

6    said.

7          THE DEFENDANT:  I have met a racist Trump supporter.

8    Before then, I didn't.  I thought it was all ideas.  I'm just

9    giving you the example of why my ideas had changed.  And, yeah,

10   I met one from south Florida, he'll be sentenced next month.

11   I've been in three jails with this guy.  I've been in Northern

12   Neck, Lewisburg, and now in DC.  Before I never experienced any

13   of that.  And when I saw this rhetoric on the TV, oh, that's a

14   bunch of lies.  Now, we might not be like that in the

15   Los Angeles area but, you know, it took all of this to say,

16   yeah, yeah, there is somebody like that.  You know, I've never

17   been more offended in my gut.  I've never been offended like

18   that.  I've never had anybody tell me anything racist like

19   that.

20         I can tell you there's a difference now because I

21   have been reading the Bible.  Before, Your Honor, I was not

22   reading the Bible.  And I find the Bible has all the answers

23   and it's not going to lead me anywhere wrong.  I've actually

24   led a study -- study sessions and many prayer circles.  And I

25   know it's a fight of good and evil and we're not to put a face

1   on our enemy, and we don't return evil with evil, but we return

2   evil with good.  And I understand that taking matters into my

3   own hands on January 6 showed a lack of faith in God, which was

4   very arrogant of me to think that, I knew better.  And I am --

5   I am more humbled now, Your Honor.

6          I'm not sure what more lessons there will be to learn

7   in the future, but I'm sure there will be many.  And I'm hoping

8   that one day I will be out in time to have a family, Your

9   Honor.  I don't have any children.  You know, I hope to have a

10  beautiful wife one day and raise them, and it's really what I

11  want to do.  I want to just have a normal life and check

12  homework and did you -- did you clean your room? that sort of

13  thing.  I want to be the father that I didn't have.  I didn't

14  grow up with a father, and the stepdad that I had for a couple

15  years, he was -- he was not a good example.

16         Jail has put a new perspective to me, given me a new

17  perspective in my life.  I'm too old to be breaking the law.

18  I'm too -- I'm not -- I'm going to be 41 years old next month.

19         And I need to be there for my mom.  She -- she's

20  having difficulty working a full-time job right now.  She's 72

21  years old and she was pretty dependent on me, to a certain

22  extent.  She -- I believe the world takes advantage of my mom.

23  You go get a tire -- she had a tire issue, she might need a

24  rotation, they're just going to sell her a whole set of tires.

25  She doesn't know any better.  Pilot on the water heater might

1       go out, they're going to sell her a water heater.  My mom is a

2       worry, somebody that I worry about and I want to be there for

3       her.

4               She didn't raise me to break the law and I wish I

5       could have only thought about her more before my travels to

6       January 6.  I trust everybody in this room is more politically

7       aware, I guess in part to January 6, and that's good enough for

8       me.  I never want to return here.  I never want to come back to

9       DC.  I did what I thought was right at the time and I'm paying

10      with it by wasting some good years of my life in a cell.  Life

11      has always seemed unfair to me, but now I just want to kind of

12      go back to that unfair life that I used to have.

13              All I've ever experienced was struggle; struggle to

14      survive, struggle to pay bills, get bills paid.  And I've

15      experienced police who think I'm someone else or that I'm

16      something else.

17              The prosecutor is asking 14 years of my life.  And

18      I've done -- I've done a lot of things to try to keep a clean

19      record.  Before this I think the only thing I used to do wrong

20      was speed occasionally in my car -- of course, weed is legal in

21      California -- besides smoking weed.

22              I'm called a terrorist.  And I'm not a white

23      supremacist, I'm a person supremacist, I would say.

24              Your Honor, I'd like to apologize for taking this

25      Court's time.  We shouldn't be here.  We shouldn't have to do

1    all of this.  If you let me out today, I would probably go to

2    driving a forklift with my GED and live with my mom.  I don't

3    know what kind of threat I really would be, but apparently the

4    government sees me as a great one.  I don't know exactly what

5    more I can give.

6           And I kind of -- I told -- I told this marshal right

7    here on the way up here, I told him it kind of feels like your

8    mom or your dad told you that they don't love you.  That's how

9    I feel because I love this country.  And I don't know if that

10   makes sense.  But that's just how it feels right now.  And

11   that's all, Your Honor.  That's all I have to say.

12          THE COURT:  All right.  Thank you.

13          I'm going to take a break.  Court reporter needs one

14   and I need one to absorb some of what I've heard and just

15   review, reorganize and take all this into consideration.

16          So I expect we'll resume in approximately 15 minutes.

17   But we're going to take a break right now.

18          (Recess.)

19          THE COURTROOM DEPUTY:  Your Honor, recalling criminal

20   case number 21-246-1, the *United States of America v. Daniel*

21   *Joseph Rodriguez*.  Mr. Rodriguez is present and in the

22   courtroom, represented by Ms. Levy and Ms. Lambrose.

23   Government counsel in the building represented by Ms. Paschall

24   and Mr. Mariano.

25          THE COURT:  All right.  As I said at the beginning

1     this morning and as I said on the day you plead guilty, there's

2     a statute that tells judges what they're supposed to consider

3     when they think about sentencing someone and it lists a number

4     of factors and I'm going to go though all of them, and that may

5     take some time.

6           The first thing I'm supposed to think about is the

7     nature and circumstances of the offense.  The facts in this

8     case fall into three categories:  Your activities and

9     statements prior to January 6, your actions on January 6, and

10    your actions after January 6.  And none of it is good.  All of

11    the conduct is extremely serious and it places you among the

12    most serious offenders in the January 6 cases.

13          I could, given the plea to conspiracy, highlight

14    statements made by other members of the group, certainly Ed

15    Badalian, who was convicted of conspiring with you.  But it's

16    your sentencing, so I'm only going to be quoting your words.

17          They start back in November of 2020 and before you

18    were already actively engaged in attending political rallies

19    and using violent rhetoric; anti-vax rallies, anti-COVID

20    restriction rallies, anti-liberal, anti-Black Lives Matter, and

21    being out there to back the blues, in your word.  A lot of

22    these messages are all set out in Government Exhibit 1.

23          The defense emphasizes how deeply you admired

24    President Trump.  But from the start, though, at the patriots

25    MAGA group, it wasn't about let's go to rallies and show

1    President Trump our support, let's go to DC to hear what he has

2    to say.  Your messages were all blood, war, weapons, hanging.

3    Never anticipated, never even discussed a peaceful gathering,

4    even when you thought your candidate was going to win.  You

5    used those words over and over.  And I'm not going to quote

6    every single message.

7         But on November 5 you said, "The election is going as

8    planned.  These shitbags are going to be arrested and in

9    prison.  It's not a game anymore, it's war, and with war you

10   just need to survive."  You mused about getting a folding 9mm

11   carbine.  "Offensive weapons are key in war for distance

12   advantage."

13        You bought into the notion that the Democrats were

14   going to steal the election even before the results were known,

15   as the former president set you up to do.  On November 6 you

16   said, "Democrats are going to end up dead or in prison."  On

17   November 8th you're talking about renting a van to go to DC in

18   response to an InfoWars call to travel across the U.S. to,

19   quote, reclaim our birthright.  And after seeing photos of the

20   Biden supporters taking to the streets to celebrate after the

21   election had been called, you said, "That's where the battle

22   will be decided.  Will there be more of us or them?"  And as

23   you read these messages you can't escape the conclusion that

24   Mr. Rodriguez is not just a follower, he calls for action, over

25   and over.

1          November 9th, "There are people worthy of the death

2     penalty.  Evil is real.  Enemy of humanity," and you start

3     trying to figure out how to build a gallows.  You think

4     inauguration is the time you should be going, at first.

5          By November 12th, you want more control over who is

6     going to be included in the patriots MAGA group chat.  You need

7     to keep it safe, given what you're talking about.  And you

8     express concerns about FBI surveillance.  You've been tracking

9     Rudy Giuliani and Sidney Powell and their activities and their

10    investigations closely, but meanwhile the bellicose language

11    builds and builds and never abates.

12         November 16, "The enemy is BLM, antifa.  Need to

13    learn battle strategies."  November 19th, you talk about war

14    and vigilante justice.  November 25th, hanging traitors,

15    including Democrats and Republicans that don't rule the way you

16    want them to or don't do what you expect they're going to do.

17         You say, when talking about the election, "When

18    they're getting overrun and offed, they'll call on us."

19         So the goal was to train, to be prepared to win what

20    your co-conspirator Ed called an arms race between the people

21    and the tyrants.  And you, in a chilling precursor of what was

22    to come said, quote, We must go unchallenged by law

23    enforcement, close quote.

24         You paid attention to the Oath Keepers and the Proud

25    Boys and you felt kind of wistful about how hard it was to

1    organize the patriots.  On December 9th you're admiring other

2    people's weapons and you got involved in the promotion of

3    patriot paint ball as a way to train.  Meanwhile, you're

4    following the contested states as one by one they are decided.

5            December 14, "We won't allow criminals to run this

6    country anymore.  1776 forever, if it's the last thing some of

7    us do.  Something glorious is about to happen."  December 17th

8    you say, "The civil war has already started."

9            And then on December 19th the group learned that the

10   president had Tweeted, "Big protest in DC on January 6.  Be

11   there, it will be wild."  And in the communications that day

12   and for the next several days you say, "Trump is calling on us,

13   we're going.  We have to do everything to go.  It's not as if

14   you want to go or not, we must go."  And you agree with Ed's

15   post that it's time it refresh the tree of liberty with the

16   blood of tyrants.

17           In late December you're talking about what to bring;

18   goggles, bear spray.  Not all defensive items.

19           "We got to go handle this shit in DC so the crooked

20   politicians don't have an army of thugs threatening violence to

21   back their malevolent cabal ways."  How are you going to get

22   there?  Well, "I can't just take my fists to fight for America,

23   so I can't fly," and you organized the van.  "Congress can

24   hang," you said, "I'll do it.  Please let us get these people,

25   dear God."

1          Another hint of things to come, on December 30th you

2     say, "The blues better get with this shit and back us."

3     January 1st you're checking to make sure everybody is bringing

4     the right weapons; knives, stun guns, pepper spray, bear spray.

5     What do you call it?  "War, baby."

6          You know this is wrong.  You're again trying to

7     narrow the group to the people most trusted.

8          On January 3rd you share a poster that has the plan;

9     Freedom Plaza on January 5th, the Ellipse on January 6 and the

10    Capitol building.  You knew where you were headed before you

11    went.  You didn't just get swept along that day.  And at 11:44

12    p.m. on January 5th, "There will be blood on the streets.

13    Welcome to the revolution."

14         So what happens on January 6?  The group goes to the

15    rally at the Ellipse.  When someone points a camera at you,

16    you're ready with a throat-slashing gesture for President

17    Biden.

18         You make your way past broken-down barricades and

19    signs, you ignore the presence of officers, warnings, and

20    teargas to get not only to the west front of the Capitol

21    grounds, but the lower West Tunnel, the location of one of the

22    worst, prolonged battles of the day.

23         You arrive at 2:46 p.m.  And what do you see?  It's

24    exactly what you came to see.  You cheered at Gina, what she's

25    filming, "Yeah, we're F'ing doing it."  The tunnel was a

1    confined space.  It was utter chaos.  Words do not capture the

2    noise, how many people were packed together, the ragged,

3    exhausted, outnumbered line of Capitol Police officers, with

4    Metropolitan Police officers slowly arriving to reinforce them,

5    is trying to keep the mob from gaining access to the inside of

6    the Capitol through the double doors at the end of the tunnel.

7           Members of Congress and their staff were huddling in

8    fear for their lives nearby.  They can hear the chants.  They

9    can hear the struggle.  The mob turns every possible object

10   into a weapon.

11          And you are not content to be a spectator.  You are

12   not content to simply be part of the heave-ho motions directing

13   the force of the group as a whole at the officers, although

14   that would have been bad enough.  No.  When you see another

15   rioter aim a fire extinguisher at the ceiling of the tunnel,

16   you make your way to him and you were seen seconds later

17   spraying it yourself at the police officers.

18          When others start to retreat after the unsuccessful

19   heave-ho, you manage to get your hands on a long pole, which

20   you then shove at the officers.

21          Ultimately, at 2:52 p.m., Kyle Young taps you in

22   particular on the shoulder.  We don't know why and we don't

23   know how Mr. Young got the weapon, but he hands you a small

24   black rectangular object, then he takes the time to show you

25   how to use it.  You can see this on the CCTV.  And as Sergeant

1   Mastony's body-worn camera reflects, you then lunge at the

2   police line with it next.  Other people are just deploying

3   their cell phones to video.  That passive observer role was not

4   good enough for you.

5         You leave the tunnel, but then you're back and you

6   add your bulk and your enthusiasm to another heave-ho attempt

7   against the officers.  These heave-hos don't sound like a big

8   deal, doesn't sound like much.  But if you see the videos,

9   you'll see that the tunnel was packed with people, many with

10  improvised weapons.  Whatever the throngs of protestors were

11  doing outside, the mob in the tunnel joined together in a

12  single unlawful objective:  To break their way into the closed

13  United States Capitol by force.  There's no other way to

14  describe it.  And you were a part of it.  Just as you promised

15  you would be.  And you still have the weapon.

16        There comes a point when the battle has lasted almost

17  40 minutes and the police have managed to push the rioters

18  back, to the front of the tunnel.  Officer Fanone, who had

19  appeared on the scene when he heard what was going on at the

20  Capitol and went directly there to relieve the beleaguered

21  members of the Capitol Police who had already been fighting for

22  two hours, he's at the front.

23        Eventually the officers are able to press the rioters

24  back towards the mouth of the tunnel.  Officer Fanone is still

25  thinking about how he can help:  Let's get some fresh guys up

1    front.  Let the people who are hurt move back to get

2    assistance.  He moves forward, towards the mouth of the tunnel.

3    And another member of the mob, Albuquerque Head, takes it upon

4    himself to put his arm around Fanone's neck, claiming he's

5    there to help him.  "Hey, I'm going to try to help you out of

6    hear.  You hear me?"  And Officer Fanone actually says, "Thank

7    you."

8         But then Mr. Head drags him down the steps and into

9    the crowd, shouting "Hey, I've got one."  You can see many

10   other protestors reacting in horror, backing away, yelling,

11   "No," waving, signaling with their arms to stop.  But not you.

12   Who answers Mr. Head's call?  You.  You move towards the

13   officer who is being restrained.  You are then pressing the

14   electric weapon against side of his neck below his ear.  And

15   you can hear him, because we hear it on the video, screaming in

16   pain.  He tries to pull back.  He tries to get away.  But you

17   weren't done.

18        You placed the weapon again at the back of his neck

19   and begin pressing again, and the officer screams again.  The

20   defense maintains in its sentencing memorandum -- and I do not

21   accept -- that notwithstanding the plea to the use of an

22   electric shock weapon, the dangerous weapon you were using was

23   something much less dangerous, a milder electric current.  But

24   you took an oath and you swore before me that you used an

25   electric shock weapon, a dangerous weapon.

1          The definition of that is clear, it's
2     straightforward.  It's an object that is capable of causing
3     serious bodily injury or death to another person.  And the
4     defendant used it in that manner.  More important, whatever it
5     was, you thought it was some sort of taser and you knew you
6     could shock someone with it and you used it to shock someone.

7          You also knew that you had absolutely no training in
8     what to do with it, how long you could safely hold it against a
9     person's body, how many times you could use it in succession,
10    and where on a person's body it would be safe to use.  And no
11    one, not even the defense expert, has suggested that multiple
12    applications to someone's neck, pressing it against their neck,
13    as opposed to a quick poke against their body is the intended
14    use of this item, that it would be safe.

15         Plus, to be a dangerous weapon for purposes of the
16    law, it's all about what you could do with it.  It could be a
17    beer bottle, it could be a chair, it could be a flagpole.  This
18    is beyond dispute.  And the fact that Officer Fanone was
19    rendered unable to fend the rioters off for even that short
20    period of time enabled another individual to reach in and strip
21    him of not only his badge, but his lifeline, his radio.  And
22    the crowd was chanting for his gun.  "Kill him with his gun."
23    All Officer Fanone could do was plead to them that he had
24    children.

25         With the help of some other protestors still equipped

1   with their own humanity, Officer Fanone manages to make his way

2   back to the mouth of the tunnel where he collapses.  He was

3   unconscious.  Sergeant Mastony had to drag him back inside.  It

4   takes about two and a half minutes to revive him.  And the

5   first thing he says when he comes to is, "Did we take back the

6   door?"

7        The officer was rushed to the hospital.  And without

8   getting into all the details of his personal medical history in

9   the government's sealed submission, there is no question that

10  the electrical shock had a significant effect, and he's never

11  been the same.  He is, understandably, angry.  He used his time

12  before me today to express his anger about a larger point,

13  about issues that I think he knows that it's not up to the

14  Court to decide.

15       But he's also spoken here before and eloquently

16  explained how the mental and physical repercussions he suffered

17  after meant he could never work as a police officer again and

18  what that does to him after his many years of service.

19       What does the defendant do next?  While Officer

20  Fanone is undergoing emergency treatment for potential damage

21  to his heart, the defendant is crowing about his exploits.

22  That afternoon, while still on the Capitol grounds, he messages

23  the others, "Oh, my God.  I did so much fucking shit and got

24  away."  And then he says, "I tased the fuck out of the blue."

25       All of that would be horrific enough, but Daniel

1    Rodriguez was not done.  At a little before 5 p.m., he joins

2    his friends from LA by entering through the broken window just

3    next to the lower West Tunnel.  Inside people are breaking up

4    furniture to create and share more makeshift weapons and they

5    tear down a door to gain access to rooms inside and hand it out

6    to members of the mob outside.

7           The defendant tries to break another window, pounding

8    at it with a pole, and he yells for other members of the mob to

9    come inside.  He starts rummaging through desks, claiming he's

10   looking for intel.  And he finds an escape hood which he hangs

11   onto and takes with him when he leaves the building.  Now he's

12   a thief, too.

13          Eventually officers gain entry and demand that the

14   rioters leave and Mr. Rodriguez escapes out of the window he

15   came in through.  His parting shot when he's leaving, he takes

16   a photo of a gallows that had been constructed on the grounds

17   with an empty noose hanging on it and he posts, "No democrats

18   found, unfortunately."

19          In other words, everything he told us today that he

20   was afraid other people were going to do is exactly what he

21   did.  He was a one man army of hate, attacking police officers,

22   destroying property.

23          And what happened afterwards?  None of that was

24   enough for Danny Rodriguez either.  He was still fired up.  On

25   January 8th he's texting he's ready to go somewhere else

1    there's a protest.  But he's already voicing concerns about FBI

2    and what they know, and he's obstructing justice.

3            On the drive back, they learn that an acquaintance

4    from LA who had been in the tunnel and in the window and the

5    room directly to the left with the defendant, the one who

6    actually called him to join her there, shared some of her

7    videos with Infowars.

8            Defendant admitted at the time of the plea that on

9    January 10th, with others, he then went to her house to direct

10   her to delete or transfer to a secure hard drive the video

11   evidence that would have revealed their participation in the

12   riot, to make it unavailable for the foreseeable grand jury

13   investigation.

14           And the next day he's telling the group, "We need to

15   get together to talk about everything that never happened in

16   DC," telling people not to share the pictures of Gina on the

17   windowsill.  Not one thing he saw -- not the battles, not the

18   destruction, not the teargas, not the injuries suffered, not

19   the reports afterwards about the damage to and the defilement

20   of the building, not the reports afterwards about the injured

21   officers, about people dying -- none of it chastened him in any

22   way.  He expressed no remorse and he never questioned his own

23   actions.

24           What did he post on Telegram?  "We must be ready next

25   time for Pence's bodyguard.  We must do much more next time."

1          Those then are the nature and circumstances of the

2     offense.  A plan to travel to DC to engage in violence in order

3     to obstruct and interfere with the certification of the

4     election, actually engaging in violence in the battle in the

5     tunnel where the defendant and others were seeking to gain

6     entry into the closed building.  Capping that off with an armed

7     assault on a uniformed officer who he knew was performing his

8     official duties at the time, an officer being held down, being

9     stripped of his badge and radio, and pleading for his life with

10    people threatening to take his gun.  Rendering that officer

11    unconscious, then breaking into the Capitol itself and damaging

12    and stealing property and obstructing the criminal

13    investigation into all of it afterwards.

14          Second thing I'm supposed to think about is the

15    history and characteristics of the defendant.  And it is

16    important to recognize that you are more than just the man who

17    came to the District of Columbia on January 6.  You are close

18    to 40 years old.  You've had some previous arrests, but no

19    prior convictions.  You were raised by a single mother under

20    difficult circumstances who, as you lovingly and

21    compassionately explained, had to work multiple jobs to support

22    you.

23          Your father died when you were very young, but he had

24    never been a part of the family unit before that.  You didn't

25    graduate high school; you left to work.  But you did obtain

1   your GED.  You left to join the workforce while you were still

2   in high school and you've been employed for many years

3   afterwards in various capacities, usually retail or warehouse

4   type jobs.  You can operate forklifts and heavy machinery.

5   It's positive that you've always supported yourself

6   financially.

7          Your mother reports you've always been hardworking

8   and responsible.  You played a key role helping around the

9   house, even as a child.  Your sister echoes that you had a life

10  of willingness to work hard, maintaining a close relationship

11  with your mother.  She also called you helpful, energetic, and

12  fun-loving, and not the only one that thinks that.

13         There was a letter from a woman who describes herself

14  as a long-time good friend, your high school girlfriend.  She

15  says you're a passionate person, you have a good heart, you

16  want to make a difference in the world, and you feel things

17  deeply.  And that may be true, but you are deeply misguided

18  about how to go about it.

19         A co-worker and former supervisor who spent hours by

20  your side talks about what an amazingly trustworthy and loyal

21  friend you can be.  You're dependable.  You're there in times

22  of need, you're like an uncle to his kids.

23         All that is somewhat contrary to the picture in the

24  defense memorandum and in the psychologist report of how he's

25  been lonely.  He's actually established real relationships

1    throughout his life.

2          The mother also reports the fact that the defendant's

3    arrest and incarceration has had a terrible impact on her.

4    She's been unable to keep her house, she's very fearful of what

5    she's going to do if he remains absent much longer, and she

6    wishes to see him again.  So I'll be certain to recommend a

7    designation as close to home as possible.

8          She blames herself.  But I hope she can come to

9    understand that it was not her fault.  She didn't know what you

10   were planning, and if you'd told her, you probably wouldn't

11   have heeded her suggestion to stay home.  And while the defense

12   has asked me to recognize how much she needs you,

13   unfortunately, that didn't enter your mind the day you rented

14   the van.

15         The presentence report indicates that there are --

16   that you say you have no substance abuse issues.  I'm not

17   entirely sure that's correct, given the frequency of your

18   marijuana use, whether it's legal or not.  Certainly didn't

19   help your judgment in any way.  But you have managed to stay

20   away from more serious addictive substance for your entire

21   life, and gangs, and that's all positive.

22         It's also in your favor that you accepted

23   responsibility for your conduct by entering a plea of guilty in

24   this case.

25         I do have to quibble with counsel's description of

1    this as early acceptance that dates back to the day of your

2    arrest.  You spent more than two hours with the police officers

3    that day and you spent most of that time lying; lying about

4    where you'd been on January 6, lying about what you did,

5    obfuscating about who you were with.

6          Ultimately, when confronted with irrefutable video

7    evidence of your attack on Officer Fanone, you admitted it was

8    you.  You got tearful and overcome as the reality and the

9    horror of what you had done -- or perhaps the reality of what

10   you were facing -- sank in.

11         But then you pulled yourself together and started

12   backpedaling right there in the FBI office.  Well, you said, it

13   really wasn't a big deal after all because don't police

14   officers have to get tased as part of their training?  This guy

15   knew what it was like to be tased.  And you suggested that we

16   didn't need to feel too badly about your attacking his neck,

17   didn't you notice he had tattoos there?  Doesn't it hurt to get

18   tattoos?

19         You were already justifying your actions, minimizing

20   them in an ugly, shocking way.  I don't think you fully

21   accepted responsibility until you pled guilty almost two years

22   later, in February 2023.  And even with that, I have to say

23   that today was not the best day to say that you had to be

24   armed, you had to be ready, you had to be aggressive because

25   police don't always do the right thing.

1        But you deserve credit for your plea and it will be

2   considered in your sentence.  And you wrote a letter to the

3   officer expressing remorse to him directly.

4        There's another disturbing aspect of this case,

5   though, is that the sentencing memo did a similar step

6   backwards by arguing, notwithstanding the plea, that it wasn't

7   really a dangerous weapon, it wasn't an electric shock weapon,

8   it was just a sparkle flashlight.  It was offensive.  It was

9   inconsistent with the plea.  It was inconsistent with the fact

10  that you rendered him unconscious, which can't usually be done

11  with a flashlight unless you bash someone in the head with it.

12       It's also important to add that even according to the

13  defense submissions, there were no mental health issues, no

14  cognitive issues playing a role that I need to address here.

15       I was actually somewhat perplexed by the defense

16  decision to share the forensic report of a psychologist as it

17  gave me a little bit of a deeper or broader picture, but

18  provided very little in the way of mitigating circumstances.

19  There are no psychiatric issues to explain what happened.  This

20  defendant is not impaired.

21       Yes, the author reported that the defendant, like,

22  unfortunately, many others, felt hurt and rejected by society.

23  But even after extended, cooperative interviews, he couldn't

24  say more than:  He was an ordinary man of limited education who

25  endeavored, wrongfully, to belong to a group whose goals he

1   only partially appreciated and whose conduct he only

2   temporarily accepted.  But he was the leader of that group and

3   I'm not sure I agree with the "only temporary."

4        But even if that was accurate, he is a man of average

5   intelligence, he's not impaired, he's not limited in his

6   capacity to reason or understand in any way.  He's not

7   suffering from any mental or emotional disorder or psychosis.

8   He's a little impulsive, perhaps a little immature for his age;

9   it's borne out by what you see in video and what was described

10  in the trial of his codefendant, that mixture of serious

11  revolutionary thinking and the use of violent imagery, and a

12  guy falling out laughing at paint ball, supposedly practicing

13  tactics and strategy, but appearing to onlookers more like a

14  boy playing war.

15       In the end, the report provided unremarkable

16  observations and the author's primary conclusion offered no

17  more than the sentence that was repeated in the sentencing

18  memo, that Mr. Rodriguez was very lonely and isolated.  And

19  although he had girlfriends and steady employment, until he

20  found the right-wing groups, he'd been by himself a lot.

21       The therapist/psychologist/psychiatrist suggested

22  those groups provided him with companionship and activity where

23  he could join in with others, and they provided him with a

24  sense of social utility, mission and belonging.  I guess

25  Mr. Rodriguez didn't tell him that it was the weed that caused

1    them to bond, as opposed to ideology.  But with them, yes, he

2    was a fellow player and not merely an another employee working

3    a shift.

4           And that all may be a very accurate characterization,

5    although the letters I got suggest that you have maintained

6    real friendships over the years.  But that sense of isolation,

7    it's not an easy state to be in.  And the sense of not getting

8    a fair shake in a country with true disparities in education

9    and opportunity, between rich and poor, that's not an

10   unreasonable thing to feel.  And for you it's been a struggle.

11   There's been -- there's a lot in the country that needs to be

12   fixed.  You can't disagree with any of that.

13          The problem is, while all of that may have gotten you

14   to the Ellipse on January 6, it doesn't explain what happened

15   after.  The fact is, you showed up in DC spoiling for a fight,

16   and a fight was the first thing you did when you got to the

17   Capitol.  Nothing about your desire to belong to group with

18   shared values and ideas explains your engaging in violence.

19   The others in your own group notably did not.

20          As I've said before, millions of people supported the

21   former president.  He spoke to their vision for the future of

22   the country, or their sense of discontent, like you were.  And

23   they voted for him and they cheered at his rallies.  Many of

24   them were equally persuaded by his irresponsible and knowingly

25   false claims that the election had been stolen, but they didn't

1     all heed his call to descend on Washington.  And even of the

2     tens of thousands of people who did, they did not all enter the

3     Capitol illegally.  And of the thousands who did enter they

4     were not all physically destructive, breaking furniture and

5     windows, helping themselves to government property.

6          And even the most avid Trump supporters did not all

7     engage in violent, vicious, hand-to-hand combat with members of

8     law enforcement.  And only a very few of those who did attack

9     an officer did so with a weapon and put that officer in the

10    hospital, ruining their life.

11          It is for this you stand before me to be sentenced,

12    not your admiration for Donald Trump or your political views or

13    your exercise of your First Amendment rights.

14          I don't accept for a second, and the forensic report

15    doesn't even begin to suggest what counsel wrote in the

16    sentencing memo, that the former president's lies and

17    manipulation compelled you to take a stand, that your belief in

18    his words drove you to lose all sense of right and wrong.  As

19    you said yourself, you knew right and wrong from your own

20    upbringing.

21          While your sentencing memorandum argues forcefully

22    why the former president bears responsibility for what he

23    unleashed, you can't blame what you did once you got there on

24    anyone but yourself.

25          The statute also says that the Court is required to

1    impose a sentence that's sufficient, but not greater than

2    necessary to accomplish the purposes that are set forth in the

3    statute.  And, therefore, I have to think about the need for

4    the sentence imposed to reflect the seriousness of the offense,

5    to promote respect for the law, to provide just punishment for

6    the offense.

7          I'm supposed to afford adequate deterrence for

8    criminal conduct by you in the future, and by everybody else.

9    I'm supposed to protect the public from further crimes

10   committed by you.  I'm not sure that's a strong factor here.

11   And I'm supposed to consider providing you with educational or

12   vocational training.  And that's not really a factor that plays

13   into this either, but the others are.

14         The law requires, and in this case it's essential

15   that the sentence reflect the seriousness of the offense,

16   promote respect for the law, and fulfil the goal of deterring

17   both you and others from similar acts in the future.

18         So what is this offense?  You chose to attack a law

19   enforcement officer, uniformed and on duty, the man who showed

20   up, who volunteered to help the other officers trying to

21   contain a riot.  Doing his job.  And what was the job?

22   Protecting the seat of your government, protecting the seat of

23   all of our government.  Protecting the United States Capitol, a

24   building that was, at least until that day, a symbol of

25   democracy to the entire world.  He was protecting the very

1   essence of democracy; the peaceful transfer of power after a

2   democratic election.

3           He was protecting America.  That's who Officer Fanone

4   was.  That's what Officer Fanone was doing.  What did you do?

5   You drove yourself across the country to do battle, to stop the

6   certification of an election after every single court that

7   looked into it -- judges appointed by both parties and even by

8   President Trump himself -- had said there was no fraud to be

9   found.

10          You called yourself and the others patriots.  "It's

11  1776."  But that's not patriotism.  Patriotism is loyalty to

12  your country, loyalty to the Constitution, not loyalty to a

13  single head of state.  That's the tyranny we rejected in 1776.

14          So with respect to deterrence, people need to

15  understand that they cannot do this or do anything like it

16  again.  They cannot try to force their will on the American

17  people once the American people have spoken at the ballot box.

18  That's the opposite of democracy.

19          And the threat to democracy, the shadow of tyranny

20  has not gone away.  January 6 may have been two and a half

21  years ago, but the claims that the election were stolen,

22  they're still being repeated by people and media outlets that

23  are well aware they aren't true.

24          Now other disappointed candidates have taken up the

25  theme, challenging their own election results, seizing on the

1    fraud canard as a legitimate tactic.  And it seems to work

2    because with only a few exceptions, others in the public eye

3    are not willing to risk their own power or their popularity by

4    calling it out.

5          The statute talks about respect for the law, and it

6    offends the rule of law just as much to look away, to fail to

7    speak the truth.  So we have to do it here.

8          People who are still disseminating or enabling the

9    lie that the election was stolen today need to see that there

10   are real consequences.  And the people who believe what they've

11   been told, the people who are upset, they need to understand

12   that no matter how outraged they are, when they cross the line

13   and they break the law, and most importantly when they decide

14   to do battle with the officers who were doing their duty, they

15   will be held accountable and the consequences will be serious.

16         In this particular case, on top of your complete

17   distortion of the concepts of patriotism and what it means to

18   be an American, there's another aspect of this case that's

19   equally troubling.

20         You dressed up your ongoing battle with the Black

21   Lives Matter movement and your attendance at their rallies with

22   a lot of talk about respect for the police.  We've got to back

23   the blues.  But it all just evaporated and you showed your true

24   colors when law enforcement got in your way.

25         I've watched these particular videos over and over

1    given the number of people involved in this single assault and

2    the various bond hearings and sentencings that have ensued, and

3    it shocks me every single time to see that your attack on

4    Officer Fanone took place directly under the banner of a giant

5    Blue Lives Matter flag.  Blue Lives Matter.  We saw it today.

6    I don't think ironic is good enough word to describe that.

7            And there's a defining moment that's even more

8    striking than that.  While the government began its memorandum

9    with a pretty powerful quote of yours from before January 6,

10   "There will be blood.  Welcome to the revolution," the single

11   statement of yours that was chilling then, that still shocks

12   now and epitomizes this entire case to me was your post on

13   January 6, "I tased the fuck out of the blues."

14           Some people have tried to vilify Officer Fanone,

15   including in my courtroom, but he did nothing that day but show

16   up to support the Capitol Police who were fighting against

17   impossible odds, and he put his life on the line to protect the

18   men and women of the United States Congress, the United States

19   Capitol building, and democracy itself, against a mob.

20           His courage and bravery were met with an assault that

21   almost took his life, and left him unable to perform his job

22   again.  Yet his character was revealed when he came too and all

23   he could say was, "Did we hold the line?"  Meanwhile, you chose

24   to sum yourself up with an immature, sickening boast.

25           So this sentence has to send a message that restores

1    respect for the law and underscores just how serious this was.

2          The law tells me I'm also supposed to think about the

3    need to avoid unwarranted sentencing disparities among

4    defendants with similar records who have been found guilty of

5    similar conduct.  That last factor reveals why the defense

6    proposal of a 60-month sentence does not begin to suffice.

7          The defense points to the other individuals involved

8    in this assault.  Mr. Young, like the defendant, fought in the

9    tunnel with an array of weapons and then handed the defendant

10   electroshock weapon and held the officer's arm down and he

11   received seven years.  Mr. Head, who pulled the officer into

12   the crowd, received seven and a half, 90 months.  Yes, they had

13   longer records, but that's not really what drove the sentences.

14         The defendant, the only one who pled to the 20-year

15   count and not Section A of 111, the only one who was armed, the

16   one who caused bodily injury, the one who inflicted lasting

17   harm, the one who played the most significant role cannot

18   possibly get a sentence that is lower than those two did.  For

19   that count alone it must be more.

20         And the defense says, well, when you're looking at

21   sentencing disparities, he's really not like the Oath Keepers.

22   Their concerted, organized action was different, it's true.

23   And that all bore on the question of whether the terrorism

24   enhancement would apply.  But he differentiated himself from

25   them by committing a horrific assault, when they did not.

1          And that's before you even get to the obstruction of

2     the certification, which alone has supported several years of

3     incarceration in many cases, and the tampering with the witness

4     to obstruct the grand jury on top of all of that.

5          The guidelines are supposed to help serve this

6     function of achieving parity.  But as I noted at the start, I'm

7     not sure that the grouping under the parties' approach -- which

8     even though it may be technically correct under the

9     guidelines -- fully and fairly recognizes the need for the

10    sentence to recognize this assault, this distinct conduct, with

11    its separate victim in particular.

12         But the guidelines didn't always cover all the

13    considerations.  For instance, the defendant has been detained

14    for approximately 27 months, since March 31st of 2021.  I'm not

15    impressed by the defense complaints about his being moved.  The

16    memo says, oh, my gosh, all of a sudden he was brought here

17    from Lewisburg, and nobody told us, in early May.

18         In early May he was supposed to be sentenced.  It

19    only got moved because the defense moved for a continuance, and

20    that is why he was brought here in early May.  And he was moved

21    to Lewisburg initially, along with many federal detainees, when

22    the marshal service found deficiencies at DC jail and were able

23    to access a federal facility, instead of the state facility,

24    like Northern Neck, for federal prisoners awaiting trial.  And

25    that enabled counsel to communicate with him effectively.

1          But I do think it's important to take into

2    consideration that a great portion of the time this defendant

3    has already served overlapped with the COVID pandemic,

4    certainly all nine months of 2021 and a good portion, if not

5    all of 2022.  It's true, he was incarcerated through no one's

6    fault but his own, but his jail experience has been

7    overshadowed by the specter of the virus, the need for more

8    isolation than usual, less contact with counsel and family,

9    limited programming, if any, less opportunity to move within

10   the facility, constant worry.  And he was in a regional

11   facility and not a federal prison.

12          In other words, he was enduring harsher conditions

13   and limited opportunities which, to draw an analogy, can be a

14   basis for a departure for immigrants under *United States versus*

15   *Smith*, 27 F.3d 649.  So in my view, just a day-for-day credit

16   for time served wouldn't account for the time he has served

17   sufficiently.

18          So in my discretion, when I'm looking at all the

19   sentencing factors, including the need for the sentence to be

20   sufficient but not greater than necessary, to provide just

21   punishment and afford deterrence for the future, and the need

22   to avoid unwarranted sentencing disparities, I will factor that

23   into my determination as if more time had already been served.

24          I'm also supposed to think about the need to provide

25   restitution to any victims of the offense, and I'm going to do

1    that.

2            I should have brought you to the lectern before I

3    started this entire speech.  But I think it would be

4    appropriate that as I'm about to pronounce your sentence, that

5    you and your counsel return to the lectern.

6            So, Mr. Rodriguez, in an exercise of my discretion,

7    after consideration of all the statutory factors, the sentence

8    to be imposed is as follows:  It's the judgment of the Court

9    that you are hereby sentenced to a period of 60 months on Count

10   1.

11           You are hereby sentenced to a period of 121 months on

12   Count 2.

13           You are sentenced to a period of 24 months on Count

14   3.

15           And you are sentenced to a period of 151 months on

16   Count 6.

17           All the sentences will be run concurrent to each

18   other.

19           This is based on a consideration of all the statutory

20   factors and what would be sufficient, but not greater than

21   necessary, and it would be my sentence whether I applied the

22   enhancement for restraining the victim or not, whether I

23   departed under the terrorist guideline or not, and whether I

24   grouped the counts as the parties did or as the probation

25   office did.

1          You are further sentenced to serve a 36-month term of

2     supervised release on Counts 1, 2, 3, and 6, to be served

3     concurrent to each other.

4          I find that you don't have the ability to pay a fine

5     and, therefore, waive the imposition of a fine.  You are

6     required to pay $100 special assessment on each count, for a

7     total of $400.  The special assessment is immediately payable

8     to the Clerk of the Court for the U.S. District Court of the

9     District of Columbia.  While incarcerated you shall make

10    payments on the special assessment through your participation

11    in the Bureau of Prisons' Inmate Financial Responsibility

12    Program.

13         If it's not paid, after you're released, within 30

14    days of any change of address, you have to notify the Clerk of

15    the Court where you're living until the financial obligation is

16    paid.

17         Also, you are hereby ordered, as agreed, to pay

18    $2,000 to the Architect of the Capitol as restitution for the

19    damage caused to the building by you and other people.  You are

20    also ordered to pay restitution to the injured officer in the

21    amount of $96,927 for medical costs paid by the Metropolitan

22    Police Department for which you and the others are jointly and

23    severally liable.

24         Pursuant to 42 U.S. Code § 14135a, as for all felony

25    offenses, you have to submit to the collection and use of DNA

1    information while incarcerated at the Bureau of Prisons or at

2    the direction of the U.S. Probation Office.

3         Within 72 hours of your release from custody you

4    shall report in person to the probation office in the district

5    in which you are released.  I will transfer supervision to the

6    district in which you reside, but I will not transfer

7    jurisdiction over this case to another court.

8         While you're on supervision you may not possess a

9    firearm or other dangerous weapon and you may not use or

10   possess any illegal controlled substance and you may not commit

11   any federal, state, or local crime.

12        You must also abide by the general conditions of

13   supervision adopted by the U.S. probation office which were set

14   out in paragraph 170 of the presentence report, in pages 26 and

15   27 -- so you're on notice of all of them -- as well as the

16   following special conditions:

17        You shall participate in drug testing, including

18   random drug testing, to determine if you've used a controlled

19   substance.  And you must not attempt to obstruct or tamper with

20   the testing method.  You must participate in a substance abuse

21   assessment and any outpatient substance abuse treatment program

22   indicated based on that assessment at the discretion and under

23   the direction of the probation office, and follow the rules and

24   regulations of that program.  It will be up to the probation

25   officer to supervise your participation in the program and

1   identify the provider, the modality, the duration, and the

2   intensity of any treatment, if treatment is deemed necessary.

3          You must pay the total amount of the balance of the

4   restitution owed at the time of your release in an amount to be

5   determined -- a monthly amount to be determined by the

6   probation office, but not less than $200 a month, beginning 30

7   days after you're released from confinement.

8          Within 60 days after the commencement of your

9   supervision the U.S. probation office supervising you must

10   submit a progress report to the Court.  Upon receipt of the

11   report, I'll determine if your appearance is required at a

12   reentry hearing or whether we should set up a video conference

13   for that purpose.  But I plan to stay involved in this case.

14          Ms. Levy, are there any objections to the special

15   conditions?

16          MS. LEVY:  No, Your Honor.  I would ask that the

17   Court would consider making the restitution payable upon his

18   release from custody, given the amount of time that he's going

19   to have.  If the Court does not want to do that, I would ask

20   that the Court make the restitution payable at a percentage

21   while he's in custody.  His mom does not have a lot of money.

22   She would be the only person, in all likelihood, aside from

23   perhaps the two friends of his, that would put money on his

24   books for items while he's in custody.  So I would ask that the

25   Court consider making a restitution payable at an amount of 20

1      percent.

2                  THE COURT:  Well, I said the payment balance would be

3      owed at the time of his release.  I don't -- never made that

4      specific direction before because I don't know that if -- if

5      our judgment would require that it all be paid while he's in

6      custody.

7                  Does the probation officer have a recommendation with

8      respect to that?

9                  THE PROBATION OFFICER:  Your Honor, there are

10     instances where the BOP does take -- if there's money on the

11     books from him working or anything like that, the BOP may take

12     a percentage.  The defense counsel isn't wrong.

13                 THE COURT:  But it's not going to require that it all

14     be paid during that time?

15                 THE PROBATION OFFICER:  No, no.  It's -- unless they

16     put $100,000 on his book.

17                 THE COURT:  It's a condition of his sentence that it

18     be paid and that the balance of any owed at the time of his

19     release will be paid as a condition of his supervised release.

20                 Do I need to say more than that?

21                 THE PROBATION OFFICER:  I don't think so.  The Bureau

22     of Prisons will, more than likely, if he's working, take a

23     percent.  And you are correct, whatever the balance is after

24     his term of incarceration, the probation office will see to it

25     that it's paid.

1          THE COURT:  I will also recommend that he be

2     designated to serve his sentence as close as possible to his

3     family.

4          Is there any place in particular that you're asking

5     me to recommend?

6          MS. LEVY:  Yes, Your Honor.  I would ask for Terminal

7     Island, I would ask for Lompoc.  And I would request that the

8     court put in the judgment that he not be designated to

9     Victorville.

10         THE COURT:  Is that the one you were talking about in

11    Colorado?

12         MS. LEVY:  No, Your Honor.  Victorville is in

13    California, near where he is from.  It is gang-infested and

14    extremely violent.

15         THE COURT:  All right.  I will put those

16    recommendations.  And as you know, it's not up to me.  But I

17    will put that in the judgment and commitment order.

18         The probation office is ordered to release the

19    presentence investigation report to all appropriate agencies in

20    order to execute the sentence of the Court.  Any treatment

21    agencies must return it to the probation office upon the

22    defendant's completion or termination from treatment.

23         Mr. Rodriguez, you have a right to appeal the

24    sentence imposed by this Court if the period of imprisonment is

25    longer than the statutory maximum or the sentence departed

1    upward from the applicable sentencing guideline range.  If you

2    choose to appeal, you must file any appeal within 14 days after

3    the Court enters judgment.  If you're unable to afford the cost

4    of an appeal, you may request permission from the Court to file

5    an appeal without cost to you.

6            I believe, also, this is the point where the

7    government needs to make a motion with respect to other

8    charges.

9            MS. PASCHALL:  Yes, Your Honor.  At this point the

10   government would move to dismiss the remaining counts in the

11   indictment.

12           THE COURT:  Okay.  That motion will be granted.

13           Is there anything further I need to take up right now

14   on behalf of the defendant, Ms. Levy?

15           MS. LEVY:  No.  Thank you, Your Honor.

16           THE COURT:  Anything further on behalf of the

17   government?

18           MS. PASCHALL:  No, Your Honor.

19           THE COURT:  Anything further on behalf of the

20   probation office?

21           THE PROBATION OFFICER:  Your Honor, I may have missed

22   it, but did you order financial disclosure and restrictions?

23           THE COURT:  Oh, in connection with the restitution.

24   Actually, I did mean to do that.  I don't know if I have

25   language in front of me.  Let me just gather it.

1          It is further a condition of your supervised release

2     that you must provide the probation officer access to any

3     requested financial information and authorize the release of

4     any financial information.  The probation office may share

5     financial information with the United States Attorney's Office.

6     You must not incur new credit charges or open additional lines

7     of credit without the approval of the probation office.  And

8     those restrictions will remain in place as long as the

9     financial payment remains due.

10          All right.  Thank you very much, everyone.

11          THE COURTROOM DEPUTY:  Wait a minute.

12          THE COURT:  Mr. Haley, yes.

13          (Off-the-record discussion.)

14          THE COURT:  Yes, I will waive any requirement that he

15     pay interest on the restitution.

16                          *   *   *

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                        Dated this 29th day of June, 2023

8

9

10                    _____

11                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
12                    Room 6523
                      333 Constitution Avenue, N.W.
13                    Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25