UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) ) | Crim. Action No. 21-0246-1 (ABJ) |
| DANIEL RODRIGUEZ, | ) ) ) | |
| Defendant. | ) ) | |

**ORDER**

On February 3, 2025, the Court of Appeals entered an order in this case stating:

> Upon consideration of the unopposed motion to vacate convictions and remand for dismissal, it is
>
> ORDERED that the judgment of the district court be vacated and the case be remanded with instructions to dismiss the case as moot.

Order [Dkt. # 244-1]; *United States v. Rodriguez*, No. 23-3120, Order (D.C. Cir. Feb. 3, 2025) (unpublished per curiam order).

In accordance with these instructions, the Court will dismiss this case as moot.

In the interest of completeness, in fairness to the victim of this brutal offense, and in furtherance of the truth, the Court also states the following.

On February 14, 2023, defendant Daniel Joseph Rodriguez pled guilty to four of the crimes with which he had been charged in the superseding indictment in this case. He was represented by a highly experienced team from a Federal Public Defender's office. When Rodriguez entered his plea, he swore that the Statement of Offense the parties had jointly submitted to the Court was truthful, including the paragraph in which he admitted, "knowingly and voluntarily," that he "forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Michael Fanone," and that he knew at the time of the assault "that the officer was engaged in the performance of their official duties," or was assaulted "on account of their performance of their official duties." Statement of Offense [Dkt. # 160] ¶ 20. *See also id.* ¶ 15 ("The defendant applied

the electroshock weapon to the back of Officer Fanone's neck."). Thus, there was no trial and no jury involved in the finding that he was guilty.

Rodriquez also admitted that he then knowingly broke into the Capitol building itself without permission, damaging and stealing property, and that he obstructed or attempted to obstruct the criminal investigation into his conduct and the conduct of his co-conspirators afterwards.  *See* Statement of Offense ¶¶ 17, 19.

The Statement of Offense concluded with the signed acknowledgement that "I, Daniel Rodriguez, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully."

The defendant did not back away from his admission at sentencing. As part of the package of materials submitted to the Court, the defense included a letter from the defendant to the law enforcement officer he had assaulted. *See* Exhibit G to Def.'s Sentencing Mem. [Dkt. # 191-7]. In it, the defendant wrote:

> My name is Daniel Joseph Rodriguez and I write this in hopes that you accept my apology. I do not write this as an excuse for my actions on January 6th, I am not writing this to the Judge, prosecution or media. I am looking at serving a long prison sentence and no letter I write is getting me out of that. Sir, I only want to apologize from the heart.
>
> * * *
>
> Let me start by telling you I've been in jail doing lots of thinking, finding God and changing. I never should have been in Washington, D.C. I came from the Los Angeles area of California and I had no business at the Capitol. . . . I should have protected you because I have deep respect for law enforcement, and I have always stood up for police officers. You are a brave man and I wish for good things for you in the future. I want to apologize to your children as well. If I could go back and change what I did, I would.

On June 21, 2023, the defendant was sentenced to a period of imprisonment of 151 months and a term of supervised release of 36 months. Judgment [Dkt. # 202]. Consistent with its usual practice and 18 U.S.C. § 3553(a), the Court first calculated the applicable advisory sentencing range under the U.S. Sentencing Guidelines. Then, after hearing from the government, the victim, defense counsel, and the defendant himself, the Court imposed sentence, reviewing each of the factors set forth in the statute in considerable detail.

The first factor to be considered was the nature and circumstances of the offense, and the Court had been provided with a large number of exhibits, including video recordings of the defendant's actions on January 6 that were captured on CCTV and various officers' body worn cameras. As part of its discussion of that factor, the Court described Rodriguez's participation in the battle the took place in the tunnel that leads directly from the lower West terrace into the Capitol Building.

> The tunnel was a confined space. It was utter chaos. Words do not capture the noise, how many people were packed together. The ragged, exhausted, outnumbered line of Capitol Police officers, with Metropolitan Police officers slowly arriving to reinforce them, is trying to keep the mob from gaining access to the inside of the Capitol through the double doors at the end of the tunnel.
>
> Members of Congress and their staff were huddling in fear for their lives nearby. They can hear the chants. They can hear the struggle. The mob turns every possible object into a weapon.
>
> And you are not content to be a spectator. You are not content to simply be part of the heave-ho motions directing the force of the group as a whole at the officers, although that would have been bad enough. No. When you see another rioter aim a fire extinguisher at the ceiling of the tunnel, you make your way to him and you were seen seconds later spraying it yourself at the police officers.
>
> When others start to retreat after the unsuccessful heave-ho, you manage to get your hands on a long pole, which you then shove at the officers.
>
> Ultimately, at 2:52 p.m., Kyle Young taps you in particular on the shoulder. We don't know why and we don't know how Mr. Young got the weapon, but he hands you a small black rectangular object, then he takes the time to show you how to use it. You can see this on the CCTV. And as Sergeant Mastony's body-worn camera reflects, you then lunge at the police line with it next. Other people are just deploying their cell phones to video. That passive observer role was not good enough for you.

You leave the tunnel, but then you're back and you add your bulk and your enthusiasm to another heave-ho attempt against the officers. These heave-hos don't sound like a big deal, doesn't sound like much. But if you see the videos, you'll see that the tunnel was packed with people, many with improvised weapons. Whatever the throngs of protestors were doing outside, the mob in the tunnel joined together in a single unlawful objective: to break their way into the closed United States Capitol by force. There's no other way to describe it. And you were a part of it. Just as you promised you would be. And you still have the weapon.

There comes a point when the battle has lasted almost 40 minutes and the police have managed to push the rioters back, to the front of the tunnel. Officer Fanone, who had appeared on the scene when he heard what was going on at the Capitol and went directly there to relieve the beleaguered members of the Capitol Police who had already been fighting for two hours, he's at the front.

Eventually the officers are able to press the rioters back towards the mouth of the tunnel. Officer Fanone is still thinking about how he can help: Let's get some fresh guys up front. Let the people who are hurt move back to get assistance. He moves forward, towards the mouth of the tunnel. And another member of the mob, Albuquerque Head, takes it upon himself to put his arm around Fanone's neck, claiming he's there to help him. "Hey, I'm going to try to help you out of here. You hear me?" And Officer Fanone actually says, "Thank you."

But then Mr. Head drags him down the steps and into the crowd, shouting "Hey, I've got one." You can see many other protestors reacting in horror, backing away, yelling, "No," waving, signaling with their arms to stop. But not you. Who answers Mr. Head's call? You. You move towards the officer who is being restrained. You are then pressing the electric weapon against side of his neck below his ear. And you can hear him, because we hear it on the video, screaming in pain. He tries to pull back. He tries to get away. But you weren't done.

You placed the weapon again at the back of his neck and begin pressing again, and the officer screams again. The defense maintains in its sentencing memorandum – and I do not accept – that notwithstanding the plea to the use of an electric shock weapon, the dangerous weapon you were using was something much less dangerous, a milder electric current. But you took an oath and you swore before me that you used an electric shock weapon, a dangerous weapon.

The definition of that is clear, it's straightforward. It's an object that is capable of causing serious bodily injury or death to another person. And the defendant used it in that manner. More important, whatever it was, you thought it was some sort of taser and you knew you could shock someone with it and you used it to shock someone.

4

> You also knew that you had absolutely no training in what to do with it, how long you could safely hold it against a person's body, how many times you could use it in succession, and where on a person's body it would be safe to use. And no one, not even the defense expert, has suggested that multiple applications to someone's neck, pressing it against their neck, as opposed to a quick poke against their body is the intended use of this item, that it would be safe.
>
> Plus, to be a dangerous weapon for purposes of the law, it's all about what you could do with it. It could be a beer bottle, it could be a chair, it could be a flagpole. This is beyond dispute. And the fact that Officer Fanone was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him of not only his badge, but his lifeline, his radio. And the crowd was chanting for his gun. "Kill him with his gun." All Officer Fanone could do was plead to them that he had children.
>
> With the help of some other protestors still equipped with their own humanity, Officer Fanone manages to make his way back to the mouth of the tunnel where he collapses. He was unconscious. Sergeant Mastony had to drag him back inside. It takes about two and a half minutes to revive him. And the first thing he says when he comes to is, "Did we take back the door?"
>
> The officer was rushed to the hospital. And without getting into all the details of his personal medical history in the government's sealed submission, there is no question that the electrical shock had a significant effect, and he's never been the same. He is, understandably, angry. He used his time before me today to express his anger about a larger point, about issues that I think he knows that it's not up to the Court to decide.
>
> But he's also spoken here before and eloquently explained how the mental and physical repercussions he suffered after meant he could never work as a police officer again and what that does to him after his many years of service.
>
> What does the defendant do next? While Officer Fanone is undergoing emergency treatment for potential damage to his heart, the defendant is crowing about his exploits. That afternoon, while still on the Capitol grounds, he messages the others, "Oh, my God. I did so much fucking shit and got away." And then he says, "I tased the fuck out of the blue."

Tr. of Proceedings [Dkt. # 201] at 67–72.

The Court also considered the volume of information it had received concerning the history and characteristics of the defendant, and then, as the sentencing statute requires, it assessed what sentence would be sufficient, but not greater than necessary, to fulfill the goals of a criminal

5

sentence, including "the need for the sentence imposed – to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).

> The statute talks about respect for the law, and it offends the rule of law just as much to look away, to fail to speak the truth. So we have to do it here. . . .
>
> In this particular case, on top of your complete distortion of the concepts of patriotism and what it means to be an American, there's another aspect of this case that's equally troubling.
>
> You dressed up your ongoing battle with the Black Lives Matter movement and your attendance at their rallies with a lot of talk about respect for the police. We've got to back the blues. But it all just evaporated and you showed your true colors when law enforcement got in your way.
>
> I've watched these particular videos over and over given the number of people involved in this single assault and the various bond hearings and sentencings that have ensued, and it shocks me every single time to see that your attack on Officer Fanone took place directly under the banner of a giant Blue Lives Matter flag. Blue Lives Matter. We saw it today. I don't think ironic is a good enough word to describe that.
>
> And there's a defining moment that's even more striking than that. While the government began its memorandum with a pretty powerful quote of yours from before January 6, "There will be blood. Welcome to the revolution," the single statement of yours that was chilling then, that still shocks now and epitomizes this entire case to me was your post on January 6: "I tased the fuck out of the blues."
>
> Some people have tried to vilify Officer Fanone, including in my courtroom, but he did nothing that day but show up to support the Capitol Police who were fighting against impossible odds, and he put his life on the line to protect the men and women of the United States Congress, the United States Capitol building, and democracy itself, against a mob.
>
> His courage and bravery were met with an assault that almost took his life, and left him unable to perform his job again. Yet his character was revealed when he came to and all he could say was, "Did we hold the line?" Meanwhile, you chose to sum yourself up with an immature, sickening boast.

Tr. of Proceedings at 85–86.

All of this is as much a part of the record of the proceedings in this case as the Order of the Court of Appeals occasioned by the Presidential pardon. In accordance with that Order, this case is hereby **DISMISSED AS MOOT.**

But Michael Fanone's heroism will never be moot. And no proclamation or order vacating a conviction can erase the truth: that all of the individuals charged with attacking him on January 6 came into court and voluntarily swore that they were guilty, and justice was served.

*[signature]*
AMY BERMAN JACKSON
United States District Judge

DATE: February 6, 2025